# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF KENTUCKY
# LEXINGTON DIVISION

---

FORCHT BANK, N.A., KENTUCKY
BANKERS ASSOCIATION, and BANK
POLICY INSTITUTE,

<em>Plaintiffs</em>,

v.

CONSUMER FINANCIAL
PROTECTION BUREAU and ROHIT
CHOPRA, in his official capacity,

<em>Defendants</em>.

---

No. 5:24-cv-00304-DCR

**ELECTRONICALLY FILED**

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Forcht Bank, N.A., the Kentucky Bankers Association, and the Bank Policy Institute, by and through undersigned counsel, bring this amended complaint for declaratory and injunctive relief against Defendants Consumer Financial Protection Bureau and Director Rohit Chopra, in his official capacity, alleging as follows:

## INTRODUCTION

1.      This is a case about a federal agency overstepping its statutory mandate and injecting itself into a developing, well-functioning ecosystem that is thriving under private initiatives.  The rule that Plaintiffs challenge seeks to cut off that private development and replace it with a complicated, expensive, mandatory regulatory framework that Congress never authorized.  Worse yet, the framework the agency has adopted is fundamentally unsafe, so the primary result of its overreach will be to harm the very consumers it is charged with protecting.

2.      A bank's fundamental mission is to safeguard its customers' deposits while providing services that allow those customers to access and deploy their financial assets in the ways they choose.  In recent years, third-party technologies have afforded consumers a number of new ways to access, analyze, and use their financial data, such as their transaction history, account balances, spending trends, and more.  While this movement toward "open banking"—a term used to describe the model where consumers authorize third parties to access their financial data in order to provide a finance-related product or service—has provided many benefits to consumers, sharing such sensitive data inherently presents risks to the security of customers' deposits and sensitive financial information.

3.     As one example of such a product, a financial-technology (or "fintech") company will offer an app that consolidates and displays in one place a consumer's financial data and assets across various accounts.  To provide that service, the fintech company needs to (i) obtain access to data about the consumer's various individual accounts (either directly or through another third-party company known as a "data aggregator"), (ii) make its own copies of the consumer's data, and then (iii) frequently update that information as often as the company deems appropriate (often multiple times a day, even if the consumer is not actively using the service).

4.     Initially, such third-party access could occur only through rudimentary methods such as "screen scraping"—*i.e.*, using the customer's login information to access and download account details from online banking portals designed for consumers.  But these methods necessarily entail giving those third-party companies access to more data than they need, including the customer's login credentials.  This form of data access, as well as the continued storage of the customer's credentials, exposes consumers to serious risks of unauthorized access to and misuse of their accounts and sensitive data.

5.     To enable consumers to participate in open banking in a safer way, market participants have developed more secure data-sharing practices that "allow[] third-party financial service providers to access consumer banking and financial data via application programming interfaces."[1]  Application programming interfaces (APIs) are software-based

---

[1] Alexey Shliakhouski, *Security in Open Banking: Concerns and Solutions*, Forbes (Aug. 19, 2021), https://www.forbes.com/councils/forbestechcouncil/2021/08/19/security-in-open-banking-concerns-and-solutions/.

protocols that allow two different applications to communicate with each other. These interfaces facilitate targeted, safer sharing of information between financial institutions and fintech companies authorized by customers to receive their information, without sharing login credentials. Over the past three years, secure APIs have displaced screen scraping as the preferred method by which banks participate in open banking.

6.      In the United States, the developing open-banking system has achieved substantial progress through private-sector efforts. Banks, including Plaintiffs and their members, have embraced this opportunity for innovation because it allows them to develop secure and attractive products for their customers. In other words, open banking is already flourishing through a private, market-based "consumer data sharing ecosystem" in which industry members have been actively participating. Bank Policy Institute & The Clearing House, Comment Letter on Rule, Docket No. CFPB-2023-0052, at 45 (Dec. 29, 2023), https://www.regulations.gov/comment/CFPB-2023-0052-0918 (BPI & TCH Cmt. Ltr.).

7.      But all sharing of consumer data—including through more secure APIs—carries risks. Placing additional copies of consumers' private financial data in the hands of more nonbank third parties necessarily increases the opportunities for that data to be stolen, compromised, or otherwise misused. And those third parties are less regulated than banks, which are subject to extensive oversight and supervision by financial regulators. Indeed, a number of fintech companies have been victimized by data breaches.[2]

---

[2] *See, e.g.*, Pierluigi Paganini, *Data Leak at Fintech Giant Direct Trading Technologies*, Security Affairs (Jan. 31, 2024), https://securityaffairs.com/158384/security/data-leak-at-fintech-direct-trading-technologies.html; Robert Lemos, *Cyberattack on Fintech Firm*

8.     Banks, under the supervision of their prudential regulators, have expertise in managing these kinds of risks.  Applying that expertise in this context, industry participants have successfully developed and refined open-banking practices that balance consumers' desire to use the valuable tools fintech companies provide against the foremost priority of protecting consumers' deposits and private data.  The result has been a flourishing and secure private open-banking system.

9.     That all changed when the CFPB stepped in to announce its new open-banking regulatory regime.  Claiming the authority of a provision of the Dodd-Frank Act enacted more than 14 years ago, the Bureau now seeks to jettison the developing, industry-driven system and replace it with a complicated, costly, and fundamentally insecure mandatory data-sharing framework.  *See Required Rulemaking on Personal Financial Data Rights* (Oct. 22, 2024), https://www.consumerfinance.gov/rules-policy/final-rules/required-rulemaking-on-personal-financial-data-rights/ (to be codified at 12 C.F.R. part 1033) (the Rule or Final Rule).  Rather than increasing consumers' ability to securely access and share their data, the Rule will impede banks' ability to protect consumers, stifle growth and innovation in open banking, and increase risks to consumers' deposits and data. Simply put, forcing banks to liberally share customers' sensitive financial information while

---

*Disrupts Derivatives Trading Globally*, Dark Reading (Feb. 2, 2023), https://www.darkreading.com/cyberattacks-data-breaches/cyberattack-fintech-firm-disrupts-derivatives-trading; Olivia Powell, *Revolut Data Breach Exposes Information for More Than 50,000 Customers*, Cyber Security Hub (Sept. 21, 2022), https://www.cshub.com/attacks/news/revolut-data-breach-exposes-information-for-more-than-50000-customers.

handcuffing banks from managing the risks of doing so is a recipe for fraud and misuse of customer data.

10.    In its proposed rule, published October 31, 2023, the Bureau proposed to install for the first time a federal regulatory regime governing "open banking"—a term or concept that appears nowhere in the governing statute. Required Rulemaking on Personal Financial Data Rights, 88 Fed. Reg. 74,796 (Oct. 31, 2023), https://www.govinfo.gov/content/pkg/FR-2023-10-31/pdf/2023-23576.pdf (Proposed Rule). Among other things, the Bureau proposed to (i) mandate the sharing of sensitive customer data such as transaction history, account balances, and even account and routing numbers with a seemingly unlimited number of third parties through a mandated "developer interface" all data providers (*i.e.*, banks) must create; (ii) force banks to oversee and be responsible for those third parties' security practices, while simultaneously limiting banks' authority to stop sharing based on risk-management concerns; (iii) outsource authority to private "standard setters" to set the rules of regulatory compliance; (iv) prescribe vague criteria that will be used to determine whether the performance of the new developer interfaces is "commercially reasonable"; (v) set entirely unrealistic deadlines to come into compliance with the new rule; and (vi) prohibit banks from collecting any fees from third parties in exchange for the newly mandated service.

11.    Given these deeply problematic aspects of the proposal, the Bureau heard from more than 11,000 commenters, many of whom requested substantial changes. *See, e.g.*, BPI & TCH Cmt. Ltr., *supra* ¶ 6; JPMorgan Chase & Co., Comment Letter on Rule, Docket No. CFPB-2023-0052 (Jan. 2, 2024), https://www.regulations.gov/comment/CFPB-

2023-0052-0975 (JPMC Cmt. Ltr.).  The Bureau nonetheless finalized its rule largely as proposed on October 22, 2024, retaining nearly all the problematic features of its proposal. Yet the Bureau chose to exempt from compliance with the Rule any depository institution with less than $850 million in assets, a decision that is difficult to square with its apparent view that consumers have a statutory right to participate in this information-sharing framework.

12.     The CFPB's bureaucratic intervention into a well-functioning area that is rapidly developing and improving through private initiatives is not just unnecessary; it is counterproductive, and it will ultimately harm consumers, the very group the Bureau is charged with protecting.  For a number of reasons, it is also unlawful.

13.     *First* and most fundamentally, the Bureau exceeded its statutory authority by requiring banks to broadly provide their customers' financial information to purportedly "authorized" third parties like fintech companies and data aggregators.  The Bureau issued the Rule pursuant to Section 1033 of the Dodd-Frank Act, which requires banks to "make available *to a consumer*, upon request, information in the control or possession of the [bank] concerning the consumer financial product or service that *the consumer obtained*" from the bank.  12 U.S.C. § 5533(a) (emphases added).  That provision—sandwiched between a provision requiring periodic affirmative disclosures "*to consumers*" about the risks and benefits of their financial products, 12 U.S.C. § 5532(a) (emphasis added), and a provision concerning banks' and regulators' timely "response *to consumers*" regarding "complaints" or "inquiries," 12 U.S.C. § 5534(a) (emphasis added)—requires banks to give *consumers* their *own* information.  And although the Act generally defines "consumer" to include "an

6

agent, trustee, or representative acting on behalf of an individual," 12 U.S.C. § 5481(4), the Rule requires data providers to share consumer information with thousands of commercial entities that plainly do not qualify as agents, trustees, or representatives of those consumers. In short, nothing in Section 1033 authorizes the Bureau to dictate terms on which banks must furnish consumers' data to innumerable, as-yet-unidentified *third parties*—with unknown credentials or security protocols—that are far less regulated than banks, pose potentially novel risks, and have no special relationship with the consumer who requests the data.

14.    *Second*, the Bureau inexplicably designed the Rule in a way that substantially increases security risks to consumers while refusing to increase—or even reducing—the level of security protection that will be afforded to those customers' deposits and data. On the risk side, the Bureau decided to require banks to provide access not only to information about a customer's account, but also to information enabling third parties to *initiate payment from that account*. On the security side, having ordered banks to provide this sensitive data to third parties, the Bureau declined to assume the primary responsibility for ensuring those third parties can be trusted with that data. Instead, the Rule:

- imposes upon *banks* a vague duty to "[d]ocument" the compliance with consumer authorization requirements of potentially thousands of fintechs and data aggregators, which are not subject to the same data security requirements and expectations as banks, *see* Final Rule at 576 (to be codified at 12 C.F.R. 1033.331(b)(1)(iii));

- substantially limits banks' ability to deny access to those third parties on risk-management grounds by purporting to confine that discretion to narrowly prescribed circumstances, *see* Final Rule at 574 (to be codified at 12 C.F.R. 1033.321);

- declines to require the third-party fintech companies and data aggregators to use the APIs that the banks will be forced to build, thus permitting the continued use of the screen-scraping method of obtaining consumer data that even the Bureau admits is a serious security risk; and

- refuses to articulate any principles for allocating liability among the various actors in this transmission chain when consumer data is misused, compromised, or stolen.

The Bureau failed to persuasively justify why it rejected comments pointing out these issues (and in fact made some of them even worse in the Final Rule). The end result is a regime that, in addition to exceeding the Bureau's statutory authority, is quintessentially arbitrary and capricious.

15.    *Third*, in addition to tasking banks with the obligation to "document" third-party security practices and regulatory compliance, the Bureau outsourced the authority to set standards for compliance to private, third-party organizations. In several key respects, the Rule provides that banks' compliance with the obligation to share information will be measured by compliance with standards set by private organizations. But nothing in Section 1033 or any other statutory provision authorizes the Bureau to let private organizations decide policy or legal questions that determine banks' compliance with

8

regulatory mandates. The Bureau explained that technical specifications for APIs may become obsolete more quickly than the Bureau can act. *See* Proposed Rule at 74,801. But reference to private standard setters for technical formatting requirements is a far cry from relying on standard setters for policy and legal questions regarding banks' risk-management practices and reasonable frequency limitations on interface access, among other matters. This kind of delegation of regulatory authority to a private organization raises serious constitutional questions, but is in any event unauthorized by the statute.

16.    *Fourth*, the Rule sets performance standards that data providers' new developer interfaces have to meet, but those standards are entirely unclear and often overlapping, leaving data providers effectively to guess what they need to do to comply. The Rule sets a "quantitative" requirement that developer interfaces must provide a "proper response" to at least 99.5% of data requests. But even achieving that demanding metric is not sufficient; the Bureau has retained discretion to determine that an interface that meets this quantitative measurement is nonetheless performing inadequately based on an array of other qualitative performance metrics that will be measured in vague and confusing ways.

17.    *Fifth*, the Rule imposes a timeline for data providers to come into compliance with the Rule that is fundamentally incompatible with its dependence on standard setters to determine rules for compliance. As explained, the Bureau will depend heavily on private standard-setting organizations to give particularized content to many more general provisions of the Rule. But no such "consensus standards"—as the Bureau calls them—exist today; indeed, the Bureau has not even recognized a single standard-setting

organization.  The Bureau's decision to set compliance deadlines on dates certain, without regard to when any such standard setter issues any such "consensus standard," is arbitrary and irrational because it starts a clock for compliance with entirely unknown standards.

18.    *Sixth* and finally, having imposed these enormous out-of-pocket costs and exposed banks to a substantial and unreasonable risk of liability, the Rule impermissibly bans banks from charging *any* fees designed to recoup those costs to the third-party fintechs and aggregators who will profit from the new framework.  Section 1033 does not authorize the Bureau to adopt such a one-sided fee prohibition that effectively gives a windfall to commercial entities like fintechs and data aggregators.  Nor has the Bureau adequately justified its fee prohibition, even if Section 1033 allows it.

19.    For all these reasons and as explained below, this Court should bring a halt to the Bureau's unlawful efforts to force banks to engage in unsafe dissemination of their customers' personal financial information and set aside the Rule under the Administrative Procedure Act (APA).

## PARTIES

20.    Plaintiff Forcht Bank, N.A., is a federally chartered, community-focused bank that has been serving Kentuckians since 1985 and has its principal place of business at 2404 Sir Barton Way, Lexington, Kentucky 40509.  Forcht Bank has over $1 billion in total assets.

21.    Plaintiff Kentucky Bankers Association (KBA) is a Kentucky non-stock, nonprofit corporation created pursuant to Kentucky Revised Statutes 273.161 through 273.369 that has its offices at 600 W. Main Street, Suite 400, Louisville, Kentucky 40202.

KBA is a trade association that has as members approximately 150 national banks, state banks, and savings banks representing virtually all the commercial banking industry in Kentucky.  KBA has been in existence since 1891, and it was formally incorporated in its present form in 1911.  According to Article III of KBA's Articles of Incorporation, the "purposes of the Association are to promote the general welfare and usefulness of banks, trust and title companies, and financial institutions doing business in the Commonwealth of Kentucky; to cultivate a more intimate social and business relation between the representatives of such institutions; to collect and disseminate financial and economic information; to secure unity of action."  KBA has members who reside and/or operate in the Eastern District of Kentucky, have at least $850 million in total assets, and will be adversely affected by the Rule.  KBA also has members with at least $250 billion in total assets that are therefore subject to the Rule's shortest compliance deadline.  *See* Final Rule at 562 (to be codified at 12 C.F.R. 1033.121(b)(1)).

22.     To further its core purposes of advocating for the financial-services industry, KBA has challenged numerous rulemakings and other actions of federal agencies, including the Bureau.  *See, e.g.*, *Monticello Banking Co.* v. *CFPB*, No. 6:23-cv-148-KKC (E.D. Ky. filed Aug. 11, 2023).

23.     Plaintiff Bank Policy Institute (BPI) is a nonpartisan public policy, research, and advocacy group that represents universal banks, regional banks, and the major foreign banks doing business in the United States.  BPI produces academic research and analysis on regulatory and monetary policy topics, analyzes and comments on proposed regulations, and represents the financial-services industry with respect to cybersecurity, fraud, and

other information-security issues.  A 501(c)(6) nonprofit headquartered in Washington, D.C., BPI has members who operate in the Eastern District of Kentucky, have at least $850 million in total assets, and will be adversely affected by the Rule.  BPI also has members with at least $250 billion in total assets that are therefore subject to the Rule's shortest compliance deadline.  *See* Final Rule at 561 (to be codified at 12 C.F.R. 1033.121(b)(1)).

24.    To further its core purpose of advocating for the financial-services industry, BPI has frequently submitted comments on proposed agency rules and participated in litigation concerning regulation of banks.  *See, e.g.*, BPI & TCH Cmt. Ltr., *supra* ¶ 6; Bank Policy Institute, Comment Letter on Proposed Agency Information Collection Activities (Mar. 26, 2024), https://bpi.com/wp-content/uploads/2024/03/BPI-Call-Report-FFIEC-101-and-FFIEC-102-Revisions-Comment-Letter-3.26.24-.pdf; Br. for BPI & TCH as *Amici Curiae*, *Custodia Bank* v. *Fed. Res. Bd. of Govs.*, No. 24-8024 (10th Cir. Sept. 4, 2024); Br. for BPI as *Amicus Curiae*, *McShannock* v. *JPMorgan Chase Bank, N.A.*, No. 19-80030 (9th Cir. Mar. 15, 2019).

25.    KBA and BPI bring this action on behalf of their members to advance their members' interests, as well as the interests of the entire financial-services community.  As part of advocating for their members, these association Plaintiffs are committed to ensuring safe banking practices and a stable and predictable regulatory environment that allows banks to protect their customers and manage their own liability.

26.    The Rule imposes direct, burdensome obligations on the association Plaintiffs' members.  Accordingly, BPI and its members submitted comments opposing many features of the Rule.  *See, e.g.*, BPI & TCH Cmt. Ltr., *supra* ¶ 6; JPMC Cmt. Ltr.,

*supra* ¶ 11; Wells Fargo & Company, Comment Letter on Rule, Docket No. CFPB-2023-0052 (Dec. 29, 2023), https://www.regulations.gov/comment/CFPB-2023-0052-0881.

27.    Defendant Consumer Financial Protection Bureau is a U.S. governmental agency headquartered in Washington, D.C.  The Bureau is subject to the APA pursuant to 5 U.S.C. § 551(1).

28.    Defendant Rohit Chopra is the Director of the Bureau.  He is sued in his official capacity and is also subject to the APA pursuant to 5 U.S.C. § 551(1).

## JURISDICTION AND VENUE

29.    Plaintiffs bring this action under the APA, 5 U.S.C. § 551 *et seq*.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the Constitution of the United States and the APA.  The Court has the authority to grant the requested declaratory and injunctive relief under the APA, 5 U.S.C. §§ 702-706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

30.    Forcht Bank has standing because it is directly and adversely affected by the Rule's requirement to develop interfaces for third-party access to its consumers' data, including the substantial compliance costs imposed by the Rule and the prohibition on charging any fees to third parties or aggregators to recoup those costs.  Forcht Bank is also adversely affected by the increased risk of liability it faces because the Rule does not permit it to take adequate steps to safeguard the security of its customers' financial information or protect itself from liability in the event of misuse.

31.    KBA and BPI each have associational standing to bring this suit on behalf of, and to seek judicial relief for, their respective members.  Their members are directly and

adversely affected by the Rule and accordingly have standing to sue in their own right. Specifically, Plaintiffs' members will be harmed by the Rule's requirement to build an expensive interface for disseminating consumers' information; by the unpredictable framework the Rule prescribes, which is heavily dependent on external standard setters who lack regulatory authority (as well as democratic accountability); by uncertain liability regimes that are likely to leave Plaintiffs' members facing significant legal costs because of the Rule's compelled dissemination of information to non-consumer third parties; and by the inability to charge fees for the services the Rule compels them to provide—even fees charged to commercial fintech companies or data aggregators that profit from use of the data. Finally, neither the claims asserted nor the declaratory and injunctive relief requested requires an individual member to participate in the suit. *See Association of Am. Physicians & Surgeons, Inc.* v. *U.S. Food & Drug Admin.*, 13 F.4th 531, 537 (6th Cir. 2021) (citing *Hunt* v. *Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

32.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because it is an action against an agency and officer of the United States, no real property is involved, and Plaintiff Forcht Bank resides in this district. Venue is proper in this division because Plaintiff Forcht Bank resides in this division.

## BACKGROUND

### A.    Open Banking

33.    Open banking generally refers to a model of structuring the financial-services industry in which a bank customer's financial data, with the customer's permission, can be easily shared with other companies, including other financial-services providers.

14

34.     An explosion in the number of fintech companies offering various finance-related services to consumers has driven the expansion of the open-banking system. Visa reports that 87% of Americans use some sort of open-banking service.[3] For example, a fintech company might offer a product that aggregates all of a consumer's information and assets across all their accounts so the accounts and information may be viewed in one place. Another type of fintech company includes payment-processing applications that allow for transferring funds held at banks among individuals.[4] Still other fintech companies serve more specialized functions, such as applications designed for those who are self-employed, or for landlords, or for other categories of consumers or market participants who face common financial issues.

35.     Rather than individually communicate with every financial institution fintech companies' customers use, these companies will often delegate data collection to data aggregators to assist them in compiling and updating consumers' account information. Data aggregators—as the name implies—are companies that aggregate a particular dataset from various sources. In the open-banking context, the Bureau defines data aggregators as "person[s] that [are] retained by and provide[] services" to a company "to

---

[3] Visa, *What Is Open Banking?* (Jan. 27, 2023), https://usa.visa.com/visa-everywhere/blog/bdp/2023/01/27/what-is-open-1674845638965.html; *see* J.P. Pressley, *Open Banking and APIs: What IT Leaders Need To Know*, BizTech Magazine (Apr. 30, 2024), https://biztechmagazine.com/article/2024/04/open-banking-and-apis-what-it-leaders-need-know-perfcon ("Have you used CashApp or Venmo to pay friends back for picking up a dinner check? That's open banking.").

[4] *See* Marielle Segarra, *You May Already Be Using "Open Banking." What Exactly Is It?*, Marketplace (June 24, 2021), https://www.marketplace.org/2021/06/24/you-may-already-be-using-open-banking-what-exactly-is-it.

enable access to covered [consumer] data."  Final Rule at 564 (to be codified at 12 C.F.R. 1033.131).  Such persons include business "entities."  *Id.* at 102.

36.    In recent years, industry-led developments have improved the security of open-banking practices.  Initially, sharing customers' financial information occurred through screen scraping, an insecure process of sharing financial data whereby a third party obtains access to the consumer's login credentials in order to "scrap[e]" that user's "account data."  Han-Wei Liu, *Two Decades of Laws and Practice Around Screen Scraping in the Common Law World and Its Open Banking Watershed Moment*, 30 Wash. Int'l L.J. 28, 30 (2020).  But when screen scraping is used, the consumer generally has no knowledge or control over what and how much data is actually being "scraped," or how frequently.  In addition, screen scraping presents excessive risks to the consumer.  Third parties often retain the login credentials and (potentially all) account information indefinitely— rendering it vulnerable to being stolen or misused—and/or scrape "more information than is necessary to provide the beneficial service the customer wants."[5]  For these reasons, many banks have resisted or actively blocked screen scraping.[6]

---

[5] *Fidelity Takes Steps to Address Screen Scraping*, Fidelity (Sept. 18, 2023), https://newsroom.fidelity.com/pressreleases/fidelity-takes-steps-to-address-screen-scraping/s/2f33bc18-f16d-4b66-9868-626ada9ba32b.

[6] *See, e.g.*, *id.*; Robin Sidel, *Big Banks Lock Horns with Personal-Finance Web Portals*, Wall St. J. (Nov. 4, 2015), https://www.wsj.com/articles/big-banks-lockhorns-with-personal-finance-web-portals1446683450; *see also* Proposed Rule at 74,797 (referring to the "inherent risks" of screen scraping, "such as the proliferation of shared consumer credentials and overcollection of data").

37.     Increasingly, the industry is transitioning to more secure and targeted sharing of customers' data through APIs.  An API operates like a set of instructions by which a third party, pursuant to a consumer's directive, requests certain specified information from the customer's bank account, and the bank responds to that request with the appropriate information.  This method removes any need for the customer to share (or the third party to use or retain) the customer's login credentials.  And because APIs allow the consumer and the bank to control what data is shared in response to requests controlled and verified by the consumer, they allow for the targeted transmission of data consumers want to be shared without allowing the indiscriminate "scraping" of data from an online banking portal.

38.     Banks have been active participants in developing API-based open banking through private-sector initiatives.  The Financial Data Exchange, a nonprofit industry-standards body whose members include financial institutions, fintech companies, financial data aggregators, and others, has developed an open-banking API specification that is being used by 94 million consumer accounts.[7]

### B.     Information-Sharing Risks

39.     Data is only as secure as the weakest link in the chain of transmission.  As open banking has facilitated more widespread transmission of consumer data, hackers and other bad actors have more targets to choose from in attempting to access that data for

---

[7] *FDX Hits 94 Million Accounts, CFPB Publishes FDX's Standard-Setting Application*, Financial Data Exchange (Sept. 26, 2024), https://financialdataexchange.org/ FDX/News/Announcements/FDX%20Hits%2094%20Million%20Accounts,%20CFPB%20 Publishes%20FDX's%20Standard-Setting%20Application.aspx.

illicit or other improper purposes.  Unsurprisingly, they have been trying (and at times succeeding).  *See* Paganini, *supra*, note 2; Lemos, *supra*, note 2; Powell, *supra*, note 2.

40.    One reason that sharing customer data increases risks is because fintech companies and data aggregators are subject to far less robust requirements and significantly less oversight and supervision than traditional financial institutions. Statement of Donna Murphy, Deputy Comptroller, OCC, Before the Subcommittee on Digital Assets, Financial Technology and Inclusion Committee on Financial Services, U.S. House of Representatives, 4–5 (Dec. 5, 2023), https://www.occ.gov/news-issuances/congressional-testimony/2023/ct-occ-2023-133-written.pdf (referring to risks posed by "non-bank fintech companies").  Such companies also have less experience in safeguarding information, which can lead to basic mistakes.[8]  And of course, once data has left the hands of the bank, it is no longer subject to the bank's monitoring and compliance requirements, or the bank's fraud detection systems.

41.    These third parties also have fundamentally different business models and incentives as compared to banks.  Banks' principal mission is to ensure their customers can securely deposit, access, and use their funds to further their financial goals.  Fintech companies, in contrast, may offer services to customers in exchange for targeted

---

[8] *See, e.g.*, Felix Hacquebord et al., *Ready or Not for PSD2: The Risks of Open Banking*, Trend Micro Research 11 (2019), https://documents.trendmicro.com/assets/white_papers/wp-PSD2-The-Risks-of-Open-Banking.pdf (describing a fintech company that allowed its customers' "email address[es], password[s], [and] client secret authentication[s] [to be] visible in the path of the [f]in[t]ech's API URL"—as in, in the website address for their API).

advertising or referral fees for other services.[9]  Data aggregators, for their part, are literally in the business of collecting and selling as much customer data as possible.[10]

42.    Customers can suffer serious consequences when their financial data is compromised while in the possession of commercial third parties that lack the extensive security practices (and regulatory supervision) that banks have.

43.    For instance, consider the widespread fraudulent technique of social engineering.[11]  Many consumers may be accustomed to ignoring random text messages inquiring about a recent $100 purchase at a retailer that they know they did not make.  But if the bad actor sending the text message has obtained the consumer's transaction history, the bad actor may be able to refer instead to an actual transaction the consumer did undertake, thereby increasing the risk that the consumer will believe the text is credible and comply with the bad actor's requests.

44.    Compromises of other kinds of consumer financial data can lead to even more direct consequences.  A bad actor that gains access to certain information required to

---

[9] *See, e.g.*, Tom Sullivan, *How Does Fintech Make Money?  9 Business Models Explained*, Plaid (Oct. 3, 2022), https://plaid.com/resources/fintech/how-does-fintech-and-plaid-make-money/.

[10] *See generally* Julian Alcazar & Fumiko Hayashi, *Data Aggregators: The Connective Tissue of Open Banking*, Federal Reserve Bank of Kansas City (Aug. 24, 2022), https://www.kansascityfed.org/Payments%20Systems%20Research%20Briefings/docume nts/9012/PaymentsSystemResearchBriefing22AlcazarHayashi0824.pdf;    Karl    Popp, *Revenue Models for Aggregator Companies*, Dr. Karl Michael Popp (May 6, 2024), https://www.drkarlpopp.com/karl-michael-popps-blog/revenue-models-for-aggregator-companies.

[11] *See* IBM, *What Is Social Engineering?* (accessed Oct. 17, 2024), https://www.ibm.com/topics/social-engineering.

initiate payment from a bank account—such as the routing and account numbers—may be able to trigger payments from the account without interacting with the customer at all.

45. These consequences frequently are borne by vulnerable persons. The FBI reported that fraud-related losses by those age 60 and over increased 11% in 2023, to $3.4 billion total. *Elder Fraud, In Focus*, FBI (Apr. 30, 2024), https://www.fbi.gov/news/stories/elder-fraud-in-focus. Many of those losses result from technology-related scams—such as those related to cryptocurrency, offers of tech support, and personal data breaches. *Id.*

46. Before the Rule at issue here, banks had been managing the risks related to open banking consistently with their commitment to protecting their customers and the guidance of their prudential regulators. More broadly, those regulators have recognized the obvious fact that sharing customer financial information with third parties poses risks. In recent interagency guidance addressing third parties that banks *choose* to form a contractual relationship with, the Federal Reserve System, the Federal Deposit Insurance Corporation, and the Office of the Comptroller of the Currency warned banks that "the use of third parties, especially those using new technologies, may present elevated risks to banking organizations and their customers." *Interagency Guidance on Third-Party Relationships: Risk Management*, 4 (June 6, 2023), https://occ.gov/news-issuances/news-releases/2023/nr-ia-2023-53a.pdf; *see id.* at 13 (reporting that a number of commenters on the proposed guidance "discussed . . . relationships with fintech companies" and "data aggregators" as examples of third-party relationships that "may pose heightened or novel risk management considerations"). The appropriate way to manage those risks, the

banking agencies advised, is for banks to implement "a flexible, risk-based approach to third-party risk management that can be adjusted to the unique circumstances of each third-party relationship." *Id.* at 15.

47.     These risks are even more substantial in the context of open banking, where banks must decide whether and how to share consumers' personal and financial information with potentially thousands more third parties with which banks have no voluntary, ongoing relationship.  As Acting Comptroller of the Currency Michael Hsu cautioned in a recent speech about open banking, "[s]ecurity is a prerequisite for the sharing and receiving of consumer financial data," and the "increase in the volume and complexity of consumer-permissioned sharing" brought about by open banking "may introduce new risks and necessitate new controls."  Michael J. Hsu, Remarks at FDX Global Summit: "Open Banking and the OCC," at 4 (Apr. 19, 2023), https://www.occ.gov/news-issuances/speeches/2023/pub-speech-2023-38.pdf.

48.     Bank regulators outside the United States also have long recognized the risks associated with open banking, especially when it involves payment initiation.  European regulators have had a regulatory framework governing open banking in place since 2015.  Although those jurisdictions' regulatory frameworks have their own serious flaws, they have notably carved out an active role for regulators in ensuring the safety and security of open banking.  For example, in the United Kingdom, any third party seeking to access consumers' financial data must receive authorization to do so from the Financial Conduct Authority, which then monitors the third parties' compliance with applicable regulations.  *See, e.g.*, Dan Awrey & Joshua Macey, *The Promise & Perils of Open Finance*, 40 Yale J.

21

on Reg. 1, 15-16 (2023) (citing Open Banking Implementation Entity (OBIE), *Enrolling onto the OBIE Directory: How to Guide* (2021), https://perma.cc/J249-CNFL).

49.     Also relevant here, regulators in both the European Union and the United Kingdom recognize that certain consumer financial data is so sensitive that it warrants extra protection.  Specifically, they draw a distinction between "account information services" and "payment initiation services"—the latter of which involves the sharing of information sufficient to remove money from an account (such as an account and routing number)—and require significantly heightened supervision, liability, and security for payment-initiation services. *See* BPI & TCH Cmt. Ltr., *supra* ¶ 6, at 12.

50.     In the Rule at issue in this case, the CFPB has sought to install a regulatory framework governing open banking for the first time in the United States.  The most fundamental problem is that Congress did not authorize the Bureau to do so.  But on top of that, the Bureau inexplicably adopted an approach that—contrary to federal banking regulators' guidance and in stark contrast to other open-banking regimes—puts customers' most sensitive information at risk, yet abdicates the Bureau's responsibility to mitigate that substantially increased risk.  The end result is a framework that threatens significant harm to consumers and the entire financial-services ecosystem.

## THE BUREAU'S RULEMAKING

51.     The rule at issue in this case purports to be the rulemaking required under Section 1033 of the Dodd-Frank Act.  The CFPB proposed the rule on October 31, 2023, thirteen years after Dodd-Frank was passed.  Having neglected its obligation to issue a rule

under Section 1033 for so long, the CFPB proposed a rule that goes far beyond what anyone could have contemplated in 2010.  Section 1033(a) states:

> Subject to rules prescribed by the Bureau, a covered person shall make available to a consumer, upon request, information in the control or possession of the covered person concerning the consumer financial product or service that the consumer obtained from such covered person, including information relating to any transaction, series of transactions, or to the account including costs, charges and usage data. The information shall be made available in an electronic form usable by consumers.

12 U.S.C. § 5533(a).  As stated in the Senate's section-by-section analysis of the Dodd-Frank Act, "[t]his section ensures that consumers are provided with access to their own financial information."  S. Rep. No. 111-176, at 173 (2010).

52.    From the outset of its Proposed Rule, the Bureau all but admitted it was seeking to achieve an objective far beyond the scope of Section 1033.  "*In addition* to ensuring consumers can access covered data in an electronic form from data providers," the Bureau stated, it was also proposing to "address" what it perceived as "the challenges . . . with respect to the open banking system by delineating the scope of data that third parties can access on a consumer's behalf, the terms on which data are made available, and the mechanics of data access."  Proposed Rule at 74,799 (emphasis added).

53.    Below, Plaintiffs describe the Bureau's rulemaking in four parts.  First, Plaintiffs summarize the components of the Bureau's proposed framework that are relevant to this challenge.  Second, Plaintiffs summarize the relevant comments submitted to the

23

Bureau regarding its proposal.  Third, Plaintiffs describe the partial final rule the Bureau adopted regarding how it would recognize "standard setters" under its new regime. Finally, Plaintiffs explain how, despite the comments the Bureau received, it nonetheless adopted a Final Rule that retains the unlawful and harmful aspects of the Proposed Rule.

### A.    The Bureau's Proposed Rule

54.    The Bureau issued its Proposed Rule on October 31, 2023.  As the core mandate underlying its attempt to install a new regulatory regime governing open banking, the Proposed Rule required banks to "maintain a consumer interface" and "establish and maintain a developer interface" through which consumers' financial information could be shared with consumers and a broad range of third parties.  Proposed Rule at 74,870 (proposed 12 C.F.R. 1033.301(a)).

### 1.    Required Disclosure to "Authorized Third Parties"

55.    As its central requirement, the Proposed Rule stated that a "data provider"— *i.e.*, a bank—"must make available to a consumer *and an authorized third party*, upon request, covered data in the data provider's control or possession concerning a covered consumer financial product or service that the consumer obtained from the data provider, in an electronic form usable by consumers and authorized third parties."  Proposed Rule at 74,870 (proposed 12 C.F.R. 1033.201(a)) (emphasis added).  This requirement tracked the language of Section 1033 *except* for the significant addition of the term "authorized third parties," which does not appear in Section 1033.  The Proposed Rule would require banks to provide consumer data to these third parties through the "developer interface" it required data providers to establish and maintain.  *Id.*; *see generally* Proposed Rule at

24

74,870-73 (Subpart C—Data Provider Interfaces; Responding to Requests) (proposed 12 C.F.R. 1033.301, 1033.321, 1033.331, 1033.341, 1033.351).

56.    The Proposed Rule defined an "authorized third party" as any entity that complied with certain procedures for obtaining the consumer's informed consent— procedures that *banks* would be tasked with ensuring the third party had followed. Proposed Rule at 74,869, 74,873 (proposed 12 C.F.R. 1033.131, 1033.401).  These procedures included  (i) providing  the  consumer  with  details  about  what  information  from  the consumer's bank account the third party seeks to access and why; (ii) obtaining the consumer's express informed consent to such access; (iii) agreeing to abide by a series of obligations set forth in the Proposed Rule on how the third party would collect, use, and retain the consumer's data; and (iv) advising how the consumer could revoke the third party's access.  *Id*. at 74,873 (proposed 12 C.F.R. 1033.401, 1033.411, 1033.421).  The proposal expressly permitted the third party to use a data aggregator to perform these authorization procedures on its behalf, so long as the customer is advised of the data aggregator's involvement and the data aggregator agrees to the same obligations as the authorized third party.  *Id*. at 74,874 (proposed 12 C.F.R. 1033.431).  The consumer had no ability to select a different aggregator to facilitate the transfer of data.

57.    After satisfying those authorization procedures, the authorized third party may collect, use, and retain the consumer's data to the extent "reasonably necessary to provide  the  consumer's  requested  product  or  service."    *Id*. (proposed  12  C.F.R. 1033.421(a)(1)).  The third party was then permitted to use and retain the consumer's data for the longer of (i) up to a year after the most recent authorization form was obtained, or

(ii) as long as necessary to continue providing the consumer's requested product. *Id.* at 74,873-74 (proposed 12 C.F.R. 1033.421(b)(3), (b)(4)(ii)).

58.     The Proposed Rule would then allow that authorized third party to share the consumer's data with *other* third parties, provided that the first third party "require[s] the other third party by contract to comply with the" rules governing third-party data access and use. *Id.* at 74,874 (proposed 12 C.F.R. 1033.411(f)).

59.     The Bureau did not explain why it was interpreting Section 1033 to allow such a broad swath of third parties to obtain customers' sensitive financial information. After citing the general statutory definition of "consumer" as including "an agent, trustee, or representative," 12 U.S.C. § 5481(4)), the Bureau simply asserted *ipse dixit* that the statute grants the Bureau "authority to establish a framework that readily makes available covered data in an electronic form usable by consumers *and third parties acting on behalf of consumers*, upon request." Proposed Rule at 74,802 (emphasis added). But it did not explain why it thought that any "third part[y] acting on behalf of consumers" would qualify as an "agent, trustee, or representative" of a consumer—terms that indicate a fiduciary-like relationship with an ongoing duty of loyalty to the consumer.

60.     Notably, the Bureau had not always thought this interpretation was clear: in its advance notice of proposed rulemaking, the Bureau asked, "Who should be considered 'an agent, trustee, or representative' of an individual consumer for purposes of implementing section 1033 access rights?" Advance Notice of Proposed Rulemaking Regarding Consumer Access to Financial Records, 85 Fed. Reg. 71,003, 71,010 (Nov. 6,

2020).  The Proposed Rule did not address comments the Bureau had received or explain its reasoning in answering this question so broadly.

### 2.  The "Covered Data" Banks Must Share

61.    The Proposed Rule required banks to make "covered data" available to any authorized third party.  Proposed Rule at 74,870 (proposed 12 C.F.R. 1033.201).  It defined covered data to include certain information about the customer's account(s) with the bank, such as information pertaining to transaction history and pending transactions, account balances, upcoming bill information, and account verification information.  *Id.* (proposed 12 C.F.R. 1033.211).  Covered data also included "terms and conditions" associated with the account, which generally mean the contract terms between the data provider and the consumer, such as "the applicable fee schedule," interest rates, "rewards program terms," and whether the consumer "opted into overdraft coverage" or "entered into an arbitration agreement."  *Id.* (proposed 12 C.F.R. 1033.211(d)).

62.    The Proposed Rule also required banks to share an additional category of "covered data" defined in terms of its functionality, rather than information about the customer's product.   Specifically, the Proposed Rule would require banks to share "[i]nformation to initiate payment" from an account, which "includes" a consumer's account and routing number in either tokenized or non-tokenized form.  *Id.* (proposed 12 C.F.R. 1033.211(c)).  The Bureau did not address the unique risks posed by the sharing of payment-initiation information, particularly when shared on the scale of potentially tens of millions of consumers with thousands of third parties.   Nor did the Proposed Rule draw any

distinction in treatment for this information, instead requiring that it be shared on the same terms as any other information about a consumer's account.

63.     The Bureau did not acknowledge (much less distinguish) its prior guidance recognizing an important difference between "[a]uthorized data access" and "payment authorization."  *See* CFPB, *Consumer Protection Principles: Consumer-Authorized Financial Data Sharing and Aggregation*, 4 (Oct. 18, 2017), https://files.consumerfinance.gov/f/documents/cfpb_consumer-protection-principles_data-aggregation.pdf ("Authorized data access, in and of itself, is not payment authorization. Product or service providers that access information and initiate payments obtain separate and distinct consumer authorizations for these separate activities.").

### 3.     Ensuring Third-Party Security

64.     Although the Bureau proposed to require banks to share customers' most sensitive financial information with countless third parties, the Proposed Rule did not expressly provide *any* role for the Bureau to play in ensuring that those third parties' security practices are sufficiently robust or even that they comply with the same requirements imposed on banks by the Proposed Rule.  Instead, the Bureau generally tasked *banks* with that role—while at the same time limiting banks' tools for fulfilling it.

65.     *First*, the Proposed Rule provided that the mandate that banks "*must* make available covered data" is triggered whenever the bank receives information from a third party that "[c]onfirm[s] the third party has followed the authorization procedures" prescribed by the Proposed Rule.  Proposed Rule at 74,871 (proposed 12 C.F.R. 1033.331(b)(1)(i)-(iii) (emphasis added)).

66.    *Second*, the Proposed Rule sought to circumscribe in numerous ways banks' ability to deny third parties' access to the developer interface based on risk-management concerns.

67.    For starters, the Proposed Rule deemed a denial of access to be "not unreasonable" if the denial was "necessary to comply with" the bank's obligations under relevant provisions of the Federal Deposit Insurance Act or the Gramm-Leach-Bliley Act. Proposed Rule at 74,871 (proposed 12 C.F.R. 1033.321(a)).  Troublingly, the Bureau did not specify who would determine what is "necessary," nor did it address the untenable choice banks with risk-management concerns would be put to:  deny access on safety-and-soundness grounds and risk enforcement by the CFPB for *overly restrictive* access policies, or allow access based on the Proposed Rule and risk enforcement by prudential regulators for *overly lax* policies.  *Id.*

68.    The Proposed Rule recognized that a bank may also "*reasonably* deny[]" access on risk-management grounds, *id.* (proposed 12 C.F.R. 1033.321(a) (emphasis added)), but provided that a denial would be considered reasonable only if, "at a minimum," the denial is "directly related to a specific risk of which the data provider [was] aware." *Id.* (proposed 12 C.F.R. 1033.321(b)).  The Proposed Rule did not specify or give any illustrative examples of what constitutes a "specific" risk or how serious such a risk must be.  Nor did the CFPB explain how this standard interacted with its additional caveat that access could be denied if "the third party does not present evidence that its data security practices are adequate to safeguard the [consumer's] data." *Id.* (proposed 12 C.F.R. 1033.321(d)(1)).

69.     The Proposed Rule vaguely warned that such risk-based denials must be carried out "in a consistent and non-discriminatory matter," a hazy and subjective standard that leaves banks with no assurance that a denial based on legitimate risk-management concerns—even those deemed necessary to meet expectations of its primary financial regulator—would not expose it to an enforcement action by the Bureau. *Id.* (proposed 12 C.F.R. 1033.321(b)).   Instead, banks making risk-management decisions must wonder whether a legitimate denial of access will ultimately leave them exposed if the CFPB concludes that a bank previously granted what the Bureau perceives as a materially similar request.

70.     *Third*, puzzlingly, the Bureau did not require that all authorized third parties use the new developer interface that banks would be required to establish and maintain. Nor did it ban the riskiest method of accessing customer financial data:  screen scraping. The Bureau repeatedly acknowledged "screen scraping's inherent overcollection, accuracy, and consumer privacy risks," *id.* at 74,813; that "screen scraping creates data security, fraud, and liability risks for data providers," *id.* at 74,854; and that there is "nearly universal consensus that developer interfaces should supplant screen scraping," *id.* at 74,798.  Yet the Proposed Rule did not actually ban screen scraping despite its acknowledged risks; it assumed that "the market [will] move away from screen scraping" based on the onerous obligations put on data providers regarding developer interfaces. *Id.*  Banks, by contrast, are required to walk a very fine line:  the Proposed Rule further warned that the Bureau would "evaluate whether data providers are blocking screen scraping without a bona fide and particularized risk management concern" during the implementation period; if so, the

30

Bureau would "consider using the tools at its disposal to address this topic ahead of the proposed compliance dates." *Id.* at 74,800.

71.     *Finally*, having compelled broad sharing of consumers' most sensitive information, required banks to assume primary responsibility for managing the risks of that sharing, and at the same time limited banks' authority to mitigate those risks, the Proposed Rule declined to articulate any limitations on banks' liability if customer data is breached.  The Bureau rejected proposals to ensure that liability for data misuse or compromise when data is in the hands of a third party should rest with that third party. Instead, the Proposed Rule left banks exposed to unspecified and unpredictable potential liability for data breaches that could have been avoided only by denying third parties access to their API in the first place, not to mention complaints by fintech companies and potential Bureau enforcement actions.  *See, e.g.*, U.S. Bank, Comment Letter on Rule, Docket No. CFPB-2023-0052, at 3 (Dec. 27, 2023), https://www.regulations.gov/comment/CFPB-2023-0052-0795.

### 4.     Standard Setters

72.     Having already proposed to task data providers with overseeing the security and compliance of purportedly authorized third parties, the Bureau also proposed to delegate to private organizations much of its claimed authority to set substantive standards for compliance with the Rule.

73.     In addition to employing standard-setting organizations to provide technical requirements, such as the appropriate format in which to present data, the Bureau also proposed to give private standard setters a significant role to play in measuring banks'

31

compliance with substantive and policy-oriented requirements.  For example, the Bureau proposed to look to private organizations to set "qualified industry standard[s]" for:

- how much "scheduled downtime [of the API] may be reasonable," Proposed Rule at 74,871 (proposed 12 C.F.R. 1033.311(c)(1)(i)(C));

- whether "any frequency restrictions" on the number of requests a bank will process through its developer interface "are reasonable," *id.* (proposed 12 C.F.R. 1033.311(c)(2));

- whether a bank's "method to revoke any third party's authorization" is "reasonable," *id.* at 74,872 (proposed 12 C.F.R. 1033.331(e));

- whether "a data provider's policies and procedures regarding accuracy [of information it provides] are reasonable," *id.* at 74,873 (proposed 12 C.F.R. 1033.351(c)(3)); and

- whether a bank's risk-management-related denial of access to the developer interface was "reasonable," *id.* at 74,871 (proposed 12 C.F.R. 1033.321(c)).

74.    For these substantive requirements, the Bureau generally proposed that a regulated party's "adherence to a qualified industry standard" would constitute "[i]ndicia" that the entity had complied with its obligations under the Proposed Rule. *See, e.g.*, *id.*  The Bureau did not explain what the phrase "indicia of compliance" means, but made clear that meeting any such "indicia" would be neither necessary nor sufficient to demonstrate compliance. *See* Proposed Rule at 74,807 ("[A]n entity does not have to show adherence to a qualified industry standard to demonstrate compliance with a provision of the rule . . .

Conversely, adherence to a qualified industry standard would not guarantee that the entity has complied with the rule provision.").

75.    The Proposed Rule did not identify anything in the statute that permitted the Bureau to delegate the formulation of substantive policy "standards" to private organizations.  To explain its decision, the Bureau pointed to the "granular coding and data requirements" involved in developing the interfaces that "risk[] becoming obsolete almost immediately," which led the Bureau to prefer the "efficient evolution of technical standards" that external standard-setting organizations facilitate better than government agencies.  Proposed Rule at 74,801.  But that plainly does not explain why private organizations should have a role in setting compliance standards that go beyond technical coding and data requirements, including such substantive regulatory requirements as whether a bank's risk-management determinations are "reasonable" or its policies and procedures are appropriate.  *Id.*

### 5.    Developer Interface Performance

76.    The Bureau also proposed to set performance standards for the developer interfaces that data providers would be required to develop.  But those standards were both stringent and confusing.  The Proposed Rule's baseline requirement was that a developer interface's performance "must be commercially reasonable."  Proposed Rule at 74,870 (proposed 12 C.F.R. 1033.311(c)(1)).  But the Proposed Rule then went on to propose particular performance standards, including that the interface must respond properly to at least 99.5% of queries it receives, must not have excessive downtime, and must respond to

33

requests quickly—within 3,500 milliseconds.   *Id.* at 74,781 (proposed 12 C.F.R.
1033.311(c)(1)(i), 1033.311(c)(1)(i)(C), 1033.311(c)(1)(i)(D)(*3*)).

77.    Satisfying these performance standards would not be sufficient to
demonstrate commercially reasonable performance, however.   The Proposed Rule
additionally provided that "[i]ndicia" of commercially reasonable performance included that
the interface performance meets the specifications of a qualified industry standard and
"[m]eets the applicable performance specifications achieved by the developer interfaces . . .
[of] similarly situated data providers."   *Id.* (proposed 12 C.F.R. 1033.311(c)(1)(ii)).   The
Bureau did not explain in the proposal how these "indicia" interacted with or would be
weighed against the more specific performance specifications provided.

### 6.    Compliance Deadlines

78.    Despite the substantial new obligations the Proposed Rule would impose, the
Bureau proposed to give the largest banks—depository institutions with at least $500 billion
in total assets and nondepository institutions that generated $10 billion in revenue in 2023
or expect to in 2024—a mere six months after publication of the final rule in the Federal
Register to come into compliance.   Proposed Rule at 74,869 (proposed 12 C.F.R.
1033.121(a)).

79.    In addition to the unreasonably short deadline, the Proposed Rule did not
explain why the Bureau did not key the compliance deadlines off of the promulgation of
standards by the standard-setting organizations it proposed to recognize.   As commenters
pointed out, that failure would pose challenges because "some of the industry standards

mentioned by the CFPB do not yet exist, and they will not exist until qualified industry body(s) are recognized and publish such standards." JPMC Cmt. Ltr., *supra* ¶ 11, at 31.

### 7.    Access-Fee Prohibition

80.    Finally, the Bureau proposed to forbid data providers from "impos[ing] any fees or charges on a consumer or an authorized third party" to compensate for establishing or maintaining its interfaces or processing requests for consumers' data.  Proposed Rule at 74,870 (proposed 12 C.F.R. 1033.301(c)).  In other words, banks would be required to provide the extensive services mandated by the Proposed Rule—including the significant oversight, compliance, and liability costs—for free.  According to the Bureau, the fee prohibition is "necessary . . . to effectuate consumers' rights" under Section 1033 to receive their data "upon request."  *Id.* at 74,814.  But the Bureau did not square that explanation with its later acknowledgement that banks may still indirectly lawfully "pass[] on to consumers" some of the costs of their APIs in the form of, for instance, "higher account fees."  *Id.* at 74,853.  Nor did the Bureau explain why consumers should bear the costs of significantly expanded third-party access to their data, rather than the third parties that directly benefit from that access.

81.    The Bureau proposed this prohibition on banks even recouping their costs from third parties despite recognizing the immense costs of compliance.  The Bureau itself cited a median annual cost of maintaining a developer interface of $21 million (or $210 million over a decade), which ranged as high as $47 million annually for certain banks.  *Id.* at 74,847-48.  As commenters explained, even these estimates "vastly underestimate[d] the amount of work that even the largest and most technologically advanced" banks would

"have to undertake to achieve compliance."  BPI & TCH Cmt. Ltr., *supra* ¶ 6, at 14, 67-68. And the CFPB proposed no corresponding prohibition on third parties' charging fees related to their data access and transmission, or the products or services they provide using that data.

### B.    The Comment Period

82.    The Bureau received more than 11,000 comments on its Proposed Rule.  The comments were submitted by a range of financial-services institutions, consumer organizations, and public-interest groups.  A number of commenters raised serious concerns about the Proposed Rule, such as (among many others):

- **Teller, Inc.:** The Proposed Rule exceeds the CFPB's authority by attempting to turn a "modest provision intended to provide 'consumer rights to access information'" into a license to "reinvent consumer banking" by "inaugurat[ing] 'open banking' in the United States."  Teller, Inc., Comment Letter on Rule, Docket No. CFPB-2023-0052, at 1-2 (Dec. 30, 2023), https://www.regulations.gov/comment/CFPB-2023-0052-0903 (Teller Cmt. Ltr.).  In particular, third parties are not "consumer[s]" within the meaning of the statute, and the Bureau thus cannot compel dissemination of consumers' financial information to them. *See id.* at 8-12.

- **Credit One:** The Proposed Rule "creates significant risk for consumers' sensitive financial data to be exposed to bad actors" and "appears to place unfair burdens on financial institutions," including "to ensure third parties have followed [appropriate] authorization procedures."    Credit One,

Comment Letter on Rule, Docket No. CFPB-2023-0052, at 1 (Jan. 2, 2024), https://www.regulations.gov/comment/CFPB-2023-0052-0953.   The Bureau should also ensure third parties are "held to the same exacting standards that regulated financial institutions are held to" with respect to data protection. *Id.* at 2.  The Proposed Rule is also deficient because it fails to "expressly prohibit . . . screen scraping." *Id.*

- **JPMorgan Chase & Co.:** The Proposed Rule inappropriately relies on standard setters for many choices that "tend to be in the spirit of regulatory enforcement," such as caps on frequency with which data may be accessed, the level of accuracy in responses that data providers must maintain, and the permissible amount of platform downtime.  JPMC Cmt. Ltr., *supra* ¶ 11, at 16-17.  The Proposed Rule also exceeds the CFPB's authority insofar as it would require banks to share information to initiate payment from a Regulation E account.  *Id.* at 8-11.  Finally, even with "a sizable team" of "engineers, product managers, analytics, design, [and] legal" professionals, it would take "at least two years" to perform the "extensive work" needed to generate "performance metrics that meet the CFPB's new definitions," to enable "support for required data" that banks are not already sharing, to develop many new policies, and to implement significant technological upgrades. *Id.* at 30-31.

- **BPI & TCH:** The Proposed Rule's use of standard setters could result in privately promulgated qualified industry standards receiving "extraordinary

weight by market participants."  BPI & TCH Cmt. Ltr., *supra* ¶ 6, at 13. Reliance on standard setters should be abolished with respect to certain provisions, such as the permissible total amount of API downtime and access restrictions.  *Id.* at 37.  Moreover, "the fee prohibition . . . is not grounded in the statutory text."  *Id.* at 42.

**Consumer Bankers Association:**  The CFPB lacks legal authority for the Proposed Rule because Section 1033's "plain statutory language is fundamentally centered on a consumer's right to access their own information."  Consumer Bankers Ass'n, Comment Letter on Rule, Docket No. CFPB-2023-0052, at 9 (Dec. 29, 2023), https://www.regulations.gov/comment/CFPB-2023-0052-0951.  To the extent the Bureau has authority to regulate in this realm, it should exercise that authority itself, rather than rely on standard setters.  In particular, the Bureau itself should clarify the content of certain requirements the Proposed Rule would impose, such as what would constitute an "unreasonable" restriction on the frequency of data requests.  *Id.* at 18.  And the Bureau should allow reasonable fees to be charged to authorized third parties.  *Id.* at 15-17.

- **American Bankers Association:** The Proposed Rule's "prohibition on fees" is "unsupported by law" and "represents nothing less than a forced transfer of value" from data providers to "data aggregators and third parties seeking to monetize the information."  Am. Bankers Ass'n, Comment Letter on Rule,

Docket No. CFPB-2023-0052, at 4, 11 (Jan. 2, 2024) (ABA Cmt. Ltr.), https://www.regulations.gov/comment/CFPB-2023-0052-0962. The Proposed Rule also presents grave security risks because, instead of CFPB oversight of risk management, "far too many portions of the [Proposed Rule] are reliant on data providers or standard-setting bodies." *Id.* at 5. In addition, data providers should be given at least two years to comply "after the later of: 1) standards to be deemed to comply are named; or 2) the final rule is published." *Id.* at 20. This timeframe is necessary because of several "completely new concepts" in the Proposed Rule, including requiring sharing of categories of data such as upcoming bill information. *Id.*

83.    Based on these concerns, commenters called for rescission of the Rule or at least substantial changes to numerous key elements of the Proposed Rule. *See, e.g.*, Teller Cmt. Ltr., *supra* ¶ 82.

## C.    The Final Rule Regarding Standard Setters

84.    On June 11, 2024, the CFPB finalized a portion of its Proposed Rule concerning standard setters. In particular, the CFPB published the procedures by which it would recognize external standard-setting bodies, whose "consensus standards" the Bureau proposed to rely on in interpreting various provisions of the Rule. *See* Industry Standard Setting, 89 Fed. Reg. 49,084 (June 11, 2024) (to be codified at 12 C.F.R. 1033.101, 1033.131, 1033,141), https://www.govinfo.gov/content/pkg/FR-2024-06-11/pdf/2024-12658.pdf (Standard-Setter Rule).

85.     In the Standard-Setter Rule, the Bureau explained that it would select standard-setting organizations via application based on a number of characteristics, such as the organization's openness to all interested parties, balancing decision-making power among all interested parties, transparency with respect to procedures, operation by consensus, and a system of entertaining objections and appeals that comports with due process. *See* Standard-Setter Rule at 49,091.

86.     In response to comments questioning the Bureau's authority to recognize standard setters at all, it cited a series of statutory provisions that delegate certain rulemaking authority *to the Bureau*. *See id.* at 49,086 (citing 12 U.S.C. § 5533(a) (information shall be made available to consumers "[s]ubject to rules *prescribed by the Bureau*") (emphasis added); 12 U.S.C. § 5533(d) (similar); 12 U.S.C. § 5512(b)(1) ("*The Director* may prescribe rules and issue orders and guidance, as may be necessary or appropriate to enable *the Bureau* to administer and carry out [its duties].") (emphases added)).  The Bureau did not identify any statutory provision giving the Bureau authority to delegate its rulemaking authority to private organizations.

87.     The Standard-Setter Rule also repeated the Bureau's rationale for delegating policy standards to standard-setting bodies—that "very granular technical requirements could rapidly become obsolete" if prescribed by regulators, "while industry-led standard-setting would be better able to keep pace with changes in the market and technology" if the standard setters had been recognized pursuant to fair and appropriate procedures. *Id.* at 49,084.

**D.    The Final Rule Challenged In This Case**

88.    The Bureau issued the Final Rule on October 22, 2024.  As an initial matter, the Final Rule exempted a substantial number of institutions from compliance.  The Rule "do[es] not apply to data providers . . . that are depository institutions that hold total assets equal to or less than the SBA size standard," Final Rule at 560-61 (to be codified at 12 C.F.R. 1033.111(d)), which the Rule later specifies is $850 million, *id.* at 563.  The Final Rule does not address (or explain) the apparent contradiction between the Bureau's view that Section 1033 gives consumers a statutory right to have their information shared through this framework and its denial of that purported statutory right to a substantial number of consumers.

89.    Despite the numerous objections raised during the comment period, the Bureau persisted in finalizing a rule that not only retains largely all the fundamentally problematic aspects of the Proposed Rule, but even exacerbates some commenters' concerns.

90.    *First*, the Rule still compels disclosure of customers' information to any "authorized third parties," which are defined broadly to include any third-party company that purportedly completes authorization procedures prescribed in the Rule.

91.    *Second*, the Rule persists in implementing an unsafe and irrational regulatory framework.  The Bureau continued to:

- require the sharing not only of data about the customer's account, but of "information to initiate payment" in or out of the customer's account, Final Rule at 567 (to be codified at 12 C.F.R. 1033.211(c));

41

- decline to assert a clear role for itself in ensuring third parties' compliance with authorization procedures, instead vaguely relying on banks to "[d]ocument" such compliance, *id.* at 576 (to be codified at 12 C.F.R. 1033.331(b)(1)(iii));

- impose significant limits on banks' ability to engage in risk-management-based denials of access to third parties, even in the event that banks deny such access because of the "safety and soundness standards of a prudential regulator," which is not a sufficient basis to deny access, *id.* at 574-75 (to be codified at 12 C.F.R. 1033.321(a), (b));

- refuse to require third parties to use the new developer interfaces or ban screen scraping, *see id.* at 318-19; and

- refuse to set forth any rules for fairly apportioning liability among data providers, authorized third parties, and data aggregators in the event a customer's data is breached or misused, in light of the unsafe framework the CFPB had created.

92.    *Third*, the Rule continues to outsource substantial policymaking authority to private standard-setting organizations, which will promulgate "consensus standards" to which regulated parties may adhere and thereby demonstrate "indicia" of their compliance with various aspects of the Rule.[12]  Far from looking to private standard setters for only

---

[12] The Standard-Setter Rule and Final Rule use the terminology "consensus standard" to refer to what the Proposed Rule had called a "qualified industry standard."

"granular technical requirements," Standard-Setter Rule at 49,084, the Rule delegates broad authority to define as many as 12 other elements of the Rule, including such substantive compliance issues as what constitutes "reasonable" denial of interface access on risk-management grounds or "reasonable" amounts of downtime, access limits, and other similar substantive issues, including those over which prudential bank regulators exercise substantial control and oversight authority.  Final Rule at 571-74 (to be codified at 12 C.F.R. 1033.311(c), 1033.311(d), 1033.321(c)).

93.    While the Final Rule retains the language that adherence to a consensus standard would constitute "indicia of compliance" with various provisions of the Rule, the Bureau still did not explain what it means by "indicia of compliance," and continued to warn that meeting any such indicia would be neither sufficient nor necessary to demonstrate compliance with the Rule. *Id.* at 93.

94.    *Fourth*, the Bureau made even more vague the Proposed Rule's already-convoluted framework for assessing whether a developer interface's performance is "commercially reasonable."  The Bureau abandoned the quantitative requirement that the interface respond to any request within 3,500 milliseconds, instead turning to standard setters yet again to promulgate rules governing the speediness of a response. *Id.* at 572 (to be codified at 12 C.F.R. 1033.311(c)(1)(iv)(C)).  But the Bureau retained the confusing approach of (i) requiring a baseline quantitative requirement that the developer interface provide a "proper response" to third-party requests 99.5% of the time, and (ii) stating that compliance with that requirement would not be sufficient to demonstrate "commercially reasonable" interface performance. *See id.* at 201-02 (discussing the possibility "that a data

43

provider's interface has not complied with the commercially reasonable performance requirement . . . notwithstanding that the interface met the quantitative minimum").

95.    Unlike the Proposed Rule, however, the Final Rule provides additional standards by which the Bureau will assess whether an interface's performance is commercially reasonable (without ruling out the possibility the Bureau would also consider other issues).  The Final Rule provides that an interface's performance will be assessed based on "[t]he interface's total amount of scheduled downtime," "[t]he amount of time in advance of any scheduled downtime by which notice of the downtime is provided," "[t]he interface's total amount of unscheduled downtime," and "[t]he interface's response time." Final Rule at 572-73 (to be codified at 12 C.F.R. 1033.311(c)(2)(ii)(B)-(E)).

96.    The Rule does not prescribe particular standards that govern an interface's performance in these newly identified areas, but instead returns to its vague "indicia of compliance" formulation.  "Indicia that a developer interface's performance is commercially reasonable" with respect to the specified metrics include whether its performance conforms to a consensus standard, "[h]ow the interface's performance compares to the performance levels achieved by the developer interfaces of similarly situated data providers," and "[h]ow the interface's performance compares to the performance levels achieved by the data provider's consumer interface."  *Id.* at 572 (to be codified at 12 C.F.R. 1033.311(c)(2)(i)(A)-(C)).[13]  This approach—mentioning various metrics by which an interface's performance

---

[13] The comparison to the data provider's consumer interface appeared for the first time in the Final Rule; no such metric was even suggested in the Proposed Rule.

will be assessed, and then listing only vague "indicia" of compliance with those metrics—leaves data providers essentially to guess how the Bureau might determine whether their interfaces are performing in a "commercially reasonable" manner.

97.    *Fifth*, the Bureau persisted in setting an arbitrary and irrational compliance schedule based on dates certain, rather than the issuance of "consensus standards" by standard-setting organizations.  On the date the Bureau unveiled the Final Rule, it had not yet recognized a single qualified standard-setting organization.  It did not state when any such recognition would occur, let alone when any such organization would actually issue *any* of the numerous consensus standards that the Bureau made critical to compliance with the Rule.  As a result, the compliance clock is ticking now, despite data providers having no knowledge of what "consensus standards" they might need to comply with.  And even though the CFPB warns that adhering to these consensus standards will not guarantee compliance, the standards will necessarily be a critical source of guidance regarding data providers' otherwise vague obligations.  Moreover, without offering any substantive explanation for rejecting commenters' specific concerns with compliance deadlines shorter than 24 months—let alone one that accounted for the current and indefinite lack of "consensus standards"—the Bureau set an 18-month compliance period for the largest data providers.

98.    *Finally*, notwithstanding the enormous burdens and costs described above, the Rule continues to prohibit banks from charging *any* fees to authorized third parties and data aggregators to compensate for the costs of establishing and providing access through the APIs mandated by the Rule.  Final Rule at 570 (to be codified at 12 C.F.R. 1033.301(c)).

## CLAIMS FOR RELIEF

### COUNT I
### Administrative Procedure Act
### (In Excess of Statutory Authority – Unlawful Interpretation of "Consumer")
### 5 U.S.C. § 706

99.    Plaintiffs repeat and incorporate by reference all the allegations set forth above.

100.    Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

101.    The Rule is final agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" because the Bureau does not have authority to compel provision of covered data to "authorized third parties" who are not the consumer, or at least in an agency or fiduciary-type relationship with the consumer.  *Id.*

102.    Section 1033 requires a bank to provide the *consumer*, "upon request," with information about financial products or services the *consumer* is obtaining from the bank. *See* 12 U.S.C. § 5533(a).  The purpose of this provision is to keep consumers informed about their own financial products and services.  That is confirmed by the structure of the Dodd-Frank Act, as Section 1033 is sandwiched between a provision requiring periodic affirmative disclosures "*to consumers*" about the risks and benefits of their financial products, *id.* § 5532(a) (emphasis added), and a provision concerning banks' "response *to consumers*" regarding "complaints" or "inquiries," *id.* § 5534(a) (emphasis added), neither of which plausibly contemplates obligations to potentially thousands of third-party fintech

companies or data aggregators. And it is also confirmed by the legislative history of Section 1033 itself, which unambiguously states that the provision "ensures that consumers are provided with access to their own financial information." S. Rep. No. 111-176, at 173 (2010).

103.    The general definitional provision cited by the Bureau does not alter this plain textual meaning. At the beginning of the Consumer Financial Protection Act of 2010 (Title X of Dodd-Frank), the Act defines "consumer" as "an individual or an agent, trustee, or representative acting on behalf of an individual." 12 U.S.C. § 5481(4). But that definition does not authorize the Bureau to mandate that banks share consumer data with any "authorized third party." Companies that establish arm's-length commercial relationships with consumers are neither agents, nor trustees, nor representatives of those consumers within the meaning of this definition. Those words, which are themselves undefined, are legal terms of art that are presumed to take their established, common-law meaning. *Evans* v. *United States*, 504 U.S. 255, 259 (1992).

104.    At common law, agents and trustees have a fiduciary relationship that requires an unusual level of trust and confidence and that imposes a duty of loyalty to act for the principal's benefit. *See, e.g.*, Restatement (Third) of Agency § 1.01 (Am. Law Inst. 2006); Restatement (Third) of Trusts § 2 (Am. Law Inst. 2003). Fintech companies and data aggregators do not qualify as agents or trustees. That leaves only the term "representative," which must be understood "by the company it keeps." *See McDonnell* v. *United States*, 579 U.S. 550, 569 (2016) (internal quotation omitted).

47

105.    Although the term "representative" may have a broader meaning in some contexts, here that term must be interpreted as similar in nature to an "agent" or "trustee"—*i.e.*, to mean a third party that has a special, fiduciary-like relationship with or duty of loyalty to the consumer.  *See, e.g.*, *Dubin* v. *United States*, 599 U.S. 110, 124-127 (2023).  Accordingly, in this statute, a "representative" means "someone who represents another as agent, deputy, substitute, or delegate" and is typically "invested with the authority of the principal."  *Representative*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/representative (accessed Oct. 21, 2024). Fintech companies and data aggregators seeking to profit off of consumers' financial data in exchange for providing a discrete product or service do not have any of those characteristics, and cannot be considered a customer's financial "representative" simply because the customer authorized limited access in order to obtain the product or service.

106.    For these reasons, the Bureau's promulgation of the Rule was in excess of statutory jurisdiction, authority, or limitations.  Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Rule should be held unlawful and set aside.

### COUNT II
### Administrative Procedure Act
### (Arbitrary and Capricious – Failure to Engage in Reasoned Decisionmaking by Placing Consumer Data At Risk)
### 5 U.S.C. § 706

107.    Plaintiffs repeat and incorporate by reference all the allegations set forth above.

108.    Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

109.    The Rule is final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" because the Bureau adopted a fundamentally irrational regulatory framework that increases the risk of misuse or compromise of consumer data while reducing protections that banks could afford to that data.

110.    Requiring banks to share their customers' financial data with third-party commercial actors, with limited and ill-defined ability to deny access, necessarily increases the risk of compromise of that data.  That is particularly true given that these third parties have no fiduciary relationship or duty of loyalty to consumers, nor are they comprehensively regulated for security as banks are.  Yet the Bureau's framework is set up to maximize that risk while reducing protections against it.  Viewed as a whole, that framework amounts to arbitrary and capricious rulemaking.  *See Alliance for Hippocratic Med.* v. *U.S. Food & Drug Admin.*, 78 F.4th 210, 246 (5th Cir. 2023), *rev'd on other grounds*, 602 U.S. 367 (2024).

111.    First, the Bureau unjustifiably required banks not only to share information about the customer's account, but information sufficient to initiate a payment from a consumer's account.

112.    Second, despite commenters' pleas, the Bureau chose not to mandate that third parties use the developer interfaces when available rather than use screen scraping,

notwithstanding its acknowledgement (and the near-universal agreement) that the latter practice poses unacceptable risks to consumers. Although the CFPB asserted that "[a] core objective of the final rule is to transition the market away from using screen scraping to access covered data," the Bureau took actions in the Rule that undermine that supposed objective. Final Rule at 213. In particular, the Bureau puzzlingly suggested that a data provider may under certain circumstances "violate the CFPA's prohibition on acts or practices that are unfair, deceptive, or abusive" if it blocks screen scraping, and the Rule's exemption for data providers with under $850 million in assets will effectively ensure that screen scraping will persist for those data providers. *Id.* at 214-215.

113. Third, the Bureau declined to assume responsibility for assessing and verifying these third-party actors' security practices and compliance before they are permitted to access consumers' data. Instead, the Bureau deputized banks to fulfill those functions. The Rule vaguely requires banks to "[d]ocument" that the third parties have complied with the Rule. *Id.* at 576 (to be codified at 12 C.F.R. 1033.331(b)(1)(iii)). And while it purports to expressly authorize banks to determine that third-party security practices are inadequate, that authority is sufficient to justify a denial of access only if the third party "does not present *any* evidence that its information security practices are adequate to safeguard the covered data." *Id.* at 575 (to be codified at 12 C.F.R. 1033.321(d)(1) (emphasis added)).

114. Fourth, inserting itself into an essential banking function, the Bureau placed limits on banks' ability to manage the risks of their business by denying any particular third party's access to its developer interface. In particular, the Rule prescribes an overly

demanding standard for when a risk-management-based denial is permissible, relies on standard setters to give content to this paradigmatically regulatory issue related to safety and soundness, and imposes an ill-explained "consisten[cy]" requirement for access denials that will hamstring banks that may have to make thousands of risk-management decisions daily in connection with these APIs. Notably, the Bureau's demanding standard and consistency requirement apply *even if* the bank denies access pursuant to policies and procedures that further the safety and soundness standards of its prudential regulators.

115.    These features create a framework that unacceptably puts consumers' sensitive financial data at risk and hobbles banks in their ability to protect that data. Yet the Bureau nonetheless declined to address the serious liability concerns that its regime creates. Specifically, the Bureau failed to set rules for which parties will bear liability (and under what circumstances) when a consumer's financial data is compromised under the broad sharing regime it mandated.

116.    The Bureau's approach of forcing banks to share their customers' most sensitive data and then potentially leaving banks holding the bag when that data is misused or compromised is arbitrary and capricious and fundamentally unfair.

117.    For these reasons, the Bureau's promulgation of the Rule was arbitrary and capricious. Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Rule should be held unlawful and set aside.

## COUNT III
### Administrative Procedure Act
### (Arbitrary and Capricious – Failure to Engage in Reasoned Decisionmaking with Respect to Access Denials Based on Risk Management)
5 U.S.C. § 706

118.    Plaintiffs repeat and incorporate by reference all the allegations set forth above.

119.    The APA requires a reviewing court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

120.    In addition to the fundamentally irrational nature of the Rule's data-security framework that would put consumers and their data at risk, the Rule's provisions governing risk-management-based denials of interface access are themselves "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.*  The Rule's limitations on data providers' ability to make risk-management-based denials of access irrationally restrict their ability to protect their and their customers' data, including pursuant to the safety-and-soundness requirements of their prudential regulators.

121.    As explained above, the Rule provides that a data provider's decision to deny access to its developer interface on risk management grounds will be reasonable—and thus compliant with the Rule—only in narrow circumstances, where a denial is "[d]irectly related to a specific risk of which the data provider is aware" and "[a]pplied in a consistent and non-discriminatory manner."  Final Rule at 574-75 (to be codified at 12 C.F.R. 1033.321(b)). Notably, while the Rule acknowledges that banks may need to deny interface access to comply with the safety-and-soundness standards of a prudential regulator, the Rule

expressly says that is not enough to make such denial reasonable.  Instead, any such denial based on safety and soundness principles must *also* meet the requirements that denials be "[d]irectly related to a specific risk of which the data provider is aware" and "[a]pplied in a consistent and non-discriminatory manner."  *Id.*  In other words, the Bureau warns banks that complying with safety-and-soundness standards of their prudential regulators is *not* enough to demonstrate compliance with the Rule, if the Bureau determines in its own wide and vague discretion that the denial was not "reasonable."

122.    The Bureau expressly acknowledged this remarkable overreach, explaining that a bank may deny access "to comply with safety and soundness standards of a prudential regulator . . . *and* if the denial complies with [the specific-threat and consistency requirements of] § 1033.321(b)."  Final Rule at 84.  But the Bureau said nothing about the impossible calculus its Rule would force upon banks, whereby a denial may be required by safety-and-soundness regulations and simultaneously forbidden by the Rule.  Ensuring that regulated parties have a means to comply with *all* regulations to which they are subject is "an important aspect of" any regulatory undertaking, and failing to address such a critical issue is paradigmatically arbitrary and capricious.  *Ohio* v. *EPA*, 603 U.S. 279, 293 (2024) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (*State Farm*)).

123.    For these reasons, the Bureau's promulgation of the Rule was arbitrary and capricious with respect to the significant and irrational limits it placed on data providers' risk-management authority.  Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Rule should be held unlawful and set aside.

## COUNT IV
## Administrative Procedure Act
### (Arbitrary and Capricious – Failure to Engage in Reasoned Decisionmaking with Respect to Allocating Liability)
5 U.S.C. § 706

124.     Plaintiffs repeat and incorporate by reference all the allegations set forth above.

125.     The APA requires a reviewing court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

126.     In addition to the fundamentally irrational nature of the Rule's data-security framework, the Bureau's refusal to prescribe a scheme to allocate liability for data misuse under its new framework is itself "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* Indeed, the Bureau even went so far as to warn data providers not to enter into *private agreements* with third parties as to how any such liability would be allocated. *See* Final Rule at 233. The Bureau's reliance on other liability regimes developed for contexts that entail sharing less information, and more discretion afforded to financial institutions regarding whom to share that information with, is unreasonable and unreasonably explained.

127.     As the Bureau acknowledged, multiple commenters urged the Bureau to articulate specific principles of liability. *Id.* at 34-36. The commenters reasoned that the Rule "would increase the volume of sensitive financial data accessed by third parties, particularly sensitive information to initiate a payment," which would in turn "increas[e] the risk of unauthorized transactions or other harms arising from the compromise of a data

provider's or third party's information systems, such as the risk of inaccurate data transmission." *Id.* at 34-35. Moreover, the Bureau is *forcing* data providers to share consumer information broadly, including information to allow funds to be transferred out of consumers' accounts, while simultaneously allowing data providers limited ability to deny access to their interfaces even for risk-management concerns; data providers therefore must share consumer information with third parties in circumstances in which they otherwise would not. Furthermore, data providers have no control over which third parties consumers authorize to receive access to consumer information, and indeed, consumers themselves do not even have complete control because third parties have substantial discretion in selecting a data aggregator to work with if they so choose. *See id.* at 590-91 (to be codified at 12 C.F.R. 1033.341). Under these circumstances, it is inequitable to impose primary responsibility for data misuse on data providers, who face "exposure to liability-related costs" in connection with losses caused by third parties on a scale that existing liability-allocation regimes do not contemplate. *Id.* at 35 (summarizing comments from data providers). Instead, commenters "suggested the CFPB address liability by mandating a comprehensive approach to assigning liability or safe harbors for data providers, clarifying the role of bilateral data access agreements to allocate liability, or tak[ing] other steps to reduce harms that might create liability risk." *Id.* at 35-36.

128.    The CFPB did none of these things, instead leaving intact existing and unsuitable frameworks. Liability for electronic funds transfers is governed by Regulation E. Under Regulation E, when a consumer alleges an error such as an unauthorized or incorrect electronic funds transfer, the financial institution is generally

required to promptly investigate the allegation and reimburse the consumer if it determines an error occurred. 12 C.F.R. 1005.6, 1005.11. The financial institution generally must investigate and reimburse the consumer even if a third party either made the error or caused the error through carelessness with the consumer's information. Final Rule at 39-40.

129. As commenters explained, the Regulation E structure is inappropriate for data sharing pursuant to the Rule. The Rule *compels* data providers to share a far larger volume of data—including payment-initiation information—with many more third parties who are not subject to the same oversight and data-security requirements as banks, and over whom banks exercise no control (and the Bureau itself has generally declined to assume direct supervisory authority over such entities). And the Rule substantially limits banks' ability to decline to share that information, even for risk-management reasons. Under such circumstances, the risks of consumer losses are substantially increased, and it makes no sense to force banks to bear those costs by default as they do in other contexts.

130. The Bureau inadequately responded to comments raising these concerns. Attacking a straw man, it explained that commenters' concerns about costs under Regulation E "are not specific to . . . section 1033." Final Rule at 39. That response entirely misses the crucial point that, regardless of whether these concerns exist in other contexts, the Rule *exacerbates* them—with its mandatory, freewheeling data-sharing regime—to an extent that renders the application of ordinary Regulation E rules particularly inappropriate here. Moreover, even accepting at face value the Bureau's dubious assertion that various guardrails in the Rule will protect consumers' data security, *id.* at 40, there is

56

no avoiding the reality that the sheer increase in information being transmitted will necessarily increase data compromise and risk of error overall.

131.    The Bureau failed to adequately consider and address these concerns, provide for liability rules appropriately tailored to the context of Section 1033, or allow data providers any mechanism by which to guarantee protection from liability for others' data misuse, such as permitting data providers to require third parties—as a condition of interface access—to accept liability for data misuse for which they are responsible.

132.    For these reasons, the Bureau's promulgation of the Rule was arbitrary and capricious with respect to the absence of allocation of liability for data misuse.  Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Rule should be held unlawful and set aside.

## COUNT V
### Administrative Procedure Act
### (In Excess of Statutory Authority – Compulsory Provision of Payment-Initiation Information)
### 5 U.S.C. § 706

133.    Plaintiffs repeat and incorporate by reference all the allegations set forth above.

134.    Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

135.    The Rule is final agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.*, because the Bureau does not have authority

to compel banks to provide to third parties "[i]nformation to initiate payment to or from a Regulation E account," Final Rule at 567 (to be codified at 12 C.F.R. 1033.211(c)).

136.   Section 1033 requires banks to provide information about a customer's account:   "information relating to any transactions, series of transactions, or to the account[s] including costs, charges[,] and usage data." 12 U.S.C. § 5533(a). Consistent with Section 1033's focus on providing "information" to customers, each of the specific listed terms—transactions, costs, charges, and usage data—constitutes a piece of descriptive data about an account's activity, features, or characteristics.

137.   But the Rule goes beyond the statute by requiring disclosure of a fundamentally different piece of information:  information "to initiate payment."  Final Rule at 567 (to be codified at 12 C.F.R. 1033.211(c)).  That goes beyond the scope of Section 1033. Section 1033 authorizes the sharing of information *about* a financial product or service.  Yet the Bureau has impermissibly crafted this category of covered data to enable a specific *functionality*:  payment initiation by third parties.  Those are two different things.  As even the Bureau itself has previously recognized, "[a]uthorized data access . . . is not payment authorization."  *See* CFPB, *Consumer Protection Principles: Consumer-Authorized Financial Data Sharing and Aggregation*, 4 (Oct. 18, 2017), https://files.consumerfinance.gov/f/documents/ cfpb_consumer-protection-principles_data-aggregation.pdf.

138.   Section 1033 does not authorize the Bureau to require banks to facilitate any particular functionality for third parties, let alone functionality that would allow third parties to directly move customers' money out of their accounts.

139.    For these reasons, the Bureau's promulgation of the Rule was in excess of statutory jurisdiction, authority, or limitations.  Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Rule should be held unlawful and set aside.

### COUNT VI
### Administrative Procedure Act
### (In Excess of Statutory Authority – Unlawful Delegation of
### Regulatory Authority to Private Standard Setters)
### 5 U.S.C. § 706

140.    Plaintiffs repeat and incorporate by reference all the allegations set forth above.

141.    Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

142.    The Rule is final agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" because nothing in the statute purports to authorize delegation to a private actor of the Bureau's regulatory authority—authority over matters such as appropriate access denials based on risk management, appropriate frequency caps on third parties' access to developer interfaces, and what constitutes a commercially reasonable amount of interface downtime to schedule.  *Id.*

143.    The Bureau has relied on a number of statutory provisions that empower *the Bureau* to prescribe rules.  Standard Setter Rule at 49,086 (citing 12 U.S.C. § 5533(a) (information shall be made available to consumers "[s]ubject to rules *prescribed by the Bureau*") (emphasis added); *id.* § 5533(d) (similar); *id.* § 5512(b)(1) ("*The Director* may prescribe rules and issue orders and guidance, as may be necessary or appropriate to enable

59

*the Bureau* to administer and carry out [its duties].") (emphases added)).  But none of those provisions even hints at the possibility of the Bureau outsourcing those rulemaking directives to private organizations.  The Bureau explained that it believed private standard setters could better modify granular technical requirements for standardized data formats as technology evolves, *see* Standard-Setter Rule at 49,084, but that is no justification for delegating responsibility for establishing standards of *substantive* compliance—such as what kinds of risk-management denials are "reasonable"—to private organizations.[14]

144.    Nor does the statute authorize such delegation to standard-setting organizations.  Reliance on private parties to prescribe standards of substantive law raises serious constitutional concerns regarding the impermissible congressional delegation of legislative power, and therefore is permissible only with "express congressional authorization."  *Consumers' Research* v. *FCC*, 109 F.4th 743, 777 (5th Cir. 2024) (en banc).  As noted above, there is no such authorization in Section 1033.

145.    For these reasons, the Bureau's promulgation of the Rule was in excess of statutory jurisdiction, authority, or limitations.  Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Rule should be held unlawful and set aside.

---

[14] Plaintiffs do not challenge the Bureau's ability to delegate to standard setters the authority to issue standards regarding technical requirements such as data formatting, which is arguably permitted by the statute.  *See* 12 U.S.C. § 5533(d) ("The Bureau, by rule, shall prescribe standards applicable to covered persons *to promote the development and use* of standardized formats for information." (emphasis added)).

## COUNT VII
## Administrative Procedure Act
### (Arbitrary and Capricious – Vague Developer Interface Performance Standards)
5 U.S.C. § 706

146.    Plaintiffs repeat and incorporate by reference all the allegations set forth above.

147.    The APA requires a reviewing court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

148.    The Rule is final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" because the performance standards the Rule requires developer interfaces to meet are hopelessly vague and muddled.  *Id.*  As part of its obligation to provide "a rational connection between the facts found and the choice made," an agency must "articulate[] the standards that guide[] its analysis."  *Tripoli Rocketry Ass'n, Inc.* v. *Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 437 F.3d 75, 81 (D.C. Cir. 2006) (citation omitted).  An agency acts arbitrarily and capriciously by "'fail[ing] to properly specify' its rules such that [the agency] leaves 'no method by which' a regulated party can 'gauge [its] performance.'"  *Pacific Choice Seafood Co.* v. *Ross*, 976 F.3d 932, 945 (9th Cir. 2020) (quoting *Ariz. Cattle Growers' Ass'n* v. *U.S. Fish and Wildlife*, 273 F.3d 1229, 1250-51 (9th Cir. 2001)).  As described below, the Bureau's hopelessly vague interface-performance rules run afoul of this requirement.

149.    The Rule threatens enforcement action against a data provider whose "developer interface's performance" is not "commercially reasonable."  Final Rule at 571

(to be codified at 12 C.F.R. 1033.311(c)).  But the way the Rule defines what the Bureau will consider to be "commercially reasonable" is entirely unclear.  The Rule requires a developer's interface to respond "proper[ly]" to at least 99.5% of requests.  *Id.* (to be codified at 12 C.F.R. 1033.311(c)(1)).  A proper response is one that fulfills the data request (or explains why it was not fulfilled) and is rendered "within a commercially reasonable response time."  *Id.* at 572 (to be codified at 12 C.F.R. 1033.311(c)(1)(iv)(A), (C)).  But exceeding the 99.5% threshold is not sufficient to demonstrate commercially reasonable performance.  The Rule states that the Bureau will also assess five aspects of an interface's performance (without saying whether its list is exhaustive or how these aspects should be weighed):  the proper-response rate of the interface, the interface's total amount of scheduled downtime, the amount of notice given regarding scheduled downtime, the amount of *un*scheduled downtime, and the interface's response time to requests.  *Id.* at 572-73 (to be codified at 12 C.F.R. 1033.311(c)(2)(ii)(A)-(E)).  These separate aspects of an interface's performance, in turn, are measured according to three "indicia" of commercially reasonable performance—adherence to a consensus standard, a comparison between the data provider's developer interface's performance and the performance of developer interfaces belonging to similarly situated data providers, and a comparison between the data provider's developer interface's performance and the performance of the data provider's consumer interface.  *Id.* at 572 (to be codified at 12 C.F.R. 1033.311(c)(2)(i)(A)-(C)).

150.    This amorphous and overlapping framework is impermissibly vague in at least three independent ways.

151.    *First*, the five performance metrics the Bureau references are unclear in several ways.  For starters, it is not clear if this list is exhaustive—or, if not, what other metrics could be relevant.  *See* Final Rule at 572 (to be codified at 12 C.F.R. 1033.311(c)(2)(ii)) ("[R]elevant performance specifications include . . .").  Nor is it clear how the five elements interact with each other, whether any is necessary or sufficient, whether each is of equal weight, etc.  Moreover, one element on this list of five is the interface's proper-response rate. *Id.* (to be codified at 12 C.F.R. 1033.311(c)(2)(ii)(A)).  But the Bureau separately prescribed that any interface whose proper-response rate falls short of 99.5% is performing *per se* commercially unreasonably, *id.* at 571 (to be codified at 12 C.F.R. 1033.311(c)(1)), suggesting the Bureau may *further* evaluate interfaces based on where their proper-response rate falls between 99.5% and 100%.  Similarly, another of the five metrics for evaluation is "[t]he interface's response time." *Id.* at 573 (to be codified at 12 C.F.R. 1033.311(c)(2)(ii)(E)).  But this concept, too, is already incorporated in the 99.5% minimum threshold because for a response to be "proper," it must be "provided in a commercially reasonable amount of time."  *Id.* at 572 (to be codified at 12 C.F.R. 1033.311(c)(1)(iv)(C)).

152.    *Second*, the "indicia" the Bureau will use to evaluate these five performance specifications are themselves vague and nonsensical.  Two of the three indicia require a comparison between the data provider's developer interface and other interfaces—either those of other data providers or the particular data provider's own consumer interface. *Id.* (to be codified at 12 C.F.R. 1033.311(c)(2)(i)(B)-(C)).  But the Rule provides no indication of how these comparisons will be measured or used in the Bureau's determination of whether

the data provider's interface is performing in a "commercially reasonable" manner.   In addition, the comparison between the performance of a data provider's developer interface and its consumer interface is especially inapt as between a consumer platform that serves a bank's customers directly (and generally provides numerous other functions and features as part of the customer experience) and a developer interface that responds to automated requests from countless third parties.   But the Bureau has offered no hints as to how this "compar[ison]" will be conducted.   *Cf. Tripoli Rocketry Ass'n*, 437 F.3d at 82 (faulting "unbounded comparative analysis").

153.   *Third*, the Bureau offers no guidance whatsoever on how the three "indicia" of compliance fit together when evaluating an interface's performance.   It refuses to say that a data provider would be in compliance if it satisfies one, two, or even all three of these indicia.   Nor does it specify the consequences of failing to satisfy one or more indicia. Indeed, nowhere in the Rule does the Bureau ever clearly explain what its foundational "indicia of compliance" standard actually means.

154.   The Bureau's hopelessly muddled performance standards make it impossible for data providers to determine their obligations under the Rule.   Instead, they are left to effectively guess at what metrics the Bureau might consider and use in a potential enforcement action for supposedly inadequate performance.   For these reasons, the Bureau's promulgation of the Rule was arbitrary and capricious with respect to the interface performance standards.   Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Rule should be held unlawful and set aside.

## COUNT VIII
## Administrative Procedure Act
### (Arbitrary and Capricious – Failure to Engage in Reasoned Decisionmaking with Respect to Compliance Deadlines)
5 U.S.C. § 706

155.    Plaintiffs repeat and incorporate by reference all the allegations set forth above.

156.    The APA requires a reviewing court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

157.    The Rule is final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" with respect to its compliance timelines because under the APA, an agency must explain deadlines it selects, including for compliance.  *See Wynnewood Refin. Co.* v. *EPA*, 77 F.4th 767, 782-83 (D.C. Cir. 2023); *Piedra-Alvarez* v. *Barr*, 829 Fed. App'x 833, 834 (9th Cir. 2020).

158.    Here, the Bureau set a compliance timeline that is fundamentally irrational because it is not tied to the promulgation of the consensus standards that the Bureau has made fundamental to compliance with the Rule.  Whatever force the Bureau ultimately gives to these vague "indicia of compliance," many industry members will feel compelled to seek to align with those standards to achieve as much certainty as possible under the Bureau's unclear regime.  But banks cannot build toward compliance with standards that do not exist.  And until such standards are promulgated, any steps data providers take toward compliance come with the substantial risk of being wasted in the event that they must unwind and redo that work to adapt to standards.  Left to wait some indeterminate

amount of time before they can take meaningful steps toward compliance, data providers are nonetheless staring down the certain deadlines the CFPB has prescribed.

159. At a minimum, the Bureau should have allowed large data providers the 24-month compliance period they requested. Commenters explained in detail why coming into compliance with the Rule would be a time-consuming endeavor, requiring development of new technical capabilities, enhancement of certain public-facing products and websites, and devising appropriate policies and procedures on a range of subjects. *See, e.g.*, JPMC Cmt. Ltr., *supra* ¶ 11, at 30-31. All of those changes take even longer when they must be developed and rolled out while ensuring that existing developer interfaces remain fully operable. *Id.* The Bureau failed to engage with these explanations, instead inaccurately and cursorily asserting that commenters "did not specify why 24 months would be necessary." Final Rule at 86.

160. For these reasons, the Bureau's promulgation of the Rule was arbitrary and capricious with respect to the prescribed compliance periods. Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Rule should be held unlawful and set aside.

**COUNT IX**
**Administrative Procedure Act**
**(In Excess of Statutory Authority – Access-Fee Ban)**
5 U.S.C. § 706

161. Plaintiffs repeat and incorporate by reference all the allegations set forth above.

162.    Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

163.    The Rule is final agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" because the Bureau does not have authority to prohibit banks from charging reasonable fees to third parties or data aggregators to access banks' APIs.  *Id.*   Nothing in the text or structure of Section 1033 prohibits banks from charging reasonable access fees, even to cover their costs.  When Congress intends to mandate provision of a product or service at no cost, it knows how to achieve that result. *See, e.g.*, 15 U.S.C. § 1681c-1(a)(2)(B) (Fair Credit Reporting Act requirement that consumer reporting agencies must provide to consumers all required disclosures "without charge to the consumer").  Notably, it even did so elsewhere in Dodd-Frank.  *See* 15 U.S.C. § 1691(e)(4) (Creditors shall provide copies of written appraisals or valuations "at no additional cost to the applicant."); 15 U.S.C. § 1639h(c) (requiring creditors to provide a copy of certain appraisals "without charge").

164.    Nor does Section 1033 implicitly delegate to the Bureau the authority to ban banks from charging reasonable access fees, thus providing a windfall to fintechs and data aggregators.   Although Section 1033 broadly contemplates "rules prescribed by the Bureau," 12 U.S.C. § 5533(a), interpreting such vague language to authorize federal agencies to determine when businesses are allowed to charge for providing services in a competitive area would raise serious concerns under the U.S. Constitution about the impermissible delegation of legislative power.

165.    For these reasons, the Bureau's promulgation of the Rule was in excess of statutory jurisdiction, authority, or limitations.  Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Rule should be held unlawful and set aside.

**COUNT X**
**Administrative Procedure Act**
**(Arbitrary and Capricious – Failure to Engage in Reasoned Decisionmaking with Respect to Access-Fee Ban)**
5 U.S.C. § 706

166.    Plaintiffs repeat and incorporate by reference all the allegations set forth above.

167.    The APA requires a reviewing court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

168.    Even if the Bureau had statutory authority to prohibit data providers from charging third parties reasonable fees for access to their developer interface, its decision to impose that access-fee ban in the Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" because it is both unreasonable and unreasonably explained.  *Id.*

169.    The Bureau rejected a proposal to allow "reasonable fees" because it concluded there is no "concrete indication of a workable and administrable standard" for what is "reasonable."  Final Rule at 184.  That approach stands in stark contrast to the Bureau's approach in other parts of the Rule, where the Bureau prescribed vague performance standards and reserved to itself maximum discretion to enforce those standards on a case-by-case basis.  *See, e.g.*, Final Rule at 571 (to be codified at 12 C.F.R.

68

1033.311(c)) ("A developer's interface performance must be commercially reasonable."); *id.* at 573 (to be codified at 12 C.F.R. 1033.311(d)) ("[A] data provider must not unreasonably restrict the frequency with which it receives or responds to requests."). Moreover, commenters suggested several ways to determine reasonable fees, such as by limiting fees to recouping a data provider's costs, *see* ABA Cmt. Ltr., *supra* ¶ 82, at 11; or costs plus "a margin for establishing, maintaining, receiving requests on, and transmitting covered data on developer interfaces," BPI & TCH Cmt. Ltr., *supra* ¶ 6, at 11; or a fee agreed upon following negotiations with the authorized third parties, who may themselves be profiting from the consumers' data, Indep. Commty. Bankers of Am., Comment Letter on Rule, Docket No. CFPB-2023-0052, at 7 (Dec. 29, 2023), https://www.regulations.gov/comment/CFPB-2023-0052-0883. It is therefore hard to see the Bureau's purported concern for precision as anything more than a pretext for reaching a predetermined outcome to force banks to fully bear the costs of the new regime. *See, e.g.*, *Nat. Res. Def. Council* v. *Nuc. Regul. Comm'n*, 879 F.3d 1202, 1214 (D.C. Cir. 2018) ("[I]t would be arbitrary and capricious for the agency's decision making to be internally inconsistent.") (citation and quotation marks omitted); *see also U.S. Sugar Corp.* v. *EPA*, 830 F.3d 579, 650 (D.C. Cir. 2016) (stating "[t]his court has 'often declined to affirm an agency decision if there are unexplained inconsistencies in the final rule,'" and collecting cases) (citation omitted).

170.    The Bureau also failed to justify the access-fee prohibition in light of the significant collateral consequences and distortionary effects it would cause. As commenters explained, the access-fee ban would eliminate any incentive for third parties to limit their unnecessary and inefficient access requests, and would effectively force data providers to

pass along their costs to customers in other ways. The Bureau meekly offered that "reasonable" caps on third-party access would satisfy the first concern, and it entirely ignored the second. Final Rule at 181, 573 (to be codified at 12 C.F.R. 1033.311(d)). Relying on access caps to correct for the effects of the first set of inefficiencies is hardly the answer, however. *Any* redundant access request results in inefficiencies, whether or not the request is in excess of a frequency limit. And the Bureau gives little guidance as to what sort of access caps will be tolerated; it instead outsources the matter to a standard-setting organization. *See id.* at 573 (to be codified at 12 C.F.R. 1033.311(d)). In other words, the Bureau is requiring banks to provide a free service and claiming that the free service will not be abused because banks can—at risk of substantial enforcement penalties—stop providing the service when demands cross some unknown threshold of excessiveness.

171.    Despite downplaying the consequences of the access-fee ban by suggesting access caps are an appropriate substitute, the Bureau was plainly aware of the major consequences of its fee prohibition. The Bureau understood the Rule imposes significant costs—indeed, ruinous costs for some banks—and that the fee prohibition would mean those costs could not be recouped. *See* Final Rule at 75 (A "credit union trade association" noted "that those [institutions] below [$850 million in assets] might discontinue services if they had to comply with the rule" due to "concerns about the costs of providing data access . . . under the terms of the rule."). It therefore exempted from the Rule altogether data providers with assets under $850 million. *Id.* at 179-80. This step could obviously have been avoided by simply allowing data providers to recoup their costs of compliance via reasonable

access fees.  The Bureau did not and cannot explain why it instead chose to leave customers of small data providers without vindication of their putative rights under Section 1033.

172.    For these reasons, the Bureau's promulgation of the Rule was arbitrary and capricious with respect to the access-fee ban.  Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Rule should be held unlawful and set aside.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants as follows:

(i)    A declaratory judgment that the Rule is in excess of the Bureau's statutory authority within the meaning of the Administrative Procedure Act, *see* 5 U.S.C. § 706(2)(C);

(ii)    A declaratory judgment that the Rule is arbitrary, capricious, or otherwise contrary to law within the meaning of the Administrative Procedure Act, *see* 5 U.S.C. § 706(2)(A);

(iii)    An order setting aside the Rule pursuant to the Administrative Procedure Act, *see* 5 U.S.C. § 706(2);

(iv)    An order permanently enjoining Defendants from enforcing the Rule against Plaintiffs and their members;

(v)    An order issuing all process necessary and appropriate to delay the effective date and implementation of the Rule pending the conclusion of this case;

(vi)    An order awarding Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action; and

(vii)    Any other relief as the Court deems just and equitable.

Dated:  November 18, 2024

|  |  /s/ Judson O. Littleton |
| Timothy A. Schenk (KY Bar #92011) | John T. McGarvey (KY Bar #46230) |
| KENTUCKY BANKERS ASSOCIATION | MORGAN POTTINGER MCGARVEY |
| 600 W Main Street #400 | 401 South Fourth Street, Suite 1200 |
| Louisville, KY  40202 | Louisville, KY  40202 |
| Tel:  (502) 582-2453 | (502) 560-6759 |
| tschenk@kybanks.com | jtm@mpmfirm.com |
|  |  |
| John Court* | Jeffrey B. Wall* |
| Paige E. Pidano* | Judson O. Littleton* |
| BANK POLICY INSTITUTE | SULLIVAN & CROMWELL LLP |
| 1300 I Street NW, Suite 1100 West | 1700 New York Avenue, N.W. |
| Washington, D.C.  20005 | Washington, D.C.  20006 |
| Tel:  (202) 289-4322 | Tel:  (202) 956-7000 |
| john.court@bpi.com | wallj@sullcrom.com |
| paige.paridon@bpi.com | littletonj@sullcrom.com |

*  Admitted *pro hac vice*

Robert A. Flatow*
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Tel:  (212) 558-4000
flatowr@sullcrom.com

*Counsel for Plaintiffs Forcht Bank, N.A., Kentucky Bankers Association, and Bank Policy Institute*

73