IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

FORCHT BANK, N.A., KENTUCKY
BANKERS ASSOCIATION, and BANK
POLICY INSTITUTE,

    *Plaintiffs*,

v.                                    Case No. 5:24-cv-00304-DCR

CONSUMER FINANCIAL PROTECTION
BUREAU and RUSSELL VOUGHT, in his
official capacity,

    *Defendants*.

## MOTION TO INTERVENE OF THE FINANCIAL TECHNOLOGY ASSOCIATION

Pursuant to Federal Rule of Civil Procedure 24, the Financial Technology Association ("FTA") respectfully moves to intervene as a Defendant in this case. As set forth below, FTA satisfies the standards for intervention as of right under Federal Rule of Civil Procedure 24(a) and, in the alternative, permissive intervention under Federal Rule of Civil Procedure 24(b)(1). FTA's members are impacted by the rule at issue in this case, and in light of the ongoing changes in the CFPB's leadership, it is not clear whether the CFPB will continue defending the rule. Counsel for FTA has reached out to counsel for Plaintiffs and Defendants regarding their position on this motion. Plaintiffs and Defendants have not stated their position on this motion.

## BACKGROUND

1. FTA champions the transformative role of financial technology for American consumers, businesses, and the economy. *See* Declaration of Penny Lee ¶ 2 ("Lee Decl."). As

part of that mission, FTA supports regulation that empowers consumers to access and share their financial data with the applications ("apps") and services they want to use, thus fostering innovation and competition in the financial services market. *Id.* FTA's members are innovators seeking to provide more seamless services, lower-cost products, and greater consumer choice in the financial services market. *Id.* These members leverage internet and mobile technologies to offer consumers access to credit, new payment (including pay by bank) options, and financial advisory services that can significantly reduce costs, accelerate access to funds, and improve transparency and convenience. *Id.*

The provision of these essential services, along with continued digitally native financial technology ("fintech") innovation, relies on consumers' ability to access, unlock, and share their financial data with new and often competitive financial service providers. The ability to control and share financial data empowers consumers with more efficient and convenient ways to manage their finances, and allows consumers to explore tailored, cost-effective financial products and providers. Additionally, data sharing fosters competition by enabling new entrants to enter the marketplace. This data sharing also aligns with frameworks in other jurisdictions across the globe, such as the UK, Australia, Brazil, and more, that have established a consumer data right and require financial institutions to allow consumers to securely share their data with third parties.

2. In 2010, Congress enacted the Consumer Financial Protection Act (the "Act"). Section 1033 of the Act requires banks to "make available to a consumer, upon request, information in the control or possession of the [bank] concerning the consumer financial product or service that the consumer obtained" from the bank. 12 U.S.C. § 5533(a). The Act further defines "consumer" as "an individual or an agent, trustee, or representative acting on behalf of an individual." *Id.* § 5481(4). In addition, the Act provides that the Consumer Financial Protection Bureau ("CFPB")

2

"by rule, shall prescribe standards applicable to covered persons to promote the development and use of standardized formats for information ... to be made available to consumers under this section." *Id.* § 5533(d).  The Act also authorizes the CFPB to ensure that "all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." *Id.* § 5511(a).  Finally, the CFPB is generally authorized to prescribe rules "as may be necessary or appropriate to enable [it] to administer and carry out the purposes and objectives of the Federal consumer financial laws, and to prevent evasions thereof." *Id.* § 5512(b)(1).

3.   Pursuant to these and other authorities, on October 31, 2023, the CFPB issued a proposed rule to enable consumers to more easily share their personal financial data, subject to certain safeguards.  *See* Required Rulemaking on Personal Financial Data Rights, 88 Fed. Reg. 74,796 (Oct. 31, 2023).  The CFPB began by explaining that "[d]igitization and decentralization in consumer finance create new possibilities for more seamless consumer switching and greater competitive intensity."  *Id.* at 74,796.  The CFPB therefore proposed regulations to specify the "scope of data that third parties can access on a consumer's behalf, the terms on which data are made available, and the mechanics of data access," all while "ensur[ing] that third parties act on consumers' behalf when collecting, using or retaining data."  *Id.* at 74,799.  As relevant here, the CFPB proposed to require banks to share consumer data with consumers and with third parties through a "developer interface," and proposed regulations to determine whether the performance of such developer interfaces was "commercially reasonable"; authorized standard setting organizations to develop measures of compliance with various provisions of the rules; prohibited banks from collecting access fees from third parties in exchange for providing these services; and proposed compliance deadlines.  *See generally id.* at 74,806-43.

3

FTA submitted a comment in response to the Bureau's proposed rule that "applaud[ed] the Bureau's Proposal" for its support of a robust personal financial data right. *See* Lee Decl., Ex. A ("FTA Comments"), at 1. FTA further stated it "support[ed] the Bureau's proposed incorporation of, and reliance on, a recognized standards setting organization (SSO) that will issue qualified industry standards," because "prescriptive technical requirements issued by the regulator will fail to keep pace with technological change and the development of related best practices." *Id.* at 10. Though FTA urged the CFPB to take additional steps to make data available to third parties and to clarify other aspects of the proposed rule, FTA broadly noted its "support [for] the thoughtful and consumer-centric final implementation of the rule." *Id.* at 1.

Similarly, certain FTA members also participated in the rulemaking and expressed support for the CFPB's aim to provide for greater choice and competition in the marketplace for financial services. Lee Decl. ¶ 7. For example:

- FTA member Plaid Inc. ("Plaid") commented that the CFPB's "rulemaking is critical to consumers fully realizing the consumer empowerment goal that underpins § 1033, and to achieving a fair, transparent, and competitive financial services marketplace." Lee Decl., Ex. B ("Plaid Comments"), at 2. Plaid further commented that the proposed rule's "emphasis on fair and free consumer and third party access to data providers' developer interfaces, effective and transparent authorization managed by third parties, and the role [SSOs] can play in implementing data access at a technical level will, if finalized, dramatically improve data portability, competition, and consumer outcomes." *Id*.

- FTA member Ribbit Capital commented that it "commend[s] the [CFPB] on its work to date and support[s] this effort to develop a pro-consumer open banking system in the United States." Lee Decl., Ex. C ("Ribbit Capital Comments"), at 1. Ribbit Capital further commented that it "agree[s] with the [CFPB] on the importance and value of consumer financial data and believe[s] it should be used to deliver value back to the consumer by improving financial access, choice and opportunity." *Id.* at 11.

- FTA member Stripe, Inc. ("Stripe") commented that the CFPB's "Section 1033 rule will be an important catalyst for competition by empowering consumers to choose products and services that best meet their financial needs," and "strongly support[ed] the CFPB's swift finalization of the rule." Lee Decl., Ex. D ("Stripe Comments") at 1, 2.

4

- FTA member Wise commented that "[a]s a supporter of consumer-centric financial services regulation, Wise warmly welcomes the [CFPB's] continuation of the Section 1033 rulemaking process," and "commend[ed] the [CFPB] on its efforts to consider the impact of consumer access to financial records."  Lee Decl., Ex. E ("Wise Comments"), at 1, 4.  Wise further commented that it "support[ed] the CFPB's proposal to recognize a [SSO] to issue industry standards."  *Id.* at 2.

4. On October 22, 2024, the CFPB finalized its rule largely in line with its proposal.[1]  *See* Final Rule for the Required Rulemaking on Personal Financial Data Rights, 89 Fed. Reg. 90838 (Nov. 18, 2024) ("Final Rule").  That same day, Plaintiffs filed their complaint challenging the Final Rule, which they subsequently amended on November 18, 2024.  The amended complaint alleges that the CFPB exceeded its statutory authority under § 1033 and acted arbitrarily and capriciously with respect to certain portions of the Final Rule, including by adopting an unlawful interpretation of the term "consumer" in Section 1033, unlawfully requiring disclosure of payment initiation information, unlawfully delegating authority to private SSOs, and unlawfully and unreasonably prohibiting banks from charging access fees.  *See* ECF No. 22 ("Am. Compl."), ¶¶ 99-172.  On December 27, 2024, the CFPB filed its answer to the amended complaint.  ECF No. 29.

On January 8, 2025, the CFPB issued an order recognizing Financial Data Exchange, Inc. ("FDX") as a standard setter under the Final Rule.  See Decision and Order, *In re Financial Data Exchange, Inc.*, No. 2024-CFPB-PFDR-0001 (CFPB Jan. 8, 2025), available at https://files.consumerfinance.gov/f/documents/cfpb_standard-setter-decision-and-order-of-recognition-fdx_2025-01.pdf.  The CFPB's order notes that FDX's member organizations include "depository and non-depository commercial entities."  *Id.* at 1.  FDX's website notes that its

---

[1] The CFPB finalized a portion of the proposed rule regarding standard setters on June 11, 2024.

5

members include numerous BPI members, such as Bank of America, JPMorgan Chase, and Wells Fargo.[2]

5. On January 28, 2025, the Court adopted a briefing schedule for cross-motions for summary judgment. ECF No. 34. Thereafter, a series of developments at CFPB have occurred that create uncertainty as to the CFPB's ability and/or intention to continue defending this case. On February 1, 2025, Director Rohit Chopra announced his departure from the CFPB. On February 7, 2025, Russell Vought was designated as acting Director of the CFPB. On February 8, 2025, Vought directed CFPB staff to stop working on proposed rules; suspend the effective dates of any finalized rules that are not effective; cease all investigative work, supervision, and examination activity; and refrain from making or approving filings or appearances in any litigation except to ask for a pause in proceedings.[3] On February 9, 2025, the CFPB's chief operating officer emailed staff to notify them that the CFPB's headquarters would be closed until February 14.[4] As of February 11, 2025, the CFPB's homepage returned an error message.[5]

## ARGUMENT

### I. FTA Has Associational Standing.

Because FTA seeks to preserve the final rule via a judgment in favor of Defendants, it does not have an independent obligation to demonstrate an Article III stake in this case. *See Little*

---

[2] Financial Data Exchange – Members, https://www.financialdataexchange.org/FDX/FDX/The-Consortium/Members.aspx
[3] *See, e.g.*, Landon Mion, *Russ Vought, Tapped as CFPB's Acting Director, Directs Bureau to Issue No New Rules, Stop New Investigations*, Fox News, https://foxnews.com/politics/russ-vought-tapped-cfpbs-acting-director-directs-bureau-issue-no-new-rules-stop-new-investigations (Feb. 9, 2025).
[4] *See* Brian Schwartz & Dylan Tokar, *CFPB to Close Office After Vought Tells Staff to Halt All Supervision*, Wall Street Journal, https://www.wsj.com/finance/regulation/vought-moves-to-defang-cfpb-telling-staff-to-halt-all-supervision-19f1ac9f (Feb. 9, 2025).
[5] *See* Consumer Financial Protection Bureau, consumerfinance.gov (last accessed Feb. 11, 2025).

*Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020); *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439-40 (2017). Nevertheless, even if FTA were required to establish associational standing, it could make that showing. To establish associational standing, FTA "must show that (1) its members would otherwise have standing to sue in their own right; (2) the interests that the suit seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1036 (6th Cir. 2022) (internal quotation marks omitted); *see generally Friends of the Earth, inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Each requirement is satisfied here. First, FTA is composed of members who would be directly and adversely affected by a judgment vacating the rule. These members, which are authorized third parties and data aggregators under the Rule, operate business models premised on consumers being able to access and securely share their financial data. Lee Decl. ¶ 4. For example:

- FTA member Plaid has explained that "as a data aggregator and third party," Plaid "allow[s] consumers to safely and securely share their own financial data from the institutions with which they bank (data providers) with their chosen digital finance apps and services (third parties)," thereby "accelerat[ing] greater choice and competition in the financial services marketplace" and "further[ing] the CFPB's aims of opening and decentralizing this market." Plaid Comments at 1.

- FTA member Ribbit Capital "is a global investment firm focused on the intersection of financial services and technology," and its "mission is to change the world of finance by providing capital and guidance to visionary financial services entrepreneurs around the world." Ribbit Capital Comments at 1. Ribbit Capital's portfolio "consists of more than 130 private and public company investments across six continents and a multitude of sectors within financial services, including payments, personal finance, investments and wealth, lending, insurance, cryptoassets, financial infrastructure, and financial software." *Id.* These investments include fintechs, which have "emerged to compete with traditional banks and to help eliminate consumer practices," and "are now positioned for the next wave of financial services development." *Id.*

- FTA member Stripe "is a technology company that builds economic infrastructure for businesses to transact on the Internet," and has "developed its Financial Connections product to streamline consumers' interactions with financial services by enabling consumers to elect seamless and secure bank payments online without being required to navigate burdensome (and unnecessary) manual verification processes." Stripe Comments at 1-2.  As Stripe further explained, "consumers' ability to share their financial data with third parties of their choice will accelerate the market's ability to further leverage bank payments" and "can be used to develop and provide a diverse range of financial tools to consumers." *Id.* at 2.

- FTA member Wise is a "global payments company" that "believe[s] consumers have a fundamental right to access and control their financial data," and that "when this data is shared securely at the direction of consumers, it can help them better manage their finances, while receiving improved and innovative products and services." Wise Comments at 1.

As these examples illustrate, FTA members have a clear interest in defending the Final Rule.

Second, the interests FTA seeks to protect are germane to its organizational purpose.  FTA is a trade association that represents the legal and economic interests of its member businesses.  Lee Decl. ¶ 4.  Its members have interests in ensuring "properly implemented, open banking in the United States."  FTA Comments at 19.  Hence, acting to defend the CFPB's rule here, which furthers those interests, is germane to FTA's mission.

Finally, individual member participation is unnecessary in this case because the "suit raises a pure question of law" and the claims and relief sought do not require the Court to consider the "individual circumstances" of each member.  *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 287 (1986); *Cf.* Am. Compl. ¶ 31 (agreeing that individual member participation is not needed in this suit).

## II. FTA Is Entitled to Intervene as a Matter of Right under Rule 24(a).

Under Federal Rule of Civil Procedure 24(a), the "court must permit anyone to intervene who: ... claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."

8

Fed. R. Civ. P. 24(a)(2). To satisfy this standard, a proposed intervenor must show that (1) the motion to intervene is timely; (2) the proposed intervenor has a substantial legal interest in the subject matter of the case; (3) the proposed intervenor's ability to protect that interest may be impaired absent intervention; and (4) the existing parties may not adequately represent the applicant's interest. *See, e.g.*, *Wineries of the Old Mission Peninsula Ass'n v. Twp. of Peninsula*, 41 F.4th 767, 771 (6th Cir. 2022). Each of these elements is "broadly construed in favor of potential intervenors." *Coal. to Defend Affirmative Action v. Granholm*, 501 F.3d 775, 779 (6th Cir. 2007) (quotation marks omitted); *see also Purnell v. City of Akron*, 925 F.2d 941, 950 (6th Cir. 1991).

FTA satisfies all four requirements. First, the motion is timely. In considering whether a motion to intervene is timely, the Court considers "all relevant circumstances," especially "(1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervenors knew or should have known of their interest in the case; (4) the prejudice to the original parties due to the proposed intervenors' failure to promptly intervene after they knew or reasonably should have known of their interest in the case; and (5) the existence of unusual circumstances militating against or in favor of intervention." *Stupak-Thrall v. Glickman*, 226 F.3d 467, 472-73 (6th Cir. 2000) (quotation marks omitted).

Under the "relevant circumstances" of this case, *id.*, FTA's motion is timely. As to the first factor, this litigation has not progressed past its initial stages. *Cf. In re Auto. Parts Antitrust Litig., End-Payor Actions*, 33 F.4th 894, 901 (6th Cir. 2022) (explaining that, in the context of the first timeliness factor, "[l]itigation is in its final stages when the district court has already ruled on dispositive motions, closed discovery, certified classes, or held fairness hearings that lead to

9

settlement approval" (citations omitted)). FTA moved to intervene less than three months after Plaintiffs amended their complaint and just over six weeks after Defendants filed their answer to the amended complaint; no discovery has taken place; and the parties only recently had their Rule 26 conference. *See, e.g.*, *Truesdell v. Meier*, No. 3:19-cv-66, 2020 WL 1991402, at *2 (E.D. Ky. Apr. 27, 2020) (timeliness factor satisfied when motion to intervene was filed "nearly 5 months after th[e] suit was filed" because "where little time has elapsed since the suit was filed, and little discovery has taken place, there is little prejudice to the existing parties on the basis of timeliness"); *cf. Stupak-Thrall*, 226 F.3d at 475 (motion untimely when "the court's previously identified 'finish line' ... was fast approaching"); *Suter v. Appalachian Reg. Healthcare, Inc.*, No. 14-cv-43, 2015 WL 12990211, at *1 (E.D. Ky. Mar. 6, 2015) (motion untimely when "trial ... will begin in less than four weeks"). Moreover, FTA filed its motion to intervene just days after the CFPB's acting Director ordered CFPB staff to cease many, if not all, of their functions, including ceasing all litigation activities beyond requesting a pause in litigation—thereby raising doubts as to the CFPB's ability and/or intention to continue litigating this case.

With respect to the second factor, as discussed below, FTA has a valid purpose to intervene—namely to protect the economic interests of itself and its members, which are narrower than, and may diverge from, the CFPB's broader public interest in defending the Final Rule. *See In re Automotive Parts*, 33 F.4th at 902 (noting this Circuit is "more inclined to grant intervention when the purpose of intervention is limited in scope" and does not create a "likelihood of delay").

With respect to the third factor, as noted above, FTA has moved to intervene early in this litigation, and very soon after the prior CFPB Director was fired and the acting Director reportedly ordered CFPB staff to refrain from taking any litigation activities beyond requesting a pause in litigation. *See Cameron v. EMW Women's Surgical Ctr.*, 595 U.S. 267, 279-80 (2022) (holding

that the "most important circumstance relating to timeliness" is that the prospective intervenor "sought to intervene as soon as it became clear that [its] interests would no longer be protected by the parties in the case" (internal quotation marks omitted)).

With respect to the fourth factor, the parties will suffer no prejudice because FTA intends to take no discovery and will adhere to the March 31, 2025 deadline the Court has adopted for Defendants' opposition to Plaintiffs' motion for summary judgment and cross-motion for summary judgment. *See* ECF No. 34; *see also, e.g.*, *Ctr. for Bio. Div. v. Rural Utils. Serv.*, No. 5:08-cv-292, 2008 WL 4186891, at *2 (E.D. Ky. Sept. 10, 2008) (finding no prejudice where the proposed intervenor "is prepared to promptly join these proceedings and be bound by any substantive or procedural order issued prior to an order granting intervention").

Finally, intervention is warranted here given the unusual circumstances in which the recent developments described above create considerable uncertainty as to whether the governmental defendant will continue to defend the Final Rule.

Second, FTA has "an interest relating to the property or transaction that is the subject of the action." Fed. R. Civ. P. 24(a)(2). This Circuit has adopted a "rather expansive notion of the interest sufficient to invoke intervention as of right." *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1245 (6th Cir. 1997). Courts have long recognized that trade associations comprised of members affected by a regulatory rule possess an interest sufficient to intervene in a case challenging that rule. *See, e.g.*, *First City Bank v. Nat'l Credit Union Admin. Bd.*, 111 F.3d 433, 436 (6th Cir. 1997); *see also, e.g.*, *Zillow, Inc. v. Miller*, 126 F.4th 445, 451 (6th Cir. 2025) (noting that judge in Eastern District of Kentucky allowed Kentucky Press Association to intervene post-judgment to appeal ruling striking down portion of state open records law that benefited its members); *Alaska Wilderness League v. Jewell*, 99 F. Supp. 3d 112, 122 (D.D.C. 2015)

11

(concluding that a trade association had a sufficient interest in intervening to defend a U.S. Fish and Wildlife Service regulation that benefited its member companies).

As a trade association, FTA has a substantial interest in intervening to defend a rule that benefits its members. As FTA's and various of its members' comments to the CFPB make clear, the Final Rule will have a substantial impact on FTA's members. Lee Decl. ¶¶ 4-7. FTA explained that "[f]intech innovators are leveraging internet and mobile technologies to offer consumers access to credit, new payment options, and financial advisory services that can significantly reduce costs, accelerate access to funds, improve transparency and convenience, and enhance financial inclusion." FTA Comments at 1. "Much of this innovation is the result of consumers being increasingly able to expand their access to tailored financial products by unlocking and sharing their financial data with new providers." *Id.* at 2. Accordingly, FTA submitted comments "in support of the thoughtful and consumer-centric final implementation of the rule" (while noting certain areas of the proposed rule that it advocated to change). *Id.* at 1. FTA further stated it "support[ed] the Bureau's proposed incorporation of, and reliance on, a recognized standards setting organization (SSO) that will issue qualified industry standards," because "prescriptive technical requirements issued by the regulator will fail to keep pace with technological change and the development of related best practices." *Id.* at 10. FTA's comments also discuss particular aspects of the proposed rule in granular detail, further substantiating its members' interest in the Final Rule. *Id.* at 2-19. Because FTA's members benefit from the Final Rule, FTA has a significant, protectable interest in ensuring that the Final Rule withstands challenge. Lee Decl. ¶ 4. FTA's members also submitted comments underscoring the importance of this case to fintech businesses. *See supra* at 4-5; Lee Decl., Exs. B-E.

Third, the disposition of this action may impair or impede FTA's ability to protect its interest. A potential intervenor "must show only that impairment of its substantial legal interest is possible if intervention is denied." *Wineries*, 41 F.4th at 774 (quotation marks omitted). This burden is "minimal," *id.*, requiring only that "disposition of the present action would put the movant at a practical disadvantage in protecting its interest." *Id.* (quotation marks omitted). Thus, the proposed intervenor need only show that impairment is "possible," not a certainty. *Mich. State AFL-CIO*, 103 F.3d at 1247. That possibility is apparent here: Plaintiffs seek to vacate the Final Rule. If Plaintiffs prevail, the Court's judgment would impose harm on FTA's members, as well as millions of American consumers who use FTA members' products and services and the digital finance ecosystem in which FTAs members operate.

Finally, the CFPB does not adequately represent FTA's interests. As the Supreme Court has made clear, this requirement presents "proposed intervenors with only a minimal challenge." *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 195 (2022). That "minimal challenge" is easily met when a private entity seeks to intervene on the side of the government. For example, in *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528 (1972), the Supreme Court held that a union member was entitled to intervene in a lawsuit brought by the Secretary of Labor, when the union member had filed the administrative complaint that triggered the lawsuit. "At a high level of abstraction, the union member's interest and the Secretary's might have seemed closely aligned." *Berger*, 597 U.S. at 196 (citing *Trbovich*, 404 U.S. at 529–30). But although the "Secretary's and union member's interests were 'related,'" "the interests were not 'identical'—the union member sought relief against his union, full stop; meanwhile, the Secretary also had to bear in mind broader public-policy implications." *Id.* (quoting *Trbovich*, 404 U.S. at 538–39). "Rather

13

than endorse a presumption of adequacy, the Court held that a movant's burden in circumstances like these 'should be treated as minimal.'" *Id.* (quoting *Trbovich*, 404 U.S. at 538 n.10).

In keeping with those principles, the Sixth Circuit has recognized that governmental entities do not adequately represent the interests of private parties for purposes of Rule 24(a)(2). *See Wineries*, 41 F.4th at 775 (finding private interests diverged from the local government's interest and recognizing the "[n]umerous cases from other circuits dealing with the interest of governmental entities" in relation to the interest of private entities). Other courts of appeals have taken the same view. *See Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 834 F.3d 562, 569 & n.9 (5th Cir. 2016) (finding that state agency did not adequately represent trade association's interests and collecting numerous cases); *Kane Cnty. v. United States*, 928 F.3d 877, 894 (10th Cir. 2019) (governmental interests "involve a much broader range of interests, including competing policy, economic, political, legal, and environmental factors" (quotation marks omitted)); *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736–37 (D.C. Cir. 2003) (noting that "we have often concluded that governmental entities do not adequately represent the interests of aspiring intervenors," such as when the private intervenor "is seeking to protect a more narrow and 'parochial' financial interest not shared" more broadly).

Here, too, the CFPB, a government regulator, cannot adequately represent the interests of FTA, a private trade association. Even assuming the CFPB full-throatedly defends the Final Rule—which, based on recent developments, appears uncertain given the acting Director's directive to cease the CFPB's activities—the CFPB's interests differ from FTA's interests. As a governmental entity, the CFPB's stated goal is to advance its sovereign interests. FTA's goal is to advance the business interests of its members. Although FTA believes, to the extent the CFPB elects to defend this litigation, the CFPB should prevail in its defense of the Final Rule, FTA

14

disagrees with the CFPB's exercises of power in other contexts. Further, FTA does not agree with the Final Rule in all respects: FTA urged the CFPB during the rulemaking to take additional steps to facilitate additional secure sharing of consumer data, a point made by numerous other stakeholders from across industry and academia. For example, FTA's comments explained how the CFPB should permit the "[b]roader use of data, including for secondary use and when data is de-identified" to continue to evolve technology that will help fight fraud, expand responsible credit access, and offer additional consumer benefits. FTA Comments at 4. However, the CFPB did not include such provisions in its Final Rule. Because FTA's interests and arguments differ from the CFPB's, the CFPB does not adequately represent FTA's interests for purposes of Rule 24(a).

### III. Alternatively, this Court Should Allow FTA to Permissively Intervene Under Rule 24(b)(1).

In the alternative, FTA requests that the Court grant permissive intervention under the less-demanding standard in Rule 24(b)(1). That standard provides that "[o]n timely motion, the court may permit anyone to intervene who ... has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1). In deciding whether a party should be permitted to intervene, the "court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3); *see generally Buck v. Gordon*, 959 F.3d 219, 223-25 (6th Cir. 2020); *League of Women Voters of Mich. v. Johnson*, 902 F.3d 572, 576-80 (6th Cir. 2018).

As explained above, FTA's motion to intervene is timely. And for the same reasons that FTA shares a substantial legal interest in the subject matter of this appeal, FTA has a claim that shares in the legal and factual questions likely to be raised in this case. Moreover, as explained, FTA's intervention will not unduly delay the action or prejudice the existing parties because FTA does not intend to seek any discovery and will follow the same briefing schedule the Court has

established as to the rest of the parties. *See* ECF No. 34. Therefore, the Court should grant FTA's motion to intervene under Rule 24(b)(1).

## **CONCLUSION**

The motion to intervene should be granted.

Dated: February 12, 2025

Respectfully submitted,

*/s/ Michael P. Abate*

Michael P. Abate
KAPLAN JOHNSON ABATE & BIRD
710 West Main Street, 4th Floor
Louisville, KY 40202
(502) 540-8280 (Telephone)
mabate@kaplanjohnsonlaw.com


Adam G. Unikowsky (*pro hac vice* pending)
Arjun R. Ramamurti (*pro hac vice* pending)
JENNER & BLOCK LLP
1099 New York Ave. N.W. Suite 900
Washington, DC  20001
(202) 639-6000 (Telephone)
aunikowsky@jenner.com
aramamurti@jenner.com

*Counsel for the Financial Technology Association*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 12, 2025, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Dated:  February 12, 2025                                                          */s/ Michael P. Abate*