**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

FORCHT BANK, N.A., KENTUCKY
BANKERS ASSOCIATION, and BANK
POLICY INSTITUTE,

     *Plaintiffs*,

v.                                                                  Case No. 5:24-cv-00304-DCR

CONSUMER FINANCIAL PROTECTION
BUREAU and RUSSELL VOUGHT, in his
official capacity,

     *Defendants*.

## <u>RENEWED MOTION TO INTERVENE OF THE FINANCIAL TECHNOLOGY ASSOCIATION</u>

Pursuant to Federal Rule of Civil Procedure 24, the Financial Technology Association ("FTA") respectfully renews its motion to intervene as a Defendant in this case. FTA satisfies the standards for intervention as of right under Federal Rule of Civil Procedure 24(a) and, in the alternative, permissive intervention under Federal Rule of Civil Procedure 24(b)(1). As set forth in the attached declaration, FTA's members and American consumers and businesses using their products benefit from the rule and have an interest in defending it. That interest is impaired if the rule is enjoined or otherwise suspended—even temporarily. The recent steps taken by the Consumer Financial Protection Bureau ("CFPB"), including agreeing to toll the compliance deadlines of the rule for 30 days and requesting an additional tolling period of 60 days, make clear that the CFPB cannot adequately represent FTA's interests.

This Court should hear from FTA before ordering any additional tolling or delay in the rule's compliance deadlines.  The parties cannot, consistent with the Administrative Procedure Act ("APA"), agree amongst themselves to what is effectively a stay of the existing rule without this Court making certain findings, including that Plaintiffs are likely to succeed on the merits and are suffering irreparable harm in the absence of such relief.  *See infra* Part III.  In these circumstances, FTA should be permitted to intervene as of right or permissively to defend the rule so that the Court can receive briefing as to whether to issue such a stay.

## BACKGROUND

1.  FTA champions the transformative role of financial technology for American consumers, businesses, and the economy.  *See* Declaration of Penny Lee ¶ 2 ("Lee Decl.").  As part of that mission, FTA supports regulation that empowers consumers to access and share their financial data with the applications ("apps") and services they want to use, thus fostering innovation and competition in the financial services market.  *Id.*  FTA's members are innovators seeking to provide more seamless services, lower-cost products, and greater consumer choice in the financial services market.  *Id.*  These members leverage internet and mobile technologies to offer consumers access to credit, new payment (including pay by bank) options, and financial advisory services that can significantly reduce costs, accelerate access to funds, and improve transparency and convenience.  *Id.*

The provision of these essential services, along with continued digitally native financial technology ("fintech") innovation, relies on consumers' ability to access, unlock, and share their financial data with new and often competitive financial service providers. The ability to control and share financial data empowers consumers with more efficient and convenient ways to manage their finances, and allows consumers to explore tailored, cost-effective financial products and

providers. Additionally, data sharing fosters competition by enabling new entrants to enter the marketplace. This data sharing also aligns with frameworks in other jurisdictions across the globe, such as the UK, Australia, Brazil, and more, that have established a consumer data right and require financial institutions to allow consumers to securely share their data with third parties.

2. In 2010, Congress enacted the Consumer Financial Protection Act (the "Act"). Section 1033 of the Act requires banks to "make available to a consumer, upon request, information in the control or possession of the [bank] concerning the consumer financial product or service that the consumer obtained" from the bank. 12 U.S.C. § 5533(a). The Act further defines "consumer" as "an individual or an agent, trustee, or representative acting on behalf of an individual." *Id.* § 5481(4). In addition, the Act provides that the Consumer Financial Protection Bureau ("CFPB") "by rule, shall prescribe standards applicable to covered persons to promote the development and use of standardized formats for information ... to be made available to consumers under this section." *Id.* § 5533(d). The Act also authorizes the CFPB to ensure that "all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." *Id.* § 5511(a). Finally, the CFPB is generally authorized to prescribe rules "as may be necessary or appropriate to enable [it] to administer and carry out the purposes and objectives of the Federal consumer financial laws, and to prevent evasions thereof." *Id.* § 5512(b)(1).

3. Pursuant to these and other authorities, on October 31, 2023, the CFPB issued a proposed rule to enable consumers to more easily share their personal financial data, subject to certain safeguards. *See* Required Rulemaking on Personal Financial Data Rights, 88 Fed. Reg. 74,796 (Oct. 31, 2023). The CFPB began by explaining that "[d]igitization and decentralization in consumer finance create new possibilities for more seamless consumer switching and greater

competitive intensity." *Id.* at 74,796.  The CFPB therefore proposed regulations to specify the "scope of data that third parties can access on a consumer's behalf, the terms on which data are made available, and the mechanics of data access," all while "ensur[ing] that third parties act on consumers' behalf when collecting, using or retaining data." *Id.* at 74,799.  As relevant here, the CFPB proposed to require banks to share consumer data with consumers and with third parties through a "developer interface," and proposed regulations to determine whether the performance of such developer interfaces was "commercially reasonable"; authorized standard setting organizations to develop measures of compliance with various provisions of the rules; prohibited banks from collecting access fees from third parties in exchange for providing these services; and proposed compliance deadlines. *See generally id.* at 74,806-43.

FTA submitted a comment in response to the Bureau's proposed rule that "applaud[ed] the Bureau's Proposal" for its support of a robust personal financial data right.  *See* Lee Decl., Ex. A ("FTA Comments"), at 1.  FTA further stated it "support[ed] the Bureau's proposed incorporation of, and reliance on, a recognized standards setting organization (SSO) that will issue qualified industry standards," because "prescriptive technical requirements issued by the regulator will fail to keep pace with technological change and the development of related best practices." *Id.* at 10. Though FTA urged the CFPB to take additional steps to make data available to third parties and to clarify other aspects of the proposed rule, FTA broadly noted its "support [for] the thoughtful and consumer-centric final implementation of the rule." *Id.* at 1.

Similarly, certain FTA members also participated in the rulemaking and expressed support for the CFPB's aim to provide for greater choice and competition in the marketplace for financial services.  Lee Decl. ¶ 7.  For example:

- FTA member Plaid Inc. ("Plaid") commented that the CFPB's "rulemaking is critical to consumers fully realizing the consumer empowerment goal that underpins § 1033, and to

4

achieving a fair, transparent, and competitive financial services marketplace." Lee Decl., Ex. B ("Plaid Comments"), at 2. Plaid further commented that the proposed rule's "emphasis on fair and free consumer and third party access to data providers' developer interfaces, effective and transparent authorization managed by third parties, and the role [SSOs] can play in implementing data access at a technical level will, if finalized, dramatically improve data portability, competition, and consumer outcomes." *Id*.

- FTA member Ribbit Capital commented that it "commend[s] the [CFPB] on its work to date and support[s] this effort to develop a pro-consumer open banking system in the United States." Lee Decl., Ex. C ("Ribbit Capital Comments"), at 1. Ribbit Capital further commented that it "agree[s] with the [CFPB] on the importance and value of consumer financial data and believe[s] it should be used to deliver value back to the consumer by improving financial access, choice and opportunity." *Id.* at 11.

- FTA member Stripe, Inc. ("Stripe") commented that the CFPB's "Section 1033 rule will be an important catalyst for competition by empowering consumers to choose products and services that best meet their financial needs," and "strongly support[ed] the CFPB's swift finalization of the rule." Lee Decl., Ex. D ("Stripe Comments") at 1, 2.

- FTA member Wise commented that "[a]s a supporter of consumer-centric financial services regulation, Wise warmly welcomes the [CFPB's] continuation of the Section 1033 rulemaking process," and "commend[ed] the [CFPB] on its efforts to consider the impact of consumer access to financial records." Lee Decl., Ex. E ("Wise Comments"), at 1, 4. Wise further commented that it "support[ed] the CFPB's proposal to recognize a [SSO] to issue industry standards." *Id.* at 2.

4. On October 22, 2024, the CFPB finalized its rule largely in line with its proposal.[1] *See* Final Rule for the Required Rulemaking on Personal Financial Data Rights, 89 Fed. Reg. 90838 (Nov. 18, 2024) ("Final Rule"). The Final Rule sets forth specific compliance deadlines for its provisions to take effect, ranging from April 1, 2026 to April 1, 2030. *See* 89 Fed. Reg. at 90,860, 90,956; 12 C.F.R. § 1033.121(b).

That same day, Plaintiffs filed their complaint challenging the Final Rule, which they subsequently amended on November 18, 2024. The amended complaint alleges that the CFPB exceeded its statutory authority under § 1033 and acted arbitrarily and capriciously with respect to certain portions of the Final Rule, including by adopting an unlawful interpretation of the term

---

[1] The CFPB finalized a portion of the proposed rule regarding standard setters on June 11, 2024.

5

"consumer" in Section 1033, unlawfully requiring disclosure of payment initiation information, unlawfully delegating authority to private SSOs, and unlawfully and unreasonably prohibiting banks from charging access fees. *See* ECF No. 22 ("Am. Compl."), ¶¶ 99-172. On December 27, 2024, the CFPB filed its answer to the amended complaint. ECF No. 29.

On January 8, 2025, the CFPB issued an order recognizing Financial Data Exchange, Inc. ("FDX") as a standard setter under the Final Rule. See Decision and Order, *In re Financial Data Exchange, Inc.*, No. 2024-CFPB-PFDR-0001 (CFPB Jan. 8, 2025), available at https://files.consumerfinance.gov/f/documents/cfpb_standard-setter-decision-and-order-of-recognition-fdx_2025-01.pdf. The CFPB's order notes that FDX's member organizations include "depository and non-depository commercial entities." *Id.* at 1. FDX's website notes that its members include numerous BPI members, such as Bank of America, JPMorgan Chase, and Wells Fargo.[2]

5. On January 28, 2025, the Court adopted a briefing schedule for cross-motions for summary judgment. ECF No. 34. Thereafter, a series of developments at CFPB occurred that created uncertainty as to whether the CFPB intends to continue defending this case. On February 1, 2025, Director Rohit Chopra announced his departure from the CFPB. On February 7, 2025, Russell Vought was designated as acting Director of the CFPB. On February 8, 2025, Vought directed CFPB staff to stop working on proposed rules; suspend the effective dates of any finalized rules that are not effective; cease all investigative work, supervision, and examination activity; and refrain from making or approving filings or appearances in any litigation except to ask for a pause

---

[2] Financial Data Exchange – Members, https://www.financialdataexchange.org/FDX/FDX/The-Consortium/Members.aspx

in proceedings.[3]   Consistent with that directive, the CFPB then sought stays in other pending litigation challenging CFPB rules.  *See, e.g.*, *Texas Bankers' Ass'n v. CFPB*, No. 24-40705 (5th Cir.); *Cornerstone Credit Union League v. CFPB*, No. 25-00016 (E.D. Tex. Feb. 6, 2025).

6.   On February 12, 2025, FTA moved to intervene in this matter to defend the Final Rule. On February 25, 2025, Plaintiffs and the CFPB filed a joint motion to stay proceedings for 30 days because the "CFPB's new leadership needs time to review and consider the CFPB's position on various pending agency actions and recently finalized rules, including the rule Plaintiffs challenge here."  ECF No. 40, at 2.  The joint motion further stated that the "CFPB also consents to a corresponding tolling of the compliance deadlines prescribed by the Rule."  *Id.*  The joint motion said nothing about FTA's pending motion to intervene.

7.   That same day, this Court granted a "30-day stay of these proceedings and a corresponding 30-day tolling of the obligations prescribed by the rule the plaintiffs are challenging."  ECF No. 41, at 2.  The Court amended and modified the summary judgment briefing schedule accordingly.  *Id.*  However, the Court then *sua sponte* denied FTA's motion to intervene without prejudice, stating that "[u]nless the matter is resolved by the parties on or before March 31, 2025, the FTA may renew its Motion to Intervene at that time."  *Id.*

8.   On March 26, 2025, the parties requested a further stay of the litigation and an additional tolling of the Rule's compliance deadlines for 60 days, noting that the parties "continue to be interested in exploring whether the CFPB may take some action on the Rule that will substantially affect the need for this litigation."  ECF No. 42, at 2.

---

[3] *See, e.g.*, Landon Mion, *Russ Vought, Tapped as CFPB's Acting Director, Directs Bureau to Issue No New Rules, Stop New Investigations*, Fox News, https://foxnews.com/politics/russ-vought-tapped-cfpbs-acting-director-directs-bureau-issue-no-new-rules-stop-new-investigations (Feb. 9, 2025).

## ARGUMENT

FTA renews its motion to intervene. FTA has associational standing and should be permitted to intervene as of right or permissively given its timely motion, the interest of FTA and its members (as well as the consumers and small businesses they serve) in preserving the Final Rule—an interest that will be impaired if the Rule is vacated or its compliance deadlines are delayed—and the CFPB's inability to represent FTA's interests.

Finally, as set forth below, this Court cannot accept the parties' joint stipulation to tolling of the Rule's compliance deadlines simply because the Plaintiffs and the CFPB agree to such tolling. The compliance deadlines are set forth in the Rule itself, which the CFPB issued via notice and comment after hearing from thousands of stakeholders. *See* 12 C.F.R. § 1033.121(b). The mere possibility that the CFPB "may take some action on the Rule," ECF No. 42, at 2, does not justify delaying the existing deadlines. The rule, including its deadlines, can only be suspended via a rescission—which itself requires notice and comment—or via a stay or injunction entered by this Court after affirmative findings that Plaintiffs are likely to succeed on the merits and suffer irreparable harm. FTA must be permitted to intervene to argue why such a stay or injunction is unwarranted.

## I.    FTA Has Associational Standing.

Because FTA seeks to preserve the Final Rule via a judgment in favor of Defendants, it does not have an independent obligation to demonstrate an Article III stake in this case. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020); *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439-40 (2017). Nevertheless, even if FTA were required to establish associational standing, it could make that showing. To establish associational standing, FTA "must show that (1) its members would otherwise have standing to sue in their own

right; (2) the interests that the suit seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1036 (6th Cir. 2022) (internal quotation marks omitted); *see generally Friends of the Earth, inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Each requirement is satisfied here. First, FTA is composed of members who would be directly and adversely affected by a judgment vacating the rule. These members, which are authorized third parties and data aggregators under the Rule, operate business models premised on consumers being able to access and securely share their financial data. Lee Decl. ¶ 4. For example:

- FTA member Plaid has explained that "as a data aggregator and third party," Plaid "allow[s] consumers to safely and securely share their own financial data from the institutions with which they bank (data providers) with their chosen digital finance apps and services (third parties)," thereby "accelerat[ing] greater choice and competition in the financial services marketplace" and "further[ing] the CFPB's aims of opening and decentralizing this market." Plaid Comments at 1.

- FTA member Ribbit Capital "is a global investment firm focused on the intersection of financial services and technology," and its "mission is to change the world of finance by providing capital and guidance to visionary financial services entrepreneurs around the world." Ribbit Capital Comments at 1. Ribbit Capital's portfolio "consists of more than 130 private and public company investments across six continents and a multitude of sectors within financial services, including payments, personal finance, investments and wealth, lending, insurance, cryptoassets, financial infrastructure, and financial software." *Id.* These investments include fintechs, which have "emerged to compete with traditional banks and to help eliminate consumer practices," and "are now positioned for the next wave of financial services development." *Id.*

- FTA member Stripe "is a technology company that builds economic infrastructure for businesses to transact on the Internet," and has "developed its Financial Connections product to streamline consumers' interactions with financial services by enabling consumers to elect seamless and secure bank payments online without being required to navigate burdensome (and unnecessary) manual verification processes." Stripe Comments at 1-2. As Stripe further explained, "consumers' ability to share their financial data with third parties of their choice will accelerate the market's ability to further leverage bank payments" and "can be used to develop and provide a diverse range of financial tools to consumers." *Id.* at 2.

- FTA member Wise is a "global payments company" that "believe[s] consumers have a fundamental right to access and control their financial data," and that "when this data is shared securely at the direction of consumers, it can help them better manage their finances, while receiving improved and innovative products and services." Wise Comments at 1.

As these examples illustrate, FTA members have a clear interest in defending the Final Rule.

Second, the interests FTA seeks to protect are germane to its organizational purpose. FTA is a trade association that represents the legal and economic interests of its member businesses. Lee Decl. ¶ 4. Its members have interests in ensuring "properly implemented, open banking in the United States," FTA Comments at 19, including ensuring that compliance with the Rule is required in a stable and predictable manner. Hence, acting to defend the CFPB's rule here, which furthers those interests, is germane to FTA's mission.

Finally, individual member participation is unnecessary in this case because the "suit raises a pure question of law" and the claims and relief sought do not require the Court to consider the "individual circumstances" of each member. *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 287 (1986); *Cf.* Am. Compl. ¶ 31 (agreeing that individual member participation is not needed in this suit).

## II.    FTA Should Be Permitted to Intervene as of Right or Permissively under Rule 24.

### A.    FTA Is Entitled to Intervene as a Matter of Right.

Under Federal Rule of Civil Procedure 24(a), the "court must permit anyone to intervene who: ... claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). To satisfy this standard, a proposed intervenor must show that (1) the motion to intervene is timely; (2) the proposed intervenor has a substantial legal interest in the subject matter of the case; (3) the proposed intervenor's ability to protect that interest may be

impaired absent intervention; and (4) the existing parties may not adequately represent the applicant's interest. *See, e.g.*, *Wineries of the Old Mission Peninsula Ass'n v. Twp. of Peninsula*, 41 F.4th 767, 771 (6th Cir. 2022). Each of these elements is "broadly construed in favor of potential intervenors." *Coal. to Defend Affirmative Action v. Granholm*, 501 F.3d 775, 779 (6th Cir. 2007) (quotation marks omitted); *see also Purnell v. City of Akron*, 925 F.2d 941, 950 (6th Cir. 1991).

FTA satisfies all four requirements. First, the motion is timely. In considering whether a motion to intervene is timely, the Court considers "all relevant circumstances," especially "(1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervenors knew or should have known of their interest in the case; (4) the prejudice to the original parties due to the proposed intervenors' failure to promptly intervene after they knew or reasonably should have known of their interest in the case; and (5) the existence of unusual circumstances militating against or in favor of intervention." *Stupak-Thrall v. Glickman*, 226 F.3d 467, 472-73 (6th Cir. 2000) (quotation marks omitted).

Under the "relevant circumstances" of this case, *id.*, FTA's motion is timely. As to the first factor, this litigation has not progressed past its initial stages. *Cf. In re Auto. Parts Antitrust Litig., End-Payor Actions*, 33 F.4th 894, 901 (6th Cir. 2022) (explaining that, in the context of the first timeliness factor, "[l]itigation is in its final stages when the district court has already ruled on dispositive motions, closed discovery, certified classes, or held fairness hearings that lead to settlement approval" (citations omitted)). FTA initially moved to intervene less than three months after Plaintiffs amended their complaint and just over six weeks after Defendants filed their answer to the amended complaint; no discovery had taken place; and the parties had only recently had

their Rule 26 conference.  *See, e.g.*, *Truesdell v. Meier*, No. 3:19-cv-66, 2020 WL 1991402, at *2 (E.D. Ky. Apr. 27, 2020) (timeliness factor satisfied when motion to intervene was filed "nearly 5 months after th[e] suit was filed" because "where little time has elapsed since the suit was filed, and little discovery has taken place, there is little prejudice to the existing parties on the basis of timeliness"); *cf. Stupak-Thrall*, 226 F.3d at 475 (motion untimely when "the court's previously identified 'finish line' ... was fast approaching"); *Suter v. Appalachian Reg. Healthcare, Inc.*, No. 14-cv-43, 2015 WL 12990211, at *1 (E.D. Ky. Mar. 6, 2015) (motion untimely when "trial ... will begin in less than four weeks").  Moreover, FTA filed its initial motion to intervene just days after the CFPB's acting Director ordered CFPB staff to cease many, if not all, of their functions, including ceasing all litigation activities beyond requesting a pause in litigation—thereby raising questions as to the CFPB's intention to continue litigating this case.  And following this Court's denial without prejudice of FTA's initial motion to intervene, FTA has immediately renewed its motion to intervene after the parties sought additional tolling of the Rule's compliance deadlines.

With respect to the second factor, as discussed below, FTA has a valid purpose to intervene—namely to protect the economic interests of itself and its members, which are narrower than, and may diverge from, the CFPB's broader public interest in defending the Final Rule.  *See In re Automotive Parts*, 33 F.4th at 902 (noting this Circuit is "more inclined to grant intervention when the purpose of intervention is limited in scope" and does not create a "likelihood of delay").

With respect to the third factor, as noted above, FTA initially moved to intervene early in this litigation, and very soon after the prior CFPB Director was fired and the acting Director reportedly ordered CFPB staff to refrain from taking any litigation activities beyond requesting a pause in litigation.  *See Cameron v. EMW Women's Surgical Ctr.*, 595 U.S. 267, 279-80 (2022) (holding that the "most important circumstance relating to timeliness" is that the prospective

intervenor "sought to intervene as soon as it became clear that [its] interests would no longer be protected by the parties in the case" (internal quotation marks omitted)).   And FTA has immediately renewed its motion to intervene following the parties' latest joint filing, which has now made clear that the CFPB is not aligned with FTA's interest in ensuring that the Rule is timely implemented in accordance with its stated compliance deadlines.

With respect to the fourth factor, the parties will suffer no prejudice because FTA intends to take no discovery and will adhere to the deadlines the Court adopts for additional briefing in this case.  *See* ECF No. 41; *see also, e.g.*, *Ctr. for Bio. Div. v. Rural Utils. Serv.*, No. 5:08-cv-292, 2008 WL 4186891, at *2 (E.D. Ky. Sept. 10, 2008) (finding no prejudice where the proposed intervenor "is prepared to promptly join these proceedings and be bound by any substantive or procedural order issued prior to an order granting intervention").

Finally, with respect to the fifth factor, FTA's motion to intervene is timely given the unusual circumstances in which the recent and ongoing developments described above show that the governmental defendant is not fully defending the Final Rule.

Second, FTA has "an interest relating to the property or transaction that is the subject of the action."  Fed. R. Civ. P. 24(a)(2).  This Circuit has adopted a "rather expansive notion of the interest sufficient to invoke intervention as of right."  *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1245 (6th Cir. 1997).  Courts have long recognized that trade associations comprised of members affected by a regulatory rule possess an interest sufficient to intervene in a case challenging that rule.  *See, e.g.*, *First City Bank v. Nat'l Credit Union Admin. Bd.*, 111 F.3d 433, 436 (6th Cir. 1997); *see also, e.g.*, *Zillow, Inc. v. Miller*, 126 F.4th 445, 451 (6th Cir. 2025) (noting that judge in Eastern District of Kentucky allowed Kentucky Press Association to intervene post-judgment to appeal ruling striking down portion of state open records law that benefited its

13

members); *Alaska Wilderness League v. Jewell*, 99 F. Supp. 3d 112, 122 (D.D.C. 2015) (concluding that a trade association had a sufficient interest in intervening to defend a U.S. Fish and Wildlife Service regulation that benefited its member companies).

As a trade association, FTA has a substantial interest in intervening to defend a rule that benefits its members. As FTA's and various of its members' comments to the CFPB make clear, the Final Rule will have a substantial impact on FTA's members. Lee Decl. ¶¶ 4-7. FTA explained that "[f]intech innovators are leveraging internet and mobile technologies to offer consumers access to credit, new payment options, and financial advisory services that can significantly reduce costs, accelerate access to funds, improve transparency and convenience, and enhance financial inclusion." FTA Comments at 1. "Much of this innovation is the result of consumers being increasingly able to expand their access to tailored financial products by unlocking and sharing their financial data with new providers." *Id.* at 2. Accordingly, FTA submitted comments "in support of the thoughtful and consumer-centric final implementation of the rule" (while noting certain areas of the proposed rule that it advocated to change). *Id.* at 1. FTA further stated it "support[ed] the Bureau's proposed incorporation of, and reliance on, a recognized standards setting organization (SSO) that will issue qualified industry standards," because "prescriptive technical requirements issued by the regulator will fail to keep pace with technological change and the development of related best practices." *Id.* at 10. FTA's comments also discuss particular aspects of the proposed rule in granular detail, further substantiating its members' interest in the Final Rule. *Id.* at 2-19. Because FTA's members benefit from the Final Rule, FTA has a significant, protectable interest in ensuring that the Final Rule withstands challenge. Lee Decl. ¶ 4. FTA's members also submitted comments underscoring the importance of this case to fintech businesses. *See supra* at 4-5; Lee Decl., Exs. B-E.

14

Third, the disposition of this action may impair or impede FTA's ability to protect its interest. A potential intervenor "must show only that impairment of its substantial legal interest is possible if intervention is denied." *Wineries*, 41 F.4th at 774 (quotation marks omitted). This burden is "minimal," *id.*, requiring only that "disposition of the present action would put the movant at a practical disadvantage in protecting its interest." *Id.* (quotation marks omitted). Thus, the proposed intervenor need only show that impairment is "possible," not a certainty. *Mich. State AFL-CIO*, 103 F.3d at 1247. That possibility is apparent here: Plaintiffs seek to vacate the Final Rule. If Plaintiffs prevail, the Court's judgment would impose harm on FTA's members, as well as millions of American consumers who use FTA members' products and services and the digital finance ecosystem in which FTAs members operate.

Finally, the CFPB does not adequately represent FTA's interests. When FTA initially filed its motion to intervene, there was already uncertainty as to whether the CFPB would continue to defend the Rule. The parties' prior joint motion, in which the CFPB "consent[ed] to a corresponding tolling of the compliance deadline prescribed by the Rule," ECF No. 40, at 2, reinforced that the CFPB cannot adequately represent FTA's interests, given FTA's interest in ensuring compliance with the Rule on the schedule set forth in the Rule itself. *See* 12 C.F.R. § 1033.121(b). And the inadequacy of CFPB's representation of FTA's interests is now apparent given the parties' latest joint motion, which seeks an additional tolling of the Rule's compliance deadlines for 60 days and creates continued uncertainty for businesses and consumers across that country that support the implementation of a consumer data right in the United States.

In any case, as the Supreme Court has made clear, this requirement presents "proposed intervenors with only a minimal challenge." *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 195 (2022). That "minimal challenge" is easily met when a private entity seeks to intervene

on the side of the government. For example, in *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528 (1972), the Supreme Court held that a union member was entitled to intervene in a lawsuit brought by the Secretary of Labor, when the union member had filed the administrative complaint that triggered the lawsuit. "At a high level of abstraction, the union member's interest and the Secretary's might have seemed closely aligned." *Berger*, 597 U.S. at 196 (citing *Trbovich*, 404 U.S. at 529–30). But although the "Secretary's and union member's interests were 'related,'" "the interests were not 'identical'—the union member sought relief against his union, full stop; meanwhile, the Secretary also had to bear in mind broader public-policy implications." *Id.* (quoting *Trbovich*, 404 U.S. at 538–39). "Rather than endorse a presumption of adequacy, the Court held that a movant's burden in circumstances like these 'should be treated as minimal.'" *Id.* (quoting *Trbovich*, 404 U.S. at 538 n.10).

In keeping with those principles, the Sixth Circuit has recognized that governmental entities do not adequately represent the interests of private parties for purposes of Rule 24(a)(2). *See Wineries*, 41 F.4th at 775 (finding private interests diverged from the local government's interest and recognizing the "[n]umerous cases from other circuits dealing with the interest of governmental entities" in relation to the interest of private entities). Other courts of appeals have taken the same view. *See Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 834 F.3d 562, 569 & n.9 (5th Cir. 2016) (finding that state agency did not adequately represent trade association's interests and collecting numerous cases); *Kane Cnty. v. United States*, 928 F.3d 877, 894 (10th Cir. 2019) (governmental interests "involve a much broader range of interests, including competing policy, economic, political, legal, and environmental factors" (quotation marks omitted)); *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736–37 (D.C. Cir. 2003) (noting that "we have often concluded that governmental entities do not adequately represent the interests of

aspiring intervenors," such as when the private intervenor "is seeking to protect a more narrow and 'parochial' financial interest not shared" more broadly).

Thus, even in an ordinary case, the CFPB—a government regulator—could not adequately represent the interests of FTA, a private trade association. As a governmental entity, the CFPB's stated goal is to advance its sovereign interests, while FTA's goal is to advance the business interests of its members. And, as discussed, this is far from the ordinary case in which a private trade association seeks to intervene on the same side as a governmental entity, given the agency's agreement to toll the compliance deadlines set forth in the Rule.

Moreover, although FTA here seeks to defend the consumer data rights set forth in the Final Rule, FTA disagrees with the CFPB's exercises of power in other contexts. And FTA does not even agree with the Final Rule in all respects: FTA urged the CFPB during the rulemaking to take additional steps to facilitate additional secure sharing of consumer data, a point made by numerous other stakeholders from across industry and academia. For example, FTA's comments explained how the CFPB should permit the "[b]roader use of data, including for secondary use and when data is de-identified" to continue to evolve technology that will help fight fraud, expand responsible credit access, and offer additional consumer benefits. FTA Comments at 4. FTA would participate in any future rulemaking to advance these arguments and others to further strengthen the existing Rule. Because FTA's interests and arguments therefore differ from the CFPB's, the CFPB does not adequately represent FTA's interests for purposes of Rule 24(a).

**B.    Alternatively, this Court Should Allow FTA to Permissively Intervene Under Rule 24(b)(1).**

In the alternative, FTA requests that the Court grant permissive intervention under the less-demanding standard in Rule 24(b)(1). That standard provides that "[o]n timely motion, the court may permit anyone to intervene who ... has a claim or defense that shares with the main action a

common question of law or fact." Fed. R. Civ. P. 24(b)(1). In deciding whether a party should be permitted to intervene, the "court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3); *see generally Buck v. Gordon*, 959 F.3d 219, 223-25 (6th Cir. 2020); *League of Women Voters of Mich. v. Johnson*, 902 F.3d 572, 576-80 (6th Cir. 2018).

As explained above, FTA's motion to intervene is timely. And for the same reasons that FTA shares a substantial legal interest in the subject matter of this appeal, FTA has a claim that shares in the legal and factual questions likely to be raised in this case. Moreover, as explained, FTA's intervention will not unduly delay the action or prejudice the existing parties because FTA does not intend to seek any discovery and will follow the same briefing schedule the Court has established as to the rest of the parties. *See* ECF No. 41. Therefore, the Court should grant FTA's motion to intervene under Rule 24(b)(1).

## III. This Court Should Not Further Toll the Compliance Period Without Hearing from FTA.

In their latest filing, the parties have again requested that this Court toll the compliance deadlines for the Rule. While tolling the deadlines may suit the parties' interests, this Court cannot simply agree to toll deadlines set forth in the Final Rule without at least hearing from FTA and making certain findings mandated by the APA. The parties' proposed 60-day "tolling period" would result in a substantive alteration to the compliance deadlines in the current Rule—the type of alteration that requires notice-and-comment rulemaking. To avoid notice-and-comment rulemaking, the parties are asking the Court to issue what is, in reality, 60-day stay of the Final Rule, over and above the 30-day tolling period that this Court has already granted. But under the APA, the Court cannot grant such a stay unless it makes the threshold determination that Plaintiffs are likely to succeed on the merits and a stay is needed to prevent irreparable harm. FTA should

18

be permitted to intervene so that the Court can receive briefing on whether that legal standard is satisfied.

It is a bedrock principle of administrative law that an agency cannot unilaterally—or in conjunction with plaintiffs—amend (much less repeal) their legislative rules without undertaking notice-and-comment rulemaking.  Rather, the APA "mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 101 (2015); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see generally* 5 U.S.C. §§ 553(b)-(c); 551(5).  That process requires the agency to "issue a '[g]eneral notice of proposed rulemaking,'" "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," and "consider and respond to significant comments received during the period for public comment."  *Perez*, 575 U.S. at 96 (quoting 5 U.S.C. § 553(c)).  These procedures ensure that the numerous stakeholders who have an interest in the existing rule can be heard before the rule is modified or rescinded.

Here, the Final Rule was promulgated via an extensive rulemaking process.  The agency provided notice of the proposed rule and received and considered more than 11,000 comments. Am. Compl. ¶¶ 11, 82.  That process culminated in the Final Rule.  Any modification of the Final Rule, in the absence of judicial involvement, therefore requires a new round of notice-of-comment rulemaking.  That is so even with respect to the Rule's specific compliance deadlines, ranging from April 1, 2026 to April 1, 2030, which are set forth in the regulatory text.  *See* 12 C.F.R. § 1033.121.  The CFPB reasonably explained how it chose those specific deadlines.  89 Fed. Reg. at 90,860, 90,956.  Under the APA, Plaintiffs and the CFPB cannot undo this elaborate rulemaking process by agreeing amongst themselves to delay the Rule's deadlines.

To avoid notice-and-comment rulemaking, the parties ask this Court to enter an order "tolling" the Final Rule's compliance deadlines for an additional 60-day period. Effectively, they seek a 60-day stay of the Final Rule—the practical effect of which would be to alter the deadlines currently appearing in 12 C.F.R. § 1033.121. But the APA specifies what must be shown for this court to grant such a stay—and mere agreement between the parties does not suffice. Rather, under the APA, a "reviewing court ... may issue all necessary and appropriate process to postpone the effective date of an agency action," but only "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. Moreover, the Sixth Circuit has recognized that a stay pursuant to 5 U.S.C. § 705 requires consideration of the traditional stay factors, including not only irreparable harm but also the "likelihood that the party seeking the stay will prevail on the merits of the appeal," the "prospect that others will be harmed if the court grants the stay," and the "public interest in granting the stay." *State of Ohio ex rel. Celebrezze v. Nuclear Regul. Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987). This makes sense: agency rules, including the Final Rule, affect numerous stakeholders, not just the parties participating in the litigation. Here, however, the parties have not made any showing that Plaintiffs are likely to succeed on the merits or that they will suffer irreparable harm if a stay is not granted. And this Court has not evaluated whether third parties or the public interest will be harmed if the compliance deadlines for the Rule are delayed. Granting FTA's intervention and receiving briefing on these questions is therefore essential to aid this Court's review.

Finally, to the extent Plaintiffs and the CFPB both seek for the CFPB to "take some action" to resolve this case, ECF No. 42, at 2, they cannot accomplish that result via a standard settlement agreement, in which the parties privately decide on an appropriate resolution and then dismiss the case with prejudice. Rather, this Court would need to grant an injunction, but only after finding that the factors bearing on such relief have been satisfied, including likelihood of success on the

merits and irreparable harm. *See, e.g.*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Ohio v. Becerra*, 87 F.4th 759, 768 (6th Cir. 2023). Even if both Plaintiffs and the CFPB consent to an injunction, a "consent decree is a judicial act because it places the power and prestige of the court behind the compromise struck by the parties." *Evoqua Water Techs., LLC v. M.W. Watermark, LLC*, 940 F.3d 222, 229 (6th Cir. 2019). The Court must decide for itself whether that "judicial act" has any legal basis. Allowing the parties to stipulate to an injunction in these circumstances would allow the CFPB to "circumvent the usual and important requirement, under the Administrative Procedure Act, that a regulation originally promulgated using notice and comment … may only be repealed through notice and comment." *Arizona v. City and County of San Francisco*, 596 U.S. 763, 765 (Roberts, C.J., concurring). The Court should not permit this "tactic of 'rulemaking-by-collective-acquiescence.'" *Id.*

In short, this Court has made no findings as to whether a stay or injunction is warranted. Nor has it received briefing on that issue. And because the CFPB is no longer defending the deadlines set forth in the Final Rule, it is unlikely to receive any such briefing absent FTA's intervention. The Court should therefore grant FTA's motion to intervene and set a briefing schedule to determine whether any further delay in the Final Rule's effective dates is justified.[4]

## **CONCLUSION**

The renewed motion to intervene should be granted.

---

[4] FTA has no objection to the parties agreeing to stay this *litigation* pending further developments at the CFPB, as long as the Rule's compliance deadlines are not further tolled.

Dated:  March 26, 2025

Respectfully submitted,

/s/ Michael P. Abate

Michael P. Abate
KAPLAN JOHNSON ABATE & BIRD
710 West Main Street, 4th Floor
Louisville, KY 40202
(502) 540-8280 (Telephone)
mabate@kaplanjohnsonlaw.com

*Counsel for the Financial Technology Association*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 26, 2025, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Dated:  March 26, 2025                                         */s/ Michael P. Abate*