**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

| | |
|---|---|
| FORCHT BANK, N.A., KENTUCKY BANKERS ASSOCIATION, and BANK POLICY INSTITUTE, <br><br>                   Plaintiffs, <br><br>       v. <br><br> CONSUMER FINANCIAL PROTECTION BUREAU and RUSSELL VOUGHT, in his official capacity, <br><br>                   Defendants. | No. 5:24-cv-304-DCR |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Table of Authorities .................................................................................................................. iii

Introduction ............................................................................................................................... 1

Background ................................................................................................................................ 1

    I.       Statutory and Regulatory History ........................................................................... 1

    II.     Procedural History ................................................................................................. 3

Legal Standard .......................................................................................................................... 4

Argument ................................................................................................................................... 6

    I.       The Rule Is Unlawful Under the APA .................................................................... 6

          A.   The Rule unlawfully seeks to regulate open banking by mandating the sharing of data with "authorized third parties," whereas Section 1033 is limited to ensuring that consumers can access their own data. ............................................................. 6

          B.   The Rule unlawfully prohibits data providers from recovering any fees to offset the burden that the Rule imposes on them. ......................................................... 11

          C.   The Rule unlawfully places consumer data at risk. ............................................. 13

          D.   The Rule unlawfully set tiered compliance deadlines without accounting for the development of consensus standards that would serve as indicia of compliance with the Rule itself. ............................................................................................ 16

    II.     The Court Should Vacate The Entire Rule ............................................................. 17

Conclusion ............................................................................................................................... 19

Certificate of Service

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Alcabasa v. Korean Air Lines Co.*,
 62 F.3d 404 (D.C. Cir. 1995) ............................................................................... 9

*All. for Hippocratic Med. v. FDA*,
 78 F.4th 210 (5th Cir.) ...................................................................................... 16

*Am. Petroleum Inst. v. EPA*,
 862 F.3d 50 (D.C. Cir. 2017) ............................................................................ 19

*Amerijet Int'l, Inc. v. Pistole*,
 753 F.3d 1343 (D.C. Cir. 2014) ........................................................................ 13

*Arangure v. Whitaker*,
 911 F.3d 333 (6th Cir. 2018) .............................................................................. 8

*Averett v. HHS*,
 306 F. Supp. 3d 1005 (M.D. Tenn. 2018) ......................................................... 19

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*,
 45 F.4th 846 (5th Cir. 2022) ............................................................................. 17

*Dubin v. United States*,
 599 U.S. 110 (2023) ........................................................................................... 8

*FCC v. Prometheus Radio Project*,
 141 S. Ct. 1150 (2021) ........................................................................................ 5

*In re Imerys Talc Am., Inc.*,
 38 F.4th 361 (3d Cir. 2022) ................................................................................ 9

*Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*,
 746 F.3d 698 (6th Cir. 2014) .............................................................................. 5

*Kentucky v. EPA*,
 123 F.4th 447 (6th Cir. 2024) ........................................................................... 17

*Kentucky Waterways All. v. Johnson*,
 540 F.3d 466 (6th Cir. 2008) ............................................................................ 14

*Long Island Power Auth. v. FERC*,
 27 F.4th 705 (D.C. Cir. 2022) ........................................................................... 17

*Loper Bright Enters. v. Raimondo*,
 603 U.S. 369 (2024) ........................................................................................... 5

*Louisiana v. United States Dep't of Energy,*
    90 F.4th 461 (5th Cir. 2024) ................................................................ 13

*McDonnell v. United States,*
    579 U.S. 550 (2016) ............................................................................ 8

*Mickell v. Bell / Pete Rozelle NFL Players Ret. Plan,*
    832 F. App'x 586 (11th Cir. 2020) ...................................................... 14

*Moore v. Fowinkle,*
    512 F.2d 629 (6th Cir. 1975) ............................................................... 19

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ......................................................................... 5, 13

*Ohio v. EPA,*
    603 U.S. 279 (2024) ........................................................................... 13

*Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.,*
    265 F.3d 1028 (9th Cir. 2001) ............................................................ 14

*Pickens v. Hamilton-Ryker IT Sols., LLC,*
    133 F.4th 575 (6th Cir. 2025) ............................................................... 5

*Sierra Club v. EPA,*
    60 F.4th 1008 (6th Cir. 2023) ............................................................. 17

*State of N.C. v. FERC,*
    730 F.2d 790 (D.C. Cir. 1984) ............................................................ 19

*Tennessee v. Cardona,*
    737 F. Supp. 3d 510 (E.D. Ky. June 17, 2024) .................................... 19

*Tennessee v. Cardona,*
    2024 WL 3631032 (E.D. Ky. July 10, 2024) ................................. 18, 19

*Tennessee v. Cardona,*
    2025 WL 63795 (E.D. Ky. Jan. 9, 2025) ............................................ 17

*Tiger Lily, LLC v. United States Dep't of Hous. & Urb. Dev.,*
    5 F.4th 666 (6th Cir. 2021) ................................................................... 8

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Human Servs.,*
    985 F.3d 472 (5th Cir. 2021) ................................................................ 5

*Warner v. Sch. Bd. of Hillsborough Cnty., Fla.,*
    2024 WL 2053698 (11th Cir. May 8, 2024) ......................................... 9

*West Virginia v. EPA,*
   597 U.S. 697 (2022) .................................................................................... 5

*Whitman v. Am. Trucking Ass'ns,*
   531 U.S. 457 (2001) .................................................................................... 8

*WildEarth Guardians v. Salazar,*
   741 F. Supp. 2d 89 (D.D.C. 2010) ........................................................... 14

*Yates v. United States,*
   574 U.S. 528 (2015) .................................................................................... 9

**Statutes**

5 U.S.C. § 706(2) ....................................................................................... 17

5 U.S.C. § 706(2)(A) ................................................................................... 4

5 U.S.C. § 706(2)(A), (C) ........................................................................ 1, 6

5 U.S.C. § 706(2)(C) ................................................................................... 4

12 U.S.C. § 5481(4) .................................................................................. 7, 8

12 U.S.C. § 5512(b)(1) ............................................................................... 13

12 U.S.C. § 5512(b)(1)-(2) ......................................................................... 14

12 U.S.C. § 5512(c)(8), (9) ......................................................................... 14

12 U.S.C. § 5533 .......................................................................................... 1

12 U.S.C. § 5533(a) ............................................................................... 1, 6, 7

12 U.S.C. § 5533(d) ................................................................................. 1, 7

15 U.S.C. § 1691c-2(e)(4) ........................................................................... 14

15 U.S.C. §§ 1639h(c), 1691(e)(4) .............................................................. 12

Pub. L. 111-203, 124 Stat. 1376 (2010) ....................................................... 1

**Regulations**

12 C.F.R. § 1033.111(c) ................................................................................ 2

12 C.F.R. § 1033.131 .................................................................................... 7

12 C.F.R. § 1033.211(c) ........................................................................... 3, 15

12 C.F.R. § 1033.301(c) ............................................................................................ 3

12 C.F.R. § 1033.321 ............................................................................................ 3, 15

12 C.F.R. § 1033.321(c)(1) .......................................................................................... 16

12 C.F.R. § 1033.351(b)(1) .......................................................................................... 16

12 C.F.R. § 1033.421(a)(1) .......................................................................................... 10

12 C.F.R. § 1033.421(c)(4) .......................................................................................... 10

12 C.F.R. §§ 1033.201(a), 1033.301(a), 1033.311 .......................................................... 3

Required Rulemaking on Personal Financial Data Rights, Proposed Rule,
    Request for Public Comment, 88 Fed. Reg. 74796 (Oct. 31, 2023) ........................................ 2

Required Rulemaking on Personal Financial Data Rights, Final Rule,
    89 Fed. Reg. 90838 (Nov. 18, 2024) ................................................................................ *passim*

Exec. Order No. 14219, Ensuring Lawful Governance and Implementing the President's
    "Department of Government Efficiency" Deregulatory Initiative,
    90 Fed. Reg. 10583 (Feb. 19, 2025) ................................................................................ 4

**Other Authorities**

CFPB, *Can a family member or friend help me with bill paying and banking?* (June 27, 2023),
    https://www.consumerfinance.gov/ask-cfpb/i-would-like-to-be-able-to-have-my-friend-or-
    family-member-help-with-my-bill-paying-and-banking-what-are-my-options-en-1145 .......... 9

*Representative*, Merriam-Webster Dictionary,
    https://www.merriam webster.com/dictionary/representative (last visited May 30, 2025) ........ 9

Restatement (Third) of Agency § 1.01 (2006) ................................................................ 8

Restatement (Third) of Trusts § 2 (2003) ...................................................................... 8

S. Rep. No. 111-176 (2010) ..............................................................................1, 11

# INTRODUCTION

In 2024, the Consumer Financial Protection Bureau (Bureau or CFPB) issued the Bureau's Required Rulemaking on Personal Financial Data Rights, 89 Fed. Reg. 90838 (Nov. 18, 2024) (Rule). The Rule purports to implement Section 1033 of the Consumer Financial Protection Act (CFPA), 12 U.S.C. § 5533.

In light of the President's directive to review existing regulations, the Bureau's new leadership has considered the Rule and the arguments set forth in Plaintiffs' complaint and amended complaint and has concluded that the Rule exceeds the Bureau's statutory authority and is arbitrary and capricious. Accordingly, Defendants agree with Plaintiffs that the Rule is unlawful and should be set aside under the Administrative Procedure Act.

# BACKGROUND

## I.   Statutory and Regulatory History

In 2010, Congress passed the CFPA as Title X of the Dodd-Frank Act. Pub. L. 111-203, 124 Stat. 1376 (2010). In Section 1033 of the CFPA, Congress provided that "a covered person shall make available to a consumer, upon request, information in the control or possession of the covered person concerning the consumer financial product or service that the consumer obtained from such covered person," which includes "information relating to any transaction, series of transactions, or to the account including costs, charges and usage data." 12 U.S.C. § 5533(a). Section 1033 also provides that "[t]he Bureau, by rule, shall prescribe standards applicable to covered persons to promote the development and use of standardized formats for information, including through the use of machine readable files, to be made available to consumers under this section." *Id.* § 5533(d). Section 1033 was passed to "ensure[] that consumers are provided with access to their own financial information." S. Rep. No. 111-176, at 173 (2010).

Thirteen years after the CFPA was passed, the Bureau issued a notice of proposed rulemaking purporting to implement Section 1033. *See* 88 Fed. Reg. 74796 (Oct. 31, 2023). The proposed regulations sought not only to "ensur[e] consumers can access covered data in an electronic form from data providers," but also to "address the challenges … with respect to the open banking system by delineating the scope of data that third parties can access on a consumer's behalf, the terms on which data are made available, and the mechanics of data access." *Id.* at 74799.

The Bureau issued the Final Rule on October 22, 2024. The Rule undertook to comprehensively regulate "open banking," a term that the Rule generally uses "to refer to the network of entities sharing personal financial data with consumer authorization." 89 Fed. Reg. at 90840 n.6. In response to comments opposing the rule as a whole and questioning the Bureau's legal authority to issue rules for open banking, the Bureau simply responded that "the final rule carries out Congress' objectives in CFPA section 1033(a) and the mandate at CFPA section 1033(d)" and that "the CFPB has determined the rulemaking is needed to address the challenges that have arisen in open banking." *Id.* at 90845. The Bureau also suggested that Congress enacted "the open-banking framework [] in CFPA section 1033." *Id.* at 90881.

The Rule imposes a number of obligations on "data providers"—*i.e.*, financial institutions providing services to individual consumers, 12 C.F.R. § 1033.111(c). The Rule "generally requires a data provider to make covered data available to consumers and authorized third parties upon request." 89 Fed. Reg. at 90839. Notably, the Rule requires data providers to develop a "consumer interface" and a "developer interface" to facilitate transmission of covered data to consumers and third parties, respectively. The Rule mandates that data providers make the "developer interface" available for access and use by any "authorized third party" that obtains authorization from a

consumer to access the consumer's data pursuant to procedures specified in the Rule. *See* 12 C.F.R. §§ 1033.201(a), 1033.301(a), 1033.311.

The Rule then goes on to comprehensively regulate how data providers must maintain and operate those interfaces to provide consumer data. For example, the Rule specifies the types of "covered data" that data providers must share with third parties, including various categories of information about a consumer's account and transaction history, as well as "[i]nformation to initiate payment to or from" a consumer's account. *Id.* § 1033.211(c). The Rule sets strict limits on data providers' ability to deny access to the developer interface based on risk-management concerns, including that such denials be deemed "reasonable" by the Bureau according to certain demanding standards. *Id.* § 1033.321. The Rule also prohibits data providers from charging any fees to recoup the costs of maintaining the interfaces or providing access to data, even fees charged to third-party entities. *Id.* § 1033.301(c).

## II. Procedural History

Plaintiffs sued to challenge the Rule on the same day that it was issued. ECF No. 1. Plaintiffs subsequently filed an amended complaint on November 18, 2024. ECF No. 22. The Amended Complaint raised ten separate counts alleging the Rule is unlawful under the APA. On January 28, 2025, upon joint motion by the parties, this Court entered a summary judgment briefing schedule. ECF No. 34.

Effective January 31, 2025, the President of the United States removed Former Bureau Director Rohit Chopra and designated Secretary of the Treasury Scott Bessent to serve as Acting Director. On February 7, 2025, the President designated Director of the Office of Management and Budget Russell Vought to serve as the Acting Director of the Bureau.

On February 19, 2025, the President issued Executive Order 14219. *See* 90 Fed. Reg. 10583 (Feb. 19, 2025). It instructs agencies "to review all regulations subject to their sole or joint jurisdiction for consistency with law and Administration policy." *Id.* The Executive Order emphasized that agencies must ensure that regulations are based on "the best reading of the underlying statutory authority or prohibition" and reject "regulations that impose undue burdens on small business and impede private enterprise." *Id.*

Following the change in Bureau leadership, as well as the issuance of Executive Order 14219, the Bureau conferred with Plaintiffs, and, on February 25, 2025, the parties filed a joint motion to (i) stay proceedings in this case for 30 days to allow new leadership to review the Rule and (ii) correspondingly toll the Rule's compliance deadlines for 30 days to avoid prejudice to Plaintiffs from the delay. ECF No. 40. The Court granted the motion the same day. ECF No. 41.

On March 26, 2025, the parties jointly moved for a 60-day extension of the stay of proceedings and a corresponding additional 60-day tolling of the Rule's compliance deadlines so the Bureau could complete its review of the Rule. ECF No. 42. On March 27, 2025, the Court granted the 60-day extension of the stay and of the Rule's compliance deadlines. ECF No. 45.

During the course of this litigation, the Financial Technology Association moved to intervene as a defendant in this case. ECF Nos. 36, 43. On May 14, 2025, the Court granted FTA's motion to intervene. ECF No. 56.

## LEGAL STANDARD

The APA requires a court to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). The APA further requires that agency action be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

4

"Agencies have only those powers given to them by Congress." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). "[I]n deciding whether an agency has acted within its statutory authority," "[c]ourts must exercise their independent judgment." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). When "a statute gives an agency no room at all to maneuver," it is up to the courts "to honor the statute's 'single, best meaning,' 'fixed at the time of enactment,' whether the agency has the same view or not." *Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575, 588 (6th Cir. 2025) (quoting *Loper Bright*, 603 U.S. at 400). And when "a statute delegates authority to an agency to define general terms in the statute," it falls on the courts to "'respect the delegation' by 'fixing the boundaries of the delegated authority' based on [their] independent view of the statute and 'ensuring that the agency acts within' those boundaries." *Id.* (quoting *Loper Bright*, 603 U.S. at 395, 413).

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (noting APA requires agencies to engage in "reasoned decisionmaking"). An agency's action is arbitrary and capricious if it has "relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, 746 F.3d 698, 706 (6th Cir. 2014). Courts must conduct a "searching and careful" inquiry to ensure that standard is met. *Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Human Servs.*, 985 F.3d 472, 475 (5th Cir. 2021) (citation omitted).

## ARGUMENT

The Bureau has now completed its review of the Rule and this litigation under its new leadership. Defendants have determined that the Rule is unlawful under the APA because it exceeds the Bureau's statutory authority and is arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A), (C). The Rule should therefore be set aside.

## I. The Rule Is Unlawful Under the APA

Defendants agree with Plaintiffs that the Rule is unlawful under the APA. The Bureau has identified four aspects of the Rule that render it unlawful.[1]

> A. <u>The Rule unlawfully seeks to regulate open banking by mandating the sharing of data with "authorized third parties," whereas Section 1033 is limited to ensuring that consumers can access their own data</u>

The Rule exceeds the Bureau's authority and is contrary to law because Section 1033 of the CFPA does not authorize the Bureau to broadly regulate open banking by mandating that data providers share information with "authorized third parties" as laid out in the Rule.

In Section 1033(a), Congress provided that:

> Subject to rules prescribed by the Bureau, a covered person [*i.e.*, a data provider] shall make available to a consumer, upon request, information in the control or possession of the covered person concerning the consumer financial product or service that the consumer obtained from such covered person, including information relating to any transaction, series of transactions, or to the account including costs, charges and usage data. The information shall be made available in an electronic form usable by consumers.

12 U.S.C. § 5533(a). Congress also mandated in Section 1033(d) that the Bureau must "prescribe standards applicable to covered persons to promote the development and use of standardized

---

[1]    At this time, Defendants take no position on Plaintiffs' remaining arguments—contained in Counts III, IV, V, VI, and VII of the Amended Complaint—because disposition of these claims is unnecessary to resolve the parties' dispute in its entirety.

formats for information, including through the use of machine readable files, to be made available to consumers under this section." *Id.* § 5533(d). Under the CFPA, the term "consumer" means "an individual or an agent, trustee, or representative acting on behalf of an individual." *Id.* § 5481(4).

The statute, by its express terms, ensures that a "consumer" can access their own financial information in a readable format and does so in several ways. Section 1033(a) tells data providers that they must "make available to **a consumer**" information "concerning the consumer financial product or service that **the consumer** obtained" from the data provider. *Id.* § 5533(a) (emphasis added). Likewise, Section 1033(d) concerns rules governing how information is to be "made available **to consumers**." *Id.* § 5533(d) (emphasis added).

By contrast, the Rule requires that data providers not only make the required information available to consumers but also to so-called "authorized third parties," 89 Fed. Reg. at 90839, which the Rule defines as third parties that have complied with certain "authorization procedures," *id*. at 90991 (codified at 12 C.F.R. § 1033.131). The Rule then imposes vast obligations on data providers to establish and maintain a "developer interface" to share consumer information with authorized third parties, and intricately regulates this data-sharing regime. As a result, the Rule goes beyond the language of the statute and undertakes to comprehensively regulate the system of "openbanking." *See* 89 Fed. Reg. at 90845 (noting the regulations were "needed to address the challenges that have arisen in open banking"). In doing so, the Bureau exceeded its statutory authority.

Nothing in the language of Section 1033 or its legislative history suggest that Congress intended to delegate to the Bureau free-ranging authority to regulate the entire open banking system—that is, the intricate network of commercial entities sharing a consumer's personal financial data well beyond sharing it with the consumer directly. And where "[t]here is no clear

7

expression of congressional intent in [the statute] to convey such an expansive grant of agency power," courts "will not infer one." *Tiger Lily, LLC v. United States Dep't of Hous. & Urb. Dev.*, 5 F.4th 666, 671 (6th Cir. 2021); *see also Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress ... does not, one might say, hide elephants in mouseholes."). Here, the disconnect between the narrow scope of Section 1033 and the ambitious reach of the Rule makes clear that the Bureau exceeded its authority in attempting to regulate the open banking system.

In response to comments that the Bureau lacked the statutory authority to regulate authorized third parties, the Bureau defended its approach under the theory that "the substance of the rule aligns with the CFPA's definition of consumer," notwithstanding "using different vocabulary within the rule," since the Rule refers to "an agent, trustee, or representative acting on behalf of that individual as an 'authorized third party.'" 89 Fed. Reg. at 90920-22. But this argument stretches the definition of "consumer" past its breaking point.

When interpreting a statute, courts must "[f]irst and foremost ... analyze the statutory text," and "when the text standing alone does not supply an answer, courts must consider canons of interpretation" that can "make[] the statute's meaning clear." *Arangure v. Whitaker*, 911 F.3d 333, 336 (6th Cir. 2018). Here again, the statute defines a consumer as an "agent, trustee, or representative acting on behalf of an individual." 12 U.S.C. § 5481(4). The terms "agent" and "trustee" both involve a fiduciary relationship and a duty of loyalty to act for the principal's benefit. *See, e.g.*, Restatement (Third) of Agency § 1.01 (2006); Restatement (Third) of Trusts § 2 (2003). And the term "representative" in the statute "should be read in a similar manner to its companions"—that is, it should take on a meaning similar to the words "agent" and "trustee" listed alongside it. *See, e.g.*, *Dubin v. United States*, 599 U.S. 110, 126 (2023); *McDonnell v. United States*, 579 U.S. 550, 569 (2016). A common meaning of the term "representative" at law involves

a special relationship and a fiduciary or similar obligation to those they represent—such as, for instance, an executor of an estate, a parent or guardian, or other designated person. *See, e.g.*, *In re Imerys Talc Am., Inc.*, 38 F.4th 361, 376 (3d Cir. 2022) ("'Legal representative' is a term of art, referring to one who owes fiduciary duties to his absent, represented constituents."); *Alcabasa v. Korean Air Lines Co.*, 62 F.3d 404, 408 (D.C. Cir. 1995) ("[A] personal representative has a fiduciary duty to bargain for the rights of all the decedent's beneficiaries and to turn over to them their appropriate share of any proceeds."); *Warner v. Sch. Bd. of Hillsborough Cnty., Fla.*, No. 23-12411, 2024 WL 2053698, at *2 (11th Cir. May 8, 2024) ("[C]ertain representatives, including parents, [are permitted] to sue on behalf of minors."); *see also* CFPB, *Can a family member or friend help me with bill paying and banking?* (June 27, 2023), https://www.consumerfinance.gov/ask-cfpb/i-would-like-to-be-able-to-have-my-friend-or-family-member-help-with-my-bill-paying-and-banking-what-are-my-options-en-1145 (noting specific ways to designate a friend or family member to help with banking). But the term "representative" should not be given an "all encompassing" or "unbounded reading" that would subsume "agent" and "trustee" and "render those words misleading surplusage." *Yates v. United States*, 574 U.S. 528, 546 (2015). Thus, the best reading of "representative" is "someone who represents another as agent, deputy, substitute, or delegate usually being invested with the authority of the principal." *Representative*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/representative (last visited May 30, 2025). Here, there is no fiduciary relationship, duty of loyalty, or special relationship between a consumer and an authorized third party as defined by the Rule. To the contrary, an authorized third party as laid out in the rule is a commercial actor broadly allowed to use data for purposes beyond directly serving the consumer. Under the Rule, an authorized third party is allowed to collect, use, and retain data about a

particular consumer so long as it is "reasonably necessary to provide the consumer's requested product or service" to consumers generally. 12 C.F.R. § 1033.421(a)(1). This means an authorized third party can use a particular consumer's data for the purpose of generally improving the product or service the consumer requested, even if that improvement does not directly benefit the particular consumer whose data is being used. *See id.* § 1033.421(c)(4); *see also* 89 Fed. Reg. at 90942 (explaining that "third parties are generally permitted to use data, including de-identified data, to train a fraud detection algorithm or to improve the budgeting recommendation attribute of a personal financial management service"). Indeed, the Bureau recognized that the Rule's forgiving "reasonably necessary" standard will sometimes even mean that a third party can keep using a consumer's data after the consumer has revoked their consent to the third party. 89 Fed. Reg. at 90942 n.115 (noting it could be "practically infeasible" for third parties to delete data in certain circumstances, and as such, it would be "consistent with the general limitation standard for the third parties to retain the data … connected to a consumer who requests revocation").

At bottom, the Bureau stretched the meaning of the definition of "consumer" to encompass a third party that is authorized under the rule to not just collect data on behalf of that individual consumer, but to *use* it for the improvement of its own products to serve all of their customers as a collective whole. And while treating consumers as an undifferentiated mass might make sense as part of an open banking system, it finds no support in Section 1033, which addresses a consumer's ability to obtain information about the particular consumer financial product or service that they themselves obtained. The Bureau exceeded its authority when it used the term "representative" as a hook to establish a comprehensive open-banking regulation, instead of adhering to the statutory authority to only make a consumer's information available to that

individual consumer or those who are actually acting as agents, trustees, or representatives on that individual's behalf.

Finally, the limited legislative history confirms what the statute's text and structure make clear: the statute was intended simply to ensure that consumers would have access to their own information. *See, e.g.*, S. Rep. No. 111-176, at 173 (2010) (Section 1033 "ensures that consumers are provided with access to their own financial information."). There is no evidence that Congress in 2010 authorized (or even contemplated) a comprehensive open-banking regime or the scale of data-sharing the Rule mandates when it enacted this relatively concise provision in Section 1033 without extended discussion.

B.  The Rule unlawfully prohibits data providers from recovering any fees to offset the burden that the Rule imposes on them.

The Rule separately exceeds the Bureau's authority and is contrary to law because Section 1033 does not authorize the Bureau to prohibit banks from charging any fees for maintaining and providing access through the required developer interfaces. Similarly, the Rule is arbitrary and capricious because the Bureau failed to engage in reasoned decisionmaking when it determined in a conclusory fashion that permitting data providers to charge any fee—even a reasonable one—would impede consumers' rights to access their data under Section 1033.

To start, the Rule's fee prohibition is in excess of the Bureau's authority. The statute provides that data providers must "make available to a consumer" certain information about the consumer's financial product or service. In the Rule, the Bureau interpreted that provision to mean that data providers must not only make information available to consumers, but it must also make that information available to commercial third parties, free of cost. The Rule requires data providers to expend significant costs to provide and maintain complex developer interfaces, but it simultaneously prohibits them from charging fees to recoup such costs, even from third parties.

While the Rule justified this prohibition on the ground that "Congress did not authorize fees," 89 Fed. Reg. at 90884, it is equally true that Congress did not forbid fees. In other words, the statute is silent on the question of fees. If Congress had intended to require data providers to make information available under Section 1033 without the ability to charge a reasonable fee, it would have said so expressly. Indeed, Congress has made such obligations explicit in other contexts. *See, e.g.,* 15 U.S.C. §§ 1639h(c), 1691(e)(4).

Congress's silence on fees is a particularly shaky foundation for the Rule's absolute fee prohibitions. The statute itself simply dictates that data providers "make available to a consumer" their consumer's financial data, yet the Rule regulates beyond the scope of the statute by mandating that data providers make consumer data available to other commercial actors in a costly and complicated data-sharing system. The Rule then adds insult to injury by forcing data providers to bear the costs of this new regime, giving a windfall to third parties that directly benefit from that access requirement. Indeed the Rule itself acknowledges the significant costs for data providers to establish and maintain a developer interface. *See* 89 Fed. Reg. at 90962 (noting "that $15 million in annual ongoing costs is consistent with the CFPB's estimates for large data providers with millions of accounts"). There is no indication in Section 1033 that Congress authorized the Bureau to force data providers to establish a separate complex and costly system to make information about consumers available to separate commercial actors, free of charge.

The Rule's contrary logic proves too much. According to the Rule, "[i]f data providers could decide what fee to charge, they could limit or eliminate the right that CFPA section 1033 confers." 89 Fed. Reg. at 90884. But the Rule goes far beyond ensuring that fees do not get in the way of information being made available to consumers and instead forces data providers to bear significant costs in making data available for the open banking system to function. In other words,

while the Bureau may have had the authority to prohibit fees in some instances where necessary to prevent evasion, *see* 12 U.S.C. § 5512(b)(1), this Rule exceeds that authority by prohibiting *all* fees in *all* instances, no matter how costly the burden.

Even if the Bureau had statutory authority to prohibit data providers from charging fees, it was unreasonable for the Bureau to impose that prohibition in the Rule, and the prohibition is therefore arbitrary and capricious. Notably, the Bureau failed to justify its reasoning that *any* fee would burden the right of consumers to obtain their information under Section 1033. Nor did the Bureau adequately explain why an alternative approach to an outright fee prohibition—such as allowing data providers to charge "reasonable fees"—would be insufficient to safeguard the rights that Section 1033 confers. At most, the Bureau stated that "allowing data providers to charge what they see as commercially reasonable fees is likely to obstruct consumers' ability to use their data." 89 Fed. Reg. at 90886. But this sort of conclusory assertion "is no substitute for reasoned consideration" and does "not constitute adequate agency consideration of an important aspect of a problem." *Louisiana v. United States Dep't of Energy*, 90 F.4th 461, 473 (5th Cir. 2024); *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[C]onclusory statements will not do; an 'agency's statement must be one of reasoning.'" (citation omitted) (emphasis in original)).

C.   The Rule unlawfully places consumer data at risk.

The Rule likewise does not comply with the APA's reasoned-decisionmaking requirement because the Bureau failed to assess the cumulative effects of its individual decisions pertaining to the risks the Rule poses to consumer data as a result of its extensive data-sharing requirements.

An agency violates the reasoned-decisionmaking requirement when it "fail[s] to consider an important aspect of the problem" it is addressing. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43; *Ohio v. EPA*, 603 U.S. 279, 292-94 (2024). An important aspect of the problem is the

cumulative effect of an agency's rule, and the failure to consider these effects in the aggregate can render an agency's decision arbitrary and capricious. *See, e.g.*, *Kentucky Waterways All. v. Johnson*, 540 F.3d 466, 492 (6th Cir. 2008) (noting agency's approach "avoids answering th[e] question" of "assessing the exemptions' cumulative effects," which is necessary for the court to meaningfully review the agency's decision under the arbitrary-and-capricious standard); *WildEarth Guardians v. Salazar*, 741 F. Supp. 2d 89, 102 (D.D.C. 2010) ("Accordingly, the Court finds that FWS' failure to consider the cumulative effect of the listing factors renders the Finding arbitrary and capricious."); *Mickell v. Bell / Pete Rozelle NFL Players Ret. Plan*, 832 F. App'x 586, 594 (11th Cir. 2020) (agency "abused its discretion by failing to consider the combined effects of all [] impairments" in assessing a person's disability); *Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1036 (9th Cir. 2001) (noting importance that "the effects of individual projects are aggregated to ensure that their cumulative effects are perceived and measured"). In enacting the CFPA, Congress recognized the critical importance of consumer privacy. *See, e.g.*, 12 U.S.C. § 5512(b)(1)-(2) (requiring the Bureau to consider "benefits and costs to consumers" when issuing rules); *id.* § 5512(c)(8), (9) (noting privacy considerations and consumer privacy for the Bureau to consider in monitoring risks to consumers); 15 U.S.C. § 1691c-2(e)(4) (allowing the Bureau to modify or delete information to "advance a privacy interest"). The Bureau correctly understood that the Rule's impact on consumer privacy was an important part of the problem under consideration. *See, e.g.*, 89 Fed. Reg. at 90935-36 ("[T]he final rule advances several substantial interests, including the need for consumer control of personal financial data and privacy protections."); *id.* at 90957 (explaining that one of the Rule's chief aims was to "ensure privacy and data security for consumers by limiting the collection, use, and retention of data that are not needed to provide the consumer's requested service").

14

Notwithstanding the importance of consumer privacy, and notwithstanding Section 1033's limited scope in ensuring consumers have access to their own data, the Rule greatly expanded the scope of Section 1033 to encompass a vast data-sharing framework, inviting greater risk to consumer privacy and data security. To start, it requires the disclosure of highly sensitive consumer financial information—including highly sensitive payment-initiation information—that banks must make available to both consumers and third parties. *See* 89 Fed. Reg. at 90870-73; *see also* 12 C.F.R. § 1033.211(c). Then, the Rule permits authorized third parties to outsource access to consumer data to still other third parties, known as data aggregators (whom the consumers don't get to choose), thereby increasing the number of parties accessing data and the attendant risks that attach. *See* 89 Fed. Reg. at 90840, 90864-65. Further, the Rule establishes a lax system for assessing and verifying authorized third parties' security practices. Under that system, a bank is limited in its ability to deny access to its developer interface based on risk-management concerns to narrowly prescribed circumstances, and the Rule otherwise limits banks' ability to deny access to sensitive consumer information, even when the bank believes denial is appropriate to satisfy its safety and soundness obligations, information security obligations, or other risk management duties. *See* 89 Fed. Reg. at 90896-903; *see also* 12 C.F.R. § 1033.321. Finally, even though the Bureau repeatedly acknowledged that "screen scraping poses risks to consumer privacy and data security," 89 Fed. Reg. at 90923, the Bureau declined to prohibit the practice.

While the Bureau attempted to explain its reasoning behind these individual choices in isolation, it never adequately addressed the effect of those choices in combination on the risks to consumers' sensitive financial data posed by the overall data-sharing framework. This failure to consider the cumulative impact of the Bureau's choices—or explain why it did not do so—renders the Rule inadequately justified. The aggregate effect of these decisions regarding data security led

15

to a data-sharing framework that poses unacceptable risk to the security of consumer data and is arbitrary and capricious. *See All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 246 (5th Cir.).

    D.  <u>The Rule unlawfully set tiered compliance deadlines without accounting for the development of consensus standards that would serve as indicia of compliance with the Rule itself.</u>

Finally, even if the Rule is valid in its substance, the Rule's compliance deadlines are arbitrary and capricious because they unreasonably do not account for the development of consensus standards.

The Rule established a framework of "consensus standards," to be set by recognized standard-setting bodies, that would serve as indicia for compliance for various provisions affecting data providers and third parties. For instance, the Rule sets forth that a data provider can rely on a consensus standard related to risk management for whether it reasonably denied a consumer or third party access to its interface, *see* 12 C.F.R. § 1033.321(c)(1), or on a consensus standard related to data fields for whether it appropriately created a record of data fields related to covered data, *id.* § 1033.351(b)(1).

The Rule acknowledged the possibility that consensus standards would not become available until after the relevant compliance dates. 89 Fed. Reg. at 90889. Nonetheless, the Bureau declined to tie the compliance dates to the establishment of consensus standards, instead staggering the compliance dates (depending on a data provider's size or revenue) based on the Rule's publication in the Federal Register.

As the Bureau acknowledged, "most" commenters who addressed the compliance deadlines "recommended that compliance dates account for the timeline for development of consensus standards … and occur after the CFPB's recognition of a standard-setting body, occur after the issuance of a qualified industry standard, or some combination of the above." 89 Fed.

Reg. at 90859. The Bureau failed to explain why it was not adjusting the compliance deadlines to account for the consensus standards. At most, the Bureau stated that the "compliance periods for each tier in the final rule will ensure that data providers of different sizes and resources will have the appropriate amount of time to comply," 89 Fed. Reg. at 90860, but that assertion doesn't explain away the Bureau's failure to consider an important aspect of the problem—that is, how data providers can be expected to use as a guidepost consensus standards that might not be in existence at the time of their compliance deadlines. Indeed, it was the *Bureau* that decided to import consensus standards into the Rule's obligations for data providers, and it was unreasonable for the Rule to create a regulatory framework that relies on consensus standards to serve as indicia of compliance with regulatory obligations, and then to fail to account for those consensus standards when setting the compliance deadlines. The compliance deadlines are therefore arbitrary and capricious.

**II.  The Court Should Vacate The Entire Rule.**

Due to the numerous legal infirmities set forth above, the Court should hold that the Rule is unlawful under the APA and vacate the Rule.

"[C]ourts treat vacatur as the default and remand without vacatur as the 'rare' remedy." *Kentucky v. EPA*, 123 F.4th 447, 473 (6th Cir. 2024) (citing *Sierra Club v. EPA*, 60 F.4th 1008, 1022 (6th Cir. 2023)), *cert filed*, No. 24-961 (Mar. 6, 2025); *see also Long Island Power Auth. v. FERC*, 27 F.4th 705, 717 (D.C. Cir. 2022) (quoting 5 U.S.C. § 706(2)); *Tennessee v. Cardona*, No. 24-cv-072-DCR, 2025 WL 63795 (E.D. Ky. Jan. 9, 2025); *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022). Courts sometimes fashion a different remedy if the agency error is not "serious" or vacatur would be especially "disruptive," *Kentucky*, 123 F.4th at 472-73 (citing *Long Island Power Auth.*, 27 F.4th at 717). But these exceptions do not apply where, as

here, "the agency committed a 'fundamental' error—such as taking a substantively illegal action," and where vacatur would not, for example, "upend years of transactions entered in reliance on the agency's action." *See id.* In light of the fundamental lack of statutory authority for the Rule and because no disruptive consequences would arise from vacatur of a rule that has not yet fully come into effect, the Rule should be vacated in its entirety.

The Rule should also be vacated because the unlawful portions cannot be severed. When conducting a severability analysis, courts conduct a "a two-step inquiry," first determining "whether the regulation will function in a manner consistent with the intent of the agency," and then determining "whether the agency would have promulgated the rule in the absence of the severed provisions." *Tennessee v. Cardona*, No. 2:24-cv-072-DCR, 2024 WL 3631032, at *10 (E.D. Ky. July 10, 2024) (Reeves, J.) (cleaned up).

Here, the Bureau stated its intent that "if any of the provisions in subpart D [Authorized Third Parties] were stayed or determined to be invalid, the [Bureau] intends that subpart D, together with references to third parties and authorized third parties elsewhere in part 1033, shall not continue in effect." 89 Fed. Reg. at 90989. Because the Bureau's inclusion of authorized third parties is unlawful, see Section I *supra*, it follows that the remainder of the provisions governing third parties should also be vacated.

While the Bureau also stated its intent that other aspects of the Rule are severable, that provision "do[es] not function as a get out of jail free card," and "[c]ourts are not required 'to proceed in piecemeal fashion', going 'application by conceivable application' to effectively rewrite regulations in an effort to save them from their statutory and unconstitutional defects." *Tennessee v. Cardona*, 2024 WL 3631032, at *10. Here, the unlawful aspects of the Rule—including the references to third parties and the risks to consumer data—so "permeate[]" the entire Rule that the

Court should not be left with the task of "excis[ing] the portions" of the Rule that are unlawful; such "rulemaking is exclusively within the purview of the Executive Branch." *Tennessee v. Cardona*, 737 F. Supp. 3d 510, 570 (E.D. Ky. June 17, 2024) (Reeves, J.). The Bureau designed a comprehensive regulatory scheme aimed at open banking and far afield of Section 1033's dictates. This regime is not "incidental and subordinate" to the Rule, but rather "essential" and "interwoven," *cf. Moore v. Fowinkle*, 512 F.2d 629, 632 (6th Cir. 1975), with the whole of the text, which focuses on open banking in its preamble and contains references to "authorized third parties" throughout. Given the broad scope of the unlawful aspects of the Rule, "there is substantial doubt that the agency would have adopted the same disposition regarding the unchallenged portion if the challenged portion were subtracted," and "partial affirmance is improper." *See Averett v. HHS*, 306 F. Supp. 3d 1005, 1021 (M.D. Tenn. 2018) (quoting *State of N.C. v. FERC*, 730 F.2d 790, 795–96 (D.C. Cir. 1984) (citing *Am. Petroleum Inst. v. EPA*, 862 F.3d 50, 71 (D.C. Cir. 2017)). Thus, vacatur is the appropriate remedy. *Tennessee v. Cardona*, 2024 WL 3631032, at *10 ("[T]he challenged provisions and embedded interpretive guidance is so integral to the Final Rule that attempting to salvage provisions through severance would leave an incoherent regulatory framework.").

## CONCLUSION

For the foregoing reasons, this Court should issue an order holding the Rule unlawful and vacating the Rule under the APA.

DATED: May 30, 2025

Respectfully Submitted,

MARK PAOLETTA
*Chief Legal Officer*

DANIEL SHAPIRO
*Deputy Chief Legal Officer*

VICTORIA DORFMAN
*Senior Legal Advisor*

CHRISTOPHER DEAL
*Assistant General Counsel for Litigation*

*/s/ Lauren Gorodetsky*

Lauren Gorodetsky
*Counsel*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
(202) 435-7560
lauren.gorodetsky@cfpb.gov

*Counsel for Defendants Consumer Financial Protection Bureau and Russell Vought*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of this Motion was filed electronically through the Court's ECF system.

DATED: May 30, 2025

/s/ Lauren Gorodetsky

Lauren Gorodetsky
*Counsel*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
(202) 435-7560
lauren.gorodetsky@cfpb.gov

*Counsel for Defendants Consumer Financial Protection Bureau and Russell Vought*