**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION**

| | |
|---|---|
| FORCHT BANK, N.A., KENTUCKY BANKERS ASSOCIATION, and BANK POLICY INSTITUTE,<br><br>*Plaintiffs*,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU and RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau,<br><br>*Defendants*,<br><br>FINANCIAL TECHNOLOGY ASSOCIATION,<br><br>*Intervenor-Defendant*. | Case No. 5:24-cv-00304-DCR<br><br>Hon. Danny C. Reeves |

**INTERVENOR-DEFENDANT FINANCIAL TECHNOLOGY ASSOCIATION'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

BACKGROUND ..... 4

A. Fintech and the Financial Technology Association ..... 4

B. Statutory Background ..... 6

C. The Rule ..... 7

D. Procedural History ..... 10

STANDARD OF REVIEW ..... 10

ARGUMENT ..... 13

I. The Rule's Requirement That Banks Share Financial Data with "Authorized Third Parties" Is Consistent with the Act's Definition of "Consumer" (Count I) ..... 13

A. "Authorized Third Parties" Are "Representatives" of an Individual Consumer and Therefore Satisfy the CFPA's Definition of "Consumer" ..... 14

B. Context Confirms That "Authorized Third Parties" Are "Consumers" ..... 16

C. Plaintiffs' and the CFPB's Contrary Arguments All Fail ..... 18

1. The statutory definition of "consumer" does not require a "special, fiduciary-like relationship with the individual consumer" ..... 18

2. This Court must apply the CFPA's statutory definition ..... 22

3. Plaintiffs' argument regarding data aggregators fails ..... 27

II. The CFPB Did Not Impermissibly Delegate to Standard-Setting Organizations (Count VI) ..... 29

III. The Rule's Data-Sharing Framework Is Not Arbitrary and Capricious Simply Because Plaintiffs Find Many Aspects of It Objectionable (Count II) ..... 32

IV. Plaintiffs' Flyspecking of the Rule Lacks Merit ..... 35

A. Section 1033 Authorizes the CFPB to Require Banks to Share Payment-Initiation Information (Count V) ..... 35

B. The Rule Reasonably Regulates Banks' Ability to Deny Access Based on Risk-Management Concerns (Count III) ....................36

C. The CFPB Reasonably Declined to Adopt a Tort-Liability Scheme for Data Breaches (Count IV)....................39

D. The Rule's Performance Standards for Developer Interfaces Are Perfectly Clear (Count VII) ....................41

E. The Rule's Compliance Timeline Is Reasonable (Count VIII). ....................42

F. The Rule's Prohibition of Access Fees Is Both Lawful and Reasonable ....................44

1. The Rule's prohibition of access fees is lawful (Count IX)....................45

a. Section 1033 does not permit banks to charge fees for accessing covered information....................45

b. Section 1033 grants the CFPB authority to prohibit access fees ....................47

2. The Rule's prohibition of access fees is reasonable (Count X)....................49

G. The Rule's Severability Provision Must Be Respected and Enforced....................50

CONCLUSION....................50

CERTIFICATE OF SERVICE ....................52

## TABLE OF AUTHORITIES

**CASES**

*Alliance for Hippocratic Medicine v. United States FDA*, 78 F.4th 210 (5th Cir. 2023), *rev'd*, 602 U.S. 367 (2024) ....................34–35

*Arizona v. Biden*, 40 F.4th 375 (6th Cir. 2022)....................11, 35

*Arizona v. City & County of San Francisco*, 596 U.S. 763 (2022)....................12

*Azar v. Allina Health Services*, 587 U.S. 566 (2019) ....................25

*Bark v. United States Forest Service*, 958 F.3d 865 (9th Cir. 2020) ....................34

*CFPB v. Community Financial Services Ass'n of America*, 601 U.S. 416 (2024)....................6

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012) ....................11

*City & County of San Francisco v. USCIS*, 992 F.3d 742 (9th Cir. 2021) (mem.)....................12

*Davenport v. Lockwood, Andrews & Newnam, Inc.*, 854 F.3d 905 (6th Cir. 2017) ....................22

*Department of Agriculture Rural Development Rural Housing Service v. Kirtz*, 601 U.S. 42 (2024)....................22–25

*Digital Realty Trust, Inc. v. Somers*, 583 U.S. 149 (2018) ....................23

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ....................12

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021)....................11, 35

*FDA v. Wages & White Lion Investments, L.L.C.*, 145 S. Ct. 898 (2025)....................12

*Firearms Regulatory Accountability Coalition, Inc. v. Garland*, 112 F.4th 507 (8th Cir. 2024)....................42

*Fischer v. United States*, 603 U.S. 480 (2024) ....................20

*Good Samaritan Hospital v. Shalala*, 508 U.S. 402 (1993) ....................12

*Johnson v. Peabody Coal Co.*, 26 F.3d 618 (6th Cir. 1994)....................12

*Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709 (2018) ....................36

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ....................10

*Michigan v. EPA*, 576 U.S. 743 (2015) ....................12

*Michigan Department of Environmental Quality v. Browner*, 230 F.3d 181 (6th Cir. 2000)....................27, 29

*Miller v. Garland*, 674 F. Supp. 3d 296 (E.D. Va. 2023) ....................42

*Mississippi Commission on Environmental Quality v. EPA*, 790 F.3d 138 (D.C. Cir. 2015) (per curiam) ....................42

*Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274 (6th Cir. 2009) ....................48

*National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007) ....................11

*National Truck Equipment Ass'n v. NHTSA*, 711 F.3d 662 (6th Cir. 2013)....................29–30

*Oakbrook Land Holdings v. Commissioner*, 28 F.4th 700 (6th Cir. 2022)....................12

*PDK Laboratories Inc. v. United States DEA*, 438 F.3d 1184 (D.C. Cir. 2006) ....................42

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) ....................12

*Seila Law LLC v. CFPB*, 591 U.S. 197 (2020) ....................6

*Sierra Club v. United States Department of the Interior*, 990 F.3d 909 (5th Cir. 2021) ....................34

*Smith v. Aegon Cos. Pension Plan*, 769 F.3d 922 (6th Cir. 2014)....................11

*Sturgeon v. Frost*, 587 U.S. 28 (2019) ....................22

*Tabor v. Joint Board for the Enrollment of Actuaries*, 566 F.2d 705 (D.C. Cir. 1977) ....................30

*Texas v. United States EPA*, 983 F.3d 826 (5th Cir. 2020)....................42

*United States Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004)....................30–31

*Waetzig v. Halliburton Energy Services, Inc.*, 145 S. Ct. 690 (2025) ....................20–21

**STATUTES**

5 U.S.C. § 603(a) ....................34

12 U.S.C. § 5481....................22

12 U.S.C. § 5481(4) ....................3, 7, 9, 13–14, 20, 23, 27

12 U.S.C. § 5493(c)(2)(A) ....................23

12 U.S.C. § 5493(g)(1) ....................23

12 U.S.C. § 5511(a) ....................6

12 U.S.C. § 5511(b)(1) ....................25

12 U.S.C. § 5512(b)(1) ....................7, 29, 31, 48

12 U.S.C. § 5512(b)(2)(A)(i) ....................33

12 U.S.C. § 5512(b)(2)(B) ....................33

12 U.S.C. § 5512(c) ....................25

12 U.S.C. § 5533 ....................2

12 U.S.C. § 5533(a) .................... *passim*

12 U.S.C. § 5533(b)(4) ....................46

12 U.S.C. § 5533(c) ....................25, 46

12 U.S.C. § 5533(d) ....................2, 7, 16, 25, 31

15 U.S.C. § 1639h(c) ....................46

15 U.S.C. § 1681c-1(a)(2)(B) ....................46

15 U.S.C. § 1691(e)(4) ....................46

15 U.S.C. § 1693o-2(a)(1) ....................45

15 U.S.C. § 1693o-2(a)(2) ....................45

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ....................6

National Technology Transfer and Advancement Act of 1995, Pub. L. No. 104-113, 110 Stat. 775 (1996) ....................31

**RULES AND REGULATIONS**

Fed. R. Civ. P. 60(b) ....................21

12 C.F.R. § 1033.121(b) ....................43

12 C.F.R. § 1033.131 ....................26

12 C.F.R. § 1033.211(c) .......... 32, 35

12 C.F.R. § 1033.301(c) .......... 44

12 C.F.R. § 1033.301(c)(1) .......... 44

12 C.F.R. § 1033.301(c)(2) .......... 44

12 C.F.R. § 1033.311(c) .......... 41

12 C.F.R. § 1033.311(c)(1)(i) .......... 41

12 C.F.R. § 1033.311(c)(1)(ii) .......... 41

12 C.F.R. § 1033.311(c)(1)(iii) .......... 41

12 C.F.R. § 1033.311(c)(1)(iv) .......... 41

12 C.F.R. § 1033.311(c)(2)(i) .......... 30

12 C.F.R. § 1033.311(c)(2)(i)(A) .......... 30, 41

12 C.F.R. § 1033.311(c)(2)(i)(B) .......... 41

12 C.F.R. § 1033.311(c)(2)(i)(C) .......... 41

12 C.F.R. § 1033.311(c)(2)(ii)(A) .......... 41

12 C.F.R. § 1033.311(c)(2)(ii)(B) .......... 41

12 C.F.R. § 1033.311(c)(2)(ii)(C) .......... 41

12 C.F.R. § 1033.311(c)(2)(ii)(D) .......... 41

12 C.F.R. § 1033.311(c)(2)(ii)(E) .......... 41

12 C.F.R. § 1033.321(a)(2)(iii) .......... 38

12 C.F.R. § 1033.321(b) .......... 37–39

12 C.F.R. § 1033.321(b)(1) .......... 37

12 C.F.R. § 1033.321(b)(2) .......... 37

12 C.F.R. § 1033.321(c) .......... 39

12 C.F.R. § 1033.321(c)(1) .......... 30

12 C.F.R. § 1033.321(c)(2) .......... 39

12 C.F.R. § 1033.321(c)(3) ....................................................................................39

12 C.F.R. § 1033.331(b)(1)(iii) ................................................................................32

12 C.F.R. § 1033.401 ..............................................................................................9

12 C.F.R. § 1033.401(a) .........................................................................................15

12 C.F.R. § 1033.401(b) .........................................................................................15

12 C.F.R. § 1033.401(c) ......................................................................................9, 15

12 C.F.R. § 1033.411 ..............................................................................................9

12 C.F.R. § 1033.411(a) ......................................................................................9, 15

12 C.F.R. § 1033.411(b) .........................................................................................15

12 C.F.R. § 1033.421 ..............................................................................................9

12 C.F.R. § 1033.421(a) .........................................................................................15

12 C.F.R. § 1033.421(a)(1) .....................................................................................28

12 C.F.R. § 1033.421(e) .........................................................................................15

12 C.F.R. § 1033.421(g)(1) .....................................................................................15

12 C.F.R. § 1033.421(g)(3) .....................................................................................15

12 C.F.R. § 1033.421(h) .........................................................................................16

12 C.F.R. § 1033.431(c) .........................................................................................27

40 C.F.R. § 1508.7 .................................................................................................34

50 C.F.R. § 402.02(d) .............................................................................................34

Request for Information Regarding Consumer Access to Financial Records,
81 Fed. Reg. 83,806 (Nov. 22, 2016) ...................................................................7–8

Required Rulemaking on Personal Financial Data Rights,
88 Fed. Reg. 74,796 (Oct. 31, 2023) ...............................................................1, 7–9

Required Rulemaking on Personal Financial Data Rights, 89 Fed. Reg. 90,838
(Nov. 18, 2024) ..................................................................................... *passim*

Required Rulemaking on Personal Financial Data Rights; Industry Standard-Setting, 89 Fed. Reg. 49,084 (June 11, 2024) .........................................29–30

**OTHER AUTHORITIES**

*Available*, *Oxford English Dictionary* (3d ed. 2010), https://www.oed.com/dictionary/available_adj ........45

Bank Policy Institute & The Clearing House, Comment Letter on Proposed Rulemaking on Personal Financial Data Rights (Dec. 29, 2023), https://downloads.regulations.gov/CFPB-2023-0052-0918/attachment_1.pdf........18, 29, 32, 43

Barr, Michael S., et al., *Consumer Autonomy and Pathways to Portability in Banking and Financial Services* (Univ. of Mich. Ctr. on Fin., Law & Pol'y, Working Paper No. 1, 2019), https://financelawpolicy.umich.edu /sites/cflp/files/2021-07/umich-cflp-working-paper-consumer-autonomy-and-data-portability-pathways-Nov-3.pdf ........26

*Black's Law Dictionary* (9th ed. 2009)........14, 19

CFPB, *Consumer Protection Principles* (Oct. 18, 2017), https://files.consumer finance.gov/f/documents/cfpb_consumer-protection-principles_data-aggregation.pdf ........8

*Financial Technology Ass'n v. CFPB*, No. 24-cv-2966 (D.D.C. filed Oct.18, 2024) ........4

Hawkins, Matt, *The History and Rise of APIs*, Forbes (June 23, 2020), https://www.forbes.com/councils/forbestechcouncil/2020/06/23/the-history-and-rise-of-apis........17

Luscombe, Belinda, *Intuit Buys Mint.com: The Future of Personal Finance?*, Time (Sept. 15, 2009), https://time.com/archive/6906464/intuit-buys-mint-com-the-future-of-personal-finance........17

Office of Management & Budget, Executive Office of the President, Revised OMB Circular A-119 (1998) ........31

Office of the Comptroller of the Currency, *Bank-Provided Account Aggregation Services: Guidance to Banks*, OCC Bulletin 2001-12 (Feb. 28, 2001), https://www.occ.gov/news-issuances/bulletins/2001/bulletin-2001-12.html........17

Restatement (Third) of Agency (2006)........19, 22

*Right*, *Oxford English Dictionary* (3d ed. 2010) (def. II.8), https://www.oed.com/dictionary/right_n ........45

S. Rep. No. 111-176 (2010)........25–26

U.S. Department of the Treasury, *A Financial System That Creates Economic Opportunities: Nonbank Financials, Fintech, and Innovation* (July 2018), https://home.treasury.gov/sites/default/files/2018-07/A-Financial-System-that-Creates-Economic-Opportunities---Nonbank-Financi....pdf ...............................26, 28

## INTRODUCTION

At stake in this case is a Rule that protects consumers' access to their own financial information, promotes competition, and makes the financial-services ecosystem safer. In the Consumer Financial Protection Act ("CFPA"), Congress conferred "consumers"—defined to include not only individuals but also their representatives—with the right to freely access their financial information. Exercising explicit statutory rulemaking authority, the Consumer Financial Protection Bureau ("CFPB") vindicated that right by allowing consumers to authorize third-party companies, including financial-technology (or "fintech") companies, to access that data to power innovative services that help consumers manage their finances, make electronic payments, and obtain credit on competitive terms. The Rule is the culmination of a bipartisan process, involving collaborative efforts between government and industry across Administrations of both parties, to decentralize and regulate consumer-permissioned data sharing. Those efforts were motivated in large part by the understanding that banks, absent open-banking regulation, "use their market power and incumbency to privilege their concerns and interests above fair competition that could benefit consumers." Required Rulemaking on Personal Financial Data Rights, 88 Fed. Reg. 74,796, 74,798 (Oct. 31, 2023) ("Proposed Rule"). Thus, the Rule promotes technological innovation by ensuring that banks will not act as gatekeepers to inhibit the growth of open banking.

That is all at risk now. Plaintiffs—a bank and two banking trade associations—seek to vacate the Rule. Plaintiffs' challenge purports to be motivated by a concern about data security, but in truth the CFPB addressed banks' stated concerns by incorporating extensive security measures into the Rule. Indeed, beyond offering generalities about hypothetical data breaches, Plaintiffs cannot identify any aspect of the Rule that will create security risk—and in fact, without the Rule, data may be less secure. Plaintiffs' true concern is that allowing consumers to unlock and leverage their banking data opens opportunities for other financial-services providers to

compete with banks. Fintech providers compete with incumbent banks in offering services such as budgeting, bill payments, and credit. But consumers cannot use those services unless they can easily access and share account information from their banks with their preferred fintech providers.

Plaintiffs claim the Rule is unnecessary because the market has flourished without it. But as the CFPB explained, fintech and other third-party providers have experienced inconsistent access to data and have had to rely on outdated "screen scraping" because banks have either lacked the necessary interfaces or refused to make them available absent one-sided contractual terms. Efforts to achieve consistent and more secure methods of granting consumers free access to their banking information have struggled in light of banks' obvious incentives to restrict competition. Vacating the Rule—and adopting the atextual constraints on the CFPB's authority Plaintiffs endorse—would place consumers' right to control their financial data at risk, while ceding market control to incumbent banks. And though the CFPB has now done an about-face and urges vacatur of its own Rule, its positions are meritless and entitled to no deference. If the CFPB wishes to change the Rule, it must adhere to the required notice-and-comment process, not leverage Plaintiffs' lawsuit to end run around these requirements.

The Rule implements Section 1033 of the CFPA, 12 U.S.C. § 5533. Section 1033(a) requires banks, "[s]ubject to" the CFPB's rulemaking authority, to "make available to a consumer," "upon request," "information relating to" financial products and services (like bank accounts). *Id.* § 5533(a). Section 1033(d), meanwhile, directs the CFPB to "prescribe standards" to promote "standardized formats for information, including through the use of machine readable files, to be made available to consumers." *Id.* § 5533(d). In 2024, after years of deliberation and industry collaboration—and an exhaustive notice-and-comment process—the CFPB promulgated the Rule at issue. In line with the CFPA, the Rule requires certain banks and other financial

institutions, upon request, to share consumers' financial data with their selected third-party providers, subject to extensive privacy, security, and informed-consent requirements.

Plaintiffs' pretextual criticisms of the Rule all fall flat. Their primary argument is that Section 1033 grants a right of access to financial data only to consumers themselves and an exceptionally narrow set of others with "fiduciary-like" relationships to consumers. That position is foreclosed by the statutory text. Under the CFPA, the term "consumer" is broad, encompassing not just the individual accountholder but also any "representative" who "act[s] on behalf of" the accountholder. *Id.* § 5481(4). Hewing to that statutory definition, the Rule includes numerous measures designed to ensure that authorized third parties would serve as "representatives" who "act[] on behalf of an individual" under the ordinary meaning of those words. *Id.* The Court should reject Plaintiffs' suggestion to discard the ordinary definition of "representative" and replace it with Plaintiffs' made-up definition that appears in no dictionary or legal source.

Plaintiffs' position also makes little sense. The CFPA was designed to facilitate access to financial data so that consumers can leverage financial technology to *use* that data. This cannot meaningfully occur if consumers may not authorize third-party providers to access their banking information. Plaintiffs' atextual reading of Section 1033 would return the market to one where individual consumers' access to their own financial data has limited utility, and in which the most powerful financial institutions continue to determine who can access competitive financial services and how. That was the state of the market before Congress granted consumers the right to control their own data, and it was precisely the situation that Congress intended to change.

Aside from their statutory argument, Plaintiffs also present scattershot criticisms of various aspects of the Rule and the CFPB's reasoning. None of Plaintiffs' arguments about the CFPB's authority has any merit, and Plaintiffs' policy disagreements with the Rule are not grounds for

vacatur in light of the deferential standard of review for agency decisionmaking developed through the notice-and-comment process—particularly on this record, given the care the CFPB took to explain its rationale for the Rule's provisions and to respond thoughtfully to comments it received.

The CFPB, for its part, has taken the extraordinary step of asking the Court to enter judgment against itself. Intervenor-Defendant Financial Technology Association ("FTA") recognizes that, in light of the change of Administration, the current CFPB will disagree with aspects of the prior CFPB's work and seek to undo it. Indeed, FTA itself disagrees with certain aspects of the Rule (not to mention other actions by the prior CFPB[1]) and, if the CFPB opens up a new notice-and-comment period, FTA is ready to work with the CFPB to improve the Rule, consistent with the CFPA's goal of protecting consumer rights and enhancing competition. But by enlisting this Court in its effort to overturn the prior Administration's actions, the CFPB is improperly short-circuiting notice-and-comment requirements. The CFPB's newfound objections to the rule are pure policy arguments that are its own responsibility to rectify, to the extent lawful, as part of the ordinary rulemaking process. The Court should apply the plain language of the CFPA and uphold the well-reasoned policy analysis developed through the gauntlet of notice-and-comment rulemaking. And the Court should reject the CFPB's request to adopt artificial and atextual constraints on its own statutory authority, and instead allow the ordinary administrative process to run its course. That result follows the best reading of the statutory text, and it preserves both competition in the marketplace and consumers' access to critical financial services.

## BACKGROUND

### A. Fintech and the Financial Technology Association

"Fintech" refers to financial technologies that enable and enhance the delivery and use of

[1] For example, FTA recently sued the CFPB over a different interpretive rule which the CFPB has since withdrawn. *See Fin. Tech. Ass'n v. CFPB*, No. 24-cv-2966 (D.D.C. filed Oct. 18, 2024).

financial services by consumers. Most Americans today use financial-technology services, for purposes such as reviewing their financial accounts, paying bills, sending money, accessing credit, budgeting, and many others. Many fintech services are offered via smartphone apps: for example, an app might enable consumers to electronically pay bills and send money to friends or family.

To effectively use fintech services, consumers need to be able to share their financial data from their banks with third-party providers. For example, consumers need to share their financial-transaction history to use a budgeting service, and they need to share their account and routing numbers to enable payments. The ability to share data facilitates competition by allowing new, more tailored, and lower-cost entrants in the financial-services marketplace and ensuring that information is no longer trapped with incumbent providers. Letter from Penny Lee, President & Chief Exec. Officer, Fin. Tech. Ass'n, to CFPB 2 (Dec. 21, 2023), ECF No. 43-1, Ex. A. As the CFPB put it in the Rule at issue here, "[c]onsumers' ability to easily switch providers of consumer financial products and services creates strong competitive incentives that result in superior customer service and more favorable terms for consumers." Required Rulemaking on Personal Financial Data Rights, 89 Fed. Reg. 90,838, 90,840 (Nov. 18, 2024) ("Rule").

FTA champions the transformative role of financial technology for American consumers, businesses, and the economy. *See* Declaration of Penny Lee ¶ 2, ECF No. 43-1. FTA's members are innovators seeking to provide more seamless services, lower-cost products, and greater consumer choice in the financial-services market. *Id.* These members leverage internet and mobile technologies to offer consumers access to credit, new payment (including pay by bank) options, and financial advisory services that can significantly reduce costs, accelerate access to funds, and improve transparency. *Id.* The provision of these services, along with continued financial-technology innovation, relies on consumers' ability to access and share their financial data with

new and competitive financial-service providers. Hence, as part of that mission, FTA supports regulation that empowers consumers to access and share their financial data with the apps and services they want to use, thus fostering competition in the financial-services market. *Id.*

**B. Statutory Background**

The CFPA emerged from a 2007 proposal for "the creation of a new, independent federal agency focused on regulating consumer financial products." *Seila Law LLC v. CFPB*, 591 U.S. 197, 205 (2020). This need was spurred by the belief that "financial products marketed to ordinary American households—credit cards, student loans, mortgages, and the like—had grown increasingly unsafe due to a regulatory jumble that paid too much attention to banks and too little to consumers." *Id.* (quotation marks omitted). Soon after the proposal to create this new agency, "the subprime mortgage market collapsed, precipitating a financial crisis that wiped out over $10 trillion in American household wealth and cost millions of Americans their jobs, their retirements, and their homes." *Id.* Thereafter, the proposal "met its moment." *Id.*

In 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank"). The CFPA, Title X of Dodd-Frank, created the CFPB and "charged [it] with enforcing consumer financial protection laws to ensure 'that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive.'" *CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 421 (2024) (quoting 12 U.S.C. § 5511(a)).

This case concerns Section 1033 of the CFPA, which states that "[s]ubject to rules prescribed by the [CFPB]," banks "shall make available to a consumer, upon request, information in the control or possession of the [bank] concerning the consumer financial product or service that the consumer obtained" from the bank. 12 U.S.C. § 5533(a). The CFPA further defines

"consumer" as "an individual or an agent, trustee, or representative acting on behalf of an individual." *Id.* § 5481(4). In addition, the Act provides that the CFPB "by rule, shall prescribe standards applicable to covered persons to promote the development and use of standardized formats for information[] … to be made available to consumers under" Section 1033. *Id.* § 5533(d). Finally, the CFPB is generally authorized to prescribe rules "as may be necessary or appropriate to enable [it] to administer and carry out the purposes and objectives of the Federal consumer financial laws, and to prevent evasions thereof." *Id.* § 5512(b)(1).

### C. The Rule

Exercising its rulemaking authority under Section 1033 and other provisions of the CFPA, on October 31, 2023, the CFPB issued a proposed rule creating a regulatory framework for "open banking"—that is, a scheme enabling consumers to more easily share their personal financial data, subject to certain safeguards. *See* Proposed Rule at 74,796. But the development of an open-banking rule had been in the works—and had enjoyed broad bipartisan support—since 2016, across multiple Administrations. The genesis of the Rule was a 2016 request for information issued by the CFPB, in which the agency sought comments from consumers, banks, fintechs, privacy groups, and others about digital access to, and use of, financial information. *See* Request for Information Regarding Consumer Access to Financial Records, 81 Fed. Reg. 83,806, 83,806–07 (Nov. 22, 2016) ("2016 RFI"). During the first Trump Administration, the CFPB continued to move toward developing a robust open-banking regime. In 2017, the agency "published a summary of comments received in response to the RFI and other stakeholder meetings." Rule at 90,841 n.17. Then, in 2020, the CFPB "held a symposium with stakeholders" to discuss the forthcoming open-banking rule and published an advanced notice of proposed rulemaking. *Id.* at 90,841. Throughout this process, the CFPB hewed to the view that financial-technology companies authorized by consumers to access financial information had the same rights under

Section 1033 as consumers themselves. *See* 2016 RFI at 83,806 ("This RFI … refers to consumer access to [financial-product or -service] information, *including access by entities acting with consumer permission*, as 'consumer-permissioned' access." (emphasis added)); CFPB, *Consumer Protection Principles* 3 (Oct. 18, 2017) https://files.consumerfinance.gov/f/documents/cfpb_consumer-protection-principles_data-aggregation.pdf (describing the Section 1033 right as including a consumer's right "*to authorize trusted third parties* to obtain [financial-product or -service] information from account providers to use on behalf of consumers, for consumer benefit, and in a safe manner" (emphasis added)).

These bipartisan efforts culminated in the Proposed Rule, in which the CFPB reaffirmed its longstanding view that "[d]igitization and decentralization in consumer finance create new possibilities for more seamless consumer switching and greater competitive intensity." Proposed Rule at 74,796. The CFPB observed that financial technology was playing an increasingly important role in American consumers' financial lives, estimating that "at least 100 million consumers have authorized a third party to access their account data," and that there were as many as 10,000 fintech entities providing services for those consumers. *Id.* at 74,798. But despite the flourishing of innovative products, the CFPB recognized that certain actors in the financial-services space remained "able to use their market power and incumbency to privilege their concerns and interests above fair competition that could benefit consumers." *Id.* And in particular, it observed that banks in the then-current open-banking ecosystem "may minimize the data they share or refrain from sharing altogether to protect their market position." *Id.* at 74,799.

The CFPB therefore proposed regulations to specify the "scope of data that third parties can access on a consumer's behalf, the terms on which data are made available, and the mechanics of data access," all while "ensur[ing] that third parties act on consumers' behalf when collecting,

using, or retaining data." *Id.* As relevant here, the CFPB's proposal would require banks (that is, "data providers" in the technical regulatory parlance) to share consumer data with consumers and with "authorized third parties"—*i.e.*, consumers' representatives—through a "developer interface," and it included criteria to determine whether the performance of such developer interfaces was "commercially reasonable"; authorized standard-setting organizations ("SSOs") to develop measures of compliance; prohibited banks from collecting access fees from third parties; and proposed compliance deadlines. *See id.* at 74,806–43.

In October 2024, the CFPB finalized its Rule largely in line with its proposal. The CFPB explained in detail why the Rule was needed notwithstanding open banking's successes to date, explaining that banks have not always provided consistent or meaningful data access to consumers' third-party providers, leading to those providers' reliance on "screen scraping" (*i.e.*, use of consumers' login credentials), and that efforts to achieve more secure open banking had struggled. Rule at 90,840–41. The Rule took steps to ensure that "third parties are acting on behalf of consumers when accessing their data." *Id.* at 90,842. It achieves that result by setting forth a three-step authorization procedure for a provider to become "authorized third part[ies]" and thus consumers' "representatives" under the CFPA. 12 C.F.R. § 1033.401; *see* 12 U.S.C. § 5481(4). The third party must (1) provide the consumer with an authorization disclosure, *see* 12 C.F.R. § 1033.411; (2) provide a statement to the consumer in that disclosure certifying that the third party agrees to numerous obligations, *see id.* § 1033.421; and (3) obtain the consumer's express informed consent by obtaining a signed authorization disclosure, *see id.* § 1033.401(c). These procedures "are designed to ensure that third parties accessing covered data under [Section 1033] pursuant to the rule's framework are 'acting on behalf' of a consumer, and therefore consistent with the [CFPA's] definition of consumer." Rule at 90,861 (quoting 12 U.S.C. § 5481(4)).

The Rule ensures security and reliability, too, "by applying a consistent set of security standards across the market" and "by promoting the accurate and consistent transmission of data that are usable by consumers and authorized third parties." *Id.* at 90,842. And by giving consumers an "even greater ability to take advantage of the many products or services already available," as well as giving banks "stronger incentives to enhance their products and services to retain their customers," the Rule promotes competition for financial services. *Id.* at 90,845.

### D. Procedural History

Plaintiffs filed their complaint challenging the Rule the same day the CFPB issued it, and they subsequently amended their complaint on November 18, 2024. The amended complaint alleges that the CFPB exceeded its statutory authority under Section 1033 and acted arbitrarily and capriciously. *See* ECF No. 22, ¶¶ 99–172. On December 27, 2024, the CFPB answered the amended complaint. ECF No. 29. After this Court set a summary-judgment briefing schedule, ECF No. 34, Plaintiffs and the CFPB jointly filed a motion to stay proceedings so that the CFPB, following the change in Administration, could review the Rule. ECF No. 40, ¶¶ 2–3. On May 30, 2025, Plaintiffs filed their motion for summary judgment. ECF No. 59. The CFPB submitted a motion purportedly seeking an "order granting summary judgment in Defendants' favor," ECF No. 58, at 1, but it actually requests the Court to enter summary judgment *against* Defendants (*i.e.*, itself). The CFPB argues that the Rule is unauthorized by the CFPA and the analysis in the Rule is incorrect and deficient in certain respects. ECF No. 58-1 ("CFPB Br.").

## STANDARD OF REVIEW

Some of the key issues in this case are matters of statutory interpretation—in particular, the meaning of the term "representative" and the meaning of the term "consumer." It is the Court's job to answer those interpretive questions. In doing so, it owes no deference to the views of the CFPB. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 398–404 (2024).

The CFPB's newly expressed statutory-interpretation arguments are entitled to *no* deference—not even modest *Skidmore* deference—because the CFPB's position does not "reflect careful consideration"; has never been expressed by the CFPB before now; is inconsistent with the agency's prior views; is an "about-face"; and has never been articulated in rulemaking or enforcement. *Smith v. Aegon Cos. Pension Plan*, 769 F.3d 922, 928–29 (6th Cir. 2014) (quotation marks omitted); *cf. Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 154–57 (2012) (declining to afford *Auer* deference when an agency switches position in litigation).

Plaintiffs also attack many aspects of the rule as arbitrary and capricious. "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). This Court's job is not to weigh the competing policy arguments; it is "simply [to] ensure[] that the agency has acted within a zone of reasonableness and … has reasonably considered the relevant issues and reasonably explained the decision." *Id.*; *see Arizona v. Biden*, 40 F.4th 375, 392 (6th Cir. 2022) ("We seek merely to ensure that the agency considered relevant data points and offered a satisfactory explanation for its decision."). Nor may a court nitpick minor gaps in an agency's reasoning—rather, it must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (quotation marks omitted).

Here, policy deference is due *only* to the agency's reasoning *as set forth in the Rule*—not to the CFPB's new position that its own Rule is arbitrary and capricious. The Rule is the only product of agency decisionmaking that has gone through the APA's notice-and-comment procedures, and it reflects the input of 11,000 commenters comprising a broad range of stakeholders with an interest in open banking, privacy and security, and consumer access to safe

financial services. There is no basis for affording deference to ad hoc agency positions belatedly announced in 20-page briefs outside of the formal rulemaking process. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016); *Johnson v. Peabody Coal Co.*, 26 F.3d 618, 619–20 (6th Cir. 1994) (citing *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993)).

In fact, the CFPB's attacks on its own Rule should be afforded no deference whatsoever because the CFPB seeks to use this Court's power to avoid the strictures of notice-and-comment rulemaking. If the CFPB believes the Rule is unwise, it may undertake a new rulemaking process, and the agency will thereafter receive appropriate deference to the policy rationales explained in any new rule so long as changes in position are adequately explained. *See FDA v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 917 (2025). But the CFPB cannot avoid these requirements by simply acquiescing in summary judgment here. *See Arizona v. City & County of San Francisco*, 596 U.S. 763, 766 (2022) (Roberts, C.J., joined by Thomas, Alito & Gorsuch, JJ., concurring) (questioning whether this "tactic of 'rulemaking-by-collusive-acquiescence' … comport[s] with the principles of administrative law" (quoting *City & County of San Francisco v. USCIS*, 992 F.3d 742, 744 (9th Cir. 2021) (VanDyke, J., dissenting))).

What is more, it is a "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)); *see Oakbrook Land Holdings v. Comm'r*, 28 F.4th 700, 721 (6th Cir. 2022) ("Under [the *Chenery*] rule, an agency must defend its actions based on the reasons that animated the act at issue, not for reasons that it formulated during litigation."). Thus, a court must disregard an agency's rationales that are newly formulated in litigation—regardless of whether the agency's new rationales reflect an attempt to *support* the agency action or, as here, to *attack* that action.

## ARGUMENT

### I. The Rule's Requirement That Banks Share Financial Data with "Authorized Third Parties" Is Consistent with the Act's Definition of "Consumer" (Count I).

Plaintiffs claim that the Rule exceeds the CFPB's statutory authority because Section 1033 purportedly does not authorize the CFPB to require banks to share individual consumers' financial data with what Plaintiffs describe as "commercial third parties." ECF No. 59-1, at 13 ("Plfs. Br."). That argument contradicts the CFPA's text, structure, and purpose. Section 1033 directs that a bank "shall make available to a consumer, upon request, information in the control or possession of [the bank]" that relates to the "service that the consumer obtained from [the bank]." 12 U.S.C. § 5533(a). The CFPA defines "consumer" as "an individual or an agent, trustee, or representative acting on behalf of an individual." *Id.* § 5481(4). And the Rule provides that only "authorized third parties" who comply with specified "authorization procedures"—procedures that ensure the third parties act on behalf of the individual consumer—are permitted to access the individual's data. Because every third party entitled to access rights under the Rule is a "representative" and hence a "consumer" under the CFPA, the Rule fits within the CFPB's statutory authority.

In addition, the Rule advances Section 1033's purpose of allowing consumers meaningful and safe access to their own financial data. All parties agree that if a consumer asked a bank for covered data for purposes of uploading it to a third-party app himself, that request would fall within Section 1033's scope. Yet sharing data in that manner is cumbersome, insecure, and may result in third-party apps relying on stale and unreliable information. By facilitating third-party access, the Rule ensures that consumers can access and share their own data more quickly and securely—a critical step in being able to meaningfully avail themselves of competitive financial services. Thus, as the CFPB correctly concluded, there is "no textual, historical, or consumer-protection basis for limiting [the access right] in the artificially cramped way" Plaintiffs suggest. Rule at 90,881.

### A. “Authorized Third Parties” Are “Representatives” of an Individual Consumer and Therefore Satisfy the CFPA’s Definition of “Consumer.”

The Rule falls within CFPB’s statutory authority because it requires banks to share data only with the individual consumer and “authorized third parties” who satisfy the CFPA’s definition of “consumer.” The Rule’s extensive regulations governing “authorized third parties”—regulations that Plaintiffs largely ignore—ensure that the third parties who access financial data qualify as “representatives acting on behalf of [the] individual” to whom that data relates. 12 U.S.C. § 5481(4). As the CFPB explained, the “plain meaning of [Section] 1033, in combination with the CFPA’s definition of consumer … requires data providers to make covered data available to consumers’ authorized third party representatives.” Rule at 90,881.

This conclusion follows from the ordinary meaning of the term “representative.” A “representative” is “[o]ne who stands for or acts on behalf of another.” *Representative*, *Black’s Law Dictionary* 1416 (9th ed. 2009). As Plaintiffs note, nonlegal dictionaries similarly define “representative” as someone who is “authorized to act” on behalf of the individual. Plfs. Br. 17.

“Authorized third parties,” as defined in the Rule, fall squarely within those dictionary definitions of “representative.”[2] Crucially, the Rule includes numerous protections designed to ensure that authorized third parties genuinely act on behalf of consumers—and thus satisfy the dictionary definition of “representative.” The Rule provides that an “authorized third party” is a “third party that has complied with the [Rule’s detailed] authorization procedures.” Rule at 90,861. Those procedures in turn impose numerous obligations to constrain the third party to act “on behalf

---

[2] Indeed, the Rule’s preamble frequently refers to these “authorized third parties” as “authorized third party *representatives*,” *see, e.g.*, Rule at 90,845, 90,866, 90,881, and the entire Rule was plainly designed with the CFPA’s definition of “consumer” in mind. *See id.* at 90,921 (“The CFPB has framed subpart D precisely to ensure that covered data are available only to agents, trustees, and representatives acting on behalf of the consumer.”).

of" the consumer. These provisions of the Rule "are designed to ensure that … consumers provide informed consent to third parties that access covered data pursuant to the [Rule's] framework, that consumers retain control over third parties' access, and that third parties *act on behalf of consumers* when collecting, using, and retaining covered data." *Id.* at 90,921 (emphasis added).[3]

For example, the Rule requires that the "third party must seek access to covered data from a data provider *on behalf of a consumer* to provide a product or service the consumer requested," and must also (1) "[p]rovide the consumer with an authorization disclosure"; (2) "[p]rovide a statement to the consumer in the authorization disclosure … certifying that the third party agrees to [specified] obligations"; and (3) "[o]btain the consumer's express informed consent to access covered data on behalf of the consumer by obtaining an authorization disclosure that is signed by the consumer." 12 C.F.R. § 1033.401(a)–(c) (emphasis added). Likewise, the Rule details the form and content of the authorization disclosure, including that it "be clear, conspicuous, and segregated from other material," and that the names included in the authorization "be readily understandable to the consumer." *Id.* § 1033.411(a); *see also id.* § 1033.421(g)(1) (provision "[e]nsuring consumers are informed" by requiring third parties to "provide the consumer[s] with a copy of the authorization disclosure"). Third parties must also provide the individual consumer with extensive disclosures regarding the nature and duration of data collection. *Id.* § 1033.411(b). Similarly, the Rule imposes "[t]hird party obligations," which include "limitation[s] on collection, use, and retention of consumer data," *id.* § 1033.421(a), and creates security requirements, *id.* § 1033.421(e). Consumers have the right to request more information as to data collection, *id.* § 1033.421(g)(3), and may revoke third parties' authorization through a method "that is as easy to

[3] In FTA's respectful view, certain of these obligations are unnecessary and unduly impose limitations on fintech and other third-party providers that do not apply to banks themselves.

access and operate as the initial authorization," *id.* § 1033.421(h).

Via all of these mechanisms—ranging from requiring the individual consumer's express informed consent to ensuring that the individual consumer can easily revoke authorization when desired—the CFPB ensured that the "authorized third parties" subject to the Rule do in fact act "on behalf" of the individual consumer and are hence "representatives" under the natural meaning of that term. Therefore, the Rule complies with the statutory definition of "consumer."

### B. Context Confirms That "Authorized Third Parties" Are "Consumers."

Powerful structural evidence within Section 1033 confirms that third-party providers qualify as "representatives," and therefore as "consumers." The statute provides that covered "information shall be made available in an electronic form usable by consumers," 12 U.S.C. § 5533(a), and specifies that the CFPB must prescribe rules to "promote the development and use of standardized formats for information, including through the use of machine readable files, to be made available to consumers," *id.* § 5533(d). "Machine readable" files (as opposed to "human readable" files) implies that the files will be used by third-party software providers, and "standardized formats" implies that nascent third-party providers could develop software compatible with those machine-readable files. Thus, the purpose of Section 1033 is to facilitate a broader ecosystem in which authorized third parties access financial data on behalf of consumers.

Under Plaintiffs' reading of Section 1033, however, consumers would be forced to manually download their own data to their devices and then upload it to third-party apps, rather than have the banks transmit the data to the authorized third parties. Congress could not possibly have desired this illogical, insecure, and inefficient scheme. Requiring manual downloads and uploads is not only cumbersome and complex for unsophisticated consumers, but also unsafe for consumers who may use unsecured channels and may be vulnerable to malicious data thieves. Further, requiring individual consumers to manually download this information would render the

third-party products far less useful—or not usable at all. Indeed, a "rule requiring only that data providers make financial information available to individual consumers, as opposed to also requiring them to make the information available to third parties authorized by consumers, would significantly impair the uses to which consumers, through authorized third parties, are actually putting their financial data today." Rule at 90,881. For instance, to give useful spending advice, budgeting apps require a consistent stream of transaction data to be shared in real time. Likewise, payment apps are more useful when they can check real-time balances on a bank account. This real-time data sharing cannot realistically occur unless the app can access an individual's banking data in real-time. Digitally connecting one's bank account to a chosen fintech app is thus not only more expedient and secure, but is fundamental to the utility of the apps on which individuals rely.

Plaintiffs observe that Section 1033 was enacted "just a few months after the first iPad was announced," Plfs. Br. 2, implying that Congress would not have anticipated consumers' utilization of third-party entities to manage their finances. To the contrary, as the CFPB observed, "open banking emerged in the early 2000s, along with interfaces designed for developers of products or services to request consumer information, and related industry standard-setting activity." Rule at 90,840.[4] In fact, the "U.S. consumer data sharing market encompassed consumers' authorized third party representatives at the time Congress enacted the CFPA in 2010," and "many consumer-authorized third party representatives were providing personal financial management use cases well before 2010." *Id.* at 90,881. Given Congress's specific reference to standardized, machine

[4] *See* Off. of the Comptroller of the Currency, Bank-Provided Account Aggregation Services: Guidance to Banks, OCC Bulletin 2001-12 (Feb. 28, 2001), https://www.occ.gov/news-issuances/bulletins/2001/bulletin-2001-12.html; *see also* Matt Hawkins, *The History and Rise of APIs*, Forbes (June 23, 2020, 8:20 AM EDT), https://www.forbes.com/councils/forbestechcouncil/2020/06/23/the-history-and-rise-of-apis; Belinda Luscombe, *Intuit Buys Mint.com: The Future of Personal Finance?*, Time (Sept. 15, 2009), https://time.com/archive/6906464/intuit-buys-mint-com-the-future-of-personal-finance.

readable formats and the extensive historical record showing early understandings of open banking at the time Dodd-Frank was enacted, it is clear that open banking is exactly what Congress had in mind when it enacted Section 1033. In the CFPB's words, "Congress in fact did intend that the 2010 CFPA and the CFPB's rule implementing it … would broaden and deepen the consumer-permissioned data sharing market that existed at that time by requiring data providers to share financial data with consumers' third party representatives." *Id.* This Court should not adopt an interpretation of Section 1033 that would lead to artificial constraints on individuals' ability to use these services and on fintech and other third-party companies' ability to compete with incumbent banks—competition that Congress specifically contemplated in Section 1033(d).

### C. Plaintiffs' and the CFPB's Contrary Arguments All Fail.

#### 1. *The statutory definition of "consumer" does not require a "special, fiduciary-like relationship with the individual consumer."*

Plaintiffs primarily argue that the Rule exceeds the CFPB's statutory authority because "representative" should not be given its ordinary meaning but instead be understood to require a "special, fiduciary-like relationship." Plfs. Br. 17. Similarly, the CFPB in its brief now defines "representative" as "involv[ing] a special relationship and a fiduciary or similar obligation" to the individual. CFPB Br. 8–9. Plaintiff Bank Policy Institute ("BPI") did not make this argument in its comments during the rulemaking process. To the contrary, BPI expressed its "general[] support" for the CFPB's formulation of an "authorized third party" and encouraged the CFPB to ban "screen scraping" precisely because "authorized third parties" could otherwise access information under the Rule.[5]

This Court should reject Plaintiffs' newly minted definition for the simple reason that it is

[5] Bank Pol'y Inst. & The Clearing House, Comment Letter on Proposed Rulemaking on Personal Financial Data Rights 38–39 (Dec. 29, 2023), https://downloads.regulations.gov/CFPB-2023-0052-0918/attachment_1.pdf ("BPI Comments").

not what "representative" means. Plaintiffs cite no dictionary, legal source, or case that has ever said that the word "representative" requires a "fiduciary-like relationship." The CFPB relies on cases referring to "[l]egal representatives" or "personal representatives." CFPB Br. 9. But those are not the terms Congress included here, though it did use "legal representative" *elsewhere* in Dodd-Frank. *See, e.g.*, Dodd-Frank § 913(a), 124 Stat. at 1824 (defining a "retail customer" as a "natural person, or the legal representative of such natural person"). The Court should respect Congress's decision to define "consumer" using the broader term "representative."

Plaintiffs and the CFPB offer the theory that the term "representative" must be cabined by its neighbors, "agent" and "trustee"—purportedly "terms of art" that signal a fiduciary relationship at common law. Plfs. Br. 16; *see* CFPB Br. 8–9. Plaintiffs hinge their case on the *noscitur a sociis* canon: because the terms "agent" and "trustee" imply a fiduciary relationship, the argument goes, "representative" must also imply a fiduciary relationship. Plfs. Br. 16–17. That argument fails.

First, the premise is wrong: the word "agent" does not necessarily imply a fiduciary relationship. *Black's Law Dictionary* defines an "agent" as "[o]ne who is authorized to act for or in place of another; a representative," and makes no reference to a fiduciary relationship. *Agent*, *Black's Law Dictionary*, *supra*, at 72. Although the common law has historically characterized agency relationships as fiduciary relationships, Plaintiffs' own source—the Restatement (Third) of Agency—notes that "legal usage varies," and that "[s]ome statutes … use agency terminology when the underlying relationship falls outside the common-law definition." Restatement (Third) of Agency § 1.01 cmt. b (2006). And that same source specifically notes that the "terminology of agency is widely used in commercial settings … to characterize relationships that are *not* necessarily encompassed by the legal definition of agency." *Id.* (emphasis added). Plaintiffs never defend the proposition that the word "agent" in the CFPA's definition of "consumer" implicitly

incorporates the Restatement. And if that premise is wrong, Plaintiffs' entire argument falls apart.[6]

Even if "agent" did imply a fiduciary relationship, it does not follow that a fiduciary relationship should be read into the word "representative." Plaintiffs' interpretation would cause "representative" to mean the same thing as "agent"—rendering the term "representative" surplusage and nullifying Congress's decision to pair the narrower terms "trustee" and "agent" with the broader term "representative." To be sure, the "canon of *noscitur a sociis* teaches that a word is given more precise content by the neighboring words with which it is associated." *Fischer v. United States*, 603 U.S. 480, 487 (2024) (quotation marks omitted). But the canon does not require a court to construe all words in a list to mean the exact same thing. Instead, it merely holds that words in an enumerated list generally have a relevant similarity. Here, unlike in many cases, the statute *itself* specifies the relevant similarity: it is not the existence of a fiduciary relationship, but rather that the third party is "acting on behalf of [the] individual." 12 U.S.C. § 5481(4). Thus, Plaintiffs may be correct that, under the *noscitur a sociis* canon, the word "representative" does not encompass anyone in the world who could conceivably be characterized as a "representative"—it would not encompass, for example, a member of the House of Representatives. Instead, the canon teaches that a "representative," like its neighbors, must act on behalf of the consumer, in the sense of carrying out the consumer's own wishes regarding his own financial information. As explained above, the Rule is carefully designed to ensure that authorized third parties do exactly that—that is why they meet the statutory definition of "consumer."

The Supreme Court's recent decision in *Waetzig v. Halliburton Energy Services, Inc.*, 145 S. Ct. 690 (2025), is instructive. There, the Supreme Court considered whether a case voluntarily

---

[6] Indeed, there is a substantial argument that authorized third parties qualify as "agents" under the dictionary definition of "agent." But because authorized third parties so plainly satisfy the broader term "representative," the Court need not address that question.

dismissed without prejudice counts as a "final judgment, order, or proceeding" under Federal Rule of Civil Procedure 60(b). In such a case there is no final "judgment" or "order," so the case boiled down to whether there was a final "proceeding." Similar to Plaintiffs' argument here, the defendants asserted that "the term 'proceeding' should be read to include the characteristics of the terms that come before it: 'judgment' and 'order.'" *Id.* at 699. They claimed that "[s]ince a 'judgment' and 'order' both involve some judicial determination of rights, … a 'proceeding' should at least involve some judicial action or conclusive determination of rights." *Id.* The Court unanimously rejected that argument and held that "proceeding" should be given its ordinary meaning. Although it acknowledged that "statutory terms must be read in the context of their neighbors," it held that "that rule cuts the other way here" because "[t]o read 'proceeding' to require a judicial determination would strip it of any independent meaning." *Id.* Here, too, reading "representative" to require a fiduciary relationship would strip it of independent meaning. As in *Waetzig*, this Court should construe "representative" in line with its ordinary meaning.

Perhaps in an effort to avoid rendering "representative" superfluous, Plaintiffs contend that "representative" requires a "fiduciary-*like* relationship." Plfs. Br. 17 (emphasis added); *see also* CFPB Br. 9 (referring to "fiduciary *or similar* obligation" (emphasis added)). If Plaintiffs' theory is that "fiduciary-like" means something different from "fiduciary," that argument fails as well. First, Plaintiffs offer no explanation of what "fiduciary-like" means and how it differs from "fiduciary." "Fiduciary-like" is not a recognized legal term, and Congress would not have intended to invent a new concept of "fiduciary-like" via the simple term "representative." Moreover, Plaintiffs do not explain why the ill-defined concept of "fiduciary-like" would not capture authorized third parties. The Restatement makes clear that the word "fiduciary"—even without the "like"—is a flexible term that goes well beyond traditional fiduciary relationships such

as attorney-client or doctor-patient. *See* Restatement (Third) of Agency § 1.01 cmt. e (explaining that "[f]iduciary duty does not operate in a monolithic fashion" and "does not necessarily extend to all elements of an agency relationship"). Instead, the Restatement clarifies, the term "fiduciary" merely "signifies that an agent must act loyally in the principal's interest as well as on the principal's behalf." *Id.* And if "fiduciary-like" requires a relationship that is merely *similar* to an agency relationship, authorized third parties should qualify. Notably, the preamble states that the Rule "establishes that a third party has a duty to act for the principal's benefit in its collection, use, and retention of data, which is in line with well-established principles of agency law." Rule at 90,921; *see also id.* (noting that Rule "is consistent with common law agency principles"). Thus, even accepting Plaintiffs' incorrect theory of what "representative" means, the Rule is still lawful.

2. *This Court must apply the CFPA's statutory definition.*

In addition to their theory that "representative" does not mean "representative," Plaintiffs offer the Hail Mary argument that this Court should entirely discard the statutory definition of "consumer" and instead hold that "consumer" means "individual" and nothing more. Plfs. Br. 14. This argument defies basic principles of statutory interpretation. When "Congress takes the trouble to define the terms it uses, a court must respect its definitions as 'virtually conclusive.'" *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 59 (2024) (quoting *Sturgeon v. Frost*, 587 U.S. 28, 56 (2019)). Further, the CFPA states that applying the statutory definition is *mandatory*: "Except as otherwise provided … , for purposes of [Title 12], the following definitions *shall apply*." 12 U.S.C. § 5481 (emphasis added). Plaintiffs offer no sound basis to ignore that statutory command.

Plaintiffs begin by citing a case—not involving a statutory definition—that generally directs courts to "'look to the statutory language as the "starting point for interpretation."'" Plfs. Br. 13 (quoting *Davenport v. Lockwood, Andrews & Newnam, Inc.*, 854 F.3d 905, 909 (6th Cir.

2017)). FTA agrees that this Court must look to the statutory text, but here that text includes a statutory definition that Plaintiffs seek to read out of the statute.

Plaintiffs also reference the ordinary meaning of "consumer," which they argue means "an individual" only. Plfs. Br. 14. But the Court may not "deviate from an express statutory definition merely because it 'varies from [the] term's ordinary meaning.'" *Kirtz*, 601 U.S. at 59 (quoting *Digit. Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160 (2018)). And that conclusion is especially true here, where Congress expressly broadened that ordinary meaning by defining "consumer" as "an individual" *or* "an agent, trustee, or representative acting on behalf of an individual." 12 U.S.C. § 5481(4). Indeed, in contexts where only the "individual" meaning would make sense, Congress used that language expressly. *See* 12 U.S.C. § 5493(c)(2)(A) (referring to "credit for both individuals and communities"); *id.* § 5493(g)(1) (referring to "financial literacy of individuals").

Plaintiffs advance various arguments as to why Congress' "Act-wide" definition should not apply given the specific text and context of Section 1033. Plfs. Br. 15–16. But courts "deviate from a statutory definition only when applying the definition would be 'incompatible with Congress'[s] regulatory scheme' or would 'destro[y] one of the statute's major purposes.'" *Kirtz*, 601 U.S. at 60 (alterations in original) (quoting *Digit. Realty Tr.*, 583 U.S. at 163–64). As noted, the very purpose of the CFPA is to provide the CFPB with authority to promote access to consumer financial products and services—not to limit such access. And re-defining "consumer" to exclude authorized third parties would undermine Congress's intent to promote standardized data sharing.

In any case, taken on their own terms, none of the provisions that Plaintiffs cite evinces congressional intent to limit "consumer" only to an individual. Plaintiffs point to Section 1033's title ("Consumer rights to access information"), which they argue shows that this section is an "unlikely repository for sweeping authority to compel banks to share their consumers' information

with third-party commercial actors." Plfs. Br. 14. But facilitating more efficient access to one's data by means of an authorized third party *furthers* (rather than "destroys") an individual consumer's "right[] to access information" by making that access more efficient and meaningful.

Without any reason to jettison the statutory definition of "consumer" in the phrase at issue, Plaintiffs hunt for uses of the term "consumer" elsewhere in the statute to which the statutory definition is purportedly inapplicable. This effort fails: Plaintiffs cannot establish that applying the statutory definition to any of these usages of "consumer" would destroy the CFPA's scheme, and even if Plaintiffs *could* identify an instance or two elsewhere in which "consumer" did not take its defined meaning, that would not show that the defined meaning could be ignored throughout the statute. After all, "absurdity is not contagious[]," and the "power to correct for an absurdity in one portion of a statute does not imply a license to distort other provisions of the statute." *Kirtz*, 601 U.S. at 62 (quotation marks omitted).

Plaintiffs first argue that some uses of "consumer" elsewhere in Section 1033(a) "could only refer to the individual consumer." Plfs. Br. 14. Not so. Congress' requirement that the "product or service that the *consumer obtained from*" the bank must be "in an electronic form usable *by consumers*," 12 U.S.C. § 5533(a) (emphasis added), makes perfect sense when the term "consumer" encompasses both individuals and authorized third parties. Indeed, third-party apps, like personal financial-management tools, are far more likely to depend on materials being provided in electronic form to operate effectively than individuals would.

Plaintiffs and the CFPB additionally argue that because uses of "consumer" in *other* subsections of Section 1033 support a narrow understanding of "consumer," the same must be true in Section 1033(a). For instance, Plaintiffs observe that Section 1033(c)'s statement that banks have no duty to "maintain or keep any information *about a consumer*" under Section 1033 must

refer to the individual consumer. Plfs. Br. 14 (emphasis added) (quoting 12 U.S.C. § 5533(c)). But a clarification that a bank has "no duty to maintain records" can apply equally to both an individual and an authorized third party acting on the individual's behalf—and again, the statutory definition encompasses both. Along similar lines, the CFPB briefly argues that Section 1033(d)'s discussion of how information is to be "made available *to consumers*" also supports Plaintiffs' interpretation. CFPB Br. 7 (emphasis added) (quoting 12 U.S.C. § 5533(d)). But this provision in fact shows that Section 1033 affirmatively contemplates third-party uses, because it refers to "standardized formats" and "machine readable files" that are essential for financial-technology companies to operate but have far less relevance to individual consumers. 12 U.S.C. § 5533(d).

Plaintiffs then expand the lens further, arguing that the use of "consumer" in Section 1033's neighboring sections are best read to refer to the individual consumer. Plfs. Br. 14–15. Plaintiffs additionally argue that applying the statutory definition to authorized third parties would make them "consumers" across the Act, apparently leading to absurd results elsewhere. *Id.* at 18 (citing 12 U.S.C. §§ 5511(b)(1), 5512(c)). This case does not present the question of what "consumer" means in unrelated provisions. Even if it were true that applying the statutory definition of "consumer" in some distant provision causes some unrelated problem, *Kirtz* teaches that this Court may not ignore the statutory definition in the phrase at issue here. 601 U.S. at 62.

Plaintiffs and the CFPB then turn to nontextual sources to defend their narrow understanding of "consumer." Both reference a single sentence from a Senate Report suggesting that Section 1033 "ensures that consumers are provided with access to their own financial information." Plfs. Br. 13 (quoting S. Rep. No. 111-176, at 173 (2010)); *see* CFPB Br. 11 (same). But "legislative history is not the law," and "ambiguous legislative history" cannot "muddy clear statutory language." *Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019) (quotation marks

omitted). In any case, using an authorized third party acting on the individual's behalf aids that individual in gaining "access to their own financial information." S. Rep. No. 111-176, at 173.[7]

If such extratextual sources are relevant, the consistent understanding for years has been that Section 1033 is best read to cover authorized third parties. A "drafter of the provision that became § 1033" has stated that "the scope of the provision was intended to be broad—providing a framework for customer access that would encourage competition and innovation, including through the use of third-party providers and aggregators."[8] Likewise, in 2018, the Treasury Department released a report squarely "recommend[ing] that the [CFPB] affirm that for purposes of Section 1033, third parties properly authorized by consumers, including data aggregators and consumer fintech application providers, fall within the definition of 'consumer' under [the statutory definition] for the purpose of obtaining access to financial account and transaction data."[9]

Finally, Plaintiffs also argue that the Rule itself principally defines "consumer" to refer to natural persons. Plfs. Br. 16 (citing 12 C.F.R. § 1033.131). But the preamble explains that CFPB did so simply for terminological reasons to "distinguish" between the individual himself and the "third parties that are authorized to access covered data on behalf of" that individual. Rule at 90,863. And the preamble more broadly explains that the Rule in fact "accounts for the CFPA's

---

[7] And to the extent the Court does accord any weight to legislative history, the broader Senate Report supports FTA's position because it makes clear that Congress wanted the CFPB to "have enough flexibility to address future problems as they arise," including by "adapt[ing] to new practices and new industries." S. Rep. No. 111-176, at 11.

[8] Michael S. Barr et al., *Consumer Autonomy and Pathways to Portability in Banking and Financial Services* 4 (Univ. of Mich. Ctr. on Fin., Law & Pol'y Working Paper No. 01, 2019), https://financelawpolicy.umich.edu/sites/cflp/files/2021-07/umich-cflp-working-paper-consumer-autonomy-and-data-portability-pathways-Nov-3.pdf.

[9] U.S. Dep't of the Treasury, *A Financial System That Creates Economic Opportunities: Nonbank Financials, Fintech, and Innovation* 31 (July 2018), https://home.treasury.gov/sites/default/files/2018-07/A-Financial-System-that-Creates-Economic-Opportunities---Nonbank-Financi....pdf ("2018 Treasury Report").

definition[] … by establishing third party authorization procedures … to ensure all relevant parties may access covered data." *Id.* Thus, the "substance of the [R]ule aligns with the CFPA's definition of consumer, and nothing in the CFPA prevents the CFPB from using different vocabulary within such a [R]ule." *Id.*; *see also id.* at 90,920 (similar). In short, Plaintiffs have offered no persuasive reason why the statutory definition should not apply when interpreting Section 1033(a).

3. *Plaintiffs' argument regarding data aggregators fails.*

Plaintiffs argue that the Rule's authorization of "fourth party" data aggregators shows that in at least some cases, the statutory definition is not satisfied. Plfs. Br. 17. According to Plaintiffs, that is purportedly because the consumer cannot choose whether the authorized third party uses a data aggregator, and the fourth-party aggregator is not an "agent, trustee, or representative," 12 U.S.C. § 5481(4), of the individual consumer. Plfs. Br. 17–18. This is incorrect.

As an initial matter, Plaintiffs identify no commenter who raised this issue during the notice-and-comment rulemaking period. Hence, it is waived for purposes of judicial review. *See Mich. Dep't of Envtl. Quality v. Browner*, 230 F.3d 181, 183 n.1 (6th Cir. 2000).

On the merits, Plaintiffs' argument is wrong for a straightforward reason: data aggregators, too, are "representatives" because they too must act on the consumer's behalf. *See* 12 C.F.R. § 1033.431(c). The Rule "permits data aggregators to perform the authorization procedures described in the final rule on behalf of the third party seeking the consumer's authorization," while the "third party seeking the consumer's authorization remains responsible for compliance with the authorization procedures even if it uses a data aggregator to perform the authorization procedures." Rule at 90,840. Indeed, "[i]f the third party will use a data aggregator to assist with accessing covered data, the data aggregator must certify to the consumer that it will satisfy the third party obligations" (except the obligations to ensure consumers are informed and provide a revocation mechanism, which the third party must satisfy), and "this certification must be provided to the

consumer." *Id.*; *see also id.* at 90,950–53. Further, "the third party's authorization disclosure must include the data aggregator's name and a description of the services that the data aggregator will provide in connection with accessing the consumer's covered data." *Id.* at 90,840. Because data aggregators are also extensively regulated to ensure they act on individual consumers' behalf, they qualify as "representatives" and satisfy the CFPA's statutory definition. This outcome would not have come as a surprise to the Congress that enacted Dodd-Frank, as data aggregators were already well known: the Rule cites Citibank's aggregation portal, which was introduced in 2000, and the Office of the Comptroller of the Currency's early guidance to banks on aggregation. *Id.* at 90,840 & n.7; *see also* 2018 Treasury Report 31 (concluding that data aggregators fall within the statutory definition where they are "affirmatively authorize[d], with adequate disclosure," to access individual consumers' data).

Permitting data aggregators to access data also aligns with Dodd-Frank's purpose. Data aggregators benefit consumers by streamlining the process of accessing and sharing data. Most third-party apps lack the bandwidth to build connections to thousands of financial institutions on their own. Aggregators allow individuals to instantly and securely connect their bank accounts to their chosen financial-technology apps so those individuals can use the financial services their apps provide. Aggregators play an important role in the open-banking ecosystem, powering financial-technology apps and allowing individuals to access competitive financial services. Plaintiffs offer no rational reason for restricting the use of data aggregators.[10]

---

[10] The CFPB briefly contends that the "reasonably necessary" standard in 12 C.F.R. § 1033.421(a)(1) suggests that authorized third parties need not act on behalf of consumers. CFPB Br. 9–10. But the Rule's text directly refutes that contention, stating that "[t]he third party will limit its collection, use, and retention of covered data to what is reasonably necessary to provide the consumer's requested product or service." 12 C.F.R. § 1033.421(a)(1). Indeed, in FTA's view, the "reasonably necessary" standard—which restricts certain beneficial uses of data, including all secondary uses of data—is overly stringent, has few consumer benefits, and creates a tilted playing

## II. The CFPB Did Not Impermissibly Delegate to Standard-Setting Organizations (Count VI).

Plaintiffs contend that the CFPB engaged in an impermissible delegation of authority to private SSOs to develop consensus standards for various technical aspects of the Rule. Plfs. Br. 19–21; *see Nat'l Truck Equip. Ass'n v. NHTSA*, 711 F.3d 662, 675 (6th Cir. 2013). That argument lacks merit. The CFPB did exactly what BPI asked it to do: seek guidance from industry standard-setting organizations, while reserving enforcement authority for itself. As BPI itself advocated for during the rulemaking process, this was a permissible exercise of the CFPB's authority to set rules and guidance to "enable the Bureau to administer and carry out" its duties. 12 U.S.C. § 5512(b)(1); *see id.* § 5533(a); Required Rulemaking on Personal Financial Data Rights; Industry Standard-Setting, 89 Fed. Reg. 49,084, 49,086 (June 11, 2024) ("Standard-Setting Rule").

Neither BPI nor any other commenter suggested during the comment stage that the use of SSOs might violate the nondelegation doctrine, so the issue is forfeited. *See Browner*, 230 F.3d at 183 n.1. Indeed, BPI *supported* CFPB's reliance on SSOs. *See, e.g.*, BPI Comments 13 ("We support the proposal's reliance on industry-led standard-setting bodies ('SSBs') and believe an SSB is well suited to facilitate compliance with certain aspects of section 1033."); *id.* at 32 ("The use of voluntary consensus standards, if done appropriate and established prior to any compliance data, would be both consistent with the law and practical."); *cf.* Standard-Setting Rule at 49,084 (noting that a "U.S. industry-led, voluntary consensus standards system" has numerous benefits). BPI is now suing the CFPB for doing exactly what BPI asked the agency to do.

---

field in which banks can use data for secondary purposes but third-party providers cannot. FTA's position is that such a stringent standard is not necessary to ensure that third parties are acting as a representative on behalf of the individual.

But even if the issue were preserved, it would fail because Plaintiffs "fail[] to specify any particular power … that the agency has turned around and actively delegated." *Nat'l Truck Equip.*, 711 F.3d at 675; *see Tabor v. Joint Bd. for the Enrollment of Actuaries*, 566 F.2d 705, 708 n.5 (D.C. Cir. 1977). SSOs have zero enforcement authority. If a bank does not follow an SSO's standard, the SSO cannot do anything about it. Further, SSOs also have zero lawmaking authority. Their technical standards do not carry the force of law. Instead, they serve only as "indicia of compliance" with the Rule. *See* Standard-Setting Rule at 49,084 (noting only that the standards "might be used to facilitate implementation" of the Rule); *id.* at 49,085 (noting that "[r]ecognition of standard-setting bodies that are fair, open, and inclusive can facilitate implementation of" the CFPB's rulemaking authority under Section 1033). Indeed, the CFPB declined to treat the industry standards as safe harbors. *See* Rule at 90,862 ("If the final rule provided safe harbors, as some commenters suggested, recognized standard setters could play a regulatory role, rather than a consensus standard-setting one."). Thus, the CFPB has not "delegated to another actor almost the entire determination of whether a specific statutory requirement … has been satisfied." *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 567 (D.C. Cir. 2004).

Nor, as Plaintiffs assert, do the standards "lend definite regulatory force to an otherwise broad statutory mandate" and "channel its enforcement." Plfs. Br. 21 (quotation marks omitted). To the contrary, the Rule explains that it relies on "consensus standards" as "indicia of compliance" precisely because the "indicia of compliance framework maintains [the Rule's requirements] as the applicable legal standard." Rule at 90,862. Plaintiffs object to the SSOs writing rules governing risk-based denials, allowable frequency restrictions, and "commercially reasonable" interface performance. *See* 12 C.F.R. §§ 1033.311(c)(2)(i), (c)(2)(i)(A), 1033.321(c)(1). But, as

noted, none of these is an impermissible delegation because the standards set are merely "indicia of compliance" and the SSOs have no separate regulatory or enforcement authority of their own.[11]

Nor is there any question that the CFPB had ample authority to use compliance with SSO-issued standards as "indicia of compliance." Section 1033(d) directs the CFPB to "promote the development and use of standardized formats." 12 U.S.C. § 5533(d). Plaintiffs acknowledge that the CFPB had the authority to "look to private organizations to issue standards for technical data formatting issues," Plfs. Br. 20 n.5, but do not explain why the CFPB lacked the authority to look to SSOs to issue other technical standards. Further, the CFPB properly exercised authority under Section 1033(a) (referring to "rules prescribed by the Bureau"), 12 U.S.C. § 5533(a), and Section 1022(b)(1) (authorizing the Director to "prescribe rules and issue orders and guidance, as may be necessary or appropriate[,] to enable the Bureau to administer and carry out [its duties]"), *id.* § 5512(b)(1). Those broad grants of authority easily authorize the solution of allowing industry organizations to develop standards while reserving all enforcement authority.

Indeed, such industry-led standards are routine and have been encouraged as a matter of federal statute and policy for decades. For nearly 30 years, federal law has encouraged agencies to "use technical standards that are developed or adopted by voluntary consensus standards bodies, using such technical standards as a means to carry out policy objectives or activities determined by the agencies and departments." National Technology Transfer and Advancement Act of 1995, Pub. L. No. 104-113, § 12(d), 110 Stat. 775, 783 (1996) (codified at note following 15 U.S.C. § 272); *see* Office of Mgmt. & Budget, Exec. Office of the President, Revised OMB Circular A-

[11] The CFPB has also ensured, via the Standard-Setting Rule, that the standard-setting process is fair, open, and inclusive. *Cf. U.S. Telecom*, 359 F.3d at 565–66 (noting concern for a situation where "delegation to outside entities increases the risk that these parties will not share the agency's national vision and perspective" (quotation marks omitted)).

119 (1998) (directing agencies to use voluntary consensus standards whenever possible). BPI, citing the same OMB Circular, acknowledged this very point in its comment letter. *See* BPI Comments 32 ("Federal policy has long recognized the benefits of industry SSBs in the development of the kinds of technical standards that will be needed to achieve the Bureau's vision for §1033."). The CFPB committed no legal violation in following this widespread practice.

## III. The Rule's Data-Sharing Framework Is Not Arbitrary and Capricious Simply Because Plaintiffs Find Many Aspects of It Objectionable (Count II).

Plaintiffs present four concerns with the Rule that they argue render it arbitrary and capricious. Plfs. Br. 21–24. But each of Plaintiffs' objections is simply a policy disagreement that does not establish arbitrary and capricious agency action.

Plaintiffs first note that the Rule requires banks to share information that can be used to initiate payment. Plfs. Br. 22; *see* 12 C.F.R. § 1033.211(c). As discussed below, *see* pp. 35–36, *infra*, this follows from Section 1033's mandate that "information relating to … account[s]" be made available to consumers. 12 U.S.C. § 5533(a). Plaintiffs assert without support that this will create a "severe risk of consumer harm," Plfs. Br. 22, ignoring the pages and pages of analysis in the Rule explaining how those asserted harms would be mitigated. *See* Rule at 90,870–73.

Plaintiffs' second complaint is that the Rule relies too much on banks to ensure third parties' authorization to receive data, rather than implementing a system in which the CFPB performs that authorization itself. Plfs. Br. 23. But the CFPB accepted commenters' proposal not to *require* banks to confirm third parties' authorization, and it reasonably explained why banks were likely to do so anyway given other existing statutory and regulatory requirements. *See* Rule at 90,905. The CFPB explained that, given these existing frameworks, the requirement to "document" third parties' compliance, 12 C.F.R. § 1033.331(b)(1)(iii), created no significant burden on banks. Plaintiffs do not explain why that was arbitrary, other than to point to other

countries with different laws that adopted different open-banking regimes. *See* Plfs. Br. 23.

Next, Plaintiffs preview their complaint that the Rule does not permit them to deny access based on speculative, inconsistently applied, or discriminatory security-risk determinations. Plfs. Br. 23–24. This argument is addressed below. *See* pp. 36–39, *infra*. Suffice it to say that the CFPB explained its rationale in great detail—and it is competitively concerning that banks would advocate for the right to deny access on discriminatory, inconsistently applied bases.

Finally, Plaintiffs argue that the CFPB should have banned screen scraping. Plfs. Br. 24. But it is doubtful that the CFPB had the statutory authority to ban screen scraping as part of this rulemaking. Further, both the intent and effect of the Rule—which Plaintiffs now seek to vacate—is to reduce the frequency of screen scraping by creating an alternative and more secure way of obtaining data. In any event, the Rule addressed screen scraping at length. *See* Rule at 90,922–23, 90,968–69. The CFPB was entitled to reach a conclusion different than what Plaintiffs prefer.

Still, Plaintiffs insist, the Rule is nonetheless arbitrary and capricious because the CFPB "did not adequately address the combined impact of these decisions." Plfs. Br. 24. This criticism is difficult to take seriously in light of the Rule's extensive cost-benefit analysis. Section 1022(b) of the CFPA requires the CFPB, when promulgating a rule, to gauge the rule's "potential benefits and costs to consumers and covered persons," 12 U.S.C. § 5512(b)(2)(A)(i), and to "consult with the appropriate prudential regulators or other Federal agencies prior to proposing a rule and during the comment process," *id.* § 5512(b)(2)(B). Pursuant to its Section 1022(b) obligations, the Rule contains dozens of pages "discuss[ing] the benefits, costs, and impacts of the [Rule's] specific provisions, and potential alternatives." Rule at 90,956; *see id.* at 90,956–82. And this analysis directly addresses the concerns Plaintiffs raise—for instance, it explains how the Rule mitigates costs related to liability and fraud by limiting screen scraping and creating rules restricting third

parties' collection, use, and retention of consumer data. *Id.* at 90,966. And on top of that, the CFPB included an additional lengthy discussion describing the Rule's impact on small entities pursuant to its duties under the Regulatory Flexibility Act. *Id.* at 90,982–88; *see* 5 U.S.C. § 603(a).

Additionally, when the effects of the CFPB's regulatory decisions intersected, the agency was careful to discuss their relationship. For example, the CFPB addressed Plaintiffs' security concerns in conjunction with its discussion of screen scraping and payment-initiation information. *See* Rule at 90,922–23. To the extent Plaintiffs or the CFPB are concerned about some other aspect of the "combined impact," Plfs. Br. 24, that warranted additional discussion from the CFPB, this concern is neither articulated in the comments nor explained in Plaintiffs' or the CFPB's briefs.

Further, there is no general obligation that, in addition to addressing all potential problems with a proposed rule, an agency also must include an explicit, on-the-record discussion of all possible combinations of problems and explain why each of the combinations is not a reason to jettison the rule. While some regulatory schemes do explicitly require a cumulative-effects analysis, *see, e.g.*, *Sierra Club v. U.S. Dep't of the Interior*, 990 F.3d 909, 917 (5th Cir. 2021) (discussing 50 C.F.R. § 402.02(d), a regulation implementing the Endangered Species Act); *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 871–72 (9th Cir. 2020) (discussing 40 C.F.R. § 1508.7, a regulation implementing the National Environmental Policy Act), no statute or regulation here required the CFPB to identify any specific set of considerations in conjunction.

Instead, the only authority Plaintiffs and the CFPB rely upon is the Fifth Circuit's now-vacated decision in *Alliance for Hippocratic Medicine v. United States FDA*, 78 F.4th 210 (5th Cir. 2023), *rev'd*, 602 U.S. 367 (2024). Plfs. Br. 21. But the context there is easily distinguishable: the Food and Drug Administration ("FDA") was changing the conditions under which a drug could be prescribed, so in determining whether the drug remained safe, the court held that the agency

was required to analyze the new conditions in combination. *See All. for Hippocratic Med.*, 78 F.4th at 246. That is a far cry from the cumulative-effect objection plaintiffs raise here, which is simply that they must win because there are lots of things about the Rule they do not like.

## IV. Plaintiffs' Flyspecking of the Rule Lacks Merit.

Plaintiffs offer six features of the Rule that they claim are "unlawful in isolation." Plfs. Br. 24; *see id.* at 25–40. None of Plaintiffs' arguments on this score has any merit. To the extent Plaintiffs assert that the CFPB exceeded statutory authority, they misconstrue the statutory regime. And to the extent Plaintiffs object that the CFPB reached a different policy judgment on several issues than what Plaintiffs would have preferred, the APA requires only that "agency action be reasonable," and neither Plaintiffs nor a court may "substitute [their] own policy judgment for that of the agency." *Arizona*, 40 F.4th at 392 (quoting *Prometheus Radio Project*, 592 U.S. at 423).

### A. Section 1033 Authorizes the CFPB to Require Banks to Share Payment-Initiation Information (Count V).

Under Section 1033, banks must provide consumers with "information … concerning the consumer financial product or service that the consumer obtained" from the bank, "including information relating to … the account." 12 U.S.C. § 5533(a). Among the "information" that the Rule requires banks to make available is "[i]nformation to initiate payment to or from" a bank account, "includ[ing] an account and routing number." 12 C.F.R. § 1033.211(c). As the CFPB explained, "[t]his information falls within the CFPB's authority under section 1033 as it is information in the control or possession of the covered person concerning the consumer financial product or service that the consumer obtained from such covered person." Rule at 90,872. And it is important that authorized third-party providers have access to this information so that they can "initiate a payment to or from the consumer's [bank] account," a core fintech service. *Id.* at 90,870.

Plaintiffs observe that Section 1033 does not specifically mention account and routing

numbers. Plfs. Br. 25. But Section 1033 covers any "information … *concerning* the consumer financial product or service" (*e.g.*, a bank account), and includes any "information *relating to* … the account." 12 U.S.C. § 5533(a) (emphasis added). It cannot seriously be argued that account and routing numbers do not "concern[]" or "relat[e] to" the account. *See Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717–18 (2018) (collecting cases giving expansive interpretations of the phrase "relating to" and noting that phrase's equivalence to the term "concerning").

Plaintiffs additionally argue that the CFPB lacks authority to require banks to share a "category of information defined by functionality." Plfs. Br. 25 (emphasis omitted). But under Section 1033, the CFPB may require sharing of *any* information relating to a bank account. Instead of simply mandating the sharing of *all* such information, the Rule instead requires banks to share only certain subsets of information. The Rule defines one such subset in functional terms—information needed to initiate payments—rather than in fixed terms. Nothing in the statute prohibits such a definition. And the agency offered a reasoned explanation for this definition: it was requiring the "broader" concept of "'information to initiate payment'" rather than just account and routing numbers, both because developments in technology might mean that additional or alternative information is someday needed to initiate payments, and because of a concern that the term "account and routing number" might be misinterpreted by regulated parties. Rule at 90,872.

### B. The Rule Reasonably Regulates Banks' Ability to Deny Access Based on Risk-Management Concerns (Count III).

The Rule's provisions governing when banks may deny access to their developer interfaces based on risk-management concerns was not arbitrary and capricious. To the contrary, the CFPB gave banks considerable discretion to deny access—discretion that FTA would seek to cabin further were the Rule reopened.

The Rule allows banks to deny access pursuant to policies and procedures relating to

safety-and-soundness obligations if doing so is also "reasonable" under the Rule, 12 C.F.R. § 1033.321(b), meaning that the denial is "[d]irectly related to a specific risk of which the [bank] is aware" and is "[a]pplied in a consistent and non-discriminatory manner," *id.* § 1033.321(b)(1)–(2). In imposing these requirements, the CFPB implemented nearly every security-focused safeguard that Plaintiffs and their members proposed. At the same time, the CFPB balanced banks' risk-management concerns against the CFPB's judgment that banks would be incentivized to deny access to preserve their competitive position. *See* Rule at 90,897–98 ("recogniz[ing] that data providers have obligations regarding risk management," while also "understand[ing] that data providers face some competitive incentives to deny access to third parties in ways that could threaten a consumer's right to access their data"). The CFPB's exercise of judgment in balancing those two considerations should not be second-guessed by this Court.[12]

Plaintiffs argue that this regime creates an unreasonable "conflict …. with banks' safety-and-soundness obligations." Plfs. Br. 27; *see id.* at 28 (hypothesizing an "untenable choice" for banks based only on abstract concerns). But Plaintiffs ignore the extent to which the Rule reflects the CFPB's extreme sensitivity to banks' safety-and-soundness obligations. Indeed, the Rule made several changes to address banks' concerns, including broadening the category of legal authorities that could ground a safety-and-soundness obligation. *See* Rule at 90,898 (noting that the Rule "has been restructured to clarify that safety and soundness standards and information security standards are two legal requirements that might justify denying access, *rather than specify an exhaustive list of grounds for denial*" (emphasis added)); *see also id.* (noting change to "reflect[] the fact that safety and soundness standards originate from a broader array of legal authorities and avoid[]

[12] Indeed, by now opposing this aspect of the Rule, Plaintiffs only confirm the CFPB's concern that banks would seek to leverage denials of access to reassert their gatekeeping power.

implying that banks and savings associations are the only depository institutions with safety and soundness obligations"); *id.* (noting inclusion of a catch-all in 12 C.F.R. § 1033.321(a)(2)(iii) "for other applicable laws and regulations regarding risk management to make clear that obligations regarding risk management may be found in other sources"); *id.* (noting change to "avoid excessively restricting the sources of information relevant to compliance").

Plaintiffs also object to the Rule's consistency and specificity limits. Plfs. Br. 28–29; *see* 12 C.F.R. § 1033.321(b). But the CFPB's approach was reasonable and reasonably explained. These requirements merely impose "procedural limit[s] on denials of access" and "do[] not substantively restrict the risks that a data provider may articulate." Rule at 90,901. They ensure that a bank does not arbitrarily deny requests to preserve its competitive position.

Plaintiffs fault the CFPB for relying on "consistency," despite the "rapidly evolving world of open banking." Plfs. Br. 28. The CFPB was attuned to that issue, noting that it "understands that requirements to avoid unsafe or unsound practices and threats to the security of customer information generally are not defined with precision" but "are evaluated based on constantly changing factual circumstances and managed by programs that are flexible enough to consider various factors." Rule at 90,898; *see id.* (the Rule's approach accounts for data providers' "flexibility and discretion" in implementing risk-management policies). Thus, banks may deny interface access based on "risks that have yet to materialize," as long as the harm is "articulable with specificity and based on circumstances that the data provider is aware of." *Id.* at 90,901.

As for "specificity," that requirement also does not arbitrarily constrain banks from denying access based on risk-management concerns. Plfs. Br. 28. Plaintiffs claim that the "specificity" requirement is unclear, particularly in view of the CFPB's reliance on standard setters. *Id.* at 28–29. But the regulations include an entire subsection on "[i]ndicia bearing on the

reasonableness of a denial," 12 C.F.R. § 1033.321(c); *see also* Rule at 90,902 ("The indicia … include factors that … can further guide compliance with § 1033.321(b)."). These indicia, only one of which relies on a consensus standard, include "[w]hether the denial proceeds from standardized risk management criteria that are available to the third party upon request," and "[w]hether the third party has a certification or other identification of fitness to access covered data that is issued or recognized by a recognized standard setter or the CFPB," both of which are not difficult for the bank to assess. 12 C.F.R. § 1033.321(c)(2)–(3). In light of the CFPB's careful balancing of competing interests and its extensive explanation in support of its interface-access regime, Plaintiffs have not shown that this aspect of the Rule is arbitrary and capricious.

### C. The CFPB Reasonably Declined to Adopt a Tort-Liability Scheme for Data Breaches (Count IV).

Plaintiffs argue that the Rule is arbitrary and capricious because the CFPB "failed to justify" its decision not to create a novel tort scheme governing liability for hypothetical data breaches. Plfs. Br. 29; *see id.* at 29–31. Plaintiffs are incorrect.

During the rulemaking process, some commenters suggested that the CFPB "address liability by mandating a comprehensive approach to assigning liability or safe harbors for data providers." Rule at 90,846–47. Some commenters expressed concerns that private contracts and existing statutory schemes (the Electronic Fund Transfer Act ("EFTA") and the Truth in Lending Act ("TILA")) were insufficient to address liability; others expressed "that the liability allocation under EFTA and TILA, combined with the third party data security and privacy obligations under the [Rule], would be adequate to address liability concerns." *Id.* at 90,847. Other commenters believed that bilateral data access agreements were sufficient "to address liability concerns." *Id.* The Rule acknowledged these comments in detail. *Id.* The CFPB ultimately "determined it would not be appropriate for this rule to impose a comprehensive approach to assigning liability among

commercial entities or safe harbors from the requirements" of other federal statutes and regulations. *Id.* That conclusion was both reasonable and reasonably explained.

For one thing, the CFPB reasonably explained that no commenters had "identif[ied] the legal authority the CFPB could rely on to modify laws it does not administer." *Id.* at 90,848. Plaintiffs do not bridge that gap, either, despite their asserted concerns of the CFPB exceeding its statutory authority. The CFPB could not have acted arbitrarily by declining to enact a tort-liability scheme it had no authority to enact.[13]

The CFPB additionally explained that the risk of erroneous payments that commenters had invoked was not a new problem, and that there was already a regulatory framework in place for managing improper payment requests submitted to, and disbursed by, consumers' banks. *Id.* at 90,847–48. The CFPB noted that "private network rules, contracts, and commercial law" provided a framework for managing liability for erroneous payments. *Id.* at 90,848. As for credit cards, the CFPB explained that because the Rule "does not require that [data providers] allow third parties to initiate payments using [credit-card] information, any costs arising from error investigations and the recoupment of losses by data providers are a function of how private network rules operate." *Id.* And the CFPB further observed that "[c]ommenters did not identify a plausible method through which the [Rule] would increase the risk of credit card fraud." *Id.*

The CFPB further acknowledged that the Rule's data-sharing regime might increase the risks of "unauthorized transactions and other errors." *Id.* But it explained that the Rule mitigates those risks by allowing the sharing of tokenized (*i.e.*, encrypted) account numbers, disallowing

---

[13] Plaintiffs also criticize the CFPB for not creating a liability framework that would reimburse banks for the costs of investigating data breaches, but it is even less clear what legal authorities would support such a framework, and Plaintiffs do not identify any comments that suggested CFPB should preemptively indemnify banks for these theoretical costs.

screen scraping as an acceptable method for information sharing, permitting data providers to "engage in reasonable risk management activities," and requiring third parties to commit to certain restrictions on data access, use, and retention. *Id.* Plaintiffs contend that this is no defense because these risk-mitigation aspects of the Rule are insufficient. Plfs. Br. 30–31. But having reasonably concluded otherwise, the CFPB also was reasonable in concluding that the risk of data breaches was not so severe that it warranted creation of a bespoke liability scheme.

The CFPB also explained that there was little empirical evidence to support commenters' dire predictions of crushing legal liability upon banks as a result of hypothetical data breaches of third-party companies. Rule at 90,848. Plaintiffs argue that this is an illicit "dodge" because it "takes no imagination" to know that data-breach victims would sue banks. But there was evidence before the CFPB to the contrary, *see id.*, and the CFPB reasonably found that given the lingering "complex factual [and] legal questions about a data provider's liability for directly contributing to consumer harm," it was premature to resolve all liability-related questions at this time. *Id.*

### D. The Rule's Performance Standards for Developer Interfaces Are Perfectly Clear (Count VII).

Under the Rule, "[a] developer interface's performance must be commercially reasonable." 12 C.F.R. § 1033.311(c). The Rule then sets forth what it means to be "commercially reasonable." It requires that the interface's response rate be at least 99.5% and sets forth detailed guidelines on how to calculate the response rate. *Id.* § 1033.311(c)(1)(i)–(iv). It then sets forth three "[i]ndicia that … performance is commercially reasonable," *id.* § 1033.311(c)(2)(i)(A)–(C), and for each indicium, it provides metrics for measuring performance, *id.* § 1033.311(c)(2)(ii)(A)–(E).

Plaintiffs claim that these standards are "bewildering," Plfs. Br. 33, but they are in fact straightforward. Take the first question that Plaintiffs deem hopelessly unanswerable: "what does it mean that a 99.5% proper-response rate is a necessary condition for reasonable performance, but

the proper-response rate will also be considered as part of the five more qualitative performance factors?" *Id.* There is nothing complicated about that. The Rule states that a response rate under 99.5% is unreasonably low. It further provides that a response rate above 99.5% is not *per se* acceptable and will be considered among the other performance attributes of a bank's interface.

In the end, Plaintiffs' objection appears to be that, by utilizing a multifactor-based reasonableness standard, the CFPB retains too much "discretion to determine who will be subject to enforcement." Plfs. Br. 33. But Plaintiffs give up the game when they concede that "[a]n agency may promulgate a 'holistic, multi-factor, weight-of-the-evidence test,'" so long as "that test 'define[s] and explain[s] the criteria the agency is applying.'" *Firearms Regul. Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 524 (8th Cir. 2024) (second and third alterations in original) (quoting *Miss. Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138, 150 (D.C. Cir. 2015) (per curiam)); *see* Plfs. Br. 32. Indeed, it is a black-letter principle of administrative law that agencies may use multi-factor "reasonableness" tests in gauging performance of regulated parties. *See, e.g.*, *Texas v. U.S. EPA*, 983 F.3d 826, 839–40 (5th Cir. 2020) (no need to use precise numerical thresholds in "data-intensive, technical, and complex" areas); *PDK Lab'ys Inc. v. U.S. DEA*, 438 F.3d 1184, 1194 (D.C. Cir. 2006) ("Agencies routinely employ multi-factor standards when discharging their statutory duties, and we have never hesitated to uphold their decisions when adequately explained."); *Miller v. Garland*, 674 F. Supp. 3d 296, 311 (E.D. Va. 2023) ("While numeric thresholds may be helpful or increase precision, courts have upheld agencies' use of multifactor tests even where there are none."). The CFPB permissibly adopted such a test here.

### E. The Rule's Compliance Timeline Is Reasonable (Count VIII).

Plaintiffs criticize the CFPB's decision to set fixed compliance timelines—that the "consensus standards" have not yet been fully articulated; no standard setters had been recognized at the time of promulgation; only one standard setter has since been recognized to set standards

only for technical data-formatting issues; and no standards are likely to be set given the CFPB's change in position. Plfs. Br. 34–35; *see also* CFPB Br. 16. These arguments fail.

The CFPB explained its compliance deadlines at length, reasonably concluding that the relevant consideration in determining compliance timelines was not the development of compliance standards but rather the size and revenue of the data provider. *See* Rule at 90,859–60. The CFPB reasonably explained that the size and resources of a bank best capture how much time it would reasonably take to come into compliance. *See id.* at 90,860. The agency also lengthened the compliance periods relative to the proposed rule. *Id.* at 90,859–60; *see* 12 C.F.R. § 1033.121(b). And the CFPB directly addressed comments from BPI and others seeking 24 months for compliance. *Cf.* BPI Comments 22. The agency explained that these commenters "did not specify why 24 months would be necessary to build the developer interface required by the rule" given that many already were well on their way to developing such interfaces, and that these entities had erroneously included within their estimated timeline "aspects of implementation related to onboarding" that were not necessary to come into compliance before the deadline. Rule at 90,860. Indeed, the first compliance deadline was in April 2026—providing the first tranche of banks nearly 18 months to come into compliance, with significant additional time thereafter for the subsequent tiers. In light of this extensive discussion, the CFPB's deadlines were reasonable.

As for the argument that the CFPB failed to appreciate that setting fixed compliance timelines would not make sense given the ensuing standard-setting process, that, too, is incorrect. As the CFPB's own brief recognizes, the agency did "acknowledge[ ] the possibility that consensus standards would not become available until after the relevant compliance dates." CFPB Br. 16 (citing Rule at 90,889). And in that context, the CFPB explained that (1) this possibility was less likely to arise given the "lengthening of compliance periods in the final rule," which "provides

more assurance that consensus standards will be available before compliance begins"; and (2) even if a consensus standard is not set, in at least some cases a "data provider will have certainty that its developer interface format complies with the requirement to be standardized, so long as the format is widely used by other data providers and designed to be readily usable by authorized third parties," meaning that "[i]n the event that an applicable consensus standard becomes available after the relevant compliance date, data providers can be assured of their continued compliance." Rule at 90,889. After all, the purpose of industry-led consensus standards is to conform to what industry is already doing. And, as the CFPB itself continues to recognize, these standards merely provide "indicia of compliance" that do not necessarily require delaying overall compliance with the rule. CFPB Br. 17. Thus, the CFPB set reasonable deadlines and adequately responded to comments challenging the premise of those deadlines.

### F. The Rule's Prohibition of Access Fees Is Both Lawful and Reasonable.

The Rule prohibits data providers from "impos[ing] any fees or charges on a consumer or an authorized third party" to recoup costs of establishing or maintaining data-sharing interfaces or of making data available under the Rule. 12 C.F.R. § 1033.301(c); *see id.* § 1033.301(c)(1)–(2). Plaintiffs claim that this aspect of the Rule is "doubly unlawful," both because the CFPB lacks authority to prohibit such fees and because, even if the CFPB had the authority, it was arbitrary and capricious for it to do so. Plfs. Br. 35; *see id.* at 35–40. Plaintiffs are wrong on both counts. The CFPA in fact *requires* a prohibition on access fees, as its plain text speaks of data being made available to consumers on demand. In any event, it is clear that the CFPA does not *preclude* the CFPB from prohibiting access fees. And even if the CFPB had discretion to permit or prohibit these fees, its policy choice to prohibit them was a reasonable exercise of discretion.

1. *The Rule's prohibition of access fees is lawful (Count IX).*

a. Section 1033 does not permit banks to charge fees for accessing covered information.

For starters, Plaintiffs get the statute backwards. Section 1033 does not even *permit* banks to charge fees for accessing consumer financial information. That is, had the Rule *authorized* banks to charge fees (as Plaintiffs want), the Rule would violate the plain text of Section 1033.

Section 1033 is captioned "[c]onsumer *rights* to access information," and it states that banks "shall *make available* … *upon request*" certain information to consumers and their authorized representatives. 12 U.S.C. § 5533(a) (emphasis added). The plain meanings of these terms point to the same conclusion: individual consumers and their representatives will obtain this information without needing to pay or do anything other than ask for it. Starting with the caption, in ordinary language, a "right" is a "[l]egal entitlement … to have or obtain something." *Right*, *Oxford English Dictionary* (3d ed. 2010) (def. II.8), https://www.oed.com/dictionary/right_n. Having a "right" to information is thus inconsistent with having to pay to retrieve it. Likewise, the statute commands banks to "make available" covered data "upon request," implying that it is a "request" (not a request plus payment) that triggers the obligation to create the availability of the data. And to be "available" means "[a]ble to be used, obtained, or selected" and "at one's disposal." *Available*, *Oxford English Dictionary*, *supra* (def. 4), https://www.oed.com/dictionary/available_adj. Again, data is not able to be used, or at a consumer's disposal, if he must additionally pay money before it is turned over.[14]

---

[14] Further, nothing in Section 1033 gives any indication of what the fees would be or how the CFPB should go about deciding or regulating them. Plaintiffs seem to think that the CFPB should have enacted a rate-regulation scheme under Section 1033 out of thin air. The more likely inference is that Congress did not intend there would be any fees at all. Indeed, other provisions of Dodd-Frank do authorize agencies to establish reasonable fees for certain financial services. *See* 15 U.S.C. § 1693o-2(a)(1)–(2).

What is more, Section 1033 includes a series of enumerated exceptions designed to protect banks from excessive financial burdens, such as exempting information that a bank "cannot retrieve in the ordinary course of its business." 12 U.S.C. § 5533(b)(4). Congress also provided that banks have no duty "to maintain or keep any information about a consumer." *Id.* § 5533(c). Thus, Congress struck a balance between consumers' interests and banks' burdens—banks *must* make information available to consumers upon request, but only if the bank already keeps it in the ordinary course of business, and the bank has no duty to keep information. As the CFPB explained, "Congress dealt with the policy issue of potential burden on data providers by cabining the information they are required to retrieve, rather than through compensation." Rule at 90,884. Plaintiffs would alter that careful balance by interpreting Section 1033 to give banks the power to put financial obstacles in front of consumers' ability to access their financial information. Indeed, Plaintiffs would render Section 1033's protections unnecessary: banks do not need to be protected from burdensome data requests if they can impose fees for compliance with those requests.

In arguing to the contrary, Plaintiffs invoke provisions from a different title of the U.S. Code which require that certain information be "provide[d]" "without charge." Plfs. Br. 36 (quoting 15 U.S.C. §§ 1681c-1(a)(2)(B), 1691(e)(4), 1639h(c)). This is not persuasive evidence of the meaning of Section 1033, which uses the phrase "make available," 12 U.S.C. § 5533(a), not "provide," and thus already implies a costless retrieval of information. Further, as the CFPB explained, "[o]ther longstanding consumer financial regulations prohibit fees when consumers seek to exercise statutory rights under Federal consumer financial laws that are otherwise silent on whether an entity may charge fees." Rule at 90,884 (citing Regulations E and Z).

Indeed, banks' principal desire is to extract profits from third parties who will access individuals' account information, but on their reading of the CFPA, it would be unlawful for the

Rule to even ban banks from charging *their own customers* for obtaining information on their own accounts. That appears to be precisely what the CFPA is trying to prohibit.

b. Section 1033 grants the CFPB authority to prohibit access fees.

Even if Section 1033 does not prohibit access fees, it at minimum leaves the question of access fees to the CFPB's discretion. The CFPB reasonably exercised that discretion in prohibiting those fees to "ensure[] that data providers do not inhibit consumers' ability to access their data, authorize third parties to access their data, or choose which third parties to authorize to access their data." Rule at 90,884.

Plaintiffs claim that "[n]othing in Section 1033 expressly authorizes the [CFPB] to decide whether banks may charge fees for providing customer data." Plfs. Br. 36. It is true that Section 1033 does not mention fees specifically, but that is only because it bestows upon the CFPB a much greater authority—the overarching power to prescribe rules that govern banks' provision of data. *See* 12 U.S.C. § 5533(a) (banks must make data available "[*s*]*ubject to rules prescribed by the Bureau*" (emphasis added)). Plaintiffs respond that this phrase only permits the CFPB to dictate the types of information banks must make available and the information's format. Plfs. Br. 37. But Plaintiffs' proposed limitation does not appear in the statute. The "subject to" clause gives the CFPB broad power to dictate the terms under which banks fulfill their statutory obligations. Whether a bank charges fees for data access under Section 1033 is a fundamental aspect of its compliance, which puts it in the heartland of the CFPB's rulemaking authority.[15]

The CFPB's authority to prohibit access fees is also independently authorized by another

---

[15] Plaintiffs claim that "boilerplate grants of rulemaking authority" do not generally "empower … agencies to dictate whether … businesses may charge for their products and services." Plfs. Br. 37. But the CFPB is not dictating what banks may charge, but rather ensuring banks comply with regulations providing consumers with unfettered access to their own financial data.

provision of the CFPA which entitles the CFPB to regulate "to prevent evasions" of the Act. 12 U.S.C. § 5512(b)(1). The CFPB correctly concluded that without a ban on access fees, banks could well leverage the power to impose such fees to obstruct the open-banking scheme. *See* Rule at 90,884 (noting that "[i]f [banks] could decide what fee to charge, they could limit or eliminate the right that CFPA section 1033 confers"). Plaintiffs opine that this provision of the CFPA is too ancillary to support a ban on fee shifting. Plfs. Br. 37 n.7. Not so: this is precisely the sort of anti-evasion mechanism that the CFPB has authority to enact.

Plaintiffs invoke the major-questions doctrine, *id.* at 37, but as the CFPB observed, "the costs of providing covered data to third parties are orders of magnitude lower than any level that would implicate the major questions doctrine." Rule at 90,881. There is nothing extraordinary about regulated entities bearing the cost of complying with regulations, particularly given that the CFPB painstakingly catalogued the several steps it took "to reduce data providers' data access costs." *Id.* at 90,885. Indeed, if the major-questions doctrine plays a role in this case, it runs the other way. Plaintiffs contend that the CFPB should have appointed itself a FERC-like rate regulator, charged with determining fair and reasonable access fees. This would be a major transformation of the CFPB's authority that would require clear guidance from Congress. There is no indication in Section 1033 that Congress intended to confer this authority.

Plaintiffs next argue that the Rule interferes with "fundamental national bank function[s]" because banks generally charge fees for their services. Plfs. Br. 38 (quoting *Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274, 283 (6th Cir. 2009)). But this case does not involve any traditional bank service. Instead, it involves giving consumers information about themselves that the bank maintains in the ordinary course of business. That is a compliance cost that one would naturally expect the bank to bear. And even if there were some background principle enabling

banks to charge for data access, Congress clearly overrode that principle when it directed banks to "make available" account information to consumers "upon request." 12 U.S.C. § 5533(a).

2. *The Rule's prohibition of access fees is reasonable (Count X).*

Plaintiffs finally argue that, even if the CFPB had power to ban access fees, it was arbitrary and capricious for the agency to exercise that power. Plfs. Br. 38–40. Plaintiffs claim that the CFPB did not sufficiently respond to the suggestion that *limitations* on (rather than a full prohibition of) access fees would achieve the CFPB's goal of preventing banks from obstructing access to consumer information. *Id.* at 39.

This argument fails because the CFPB acknowledged and grappled with this suggestion and ultimately concluded that there was no workable, administrable standard for limiting fees. *See* Rule at 90,886. This conclusion was reasonably explained—at great length. *See id.* at 90,884–87. In particular, it was reasonable for the CFPB to conclude that it "does not currently have information to suggest it would be appropriate or feasible to use a standardized fee schedule to account for the wide variety of circumstances in the open banking system." *Id.* at 90,886. The CFPA tasks the CFPB with ensuring that banks provide consumers with access to financial data; creating a complex system governing the reasonableness of rates for that access would be an enormous undertaking for the CFPB. Indeed, "no stakeholder offered any concrete indication of a workable and administrable standard for 'reasonable fees' despite the CFPB's solicitation of comment on point." *Id.* at 90,886–87.

Plaintiffs argue that the CFPB was barred from showing concern for administrability because "elsewhere in the Rule" the CFPB opted for more flexible standards. Plfs. Br. 39. It is not an illicit inconsistency, however, for an agency to adopt bright-line rules on some issues and more flexible standards on others. The CFPB justified its decisions: it found that a reasonableness standard was workable for technical performance but unworkable for rate regulation.

Plaintiffs take issue with the CFPB's explanation that prohibiting fees protects consumers' access to their information. *Id.* at 40; *see* Rule at 90,886. Plaintiffs observe that the Rule exempts banks with assets under $850 million, and posit that perhaps it would have better effectuated consumers' right to information had the CFPB permitted access fees and thereby reduced the financial burden on smaller banks. Plfs. Br. 40. But as the CFPB noted, the problem with access fees is that they limit the ability of smaller third-party providers to operate in the open-banking ecosystem. *See* Rule at 90,886. So while permitting fees might have allowed more small banks to participate, it would do so at the cost of shutting out smaller third-party fintechs and other providers. The CFPB made a policy choice on this issue and reasonably explained it.

### G. The Rule's Severability Provision Must Be Respected and Enforced.

Plaintiffs raise several theories under which aspects of the Rule, but not its entirety, are arbitrary and capricious. Even if that were the case, the Rule in its entirety need not be invalidated, because the Rule contains a severability provision stating that, "if any provision of the final rule, or any application of a provision, is stayed or determined to be invalid, the remaining provisions or applications are severable and shall continue in effect." Rule at 90,989. Subject to the single exception in the Rule, *see id.*, this Court should strictly apply this severability provision in the event it deems some portion of the Rule unlawful. For its part, true to form in its effort to avoid notice-and-comment rulemaking, the CFPB urges this Court to ignore the Rule's severability provision. CFPB Br. 18–19. The CFPB's plea should be disregarded—the agency's considered views on severability appear in the Rule, not in its brief.

## CONCLUSION

FTA's motion for summary judgment should be granted, and Plaintiffs' and Defendants' motions for summary judgment should be denied.

Dated: June 29, 2025

Respectfully submitted,

*/s/ Adam G. Unikowsky*

Adam G. Unikowsky (*pro hac vice*)
Arjun R. Ramamurti (*pro hac vice*)
Jonathan J. Marshall (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6000
aunikowsky@jenner.com
aramamurti@jenner.com
jmarshall@jenner.com

Michael P. Abate
KAPLAN JOHNSON ABATE & BIRD LLP
710 W. Main Street, 4th Floor
Louisville, KY 40202
(502) 540-8280
mabate@kaplanjohnsonlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Kentucky, Lexington Division, using the CM/ECF system, which will send a notice of filing to all counsel of record who have consented to service by electronic means.

Dated: June 29, 2025

*/s/ Adam G. Unikowsky*
Adam G. Unikowsky