**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

| | |
|---|---|
| FORCHT BANK, N.A., KENTUCKY BANKERS ASSOCIATION, and BANK POLICY INSTITUTE,<br><br>    Plaintiffs,<br><br>    v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU and RUSSELL VOUGHT, in his official capacity,<br><br>    Defendants, and<br><br>FINANCIAL TECHNOLOGY ASSOCIATION,<br><br>    Intervenor-Defendant. | No. 5:24-cv-304-DCR |

**PLAINTIFFS' COMBINED REPLY BRIEF IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO FTA'S CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

*Page*

INTRODUCTION ...................................................................................1

ARGUMENT ........................................................................................5

I.      FTA CANNOT SHOW THAT CONGRESS AUTHORIZED THE RULE.............5

    A.    The Rule Exceeds The Bureau's Authority Under Section 1033 (Count I)........................................................................................5

        1.    In Section 1033(a), the "consumer" refers to the consumer. ...............6

        2.    In any event, FTA misinterprets the Act-wide definition of "consumer" under Section 1002(4)..........................................................9

            a.    A Section 1002(4) "representative" must have a special, fiduciary-like relationship with the consumer. ......................... 9

            b.    FTA's broader definition of "representative" lacks any support in the text or context. .................................................... 14

    B.    FTA Cannot Defend The Bureau's Delegation Of Regulatory Authority To Private Standard-Setting Organizations (Count VI). ..............20

II.     THE BUREAU FAILED TO JUSTIFY SUBJECTING CONSUMER DATA TO IRRATIONAL RISK (COUNT II)..........................................................23

III.    THE RULE SUFFERS FROM NUMEROUS OTHER DEFICIENCIES. .........25

    A.    Payment-Initiation Information Is Outside The Scope Of Section 1033 (Count V).........................................................................................25

    B.    The Rule Irrationally Constrains Banks' Core Risk-Management Functions (Count III)..........................................................................26

    C.    FTA Cannot Defend The Bureau's Refusal To Prescribe Liability Allocation Rules (Count IV). ..............................................................28

    D.    The Developer Interface Performance Standards Are Hopelessly Vague (Count VII). .............................................................................31

    E.    The Rule's Fixed Compliance Dates Are Arbitrary And Capricious (Count VIII). ....................................................................................32

F. FTA's Attempts To Save The Fee Prohibition That Unlawfully Enriches Its Members Fail (Counts IX, X). .......................................34

 1. Congress did not authorize the Bureau to prohibit banks from charging fees (Count IX). ....................................................35

 2. The access-fee ban is arbitrary and capricious (Count X). .................41

CONCLUSION ....................................................................................................44

CERTIFICATE OF SERVICE ...........................................................................46

# TABLE OF AUTHORITIES

*Page(s)*

**CASES**

*Alliance for Hippocratic Medicine* v. *U.S*,
78 F.4th 210 (5th Cir. 2023) ....................................................24

*Assoc. of Am. R.R.* v. *U.S. Dep't of Transportation*,
721 F.3d 666 (D.C. Cir. 2013) ..................................................22

*Azar* v. *Allina Health Services*,
587 U.S. 566 (2019) ...............................................................17

*Borough of Duryea, Pa.* v. *Guarnieri*,
564 U.S. 379 (2011) ...............................................................37

*Carlson* v. *Postal Reg. Comm'n*,
938 F.3d 337 (D.C. Cir. 2019) ..................................................30

*Cincinnati Bell Telephone Co.* v. *FCC*,
69 F.3d 752 (6th Cir. 1995) .....................................................41

*City of Revere* v. *Massachusetts General Hosp.*,
463 U.S. 239 (1983) ...............................................................37

*Crypto Freedom All. of Texas* v. *SEC*,
2024 WL 4858590 (N.D. Tex. Nov. 21, 2024) ..............................26

*Dep't of Agric. Rural Dev. Rural Hous. Serv.* v. *Kirtz*,
601 U.S. 42 (2024) ..................................................................6

*Dubin* v. *United States*,
599 U.S. 110 (2023) ...............................................................10

*Earl* v. *Boeing Co.*,
515 F. Supp. 3d 590 (E.D. Tex. 2021) ........................................40

*Envt'l Def.* v. *Duke Energy Corp.*,
549 U.S. 561 (2007) .............................................................6, 7

*Evans* v. *United States*,
504 U.S. 255 (1992) ...............................................................10

*Firearms Regulatory Accountability Coalition, Inc.* v. *Garland*,
112 F.4th 507 (8th Cir. 2024) ..............................................31, 32

*Fischer* v. *United States*,
603 U.S. 480 (2024)..................................................................15

*Gulf Fishermens Ass'n* v. *Nat'l Marine Fisheries Serv.*,
968 F.3d 454 (5th Cir. 2020).............................................10, 39, 40

*Hollingsworth* v. *Perry*,
570 U.S. 693 (2013)..................................................................13

*Int'l Dark-Sky Assoc., Inc.* v. *FCC*,
106 F.4th 1206 (D.C. Cir. 2024)....................................................20, 22

*Johnson* v. *Priceline.com, Inc.*,
711 F.3d 271 (2d Cir. 2013)..........................................................13

*Loper Bright Enters.* v. *Raimondo*,
603 U.S. 369 (2024)..................................................................17

*Loving* v. *Virginia*,
388 U.S. 1 (1967)....................................................................37

*Mich. First Credit Union* v. *T-Mobile USA, Inc.*,
108 F.4th 421 (6th Cir. 2024).......................................................29

*Monroe Retail, Inc.* v. *RBS Citizens, N.A.*,
589 F.3d 274 (6th Cir. 2009).......................................................36

*Nielsen* v. *Preap*,
586 U.S. 392 (2019)..................................................................8

*Ohio* v. *EPA*,
603 U.S. 279 (2024)..................................................................24, 26

*Percoco* v. *United States*,
598 U.S. 319 (2023)..................................................................10

*Portland Gen. Elec. Co.* v. *Bonneville Power Admin.*,
501 F.3d 1009 (9th Cir. 2007).......................................................21

*S. Coast Air Quality Mgmt. Dist.* v. *EPA*,
472 F.3d 882 (D.C. Cir. 2006).......................................................13

*Sackett* v. *EPA*,
598 U.S. 651 (2023)..................................................................35

*Sturgeon* v. *Frost*,
587 U.S. 28 (2019)...................................................................7

*Sanders* v. *Allison Engine Co., Inc.*,
  703 F.3d 930 (6th Cir. 2012) ...................................................................6

*Tennessee* v. *Cardona*,
  737 F. Supp. 3d 510 (E.D. Ky. 2024) ....................................................44

*Tennessee* v. *Cardona*,
  762 F. Supp. 3d 615 (E.D. Ky. 2025) ...............................................31, 32

*Texas Workforce Comm'n* v. *U.S. Dep't of Educ.*,
  973 F.3d 383 (5th Cir. 2020) .................................................................14

*U.S. Telecom Assoc.* v. *FCC*,
  359 F.3d 554 (D.C. Cir. 2004) ...............................................................22

*United States* v. *Douglas*,
  885 F.3d 124 (3d Cir. 2018) ...................................................................12

*United States* v. *Johnson*,
  79 F.4th 684 (6th Cir. 2023) ..................................................................12

*Utility Air Regul. Grp.* v. *EPA*,
  573 U.S. 302 (2014) ..............................................................................6, 7

*W. Virginia* v. *EPA*,
  597 U.S. 697 (2022) .................................................................................38

*Whitman* v. *Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ...........................................................................20, 35

*Wigod* v. *Wells-Fargo Bank, N.A.*,
  673 F.3d 547 (7th Cir. 2012) ..................................................................12

*Williams* v. *Taylor*,
  529 U.S. 362 (2000) .................................................................................15

**STATUTES**

5 U.S.C. § 552 ...........................................................................................37

12 U.S.C. § 5481 ...............................................................................*passim*

12 U.S.C. § 5491 .......................................................................................15

12 U.S.C. § 5512 ...........................................................................20, 40, 43

12 U.S.C. § 5533 ...............................................................................*passim*

12 U.S.C. § 5534 ..............................................................................................15

12 U.S.C. § 5536 ..............................................................................................16

15 U.S.C. § 1639h ............................................................................................38

15 U.S.C. § 1681c-1 .........................................................................................38

15 U.S.C. § 1691 ..............................................................................................38

20 U.S.C. § 1090 ..............................................................................................39

28 U.S.C. § 1914 ..............................................................................................37

29 U.S.C. § 435 ................................................................................................39

42 U.S.C. § 247d-11 .........................................................................................39

42 U.S.C. § 1758 ..............................................................................................39

42 U.S.C. § 7411 ................................................................................................7

42 U.S.C. § 7602 ................................................................................................7

**REGULATIONS**

12 C.F.R. 7.4002 ..............................................................................................36

12 C.F.R. 1001.2 ..............................................................................................36

12 C.F.R. 1005.6 ..............................................................................................29

12 C.F.R. 1005.11 ............................................................................................29

12 C.F.R. 1026.13 ............................................................................................29

12 C.F.R. 1033.141 ..........................................................................................22

12 C.F.R. 1033.211 ..........................................................................................25

12 C.F.R. 1033.301 ..........................................................................................35

12 C.F.R. 1033.311 .....................................................................................*passim*

12 C.F.R. 1033.321 ...............................................................................27, 28, 33

12 C.F.R. 1033.331 ..........................................................................................22

12 C.F.R. 1033.351 ...............................................................................8, 33

12 C.F.R. 1033.421 .............................................................................13, 22

*Financial Data Exchange, Inc.*, CFPB No. 2024-CFPB-PFDR-0001
    (Jan. 8, 2025)...........................................................................................33

Request for Information Regarding Consumer Access to Financial Records,
    81 Fed. Reg. 83,806 (Nov. 22, 2016) ...................................................18

Required Rulemaking on Personal Financial Data Rights; Industry
    Standard-Setting,
    89 Fed. Reg. 49,084 (June 11, 2024)....................................................22

Required Rulemaking on Personal Financial Data Rights,
    89 Fed. Reg. 90,838 (Nov. 18, 2024) ..........................................*passim*

**OTHER AUTHORITIES**

*114 Million Reasons To Keep Moving Forward on Industry-Led Standard
    for Secure Data Sharing*, Financial Data Exchange (Apr. 25, 2025),
    https://perma.cc/V75C-E95M ...................................................................4

American Heritage Dictionary (2022) .........................................................9

Belinda Luscombe, *Intuit Buys Mint.com: The Future of Personal
    Finance?,* Time (Sept. 15, 2009),
    https://perma.cc/CNW2-XEVG...............................................................18

Black's Law Dictionary (12th ed. 2024)......................................................11

Board of Governors of the Federal Reserve System, FDIC & OCC,
    *Interagency Guidance on Third-Party Relationships* (June 6, 2023),
    https://perma.cc/D55F-26YE ...........................................................27, 28

Cambridge Advanced Learner's Dictionary (4th ed. 2013) .....................36

CFPB, *Consumer Protection Principles: Consumer Authorized Financial
    Data Sharing and Aggregation* (Oct. 18, 2017),
    https://perma.cc/846R-9GLT..................................................................18

Douglas W. Arner et al., *Financial Data Governance*,
    74 Hastings L.J. 235 (2023)....................................................................19

Evan Weinberger & Paige Smith, *JPMorgan Tells Fintechs To Pay Up For
    Customer Data Access*, Bloomberg (July 11, 2025),
    https://perma.cc/SM2T-9HES..................................................................40

H.R. 3126, 111th Cong. (2009) ...................................................18

Hugh Son, *JPMorgan Says Fintech Middlemen Like Plaid Are 'Massively Taxing' Its System With Unnecessary Pings*, CNBC (July 28, 2025), https://perma.cc/NT3T-82Z8 ...................................................40

Ian Ayres & Alan Schwartz, *No-Reading Problem in Consumer Contract Law*, 66 Stan. L. Rev. 545 (2014) ...................................................12

Merriam-Webster Online Dictionary ...................................................16

Restatement (Third) of Agency (2006) ...................................................10

Restatement (Third) of Trusts (2007) ...................................................11

S. Rep. 111-176 (2010) ...................................................19

Steve Boms, *U.S. Way Behind the Curve on Open Banking*, Am. Banker (Sept. 21, 2018) ...................................................19

U.S. Dept. of the Treasury, *Report to the White House Competition Council: Assessing the Impact of New Entrant Non-bank Firms on Competition in Consumer Finance Markets*, 28 (Nov. 2022), https://perma.cc/XTX7-C2W5 ...................................................4

Webster's Third New International Dictionary (2002) ...................................................9, 36

**INTRODUCTION**

Try as it might to salvage a Rule that forces banks to subsidize its members' businesses at the expense of consumer security—a Rule that even the adopting agency agrees is unlawful—FTA falls short at every turn.

First, FTA's argument that Section 1033 of the Dodd-Frank Act inaugurated the open-banking ecosystem in the United States distorts the text and context of the statute. In FTA's telling, when Congress in 2010 required banks to "make available to a consumer" certain data about the consumer's bank accounts, 12 U.S.C. § 5533(a), it actually meant that banks must provide that sensitive data to any commercial third party that can be said to be "acting on behalf of" the consumer. That reading not only stretches the text of the statute far beyond its natural meaning, but also leads to the incongruous result of converting third-party fintechs that are among the financial-services providers *regulated* by the Bureau into rights-holding "consumers" under Section 1033. Correctly understood, the text, structure, context, and purpose of the statute all confirm that Section 1033(a) simply requires banks to make data available *to the consumer*, or at most to a representative with the kind of special, fiduciary-like relationship that would typically accompany access to the consumer's sensitive financial information. FTA's view that such a directive has "limited utility" is a policy argument for a statute it believes Congress should have written, not the one it wrote. FTA Br. 3, ECF No. 64-1.

FTA likewise cannot defend the Bureau's pervasive reliance on private organizations to set substantive standards that govern parties' compliance with the Rule. It primarily contends that the CFPB has not formally "delegated" authority to these standard setters. But that hypertechnical argument ignores that the Bureau gave so little

content to the Rule's substantive requirements that regulated parties will as a practical matter have no choice but to conform to the private standards in hopes of avoiding enforcement actions.

Next, FTA cannot deny that the Bureau never addressed the cumulative effect of the Rule's individual provisions that bear on the security of consumers' data, and thus gave no justification for the Rule's substantial increase in risk to consumers. So FTA is left to contend that the Bureau did not need to do any such analysis at all. But it can point to no support in case law or common sense suggesting that agencies need not engage in such a holistic analysis as a critical component of reasoned decisionmaking, and it cannot distinguish case law rejecting agency efforts to justify individual provisions in a vacuum. As the Bureau agrees now that it has performed that evaluation of the Rule's cumulative impact, the Rule as a whole places consumer data at undue risk. CFPB Br. 15-16, ECF No. 58-1.

FTA derides (at 34) Plaintiffs' remaining claims as "[f]lyspecking" but offers no persuasive response to any of them.

- *Payment-initiation information.*—FTA points to nothing in Section 1033 even indicating that Congress contemplated the sharing of whatever information is needed to enable functionality (rather than information about the account), but simply asserts its policy view that such information is important to its members.

- *Constraints on risk management.*—Remarkably, FTA embraces the Rule's provision that a bank's decision to deny third-party access to its consumers' data based on its safety-and-soundness obligations may still subject it to enforcement

if the Bureau deems the denial unreasonable. Yet FTA has no explanation for how it is not arbitrary and capricious to subject a regulated party to such inconsistent regulatory obligations.

- *Allocation of liability*.—FTA repeats the Bureau's attempts to deflect responsibility for adopting principles for allocating the liability that will inevitably follow from the Rule's mass data-sharing regime. But it can point to nothing in the Rule justifying why it makes sense to saddle banks with the costs of liability *and* investigating fraud when the Rule deprives banks of their ability to address those risks before they materialize.

- *Vague performance standards.*—FTA's only response to the muddled developer-interface performance standards is to fall back on the proposition that agencies may rely on multifactor tests *if* those tests are reasonably explained—but it conspicuously fails to argue that the CFPB has reasonably explained this test.

- *Compliance deadlines*.—FTA fails to grapple with the fundamental irrationality of a Rule that relies so heavily on private standards, but demands compliance without regard to whether those standards have been issued.

- *Unlawful fee prohibition*.—FTA points to nothing in Section 1033 that expressly authorizes the Bureau to prohibit banks from charging fees for constructing and maintaining the developer interfaces the Rule requires. And FTA's arguments that Section 1033 *itself* somehow impliedly prohibits fees are even worse, as they conflict with the provision's plain meaning and numerous congressional statutes where Congress actually did prohibit fees. Finally, even if the Bureau had

authority to ban fees, FTA cannot defend its decision to do so here, particularly when it forced the Bureau to exempt customers of over 75% of banks from the supposed statutory "right" the Rule purports to implement.

Finally, throughout its brief FTA makes a variety of policy appeals and factual assertions about banks' purported anticompetitive conduct and the supposed consequences that will follow from vacating the Rule. None of that is true or relevant. In FTA's own words, its members' "business models [are] premised on consumers being able to easily access and share their financial data from their bank accounts." Decl. of Penny Lee ¶ 4, ECF No. 43-1. "Most Americans today use financial-technology services" already, and 114 million consumers have authorized as many as "10,000 fintech entities" to "access their account data." FTA Br. 5, 8 (quotation marks omitted); *114 Million Reasons To Keep Moving Forward on Industry-Led Standard for Secure Data Sharing*, Financial Data Exchange (Apr. 25, 2025), https://perma.cc/V75C-E95M. This substantial progress for consumers has been achieved because banks and fintechs typically "collaborate." U.S. Dept. of the Treasury, *Report to the White House Competition Council: Assessing the Impact of New Entrant Non-bank Firms on Competition in Consumer Finance Markets*, 28 (Nov. 2022), https://perma.cc/XTX7-C2W5. All of that progress in fostering an active and secure open-banking ecosystem has occurred without the Rule, and such progress will continue through private initiatives—rather than government edicts—if the Court sets the Rule aside.

**ARGUMENT**

**I.   FTA CANNOT SHOW THAT CONGRESS AUTHORIZED THE RULE.**

Nothing in FTA's brief refutes Plaintiffs' showing that the Rule exceeds the Bureau's statutory authority in Section 1033. Most fundamentally, FTA's position that Section 1033(a) gives the Bureau sweeping authority to force banks to share customer data with commercial third parties flouts fundamental statutory-interpretation principles. Statutory context confirms that the term "consumer" refers to an individual—or, at most, a narrow group of others with a fiduciary-like relationship with the individual consumer. And even if Section 1033 did authorize the Bureau's mass-data-sharing regime, FTA identifies no legal basis permitting the Bureau to let private organizations set the substantive standards of compliance with the Rule.

**A.   The Rule Exceeds The Bureau's Authority Under Section 1033 (Count I).**

The authority Congress gave the Bureau in Section 1033(a) does not allow the CFPB to mandate that banks broadly share their customers' information with commercial third parties. Congress instead required banks simply to "make available to *a consumer*" certain information about the products and services the consumer obtains from that bank. 12 U.S.C. § 5533(a) (emphasis added). FTA cannot refute Plaintiffs' showing that Section 1033's plain text, context, structure, and purpose all indicate that the term "consumer" means only the individual consumer. But even if FTA were right that the general, Act-wide definition of "consumer" in Section 1002(4) applies to Section 1033, *see* 12 U.S.C. § 5481(4), basic statutory-interpretation principles dictate that a consumer's "trustee, agent, or representative" must have some kind of special, fiduciary-like relationship with the

individual consumer, as would be expected to access sensitive financial data. There is no support for FTA's interpretation, which would read "agent, trustee, or representative" as surplusage, referring to anyone who purportedly "act[s] on behalf of" the consumer. *Id.*

1. **In Section 1033(a), the "consumer" refers to the consumer.**

As Plaintiffs explained, the ordinary meaning of "consumer" and all other contextual indicators show that Congress used the term "consumer" in Section 1033(a) to refer only to the individual consumer. *See* Pls. Br. 14-16, ECF No. 59-1. FTA labels that a "Hail Mary argument," and then spends five pages trying unsuccessfully to rebut it. *See* FTA Br. 22-27.

FTA does not dispute that the ordinary meaning of "consumer" refers only to an individual. It claims (at 22) that the Court should ignore that ordinary meaning in light of the general principle that "a court must respect [Congress's] definitions [of statutory terms] as 'virtually conclusive'" unless applying the statutory definition "would be 'incompatible with Congress'[s] regulatory scheme'" or "'destro[y] one of the statute's major purposes.'" *Dep't of Agric. Rural Dev. Rural Hous. Serv.* v. *Kirtz*, 601 U.S. 42, 59-60 (2024) (citations omitted). That is true as a general matter, but "virtually conclusive" is not "always conclusive." Statutory context can reveal that applying an Act-wide definition to a specific provision would be incompatible with the overall regulatory scheme, and the cases cited in Plaintiffs' brief (at 15)—and ignored by FTA—expressly declined to apply "Act-wide" definitions of statutory terms on that basis. *Utility Air Regul. Grp.* v. *EPA*, 573 U.S. 302, 316-20 (2014); *see Envt'l Def.* v. *Duke Energy Corp.*, 549 U.S. 561, 574 (2007) (presumption that a term takes its "statutory definition" "readily yields" when required by context); *Sanders* v. *Allison Engine Co., Inc.*, 703 F.3d 930, 938-39 (6th Cir. 2012). Indeed,

the "virtually conclusive" phrase originates from a treatise authored by Justice Scalia, who also authored the Supreme Court's opinion deviating from an "Act-wide" definition based on "statutory context" and the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Compare Sturgeon* v. *Frost*, 587 U.S. 28, 56 (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 228 (2012)), *with Util. Air Regul. Grp.*, 573 U.S. at 319-20 (citations and quotation marks omitted).[1]

Here, all of the relevant statutory context indicates that "consumer" means only the individual consumer. Starting with the title of Section 1033—"Consumer rights to access information"—FTA claims that third-party sharing can make the consumer's "access more efficient and meaningful." FTA Br. 23-24. That is a policy argument, not an interpretation. Whether providing a consumer's financial data directly to a third party might be useful has nothing to do with construing the scope of the *consumer's* "right[] to access information," which is the focus of Section 1033. 12 U.S.C. § 5533.

FTA similarly cannot dispute that the other uses of "consumer" in Section 1033 likewise refer to an individual consumer. For starters, Section 1033(a) itself requires that a bank shall make available to "a consumer" information considering the product that "*the consumer* obtained" from the bank. 12 U.S.C. § 5533(a) (emphasis added). Those terms

---

[1] FTA also argues (at 22) that the Court must apply the Act-wide definition of "consumer" because the Act specifies that its definitions "shall apply" throughout the Act "[e]xcept as otherwise provided." 12 U.S.C. § 5481. But this language, which is standard in definitional provisions, is not materially different from the language in the Act-wide definitions the Supreme Court declined to apply in *Utility Air Regulatory Group* and *Duke Energy Corp. See* 42 U.S.C. §§ 7411(a)(4), 7602(g).

refer to the same person, but there can be only one person who both obtains a financial product or service from a bank and requests information about that product or service: the individual consumer. *See Nielsen* v. *Preap*, 586 U.S. 392, 408 (2019) ("'the' is 'a function word . . . indicat[ing] that a following noun . . . has been previously specified by context'") (quoting Merriam-Webster's College Dictionary 1294 (11th ed. 2005)). A third party, by contrast, does not "obtain[]" consumer products from a bank. And the last sentence of Section 1033(a), directing that information be provided "in an electronic form usable by consumers," likewise is most naturally read as ensuring that the same "consumer" that requests data about the "consumer financial product or service that the consumer obtained" is able to use that information. 12 U.S.C. § 5533(a).

Turning to other subsections of Section 1033, FTA contends (at 25) that Section 1033(c)'s clarification that a bank has no "duty . . . to maintain or keep any information about a consumer," 12 U.S.C. § 5533(c), can "apply equally to both an individual and an authorized third party." That makes no sense. FTA never explains why Congress would think it necessary to specifically advise banks that they need not keep records "about" commercial third parties. *Id.* In fact, if Congress intended to create an open-banking system in which banks would be compelled to share sensitive consumer financial data with thousands of third parties, one would expect Congress to have *required* banks to keep records about such sharing for security and compliance purposes.[2] The far more natural reading of Section

---

[2] Indeed, the Rule prescribed just these kinds of recordkeeping requirements despite the prohibition in Section 1033(c). *See* 12 C.F.R. 1033.351(d). The Bureau's former leadership justified this requirement by arguing that its general rulemaking authority in Section 1022(b)(1) could override the specific recordkeeping prohibition in Section 1033(c).

1033(c) is that Congress did not intend third parties to be considered "consumers" in the first place.

### 2. In any event, FTA misinterprets the Act-wide definition of "consumer" under Section 1002(4).

Even if FTA were right that the Act-wide definition of "consumer" applies to Section 1033(a), it still fails to show that commercial third parties in arm's-length relationships with a consumer can qualify as an "agent, trustee, or representative acting on behalf of" an individual consumer. 12 U.S.C. § 5481(4). As Plaintiffs have explained (at 16), the well-established common-law meaning of the terms "trustee" and "agent" imply a special, fiduciary-type relationship between parties, and "representative" should thus be interpreted to likewise require a duty of loyalty or other fiduciary-like relationship with the consumer. FTA lacks any persuasive response.

### a. A Section 1002(4) "representative" must have a special, fiduciary-like relationship with the consumer.

FTA first accuses Plaintiffs (at 18) of seeking to apply something other than the "ordinary meaning" of the word "representative" to Section 1002(4). Not true. As Plaintiffs explained in their opening brief (at 17), "representative" is often defined as including fiduciary-like relationships in which a representative is "invested with the authority of the principal." *Representative*, Webster's Third New International Dictionary (2002); *see Representative*, American Heritage Dictionary (2022) ("[a]uthorized to act as an official

---

*See* Required Rulemaking on Personal Financial Data Rights, 89 Fed. Reg. 90,838, 90,919 (Nov. 18, 2024) (Rule or Final Rule). FTA does not defend that reasoning; it concedes (at 25) that "a bank has 'no duty to maintain records'" under Section 1033(c), but cannot explain why Congress would have absolved banks of that duty with respect to commercial third parties.

delegate or agent"). FTA does not deny that these are accurate definitions of "representative" or make any effort to grapple with them, but instead merely relies on *other* possible meanings of the word that that are arguably broader. *See* FTA Br. 14. "[A] word with 'many dictionary definitions . . . must draw its meaning from its context.'" *Gulf Fishermens Ass'n* v. *Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 462 (5th Cir. 2020) (quoting *Kucana* v. *Holder*, 558 U.S. 233, 245 (2010)).

All of the statutory context points to the narrower meaning of "representative," and FTA's attempt to minimize that context falls short. As Plaintiffs showed (at 16-17), the most important context is that the word "representative" follows the words "agent" and "trustee," and should thus take its meaning from those terms under the interpretive canon of *noscitur a sociis*. *See, e.g.*, *Dubin* v. *United States*, 599 U.S. 110, 124-27 (2023). FTA responds by pointing (at 19-20) to a comment in the Restatement indicating that the term "agent" does not *always* indicate a fiduciary relationship. But FTA does not and cannot dispute that the word "agent" is at least *presumed* "to have its common-law meaning," which undisputedly includes a fiduciary duty. *Evans* v. *United States*, 504 U.S. 255, 259 (1992). Just recently the Supreme Court stated without qualification that "[a]n 'agent owes a fiduciary obligation to the principal,'" quoting the same Restatement. *Percoco* v. *United States*, 598 U.S. 319, 329-30 (2023) (quoting 1 Restatement (Third) of Agency § 1.01, cmt. e (2005)). So even if there exist "[s]ome statutes" that "use agency terminology when the underlying relationship falls outside the common-law definition," Restatement (Third) of Agency § 1.01 cmt. b (2006), FTA offers no reason whatsoever to think that Section 1002(4) is one of them.

If anything, the rest of Section 1002(4) confirms that an agent should take on its common-law meaning, including the fiduciary requirement. Most obviously, the term "agent" precedes the term "trustee," which differs from an agent but indisputably "stands in a fiduciary or confidential relationship to another." *Trustee*, Black's Law Dictionary (12th ed. 2024); Restatement (Third) of Trusts § 78, cmt. a (2007) ("It follows from the nature of the trust relationship . . . that the trustee stands in a fiduciary relationship with respect to the beneficiaries as to all matters within the scope of the trust relationship."). Trustees, like agents, have duties to the consumer that extend beyond simply obtaining and using their data, and it is entirely natural that Congress would require such a duty in the context of sensitive financial information. Tellingly, FTA never accounts for the word "trustee" in all of its various arguments for why it believes a "representative" (and perhaps an "agent" as well) should be read to include countless commercial third parties without any fiduciary relationship.

FTA claims (at 20-21) that applying the *noscitur* canon to construe a "representative" as having a fiduciary-like relationship with the consumer would render that term superfluous, because it would reach only relationships already encompassed by "trustee" and "agent." That is incorrect. Congress used the word "representative" to include third parties who have some form of duty of loyalty or special relationship with the consumer that may not rise to the level of a formal fiduciary relationship. FTA fixates on Plaintiffs' use of the term "fiduciary-like" to explain this concept and claims (at 21) that it is "not a recognized legal term." But "fiduciary-like" is a term commonly used in various contexts to include a relationship that closely resembles a fiduciary, which is precisely

Plaintiffs' point. *See, e.g.*, *United States* v. *Johnson*, 79 F.4th 684, 713 (6th Cir. 2023); *United States* v. *Douglas*, 885 F.3d 124, 133, 134 (3d Cir. 2018); *see also Wigod* v. *Wells-Fargo Bank, N.A.*, 673 F.3d 547, 573 (7th Cir. 2012). Moreover, as explained below, it is *FTA's* interpretation that renders effectively all of Section 1033(a) surplusage. *See infra* at 14-15.

Finally, FTA briefly contends that if a "fiduciary-like" relationship need only be "similar to an agency relationship," then "authorized third parties" as defined by the Rule "should qualify" because of the Rule's third-party authorization process and restrictions. FTA Br. 22 (emphasis omitted). That is wrong, because even FTA does not argue that fintechs and data aggregators have any kind of duty of loyalty or other obligations to act in the consumer's best interests. In any event, FTA does little more than recite the Bureau's self-serving assertion in the preamble of the Rule that third parties act on behalf of consumers, which the Bureau has now renounced. FTA Br. 22; *see* CFPB Br. 10-11. Regardless, the argument fails.

FTA greatly exaggerates the Rule's "authorization" requirements. FTA Br. 9, 15. Cutting through the verbiage, the Rule effectively requires only that a consumer click "accept" on a disclosure form—perhaps displayed when first downloading an app—that recites the third party's obligations under the Rule, much like "cookies" disclosures that permeate websites today. It is far from clear that such click-through-type agreements even *could* create fiduciary-like relationships, particularly given the substantial evidence that consumers usually do not even read them. Ian Ayres & Alan Schwartz, *The No-Reading*

*Problem in Consumer Contract Law*, 66 Stan. L. Rev. 545, 547-548 (2014) (explaining that less than one percent of consumers read online contracts, and citing sources).

But even taking these disclosures at face value, they do not create agency relationships. "An essential element of agency is the principal's right to control the agent's actions," which consumers do not have under the Rule. *Hollingsworth* v. *Perry*, 570 U.S. 693, 713 (2013) (quoting 1 Restatement (Third) of Agency § 1.01, Cmt. f (2005)). For example, as Plaintiffs explained (at 17-18), consumers have no choice over whether the authorized third party involves a fourth-party data aggregator to access their information.[3] Relatedly, authorized third parties may provide a consumer's data to other third parties without the consumer's permission or even knowledge. *See* 12 C.F.R. 1033.421(f). And authorized third parties have virtually unchecked ability to use consumer data "to improve the product or service the consumer requested," *id.* § 1033.421(c)(4), even if using consumer data in this way entails "provision of covered data . . . to other third parties," *id.* § 1033.421(c). The fact that authorized third parties can unilaterally choose to use the data they are purportedly obtaining "on behalf of consumers" in these ways, without any ability of consumers to control those actions, precludes any notion that they are acting as consumers' agents. *See, e.g.*, *Johnson* v. *Priceline.com, Inc.*, 711 F.3d 271, 278 (2d Cir. 2013) (principal must retain right of "interim control" over agent in fulfilling agreed tasks). In

---

[3] FTA incorrectly contends (at 27) that Plaintiffs have "waived" an argument that data aggregators cannot be "consumers" or "representatives." Plaintiffs have argued that *no* commercial third parties are statutory "consumers" under Section 1033(a), which obviously includes data aggregators. That argument was made at length in comments. *See, e.g.*, AR_901 (Teller, Inc. Cmt. Ltr.) at 2-14; *see also S. Coast Air Quality Mgmt. Dist.* v. *EPA*, 472 F.3d 882, 891 (D.C. Cir. 2006) (Argument is preserved "so long as the comment to the agency was adequate notification of the general substance of the complaint.").

short, because authorized third parties owe no duty of loyalty to consumers and are free to pursue their own commercial ends through arm's-length relationships with consumers, they do not even resemble fiduciaries or agents.

### b. FTA's broader definition of "representative" lacks any support in the text or context.

1. In offering its definition of "representative" in Section 1002(4)—which it contends is incorporated into the definition of "consumer" in Section 1033(a)—FTA cherry-picks from a legal dictionary the broadest definition of the word "representative" that it can find, *Texas Workforce Comm'n* v. *U.S. Dep't of Educ.*, 973 F.3d 383, 386 n.5 (5th Cir. 2020), and contends that a representative therefore means anyone "who stands for or acts on behalf of another," FTA Br. 14 (quoting *Representative*, Black's Law Dictionary 1416 (9th ed. 2009)). But that reading makes the statute largely nonsensical and ignores all relevant statutory context surrounding its enactment.

The most obvious problem with FTA's reading is that it renders almost the entire definition of "consumer" in Section 1002(4) superfluous. For one thing, if "representative" meant anyone who "acts on behalf of another," there would be no need to include "trustee" or "agent" in the definition: any remotely plausible trustee or agent would surely be a representative. But it is even worse than that: if a representative is anyone who acts on behalf of another, *the entire list* of "agent, trustee, or representative" is superfluous, because anyone who is "acting on behalf of [the] individual" is a "representative" of the individual and therefore a consumer. 12 U.S.C. § 5481(4). Had that been Congress's intent, it could have simply defined "consumer" as "an individual or someone acting on behalf of an individual." As a "cardinal principle of statutory construction," courts construe statutes to

avoid such superfluity and "'give effect, if possible, to every clause and word of a statute.'" *Williams* v. *Taylor*, 529 U.S. 362, 404 (2000) (quoting *United States* v. *Menasche*, 348 U.S. 528, 538-39 (1955)). That is particularly appropriate here, when FTA's definition would render superfluous the three-noun list (trustee, agent, representative) that is the focal point of Congress's definition of the term "consumer." *See Fischer* v. *United States*, 603 U.S. 480, 493 (2024) (applying the rule against surplusage to avoid rendering superfluous "a reticulated list" that Congress had "delineat[ed]").

FTA is also wrong (at 23) that "the very purpose of the CFPA" supports its reading of "representative" (and thus "consumer" throughout the Act) to include fintechs. The purpose of the CFPA is to regulate financial services providers—including banks and fintechs—in order to further the interests of consumers. *See, e.g.*, 12 U.S.C. § 5491(a) (establishing the CFPB to "regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws"). FTA's argument would lead to the bizarre result that a regulated party could be transformed for purposes of the entire Act into a consumer, who is the intended beneficiary of the regulations.

This oddity further confirms that FTA's understanding of the Act-wide definition of "consumer" is incompatible with Congress's regulatory scheme. For instance, in a neighboring provision to Section 1033, Congress required the Bureau to "establish . . . reasonable procedures to provide a timely response to consumers, in writing where appropriate, to complaints against, or inquiries concerning, a covered person." 12 U.S.C. § 5534(a). Fintechs are "covered person[s]" because they "provid[e] a consumer financial product or service," *id.* §§ 5481(6), (6)(A), but FTA's reading would also make them

"consumers" who have a right to complain about other covered persons. *See also, e.g.*, *id.* § 5536(a)(1)(A) ("It shall be unlawful for[] . . . any covered person or service provider[] . . . to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law."). FTA musters only that "[t]his case does not present the question of what 'consumer' means in [other] provisions," FTA Br. 25, but that is the logical consequence of FTA's position that the Act-wide definition controls everywhere.

2. FTA's attempts to show that the broader context supports its sweeping reading of "consumer" in Section 1033(a) to include commercial third parties such as fintechs and data aggregators are also unpersuasive. FTA contends (at 16) that Section 1033(d)'s reference to providing data in "[m]achine readable" format necessarily implies that "the files will be used by third-party software providers" and thus confirms that Congress used Section 1033 "to facilitate a broader ecosystem in which authorized third parties access financial data on behalf of consumers." It is hard to imagine a more substantial overreading of a statutory term. "Machine readable" means that a document is "directly usable by a computer." *Machine-readable*, Merriam-Webster Online Dictionary, https://perma.cc/NQ8R-S9VG. Of course, many individual consumers had computers when Dodd-Frank was enacted in 2010, so the machine-readable requirement hardly suggests that Congress must have thought only tech companies could make use of data usable by computers.

And the phrase does not help FTA even on its own theory. In Section 1033(d), Congress directed the Bureau to prescribe standards to "*promote* the development and use of standardized formats for information, *including* through the use of machine readable

files." 12 U.S.C. § 5533(d) (emphases added). "[P]romote" does not mean "mandate," and "including" implies that not all standardized formats must be machine readable. *Id.* In other words, Section 1033 does not even require machine-readable files. If anything, that is strong evidence refuting FTA's notion that the purpose of Section 1033 was to facilitate compelled data-sharing with third-party software companies.

With no foothold in the statute, FTA makes various policy arguments about the supposed benefits of its view of the statute and the Rule. It posits (at 16) that Congress would have preferred mandating that banks broadly share consumers' sensitive financial data with commercial third parties over a system that permits consumers to "download their own data to their devices and then upload it to third-party apps." This is so, according to FTA, because "real-time data sharing cannot realistically occur unless [a third-party] app can access an individual's banking data in real-time." FTA Br. 17; *see, e.g.*, FTA Br. 13, 28. These policy appeals are irrelevant to analyzing the statute Congress actually wrote, as courts are not "free to rewrite clear statutes under the banner of . . . policy concerns." *Azar* v. *Allina Health Services*, 587 U.S. 566, 581 (2019). Indeed, the most natural reading of Section 1033(a)'s directive that banks merely "make [data] available to a consumer" is that Congress simply wanted to ensure that consumers could obtain their own data. It is hardly surprising that this little-discussed provision Congress enacted in 2010 does not match the statute FTA might wish Congress had adopted 15 years later. *See Loper Bright Enters.* v. *Raimondo*, 603 U.S. 369, 400 (2024) ("[T]he whole point of having written statutes[] [is that] every statute's meaning is fixed at the time of enactment.") (citation and quotation marks omitted).

FTA asserts otherwise, claiming that an "extensive historical record" confirms that Congress intended Section 1033 to inaugurate an open-banking system in the United States. *See* FTA Br. 17-18, 25-27. This contention is fanciful. Many well-known fintechs did not even exist in 2010, including three of the four members FTA highlighted in its motion to intervene (the fourth, Stripe, Inc., was founded in 2009).[4] In its brief (at 17-18 & n.4), FTA identifies one well-known fintech that predates Section 1033—Mint—and cites a 2009 article about the sale of Mint to Intuit. Belinda Luscombe, *Intuit Buys Mint.com: The Future of Personal Finance?*, Time (Sept. 15, 2009), https://perma.cc/CNW2-XEVG. But the article's tone makes clear that it is reporting on brand-new consumer finance trends. *See id.* ("Banks . . . have started to offer a similar [online banking] service to their customers."). And by the time the article came out in September 2009, Section 1033 already existed in virtually final form. *See* H.R. 3126, 111th Cong. § 138 (July 8, 2009).[5]

---

[4] *See* ECF No. 43 at 4-5. *See also Plaid*, Forbes, https://perma.cc/8TSL-QP9D; *The Wise Story*, Wise, https://perma.cc/7FJF-WPVF; *Ribbit Capital*, Tracxn, https://perma.cc/3UA6-2EQQ; *Stripe, Y Combinator*, https://perma.cc/W4JZ-H7A9.

[5] FTA also wrongly claims (at 7-8) that the CFPB has long expressed the view that Section 1033 authorizes open banking. The Bureau's request for information in 2016 simply said that, as a matter of terminology, it would include third parties' access to consumer data within the concept of "consumer-permissioned" access. Request for Information Regarding Consumer Access to Financial Records, 81 Fed. Reg. 83,806 (Nov. 22, 2016). It took no position on the meaning of Section 1033. And the Bureau's 2017 consumer protection principles did not "describ[e] the Section 1033 right as including a consumer's right 'to authorize trusted third parties to obtain'" their information. FTA Br. 8. That document— which again does not even *cite* Section 1033—expressly *disclaims* that it is "interpret[ing] or otherwise provid[ing] guidance on . . . existing statutes." CFPB, *Consumer Protection Principles: Consumer Authorized Financial Data Sharing and Aggregation*, 3 (Oct. 18, 2017), https://perma.cc/846R-9GLT.

In truth, European regulators are widely acknowledged to have been "the first mover[s] and leading proponent[s] of a mandatory legislative approach toward financial data governance"—yet the European Union did not adopt its open-banking framework until 2015. Douglas W. Arner et al., *Financial Data Governance*, 74 Hastings L.J. 235, 257 (2023). American commentators pronounced the United States "[w]ay [b]ehind the [c]urve" when, in 2018, policymakers conducted "one of the first official [open-banking] discussions in the halls of Congress." Steve Boms, *U.S. Way Behind the Curve on Open Banking*, Am. Banker (Sept. 21, 2018), https://perma.cc/2A8X-T4NC. As FTA tells it, however, this narrative was backwards all along: Congress had in fact set the curve and passed open-banking legislation years before anyone in the world.[6]

Even putting all of that aside, FTA still has a gaping hole in its theory: if Congress really had intended to "broaden and deepen the consumer-permissioned data sharing market" by mandating that banks "share financial data with consumers' third party representatives," FTA Br. 18 (quoting the Final Rule at 90,881), why would Congress have done so through a short, oblique provision addressing only what information banks must "make available *to a consumer*"? 12 U.S.C. § 5533(a) (emphasis added). Or specified that such information must be "in an electronic form usable by consumers"? *Id.* FTA's interpretation requires believing that Congress could have (and *knew* it could have) required third-party data sharing more expressly, but instead opted to usher in the open-

---

[6] Notably, there is not a hint in the legislative history that Congress thought it was undertaking such a groundbreaking effort to regulate open banking. Instead, the sole reference to Section 1033 is a Senate Report comment that Section 1033 "ensures that consumers are provided with access to their own financial information." S. Rep. 111-176, at p. 173 (2010).

banking era through a few references to giving consumers their data in "standardized formats" and "machine readable files." *Id.* § 5533(d). That elephant will not fit in those mouseholes. *See Whitman* v. *Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

### B. FTA Cannot Defend The Bureau's Delegation Of Regulatory Authority To Private Standard-Setting Organizations (Count VI).

An agency's delegation of its authority to a private entity is "assumed to be improper absent an affirmative showing of congressional authorization." *Int'l Dark-Sky Assoc., Inc.* v. *FCC*, 106 F.4th 1206, 1215 (D.C. Cir. 2024) (citation omitted). Although the Rule indisputably gives to private standard setters the authority to set "indicia of compliance" with the Rule's substantive requirements, FTA can identify no such congressional authorization here. The only purported statutory authorizations for such substantive delegation that FTA identifies are Section 1022(b)(1) and Section 1033(a). FTA Br. 31. But by their very terms, those provisions authorize only the Bureau and its Director to prescribe rules and guidance, not private parties. 12 U.S.C. §§ 5512(b)(1), 5533(a).

Perhaps recognizing as much, FTA tries to dodge the issue, suggesting that Plaintiffs "forfeited" this argument and are supposedly "suing the CFPB for doing exactly what [Plaintiff BPI] asked the agency to do." FTA Br. 29. That is doubly wrong. BPI endorsed the use of standard setters for technical formatting requirements, but expressed serious concerns about allowing standard setters to determine "indicia of compliance" with substantive legal obligations. *Compare* AR_916 (BPI Cmt. Ltr.) at 13-14 ("[A] standard setting body is best positioned to develop a standardized format for data sharing."), *and id.* at 31-35, *with id.* at 13-14, 36-37 ("[T]he CFPB should remove references to a [qualified industry standard] conferring indicia of compliance or indicia of reasonableness in several

cases."). And it is well established that an issue that was raised by any commenter is preserved for purposes of judicial review. *See, e.g.*, *Portland Gen. Elec. Co.* v. *Bonneville Power Admin.*, 501 F.3d 1009, 1024 & n.13 (9th Cir. 2007).[7]

Turning to substance, FTA contends (at 30-31) that the Bureau did not "actively delegate[]" a "particular power" to standard setters because the standard setters do not have "enforcement authority" or "lawmaking authority." But the fact that the Bureau will make the final decisions regarding enforcement does not change the fact that it has delegated to standard setters the creation of substantive compliance standards. FTA argues (at 30-31) that the standard setters' "indicia of compliance" do not constitute regulatory authority because they are labeled "indicia of compliance" rather than being determinative of a party's compliance. This argument is at odds with the D.C. Circuit's prior recognition that, where "metrics and standards" selected by a private entity provide the only discernible guidance for compliance with otherwise vague rules, those standards "channel [the agency's] enforcement" and amount to a private exercise of "regulatory

---

[7] FTA describes Plaintiffs' claim (at 29) as one implicating the "nondelegation doctrine," but Plaintiffs have not raised a constitutional challenge to the Bureau's delegation. Instead, Plaintiffs contend that the delegation is unauthorized by statute, and that nondelegation concerns are the source of the requirement that Congress clearly authorize an agency to delegate regulatory authority. Pls. Br. 19 n.4. In any event, both the statutory and constitutional arguments were raised by commenters. *See, e.g.*, AR_917 (American Financial Services Association (AFSA) Cmt. Ltr.) at 2 (The proposed delegation "raises numerous questions, including . . . [h]ow does the simple text of Section 1033 authorize the CFPB to create a complex regulatory structure involving [standard setters]?"); AR_882 (JPMC Cmt. Ltr.) at 15 ("The activities of a standard-setting body and the effect of any resulting standards must remain within constitutional limits. . . . [T]o the extent standard-setting bodies have decision-making power to create qualified industry standards that have the force of law in supervision or enforcement activities, they may constitute an improper delegation of federal regulatory authority to a private entity, especially if the CFPB, and not Congress, delegates such power.").

authority." *Assoc. of Am. R.R.* v. *U.S. Dep't of Transportation*, 721 F.3d 666, 670-72 (D.C. Cir. 2013), *vacated on other grounds*, 575 U.S. 43, 51-56 (2015); Pls. Br. 20-21.  Even the Bureau said as much:  while declining to itself prescribe substantive standards for compliance, it warned that consensus standards must be "giv[en] due weight" by regulated parties.  Final Rule at 90,862.[8]

Nor will the Bureau exercise any substantial reviewing authority over the consensus standards.  *See Int'l Dark-Sky Assoc.*, 106 F.4th at 1216.  To the contrary, the Bureau has stated that regulated entities may challenge any private standard they believe is problematic through an appeals process internal to the standard setter, not an appeal to the Bureau.  Required Rulemaking on Personal Financial Data Rights; Industry Standard-Setting, 89 Fed. Reg. 49,084, 49,087 (June 11, 2024) (the Standard-Setter Rule); 12 C.F.R. 1033.141(a)(3).  And the Bureau has even indicated that it may not intervene if privately set standards are flawed or not in accordance with its views.  Final Rule at 90,862 & n.55 ("[A] standard may be insufficient in some respect . . .  The CFPB *may* be able to provide additional guidance about particular consensus standards. . . .") (emphasis added).  At most, the Bureau has provided the kind of "[v]ague or inadequate assertion[] of final reviewing authority" that does not "save an unlawful []delegation."  *U.S. Telecom Assoc.* v. *FCC*, 359 F.3d 554, 568 (D.C. Cir. 2004).

---

[8] Indeed, for many substantive requirements, the Bureau provides no guidance about how to comply other than conformance with privately issued consensus standards.  *See, e.g.*, 12 C.F.R. 1033.311(c)(1)(iv)(C) ("consensus standard" only "[i]ndicia" for whether "response is provided . . . within a commercially reasonable amount of time"); *id.* § 1033.331(e) (same for whether "data provider's revocation method is reasonable"); *id.* § 1033.421(b)(3) (only indicia of whether "a new authorization request is reasonable" is "conformance to a consensus standard").

Finally, FTA observes that agencies are encouraged by federal law to "use technical standards" developed "by voluntary consensus standards bodies." FTA Br. 31 (citation omitted). But as explained, Plaintiffs have not challenged the use of standard-setting organizations to issue consensus standards on technical data formatting requirements, because Congress arguably authorized the CFPB to use private entities to set standards for "standardized formats." *See* Am. Compl. ¶ 143 n.14, ECF No. 22; Pls. Br. 20 n.5; 12 U.S.C. § 5533(d). Plaintiffs have instead challenged the Bureau's use of standard setters to lay out the "indicia of compliance with certain *substantive* provisions of part 1033." Final Rule at 90,843 (emphasis added). And FTA points to no instance in which an agency lawfully outsourced to a voluntary consensus standards body the authority to set standards of compliance with the agency's substantive mandates.

## II.  THE BUREAU FAILED TO JUSTIFY SUBJECTING CONSUMER DATA TO IRRATIONAL RISK (COUNT II).

FTA's arguments in defense of the Rule's decisionmaking process in adopting its unlawful data-sharing regime likewise miss the mark. As Plaintiffs explained (at 21-24)— and the Bureau now agrees (at 15-16)—the Bureau arbitrarily and capriciously failed to consider the *cumulative* impact on the security of consumers' sensitive financial data of four individual decisions the Bureau made: (i) requiring banks to share information that would enable third parties to initiate payment from a consumer's account, (ii) refusing to assume a clear role in vetting third parties before they obtain access to consumer data, (iii) allowing banks to deny interface access based on risk-management concerns only in narrow circumstances, and (iv) refusing to ban screen scraping as a method of data harvesting. FTA spends most of its response defending these four provisions individually.

FTA Br. 32-33.  That is the same mistake the Bureau made in the Rule:  failing to defend the impact of these four individual decisions *in combination*.[9]

When it finally turns to that error, FTA first contends (at 33) that the Bureau's obligation to perform a cumulative analysis was fulfilled by its supposedly "extensive cost-benefit analysis."  On the contrary, that analysis bolsters Plaintiffs' point:  nowhere in the "dozens of pages" of cost-benefit discussion that FTA cites does the Bureau ever address the substantial cost of placing consumers' most sensitive financial data at excessive and unjustifiable risk due to the framework the Rule has created.  *Id.*

FTA is left to contend that agencies need not conduct any such cumulative analysis of the overall effects of their regulations.  FTA Br. 34-35.  That position is impossible to square with the APA's reasoned decisionmaking requirements, which obligates agencies to consider and analyze each "important aspect of the problem" their regulations purport to address.  *Ohio* v. *EPA*, 603 U.S. 279, 293 (2024) (citation omitted).  FTA fails to distinguish the Fifth Circuit's decision in *Alliance for Hippocratic Medicine* v. *U.S. Food & Drug Admin*, which expressly held that the "cumulative effect" of multiple regulatory provisions "is unquestionably an important aspect of the problem," meaning that an agency's failure to analyze "the cumulative effect, [or] to explain why it did not," renders its decision arbitrary and capricious.  78 F.4th 210, 246 (5th Cir. 2023), *rev'd on other grounds*, 602 U.S. 367 (2024).  FTA asserts that the *facts* of that case are "easily distinguishable," FTA Br. 34-35, but that does nothing to rebut the underlying legal principle.

---

[9] Count III separately alleges that the risk-management standards are themselves arbitrary and capricious.  *See* Am. Compl. ¶¶ 118-23; Section III.B, *infra*.

Here, the Rule's impact on the security of consumers' financial data unquestionably constitutes an important aspect of the problem the Rule purports to address. In the four critical areas Plaintiffs identified, the Rule consistently sacrifices concerns about risks to consumers' sensitive financial data in favor of broad data-sharing mandates, raising a serious risk of compromise. Yet the Bureau never justified that trade-off based on the cumulative impact of its framework. Its failure to do so was arbitrary and capricious.

## III. THE RULE SUFFERS FROM NUMEROUS OTHER DEFICIENCIES.

### A. Payment-Initiation Information Is Outside The Scope Of Section 1033 (Count V).

Section 1033 requires banks to give consumers information *about* their accounts, such as transactional data or "costs, charges and usage data." 12 U.S.C. § 5533(a). The Rule goes further by mandating the sharing of information defined by the *functionality* it enables—data sufficient to enable a third party to initiate payment to or from the consumer's account. 12 C.F.R. 1033.211(c). The distinction matters: As sensitive as information about an account can be, information enabling payment initiation enables unauthorized withdrawals of consumers' money.

FTA first responds (at 36) that account and routing numbers are descriptive under Section 1033(a) because they "concern[]" or "relat[e] to" the customer's account. True, but irrelevant, because the Rule is not limited to account and routing numbers. As FTA ultimately admits, the CFPB opted to reach a "broader" category of payment initiation information defined "in functional terms . . . rather than in fixed terms." *Id.* (quoting the Final Rule at 90,872). As for that "broader" "functional" category, *id.*, FTA cannot point to any language in Section 1033(a) that even hints at authorizing the Bureau to require sharing

of such information. It can offer only the *ipse dixit* that, under Section 1033(a), "the CFPB may require sharing of *any* information relating to a bank account." *Id.* But the Bureau cannot simply expand statutory definitions in an effort to accomplish policy goals of enabling "a core fintech service." *Id.* at 35; *cf. Crypto Freedom All. of Texas* v. *SEC*, 2024 WL 4858590, at *2 (N.D. Tex. Nov. 21, 2024) (holding that the agency "exceeded its statutory authority by enacting such a broad definition").

## B. The Rule Irrationally Constrains Banks' Core Risk-Management Functions (Count III).

FTA all but concedes (at 37) that the Rule's restrictions on banks' abilities to deny third-party data-access requests based on risk-management concerns create a potential direct conflict with obligations imposed by federal banking regulators. In fact, FTA embraces the fact that the Rule deems compliance with a bank's safety-and-soundness requirements an insufficient basis to justify a decision to deny a third party's access to its customers' financial data. FTA Br. 36 ("The Rule allows banks to deny access pursuant to policies and procedures relating to safety-and-soundness obligations if doing so is also 'reasonable' under the Rule."). FTA also does not dispute that an "important aspect" of any regulatory undertaking is to ensure that regulated parties can comply with *all* their legal obligations. *Ohio*, 603 U.S. at 293. As Plaintiffs explained (at 28), the Bureau's failure to address that important aspect of the Rule was arbitrary and capricious.

FTA has no real response. It parenthetically suggests (at 37) that these are just "abstract concerns," but of course all concerns remain somewhat abstract unless and until the Rule takes effect—at which point banks will be put to the choice of denying risky access pursuant to safety-and-soundness obligations with the specter of a CFPB enforcement

action on the ground that such denial was not "reasonable." FTA claims that the Bureau displayed "extreme sensitivity to banks' safety-and-soundness obligations" and "broaden[ed] the category of legal authorities that could ground a safety-and-soundness obligation." FTA Br. 37. But none of that makes any difference when the Bureau still retained the ultimate authority to punish any denial it deems not "reasonable." 12 C.F.R. 1033.321(a)(2); *see* CFPB Br. 15. And this conflict is particularly damaging because the Bureau's requirement that a denial be related to a "specific risk," 12 C.F.R. 1033.321(b)(1), and "[a]pplied in a consistent . . . manner," *id.* § 1033.321(b), is at odds with prudential regulators' insistence on a "flexible . . . approach to third-party risk management that can be adjusted to the unique circumstances of each third-party relationship." Board of Governors of the Federal Reserve System, FDIC & OCC, *Interagency Guidance on Third-Party Relationships,* 15 (June 6, 2023), https://perma.cc/D55F-26YE (*Interagency Guidance on Third-Party Relationships*).

FTA likewise offers no persuasive defense of the Bureau's vague criteria for deeming a risk management-based denial "reasonable." FTA cites conclusory assertions in the Rule's preamble that the Bureau "understands" banks' need for "flexibility and discretion," and that "banks may deny interface access based on 'risks that have yet to materialize,' as long as the harm is 'articulable with specificity and based on circumstances that the data provider is aware of.'" FTA Br. 38 (quoting the Final Rule at 90,898, 90,901). But these glosses do not appear in the Rule itself, and ultimately do little more than restate the problematic standard that a bank must be able to identify specific concerns in a rapidly

evolving landscape where banks are daily facing new problems and questions that require a high degree of judgment.

More fundamentally, FTA ignores Plaintiffs' objection (at 28) that the Rule unreasonably subjects a bank to the risk of enforcement for being "inconsistent" if the bank determines that it should not have granted access in a previous circumstance and wishes to deny access in that circumstance going forward—a likely scenario given that banks can receive over a billion data requests per month. *See* AR_2198 (Consumer Bankers Ass'n (CBA) Ex Parte Submission) at 7. Insofar as FTA defends (at 38-39) the Rule's "indicia" of reasonableness as appropriate because they include some straightforward yes-or-no inquiries—such as whether "third party has a certification . . . of fitness . . . issued . . . by a recognized standard setter or the CFPB," 12 C.F.R. 1033.321(c)(3)—that only underscores the inflexibility of these criteria, which forbid an approach "that can be adjusted to the unique circumstances of each third-party relationship." *Interagency Guidance on Third-Party Relationships* at 15.

### C.  FTA Cannot Defend The Bureau's Refusal To Prescribe Liability Allocation Rules (Count IV).

As the Bureau admitted in the Rule (with studied understatement)—and FTA does not dispute—the Rule's mass-data-sharing regime "might increase the risks of 'unauthorized transactions and other errors.'" FTA Br. 40-41 (quoting the Final Rule at 90,848). Yet FTA, like the Bureau, has no explanation for why it makes sense not to prescribe liability-allocation rules for resulting customer losses and related investigative costs that are tailored to the mass-sharing regime the Rule creates.

FTA contends that liability resulting from this risky new regime can be allocated through existing regimes. FTA Br. 40-41. But it offers no response to Plaintiffs' observation (at 30) that the current framework puts liability for data breaches squarely on banks' shoulders, *see, e.g.*, *Mich. First Credit Union* v. *T-Mobile USA, Inc.*, 108 F.4th 421, 430 (6th Cir. 2024), and that it makes little sense to blindly apply this same framework to a world where the Bureau has forced banks to share payment-initiation information with thousands of unregulated third parties.

Mirroring the Bureau, FTA tries to avoid the issue by protesting that the Bureau cannot "modify laws it does not administer." FTA Br. 40 (quoting the Final Rule at 90,848). But it is unclear why prescribing new liability-allocation principles for a new Rule would require the Bureau to modify any existing laws. In any event, the Bureau could have provided for an exception to Regulations E and Z, which it does administer, to fairly address banks' liability that arises because of the Rule (including costs of investigations and addressing consumer complaints). *See* 12 C.F.R. 1005.6, 1005.11, 1026.13; *see, e.g.*, AR_882 (JPMC Cmt. Ltr.) at 9 ("The CFPB should require third parties to have appropriate resourcing and operations in place to manage consumer complaints, service customers, and investigate disputes, and the necessary capital and insurance to make the consumer whole."); AR_793 (U.S. Bank Cmt. Ltr.) at 3.

FTA argues the Bureau reasonably concluded that "the Rule mitigates" the "increase[d]" "risks" of "unauthorized transactions and other errors." FTA Br. 40-41 (quoting the Final Rule at 90,848). But the supposed mitigations the Bureau points to did not actually address commenters' specific concerns—specifically, the new mandate for

mass sharing of highly sensitive customer financial data coupled with significant constraints on banks' ability to counteract the accompanying new risks. An agency's attempt to rely on "mitigat[ion]" of the adverse effects of its rule should be rejected when it does not actually mitigate commenters' stated concerns. *See Carlson* v. *Postal Reg. Comm'n*, 938 F.3d 337, 346 (D.C. Cir. 2019). Here, FTA (like the Bureau) labels as "mitigation" actions banks are already allowed to undertake, *see* FTA Br. 40-41, while ignoring that the Rule eliminates other risk-mitigation techniques, *see, e.g.*, Pls. Br. 26-29. In short, the Bureau has not effectively mitigated the increased data-security risks that were identified by commenters and that indisputably flow from the Rule's data-sharing mandate. Final Rule at 90,848; CFPB Br. 15-16.

Finally, FTA defends the CFPB's conclusion that it was "premature to resolve all liability-related questions" in the Rule because "there was evidence before the CFPB" disputing how often "data-breach victims would sue banks." FTA Br. 41. Even accepting this argument at face value, it does not address the massively increased investigation costs of which banks warned. *See, e.g.*, AR_882 (JPMC Cmt. Ltr.) at 9. Nor does a professed aversion to resolving "all" liability-related questions prevent the Bureau from setting basic rules to address the issue. FTA Br. 41. Even if it is debatable how often data-breach victims would sue banks as opposed to an authorized third party, that does not make it "premature" to establish rules governing what should happen in those suits when a particular party is responsible for the breach. *Id.*

### D. The Developer Interface Performance Standards Are Hopelessly Vague (Count VII).

FTA fails to bring any clarity to the puzzling and unclear standards the Rule sets for determining whether a developer interface's performance is "commercially reasonable." 12 C.F.R. 1033.311(c). Plaintiffs agree with FTA that agencies may in some cases rely on multifactor tests "*if* that test 'define[s] and explain[s] the criteria the agency is applying.'" *Firearms Regulatory Accountability Coalition, Inc.* v. *Garland*, 112 F.4th 507, 534 (8th Cir. 2024) (citation omitted; emphasis added); *see* FTA Br. 42. But the Rule fails to meet that condition, and FTA offers only conclusory assertions that the standards are "straightforward" and "[p]erfectly [c]lear." FTA Br. 41. Far from it. Given the Rule's muddle, Plaintiffs are left in a paradigmatic scenario where there is "no way of predicting what conduct will violate the law." *Tennessee* v. *Cardona*, 762 F. Supp. 3d 615, 625 (E.D. Ky. 2025).

Plaintiffs listed (at 33) some of the many questions the Rule's compliance standards create, but FTA tries its hand at answering only one: the Rule's double usage of the 99.5% proper response-rate threshold. *See* FTA Br. 41-42. The Rule requires an interface to meet that numerical threshold, but then goes on to say that, even among those that meet or exceed this threshold, the Bureau will also consider that proper-response rate as part of a qualitative, amorphous inquiry into the interface's overall performance. *See* 12 C.F.R. 1033.311(c)(1), (c)(2)(A). FTA declares that this simply means that "a response rate above 99.5% is not *per se* acceptable," FTA Br. 42, but that is not correct. Instead, the Rule seems to suggest (without straightforwardly saying) that if a bank's interface achieves a 99.5% response rate, that figure will still be assessed further in the holistic inquiry, potentially

leaving a bank whose interface has a 99.6% proper-response rate at a higher risk of enforcement than one whose interface manages a 99.8% proper-response rate. Or maybe not—the Rule is entirely unclear.

FTA does not even pretend to have answers to the Rule's other mysteries, such as how the various factors and indicia listed in the Rule fit together to render an interface compliant or noncompliant, or whether the comparison of an interface's performance to the performance of other interfaces means that the interfaces performing in the bottom 50% will by definition be deemed noncompliant. *See* Pls. Br. 33; *see also Firearms Regulatory Accountability Coalition*, 112 F.4th at 521 ("unbounded comparative analysis" is arbitrary and capricious). FTA need not attempt to speak for the Bureau on this (or many other) uncertainties raised by the performance standards, but banks' resulting inability to "predict[] what conduct will violate the law" underscores that Plaintiffs are entitled to relief. *Cardona*, 762 F. Supp. 3d at 625.

### E. The Rule's Fixed Compliance Dates Are Arbitrary And Capricious (Count VIII).

As Plaintiffs have explained (at 34-35), given the Rule's extensive reliance on private standards, it was nonsensical for the CFPB to set compliance deadlines on dates certain rather than at some point after such consensus standards are issued.

FTA contends (at 43) that the Bureau acted reasonably because it lengthened the compliance deadline for the largest banks from six months in the Proposed Rule to eighteen months in the Final Rule. But as FTA acknowledges, part of the reason the Bureau did so was to "provide[] more assurance that consensus standards will be available before compliance begins." *Id.* at 43-44 (quoting the Final Rule at 90,899). That is an admission

of both the critical importance of the consensus standards and the irrationality of the Bureau's decision to set fixed compliance deadlines anyway.

In any case, the strategy (predictably) failed. The Bureau has certified only one standard setter, which will not even promulgate substantive standards (only standards pertaining to technical data formatting). *See Financial Data Exchange, Inc.*, CFPB No. 2024-CFPB-PFDR-0001 (Jan. 8, 2025). And the Bureau is extremely unlikely to recognize any additional organizations now that it has agreed that the Rule is unlawful. Consequently, no substantive standards have been issued or are likely to be issued before the first compliance deadline arrives. The only rational way to ensure "that consensus standards will be available before compliance begins," FTA Br. 44 (quoting the Final Rule at 90,889), is to key the compliance deadlines to the issuance of standards—yet the Bureau inexplicably refused to do so.

FTA also argues that premising compliance deadlines on such standards is unnecessary because, in at least one case, the Rule provides that a bank will be deemed compliant if it adopts a "widely used" data format. FTA Br. 44; *see also* 12 C.F.R. 1033.311(b)(2). But this provision is the only one where adopting "widely used" measures offers a path to compliance independent of standard setters. Numerous other provisions incorporate standards without any such safe harbor, such as what constitutes (i) reasonable and accurate policies governing the interface, (ii) a reasonable access denial based on risk management, (iii) a reasonable frequency limit on requests, and (iv) commercially reasonable interface performance, to name a few. *See* 12 C.F.R. 1033.311(c)(2)(i)(A), 1033.311(d), 1033.321(c)(1), 1033.351(c)(3). Furthermore, compliance with even the "widely

used" data formatting element is far from easy, since it is unclear how a bank is to determine which formats are "widely used" under the Rule prior to the compliance period.

In a final effort, FTA rehashes its argument that the consensus standards are irrelevant because they provide only "indicia of compliance."  FTA Br. 44 (citation omitted). As noted above, even the Bureau disagreed.  In its words, the consensus standards "assist entities in fulfilling their legal obligations" and should be "giv[en] due weight," Final Rule at 90,862, so it is important that standards "be available before compliance begins."  *Id.* at 90,899.  Their availability is also critical for "mitigat[ing] the cost" of compliance.  *Id.* at 90,962.  The Bureau's current recognition that the compliance deadlines are arbitrary and capricious is only the logical conclusion of its predecessor's reasoning.  *See* CFPB Br. 16-17.

**F.**     **FTA's Attempts To Save The Fee Prohibition That Unlawfully Enriches Its Members Fail (Counts IX, X).**

Plaintiffs argued in their opening brief that the Rule's ban on banks' charging reasonable fees for data access to third parties—who profit from that data access—is doubly unlawful:  it exceeds the Bureau's statutory authority and is arbitrary and capricious.  The CFPB agrees on both counts, admitting that the fee prohibition amounts to "a windfall to third parties" that "exceeds [the Bureau's] authority."  CFPB Br. 12-13. The CFPB also acknowledges it failed to explain why it did not allow "reasonable fees."  *Id.* at 13.  FTA says nothing to call into question the Bureau's concessions, which are supported by law and logic.

### 1. Congress did not authorize the Bureau to prohibit banks from charging fees (Count IX).

Having required banks to construct and extensively maintain developer interfaces to facilitate the new mass-data-sharing regime, the Bureau unlawfully prohibited banks from charging third-party fintechs and data aggregators fees to compensate for those services. *See* 12 C.F.R. 1033.301(c). As Plaintiffs explained in their opening brief (at 36-37), Congress must speak clearly to authorize agencies to bar private businesses from charging for the services they bring to the market. Congress did not clearly authorize the Bureau to make that determination in Section 1033, and FTA does not seriously argue otherwise. FTA Br. 47. Instead, FTA principally claims (at 45-47) that Section 1033 itself impliedly prohibits fees, contorting the plain text of the statute beyond recognition.

FTA concedes that Section 1033 does not expressly prohibit fees. FTA Br. 47 ("It is true that Section 1033 does not mention fees specifically."). It must accordingly show that Congress, without clearly saying so, subtly imposed billions of dollars in annual costs upon one set of market participants (banks) for the benefit of another set of market participants (fintechs), rather than allowing a well-functioning market to allocate the costs between the two. But courts do not read statutes to grant such sweeping authority to impose price controls on private industry lightly. *See Whitman*, 531 U.S. at 468; *Sackett* v. *EPA*, 598 U.S. 651, 679 (2023) (requiring "exceedingly clear language" when Congress "wishes to significantly alter the . . . power of the Government over private property") (citation omitted).

Plaintiffs previously explained (at 36) that the inference against an implied fee prohibition is particularly strong in the banking context because it has long been recognized

that "the ability to charge fees" is a "fundamental national bank function." *Monroe Retail,*

*Inc.* v. *RBS Citizens, N.A.*, 589 F.3d 274, 280, 283 (6th Cir. 2009); *see* 12 C.F.R. 7.4002(b)(2)

(OCC directive that banks charge fees "according to sound banking judgment and safe and

sound banking principles," taking into consideration "[t]he cost incurred by the bank in

providing the service"). FTA responds (at 48) that this presumption does not apply here

because providing data access is not a "traditional bank service." The OCC guidance

recognizes no such distinction, instead citing factors such as "[t]he cost incurred by the bank

in providing the service," the need for "deterrence of misuse" of the service, the potential

of the service to enhance "the competitive position of the bank," or the imperative to

preserve "the safety and soundness of the institution." 12 C.F.R. 7.4002(b)(2)(i)-(iv). And

as the CFPB itself concluded, "transmitting financial or banking data, alone or in

connection with another product or service," is a "financial product or service" for the

purposes of the CFPA. 12 C.F.R. 1001.2(b).

FTA makes much of Section 1033(a)'s requirement to "make" information "available

. . . upon request," arguing that the dictionary definition of "available" allows for use "at

one's disposal." FTA Br. 45 (citation omitted). Cherry-picking aside, that plainly is not the

only definition of "available": the term just as commonly means "at disposal [especially] *for*

*sale* or utilization." *Available*, Webster's Third New International Dictionary (2002)

(emphasis added); *see also Available*, Cambridge Advanced Learner's Dictionary (4th ed.

2013) ("able to be bought or used"). A sign at a roadside inn indicating "Rooms Available"

does not suggest that those rooms are free of charge. Or take the Freedom of Information

Act, which directs federal agencies to "make available to the public [certain] information,"

5 U.S.C. § 552(a)(1), but provides for the charging of reasonable fees, *id.* § 552(a)(4). FTA thus is wrong to claim that, by using this language, "Congress clearly overrode" the background principle that a bank may charge fees. FTA Br. 49.

FTA also wrongly contends (at 45) that the reference in Section 1033's caption to "[c]onsumer rights" implies that fees are prohibited. To the contrary, the existence of a "right" does not necessarily suggest that it can be exercised for free. For example, the Supreme Court has recognized the "constitutional right" of a person injured while being apprehended by law enforcement to "needed medical treatment"—but not necessarily for free. *City of Revere* v. *Massachusetts General Hosp.*, 463 U.S. 239, 245 (1983); *id.* at 245 n.7 ("Nothing we say here affects any right a hospital or governmental entity may have to recover from a detainee the cost of the medical services provided to him."). Similarly, anyone has the "right" to file a lawsuit, *see, e.g., Borough of Duryea, Pa.* v. *Guarnieri*, 564 U.S. 379, 387 (2011) (recognizing a constitutional "right of access to courts") (citation omitted), but litigants still pay filing fees. *See* 28 U.S.C. § 1914. "Marriage is one of the 'basic civil rights of man,'" *Loving* v. *Virginia*, 388 U.S. 1, 12 (1967) (internal citation omitted), but municipalities regularly charge fees for marriage licenses. *See, e.g., Marriage Licenses*, Fayette County Clerk, https://perma.cc/8JGM-BCBS ("The marriage license fee is $60.00"). And even if the term "consumer rights" did imply that consumers should be permitted to access their data free of charge, that implication would fall apart under FTA's view that Section 1033 equally conveys such "rights" to commercial third-party businesses such as fintechs and data aggregators who are trying to profit off the consumers' data.

FTA also points to a number of other arguably cost-saving provisions in Section 1033 as supposed evidence that Congress intended to prohibit fees. *See* FTA Br. 46 (recognizing that "banks have no duty 'to maintain or keep any information about a consumer'") (quoting 12 U.S.C. § 5533(c)); *id.* (recognizing that "information that a bank 'cannot retrieve in the ordinary course of its business'" is statutorily exempt) (quoting 12 U.S.C. § 5533(b)(4)). But these reasonable limits Congress adopted cannot be read to have implicitly addressed the far more significant question of whether banks may charge fees "in so cryptic a fashion," *W. Virginia* v. *EPA*, 597 U.S. 697, 721 (2022) (citation omitted), especially since the other limits on the data that must be disseminated are plainly not cost-saving measures, *see, e.g.*, 12 U.S.C. § 5533(b)(1) (no need to disseminate "confidential commercial information,""), *id.* § 5533(b)(2) (same for information "collected . . . for the purpose of preventing fraud or money laundering"), *id.* § 5533(b)(4) (same for "information required to be kept confidential by any other provision of law").

Responding to Plaintiffs' argument that Congress frequently specifies when fees are impermissible, FTA objects that Plaintiffs cite example statutes that use the verbiage "provide[d]" "without charge," claiming that those statutes are different from Section 1033(a)'s instruction to "make [data] available," which implies "costless[ness]." FTA Br. 46 (discussing 15 U.S.C. §§ 1681c-1(a)(2)(B), 1691(e)(4), 1639h(c)). In other words, perhaps a directive to "provide" information does not impliedly exclude fees, but a directive to make it available does. This hairsplitting is unpersuasive. As explained above, the definition of "available" implies no such thing. And other examples from the U.S. Code show that when Congress wants something to be "made available" *for free*, it says so clearly,

even in contexts where one might think a fee prohibition could be inferred.  *See, e.g.*, 42 U.S.C. § 1758(a)(5) (requiring schools to "make available to children free of charge . . . potable water for consumption"); *see also* 42 U.S.C. § 247d-11(e)(2)(C) (requiring states to "make available to all authorized users" certain "aggregate data sets," "free of charge"); 29 U.S.C. § 435(c) (requiring the Secretary of Labor to "make available without payment of a charge" copies of reports "upon request" of state agencies); 20 U.S.C. § 1090(a)(2)(A) (requiring the Secretary of Education to "make available . . . a free application" for federal financial aid).

FTA alternatively contends (at 47-48) that, even if Section 1033 does not prohibit fees, the statute leaves the Bureau discretion to impose such a prohibition.  FTA argues that Section 1033(a)'s "subject to" clause, which gives the Bureau rulemaking authority governing aspects of how banks make information available to consumers, gives the Bureau "broad power," including the power to ban fees.  FTA Br. 47.  But the "subject to" clause authorizes rulemaking about the topics addressed in the statute, like the "formats for information" to be transmitted to consumers.  12 U.S.C. § 5533(d).  Many statutes contain similar seemingly "broad grants of [rulemaking] authority" to agencies, and courts regularly "refuse[] to read such provisions to expand the agency's power beyond the statute's terms."  *Gulf Fishermens Ass'n*, 968 F.3d at 465 (internal citation omitted). Reading the phrase "subject to rules prescribed by" to authorize a fee ban in every place that phrase appears would result in a dramatic expansion of agency power—and authorize a wide range of what are effectively price controls.  And even if, as FTA says (at 48), it is not unusual for "regulated entities [to bear] the cost of complying with regulations," it is

certainly unusual for one industry to be compelled to subsidize another—at the cost of billions of dollars—via a mandate to provide extremely costly services for free.[10]

Finally, FTA wrongly contends (at 47-48) that the Bureau's authority to "prevent evasions" of federal consumer financial laws authorizes the Rule's fee prohibition. *See* 12 U.S.C. § 5512(b)(1). A rule that bans all fees in an effort to prevent hypothetical evasion impermissibly "expands the scope" of that statutory authorization. *Gulf Fishermens Ass'n*, 968 F.3d at 465; *see Earl* v. *Boeing Co.*, 515 F. Supp. 3d 590, 620 (E.D. Tex. 2021) (holding that general authorization to prescribe regulations "does not . . . provide *carte blanche* rulemaking authority . . . [so] as to enable the agency to sidestep the parameters within which Congress circumscribed [its] power"). The Bureau made no attempt to show that fees charged by any bank to third parties would functionally prevent consumers from obtaining their data, much less any conceivable risk that all banks will evade their obligations in that way. Prohibiting all fees on the unsupported supposition that "banks could well leverage the power to impose such fees to obstruct the open-banking scheme"

---

[10] In fact, because of the enormous costs of building and maintaining APIs for use by for-profit fintechs and data aggregators, the billions of requests that APIs process each month from aggregators who are harvesting data (often without a corresponding customer request), the significant value of the relevant consumer data, and substantial costs of resultant fraud, at least one bank has recently announced it will charge fees for such access. *See* Evan Weinberger & Paige Smith, *JPMorgan Tells Fintechs To Pay Up For Customer Data Access*, Bloomberg (July 11, 2025), https://perma.cc/SM2T-9HES. By purporting to permanently bar banks from charging any such fees, the Rule's fee prohibition thus represents a massive government intervention in how markets would ordinarily operate. In addition to creating unfairness, this intervention undermines market efficiency. A market-based fee system would allow banks to discourage costly and wholly unnecessary data-access requests by third parties, which tax APIs and result in lesser-quality service for all. *See* Hugh Son, *JPMorgan Says Fintech Middlemen Like Plaid Are 'Massively Taxing' Its System With Unnecessary Pings*, CNBC (July 28, 2025), https://perma.cc/NT3T-82Z8.

strains the authorization to "prevent evasions" beyond its limits. FTA Br. 48 (citation omitted). The Bureau, too, now recognizes that the anti-evasion authority is too blunt of an instrument to support the "prohibiti[on] [of] *all* fees in *all* instances." CFPB Br. 13.

### 2. The access-fee ban is arbitrary and capricious (Count X).

Nothing in FTA's brief refutes that, even if the Bureau had any authority to determine that fees should be prohibited, the fee prohibition is arbitrary and capricious.

*First*, as FTA does not deny, the APA requires agencies to "give an explanation when [declining] to adopt less restrictive measures in promulgating . . . rules." *Cincinnati Bell Telephone Co*. v. *FCC*, 69 F.3d 752, 761 (6th Cir. 1995). FTA claims (at 49) that the Bureau gave such explanation "at great length" when declining to adopt the less restrictive option of reasonable fees, but it is mistaken. The Bureau spent only two paragraphs considering the less restrictive alternative of reasonable fees, and its consideration amounts to little more than conclusory dismissals. *See, e.g.*, Final Rule at 90,886 ("Allowing cost-based fees . . . would not better effectuate the consumer data access right"); *id.* at 90,886-87 (saying there is no "workable and administrable standard for 'reasonable fees'"). Even the Bureau itself now acknowledges that its analysis was "conclusory" and "arbitrary and capricious." CFPB Br. 13. As the Sixth Circuit has noted, "conclusory statements" are no substitute for "reasoned explanation as to why the less restrictive alternatives . . . are insufficient." *Cincinnati Bell Telephone*, 69 F.3d at 761.

*Second*, FTA cannot defend the Bureau's decision to eschew a "reasonable fee" standard even when it adopted reasonableness standards elsewhere in the Rule. *Compare* 12 C.F.R. 1033.311(c) ("A developer interface's performance must be

commercially reasonable."), *and id.* § 1033.311(d) ("[A] data provider must not unreasonably restrict the frequency with which it receives or responds to requests for covered data from an authorized third party."), *with* Final Rule at 90,886 (rejecting "reasonableness" as a workable standard for access-fees). FTA recognizes the Bureau's inconsistent attitude toward "reasonableness," but claims the inconsistency is not "illicit" because the Bureau "justified its decisions." FTA Br. 49. But FTA cannot point to any place in the record where the Bureau considered or addressed this inconsistency. Any such explanation would have been difficult in any case, as there is no apparent justification for why a "reasonable" fees standard is any less workable than, for example, the "[]reasonabl[e]" frequency-restrictions that the Bureau permits banks to set on third parties' data requests. *See* 12 C.F.R. 1033.311(d). Instead, as Plaintiffs noted in their opening brief (at 39)—and FTA does not rebut—the inconsistent use of reasonableness is better explained by the Bureau's desire to impose the costs of its regime upon banks.

*Third*, FTA fails to defend the Bureau's decision to adopt a fee prohibition even when that required the Bureau to exempt over 75% of banks from the Rule altogether because they could not afford to comply without charging fees. Final Rule at 90,885, 90,985. While the Bureau now recognizes its error in prohibiting fees, FTA nonetheless argues that the Bureau made a reasonable policy choice in exempting small banks because allowing fees would have prevented "smaller third-party fintechs" from participating in the information-sharing framework. FTA Br. 50. But that just means the Bureau irrationally prioritized small fintechs over consumers—the putative rights-holders under Section 1033. In any event, FTA's reasoning collapses because data aggregators are still permitted to charge

fintechs (even small ones) any fee the market will bear for their information-gathering services. Final Rule at 90,886. FTA simply cannot defend the rationality of a fee prohibition that results in a substantial majority of consumer banks being unable to provide the data access (supposedly) contemplated by Section 1033 at all.

*    *    *

Finally, FTA makes a last-ditch plea to the Court to red-line the Rule and salvage as much of it as possible based on the "severability provision." FTA Br. 50. FTA does not contest that if the Court accepts Plaintiffs' arguments regarding the scope of a statutory "consumer," the unlawful standard-setter delegation, or the Bureau's failure to address the cumulative impact of its data-sharing framework that irrationally puts consumers at risk, the Rule must be vacated in full. *See id.* ("Plaintiffs raise several theories under which aspects of the Rule, but not its entirety, are arbitrary and capricious. Even if that were the case, the Rule in its entirety need not be invalidated."). Even as to Plaintiffs' arguments targeting other individual "aspects of the Rule," however, FTA is wrong. Plaintiffs have identified deficiencies with major elements of the Rule. *See, e.g.*, Final Rule at 90,871 ("[I]nformation to initiate payment . . . supports many essential consumer use cases."); *id.* at 90,891-92 (minimum interface performance requirement is necessary "to enable effective realization of the CFPA's goals"). Removing those individual elements of the Rule would leave in place a very different regulation from the one the Bureau promulgated—notably, one that did not undergo the required cost-benefit analysis in its new form. *See* 12 U.S.C. § 5512(b)(2)(A)(i). The Court should not take it upon itself to "excise the portions" of the Rule that are unlawful, given that "rulemaking is exclusively within the purview of the

Executive Branch," *Tennessee* v. *Cardona*, 737 F. Supp. 3d 510, 570-71 (E.D. Ky. 2024), and the Bureau itself has taken the position that the whole Rule should be set aside, CFPB Br. 17-19.  It is FTA, not the Bureau, that is seeking "to avoid . . . [the process of] rulemaking" by asking this Court to essentially deem the CFPB to have promulgated a different rule. FTA Br. 50.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to Plaintiffs and set aside the Rule, and it should deny FTA's cross-motion for summary judgment.

Respectfully submitted,

July 29, 2025

Timothy A. Schenk (KY Bar #92011)
KENTUCKY BANKERS
ASSOCIATION
600 W Main Street #400
Louisville, KY  40202
Tel:  (502) 582-2453
tschenk@kybanks.com

John Court*
Paige E. Pidano*
BANK POLICY INSTITUTE
1300 I Street NW, Suite 1100 West
Washington, D.C.  20005
Tel:  (202) 289-4322
john.court@bpi.com
paige.paridon@bpi.com


*  Admitted *pro hac vice*

John T. McGarvey (KY Bar #46230)
MORGAN POTTINGER MCGARVEY
401 South Fourth Street, Suite 1200
Louisville, KY  40202
(502) 560-6759
jtm@mpmfirm.com

  /s/ *Judson O. Littleton*
Jeffrey B. Wall*
Judson O. Littleton*
Nathan H. Golden*
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C.  20006
Tel:  (202) 956-7000
wallj@sullcrom.com
littletonj@sullcrom.com
goldenn@sullcrom.com

Robert A. Flatow*
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Tel:  (212) 558-4000
flatowr@sullcrom.com

*Counsel for Plaintiffs Forcht Bank, N.A.,*
*Kentucky Bankers Association, and Bank*
*Policy Institute*

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2025, I electronically filed this Brief in Further Support of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendant-Intervenor FTA's Cross-Motion for Summary Judgment with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ *Judson O. Littleton*

*Counsel for Plaintiffs Forcht Bank, N.A., Kentucky Bankers Association, and Bank Policy Institute*