# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## LEXINGTON DIVISION

---

FORCHT BANK, N.A., KENTUCKY BANKERS
ASSOCIATION, and BANK POLICY INSTITUTE,

        Plaintiffs,

        v.

CONSUMER FINANCIAL PROTECTION BUREAU
and RUSSELL VOUGHT, in his official capacity,

        Defendants, and

FINANCIAL TECHNOLOGY ASSOCIATION,

        Intervenor-Defendant.

No. 5:24-cv-304-DCR

---

# PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION
# TO LIFT THE STAY FOR PURPOSE OF
# POSTPONING THE RULE'S COMPLIANCE DEADLINES
# AND ENJOINING ITS ENFORCEMENT

# TABLE OF CONTENTS

*Page*

INTRODUCTION ..................................................................................................... 1

BACKGROUND ....................................................................................................... 3

    A.    The CFPB's Open Banking Rule ........................................................ 3

    B.    Procedural History ............................................................................. 6

ARGUMENT ............................................................................................................ 8

I.    THE EXISTING RULE IS LIKELY UNLAWFUL. ..................................... 9

    A.    The Rule Exceeds The Bureau's Authority Under Section 1033 (Count I). ......................................................................................... 9

        1.    In Section 1033(a), the "consumer" refers to the consumer. .............. 10

        2.    At most, a "consumer" under Section 1002(4) refers to someone with a special, fiduciary-like relationship with the individual consumer. ................................................................. 11

    B.    The Bureau Failed To Justify The Rule's Overall Framework, Which Places Consumer Data At Excessive Risk (Count II). ................................... 15

    C.    The Rule Unlawfully Prohibits Banks From Charging Fees For Interface Access (Counts IX, X). ........................................................ 17

    D.    The Compliance Deadlines Are Themselves Unlawful (Count VIII). ........... 20

II.    PLAINTIFFS WILL BE IRREPARABLY HARMED ABSENT INTERIM RELIEF. ........................................................................... 21

III.    THE EQUITIES OVERWHELMINGLY FAVOR INTERIM RELIEF. ........... 24

CONCLUSION ...................................................................................................... 25

CERTIFICATE OF SERVICE ............................................................................... 27

# TABLE OF AUTHORITIES

*Page(s)*

CASES

*Alliance for Hippocratic Med.* v. *U.S. Food & Drug Admin.*,
78 F.4th 210 (5th Cir. 2023),.................................................................................. 16

*Azar* v. *Allina Health Services*,
587 U.S. 566 (2019) .............................................................................................. 14

*Borough of Duryea* v. *Guarnieri*,
564 U.S. 379 (2011) .............................................................................................. 19

*Chamber of Com.* v. *Edmondson*,
594 F.3d 742 (10th Cir. 2010) .............................................................................. 21

*Cincinnati Bell Telephone Co.* v. *FCC*,
69 F.3d 752 (6th Cir. 1995) .................................................................................. 20

*Kentucky* v. *Biden*,
57 F.4th 545 (6th Cir. 2023).................................................................................. 21

*Consumer Fed'n of Am.* v. *Consumer Prod. Safety Comm'n*,
990 F.2d 1298 (D.C. Cir. 1993) ............................................................................ 23

*Dubin* v. *United States*,
599 U.S. 110 (2023) .............................................................................................. 12

*Envt'l Def.* v. *Duke Energy Corp.*,
549 U.S. 561 (2007) .............................................................................................. 11

*Fischer* v. *United States*,
603 U.S. 480 (2024) .............................................................................................. 14

*Hollingsworth* v. *Perry*,
570 U.S. 693 (2013) .............................................................................................. 12

*Johnson* v. *Priceline.com, Inc.*,
711 F.3d 271 (2d Cir. 2013).................................................................................. 13

*Kane* v. *De Blasio*,
19 F.4th 152 (2d Cir. 2021).................................................................................. 24

*League of Women Voters* v. *Newby*,
838 F.3d 1 (D.C. Cir. 2016).................................................................................. 24

*Louisiana* v. *Biden,*
    55 F.4th 1017 (5th Cir. 2022) ................................................................ 24

*Loving* v. *Virginia,*
    388 U.S. 1 (1967) ................................................................................... 19

*MCI WorldCom, Inc.* v. *FCC,*
    209 F.3d 760 (D.C. Cir. 2000) .............................................................. 21

*Monroe Retail, Inc.* v. *RBS Citizens, N.A.,*
    589 F.3d 274 (6th Cir. 2009) ................................................................. 18

*Nat. Res. Def. Council* v. *U.S. Nuclear Regul. Comm'n,*
    879 F.3d 1202 (D.C. Cir. 2018) ............................................................ 20

*Nielsen* v. *Preap,*
    586 U.S. 392 (2019) .............................................................................. 10

*Ohio* v. *EPA,*
    603 U.S. 279 (2024) .............................................................................. 16

*P&V Enters.* v. *U.S. Army Corps of Eng'rs,*
    516 F.3d 1021 (D.C. Cir. 2008) ............................................................ 23

*Parker* v. *U.S. Dep't of Agric.,*
    879 F.2d 1362 (6th Cir. 1989) ................................................................. 8

*Percoco* v. *United States,*
    598 U.S. 319 (2023) .............................................................................. 11

*Piedra Alvarez* v. *Barr,*
    829 F. App'x 833 (9th Cir. 2020) ......................................................... 21

*Sackett* v. *EPA,*
    598 U.S. 651 (2023) .............................................................................. 18

*Sanders* v. *Allison Engine Co., Inc.,*
    703 F.3d 930 (6th Cir. 2012) ................................................................. 11

*Texas* v. *Biden,*
    10 F.4th 538 (5th Cir. 2021) ................................................................. 24

*Tennessee* v. *Cardona,*
    737 F. Supp. 3d 510 (E.D. Ky. 2024) ................................................. 8, 9

*U.S. Sugar Corp.* v. *EPA,*
    830 F.3d 579 (D.C. Cir. 2016) .............................................................. 20

*Utility Air Regul. Grp.* v. *EPA*,
    573 U.S. 302 (2014) ............................................................................... 11

*Whitman* v. *Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ............................................................................... 18

*Williams* v. *Taylor*,
    529 U.S. 362 (2000) ............................................................................... 14

*Wilson* v. *Williams*,
    961 F.3d 829 (6th Cir. 2020) ................................................................ 24

**STATUTES**

5 U.S.C. § 553 ............................................................................................. 23

5 U.S.C. § 705 ........................................................................................ 2, 8, 24

5 U.S.C. § 706 ......................................................................................... 6, 15

12 U.S.C. § 5481 .................................................................................... 11, 13

12 U.S.C. § 5491 .......................................................................................... 14

12 U.S.C. § 5533 ..................................................................................... *passim*

15 U.S.C. § 1639h ......................................................................................... 18

15 U.S.C. § 1681c-1 ...................................................................................... 18

15 U.S.C. § 1691 ........................................................................................... 18

20 U.S.C. § 1090 ........................................................................................... 19

28 U.S.C. § 1914 ........................................................................................... 19

29 U.S.C. § 435 ............................................................................................. 19

42 U.S.C. § 247d-11 ...................................................................................... 19

42 U.S.C. § 1758 ........................................................................................... 19

**REGULATIONS**

12 C.F.R. 7.4002 ........................................................................................... 18

12 C.F.R. 1033.101 ......................................................................................... 4

12 C.F.R. 1033.121 ............................................................................................ 6

12 C.F.R. 1033.211 ........................................................................................ 5, 16

12 C.F.R. 1033.301 ..................................................................................... 5, 6, 18

12 C.F.R. 1033.311 ........................................................................................ 5, 20

12 C.F.R. 1033.321 ........................................................................................ 5, 17

12 C.F.R. 1033.331 ............................................................................................ 16

12 C.F.R. 1033.421 ........................................................................................ 4, 13

12 C.F.R. 1033.441 ............................................................................................ 11

81 Fed. Reg. 83,806 (Nov. 22, 2016) ................................................................. 23

89 Fed. Reg. 90,838 (Nov. 18, 2024) ........................................................... *passim*

## OTHER AUTHORITIES

American Heritage Dictionary (5th ed. 2022) ................................................... 12

Black's Law Dictionary (12th ed. 2024) ............................................................ 12

Cambridge Advanced Learner's Dictionary (4th ed. 2013) ............................... 19

Dan Awrey & Joshua Macey, *The Promise & Perils of Open Finance*,
    40 Yale J. on Reg. 1 (2023) ......................................................................... 17

Federal Reserve System, FDIC & OCC, *Interagency Guidance on Third-
    Party Relationships: Risk Management* (June 6, 2023),
    https://perma.cc/D55F-26YE ....................................................................... 17

*Marriage Licenses*, Fayette County Clerk, https://perma.cc/8JGM-BCBS ........ 19

*Plaid*, Forbes, https://perma.cc/8TSL-QP9D ..................................................... 15

Restatement (Third) of Trusts § 78 (2007) ....................................................... 12

*Ribbit Capital*, Tracxn, https://perma.cc/3UA6-2EQQ ...................................... 15

S. Rep. No. 111-176 (2010) ............................................................................... 14

*Secure Data Sharing*, Financial Data Exchange (Apr. 25, 2025),
    https://perma.cc/V75C-E95M ........................................................................ 4

*Stripe*, Y Combinator, https://perma.cc/W4JZ-H7A9 ................................................................ 15

Webster's New World Compact School and Office Dictionary (4th ed. 2002) ...................... 10

Webster's Third New International Dictionary (2002) ........................................................... 12

*Wise Story*, Wise, https://perma.cc/7FJF-WPVF ................................................................. 15

## INTRODUCTION

Plaintiffs filed this suit approximately ten months ago to invalidate the so-called "open banking" rule the CFPB adopted under the previous presidential administration. The Rule requires banks to create and maintain highly complex and efficient software interfaces to facilitate sharing their customers' sensitive financial data with thousands of commercial third parties, such as fintechs and data aggregators. Now, the CFPB has agreed with Plaintiffs' central arguments for why the Rule is unlawful, including that it exceeds the Bureau's statutory authority under Section 1033 of the Dodd-Frank Act by requiring disclosure to those commercial third-party entities. And the Bureau filed a motion arguing that this Court should vacate the Rule due to those legal deficiencies.

Yet Plaintiffs are no closer today to freeing themselves of their obligations to comply with the Rule than they were when they filed their complaint. That is because the CFPB, nearing the completion of already-delayed summary-judgment briefing, announced that it now intends to remedy the Rule's legal deficiencies by initiating a new rulemaking to replace it. In conjunction with that announcement, the Bureau asked this Court (over Plaintiffs' opposition) to stay this litigation indefinitely while it completes that protracted rulemaking process. The Court granted the Bureau's request for a stay and denied both Plaintiffs' and the Bureau's pending summary-judgment motions without prejudice.

But the existing Rule remains in effect until it is rescinded by the Bureau or prevented from taking effect by a court. For its part, the Bureau has taken no action to postpone the existing Rule's compliance deadlines—a fact that Intervenor-Defendant Financial Technology Association highlighted as the basis for not opposing a stay of this litigation. Yet the Bureau's process of replacing the existing Rule will doubtlessly last well

beyond those compliance deadlines.  So Plaintiffs' only means of obtaining relief from the burdens of complying with an unlawful Rule is to seek that relief from this Court. Specifically, Plaintiffs request an order staying the Rule's compliance deadlines and enjoining the Rule's enforcement until one year following the conclusion of this litigation. *See* 5 U.S.C. § 705.

Such relief is manifestly warranted here.  The Bureau itself agrees that the Rule is unlawful, but so long as the Rule and its compliance deadlines are on the books, Plaintiffs and their members have no choice but to prepare to comply with it.  Notably, if the Bureau were defending the Rule, this case would be nearing a summary-judgment decision that finally determined its lawfulness.  Yet Plaintiffs are now paradoxically in a *worse* position because of the Bureau's concession that the Rule is unlawful and decision to seek an indefinite stay while it conducts a new rulemaking.  Plaintiffs now face the profoundly unfair scenario in which, with the first compliance deadline arriving in less than a year, Plaintiffs' members are forced to incur substantial and unrecoverable costs to comply with a Rule the Bureau is actively working to replace.

This Court should prevent that inequitable result.  As explained below, all factors that traditionally govern stays and preliminary injunctions amply support granting such relief.  Plaintiffs have identified numerous legal deficiencies with the Rule—many of which the Bureau now agrees with—and would likely succeed on the merits of their challenge to the Rule.  Absent relief from this Court, Plaintiffs and their members face the irreparable harm of millions of dollars of unrecoverable compliance costs spent while the Bureau is working to "substantially revise[]" the Rule.  ECF No. 80 at 2.  And because there can be

no valid public interest in forcing parties to comply with a regulation that is both unlawful and soon to be replaced, the equities overwhelmingly favor granting relief.

## BACKGROUND

### A.     The CFPB's Open Banking Rule

The Rule at issue in this case represents the CFPB's attempt to mandate and comprehensively regulate "open banking," a system of sharing consumer financial data among financial-services providers.  *See* Required Rulemaking on Personal Financial Data Rights, 89 Fed. Reg. 90,838, 90,840 (Nov. 18, 2024).  Most typically, a third-party financial-technology company (or fintech) requests that a bank share its customers' financial data— such as transaction histories, bill payments, or account numbers—so the fintech can provide consumers with a requested service such as budgeting, peer-to-peer payment, or stock trading.  Banks support open banking and welcome the new opportunities it provides to serve their customers.  *See* Ex. 1 (Bank Policy Inst. & The Clearing House Cmt. Ltr.) at 1-2; Ex. 2 (U.S. Bank Cmt. Ltr.) at 1.[1]  But the sharing of sensitive consumer data presents "difficult [security] challenges for financial institutions," including because these third-party companies do not typically operate under the same data-security and consumer-protection controls that banks do, nor are they subject to the comprehensive regulatory supervision that banks are.  *See* Ex. 3 (Nov. 17, 2016 remarks of Former CFPB Director Richard Cordray) at 4.   Banks have thus partnered with fintechs, financial data

---

[1] Citations to exhibits are to those appended to the August 13, 2025 declaration of Judson O. Littleton, filed simultaneously with Plaintiffs' motion.

aggregators, and others to facilitate secure open-banking practices through a privately developed solution that currently serves more than 114 million consumers.[2]

Despite this substantial progress achieved by the private market, the Bureau decided to anoint itself the czar of open banking in the United States. It claimed authority to do so under Section 1033 of the Dodd-Frank Act. In relevant part, that statute provides that a bank "shall make available to a consumer, upon request, information in the control or possession of the [bank] concerning the consumer financial product or service that the consumer obtained from [the bank]." 12 U.S.C. § 5533(a). According to the Bureau, that provision authorized it to require banks to share their customers' data not only with the customers themselves, but also with any third-party actor that a customer purportedly authorizes to receive that data.

The Bureau adopted a comprehensive regime to govern its new data-sharing mandate. The most relevant provisions of the Rule, which Plaintiffs have comprehensively discussed in prior filings, *see* ECF No. 59-1 at 7-11, are briefly summarized here.

*Compelled disclosure of consumer data to third parties.*—As its central requirement, the Rule mandates that banks share their customers' financial data with "authorized third parties." 12 C.F.R. 1033.101(b). These third parties include fintechs, data aggregators—whose business model is to collect, aggregate, and sell consumer data—and any other entity that completes certain authorization and certification requirements prescribed by the Rule. *See id.* §§ 1033.401, 1033.421.

---

[2] *114 Million Reasons To Keep Moving Forward on Industry-Led Standard for Secure Data Sharing*, Financial Data Exchange (Apr. 25, 2025), https://perma.cc/V75C-E95M.

*Mechanism of data sharing.*—The Rule requires banks to create a "developer interface" to facilitate the transmission of data to fintechs and data aggregators. *See* 12 C.F.R. 1033.301(a), (b)(2); Final Rule at 90,839. The developer interface's performance must generally "be commercially reasonable" and also meet various other requirements. 12 C.F.R. 1033.311(c). Despite requiring banks to create these dedicated interfaces, the Bureau nonetheless declined to prohibit the admittedly unsafe practice of screen scraping. Final Rule at 90,895, 90,923.

*Data that must be shared.*—The Rule requires banks to share several categories of consumers' financial data through the interface, including transaction history, account balances, and upcoming bill information. 12 C.F.R. 1033.211(a), (b), (e). Over commenters' objections, *see, e.g.*, Ex. 4 (JPMC Cmt. Ltr.) at 8-12, the Rule also requires banks to share "[i]nformation to initiate payment" to or from a consumer's account, "includ[ing]," but not limited to, account and routing numbers. 12 C.F.R. 1033.211(c).

*Private standard-setting organizations and compliance deadlines.*—The Rule delegates to private organizations (to be designated by the Bureau) the authority to set standards that will guide banks' compliance with many of the Rule's substantive obligations. Such "consensus standards" will address (among many other examples) what constitutes reasonable "frequency restrictions" on third parties' access to the developer interface, 12 C.F.R. 1033.311(d), or what amounts to a "reasonable" denial of access to the interface based on concerns about risks to consumers' data, *id.* § 1033.321(c)(1). Meeting a consensus standard constitutes "indicia" of compliance with the Rule. *See* Final Rule at 90,862. Commenters urged that the Rule's compliance deadlines be deferred until after the

issuance of these "consensus standards" on which so many provisions of the Rule depend. *See, e.g.*, Ex. 4 at 30-33; Ex. 5 (Wells Fargo & Co. Cmt. Ltr.) at 12-13. The Bureau declined and set compliance deadlines on fixed dates, starting on April 1, 2026 for the largest banks. 12 C.F.R. 1033.121(b). To this day, the Bureau has not recognized a single organization that applied to issue any substantive standards.

*Prohibition on charging fees.*—The CFPB acknowledged that banks would have to spend up to $47 million a year to comply with the Rule's extensive requirements. *See* Final Rule at 90,961. Yet the Rule prohibits banks from charging *any* fees to the commercial third parties for building secure systems to enable third-party access to consumers' financial data. *See* 12 C.F.R. 1033.301(c).

### B.    Procedural History

Plaintiffs filed this APA suit to challenge the Rule on October 22, 2024, the day it was finalized. ECF No. 1. Plaintiffs' amended complaint contains ten counts alleging that the Rule is unlawful both because it exceeds the CFPB's statutory authority and is arbitrary and capricious. *See* ECF No. 22 at 46-71; *see also* 5 U.S.C. § 706(2)(A), (C).

Following the change in presidential administrations, and with Plaintiffs' consent, this Court entered stays of summary-judgment briefing for a total of 90 days to allow the CFPB under its new leadership to consider its position on the Rule and this litigation. *See* ECF Nos. 41, 45. To avoid prejudice to Plaintiffs, the Court also stayed the Rule's compliance deadlines for an equivalent period, which postponed the first deadline from April 1 until June 30, 2026. *See* ECF Nos. 41 at 2, 45 at 1; *see also* 12 C.F.R. 1033.121(b)(1). During that period, the Court lifted its stay of this case for the purpose of granting a motion

by FTA to intervene as a defendant supporting the Rule.  *See* ECF No. 56.  The Court advised in that Order that "the parties should expect to adhere to the briefing schedule outlined in the Court's Order of March 27, 2025."  *Id.* at 1.

At the conclusion of the CFPB's review process, the CFPB "determined that the Rule is unlawful and should be set aside."  ECF No. 57 at 1.  Consistent with the March 27 briefing order, the Bureau then filed a motion for summary judgment asking the Court to vacate the Rule on many of the same grounds Plaintiffs urged, including that the Rule exceeds the Bureau's authority by requiring banks to share customer data with authorized third parties.  *See* ECF No. 58-1 at 6-11.  The Bureau explained that the Rule's legal deficiencies "so permeate the entire Rule that the Court should" set aside the Rule altogether.  ECF No. 58-1 at 18-19 (quotation marks and alterations omitted).

Summary-judgment briefing proceeded in accordance with the Court's March 27 briefing order until July 29, the day Plaintiffs' and the CFPB's respective reply briefs supporting vacatur were due.  Plaintiffs filed their reply brief on that deadline.  ECF No. 79.  Less than an hour later, rather than file its reply, the Bureau filed a motion for an indefinite stay of this litigation on the ground that it "has now decided to initiate a new rulemaking to reconsider the Rule."  *See* ECF No. 80 at 2-3.  The Bureau explained that it "seeks to comprehensively reexamine this matter alongside stakeholders and the broader public."  *Id.* at 2.  And it stated that the Bureau would commence that process by issuing "an advance notice of proposed rulemaking" "within three weeks," which it envisions as a "starting point" of a process that will "culminat[e] in a new final rule that substantially revises the Rule."  *Id.*  The Bureau's motion did not address the approaching compliance deadlines in

the existing Rule—a fact that FTA emphasized in its response to the CFPB's stay motion. *See* ECF No. 82 at 1-2.

As the Bureau noted in its motion, Plaintiffs had informed the CFPB that they opposed a stay and would "file an opposition to the government's stay motion shortly." ECF No. 80 at 3. Less than three hours later, before Plaintiffs filed their opposition, the Court granted the CFPB's stay motion. ECF No. 83. It concluded that "any harm to the plaintiffs" from the CFPB's intended future rule "would be speculative and remote" because the Bureau "intends to effect significant changes" to the Rule. *Id.* at 2 (citation and quotation marks omitted). But the Court did not address the harms Plaintiffs will suffer from the *existing* Rule, given that the CFPB had not asked "to toll any existing compliance deadlines for the current rule." *Id.* at 1.

## ARGUMENT

This Court should issue an order staying the Rule's compliance deadlines and preliminarily enjoining its enforcement. Section 705 of the APA authorizes the Court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights" pending judicial review. 5 U.S.C. § 705. As this Court has recently explained, "[a] motion for a stay under [Section] 705 is judged by the same standard as a motion for a preliminary injunction." *Tennessee* v. *Cardona*, 737 F. Supp. 3d 510, 528 (E.D. Ky. 2024). The Court thus considers "1) whether the plaintiff has shown a strong or substantial likelihood of success on the merits; 2) whether the plaintiff has shown irreparable injury; 3) whether the issuance of a preliminary injunction would cause substantial harm to others; and 4) whether the public interest would be served by issuing a preliminary injunction." *Parker* v. *U.S. Dep't of Agric.*, 879 F.2d 1362, 1367 (6th Cir. 1989).

"These factors are not 'prerequisites that must be met,' but instead, 'interrelated considerations that must be balanced together.'" *Cardona*, 737 F. Supp. 3d at 528 (quoting *Ne. Ohio Coal. for Homeless and Serv. Emps. Int'l Union* v. *Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006)). "The purpose" of such interim relief "is simply to preserve the relative positions of the parties" until the merits can be fully determined. *Id.*

All these considerations warrant granting interim relief here. Plaintiffs can readily show that the Rule is likely unlawful on multiple grounds; even the Bureau itself agrees. Yet because of the way this litigation has proceeded—in particular, the Bureau's decision to seek an indefinite stay of this litigation for a new rulemaking without taking any action to postpone the Rule's compliance deadlines—Plaintiffs and their members are now in the inexplicable position of needing to expend substantial resources to prepare to comply with a regulation that the Bureau intends to replace. Preventing that nonsensical result will harm no one and substantially serve the public interest.

## I.   THE EXISTING RULE IS LIKELY UNLAWFUL.

Plaintiffs' complaint and summary-judgment briefing set forth numerous ways in which the Rule violates the APA, both because it exceeds the Bureau's statutory authority and represents arbitrary and capricious rulemaking. *See* ECF Nos. 22, 59-1, 79. The Bureau itself now agrees with many of those arguments. Plaintiffs address a subset of those claims below and would likely succeed on all of them in any challenge to the Rule.

### A.   The Rule Exceeds The Bureau's Authority Under Section 1033 (Count I).

As Plaintiffs have argued from the outset of this case, the plain text, structure, and context of Section 1033(a) make clear that banks need only make their customers' financial

data available to the individual "consumers" themselves.  At most, only a third party with a special, fiduciary-like relationship with the individual consumer may request the consumer's data under Section 1033(a).  That provision does not give the Bureau authority to compel disclosure to commercial third parties such as fintechs and data aggregators.

### 1.    In Section 1033(a), the "consumer" refers to the consumer.

Section 1033(a) allows "a consumer" to request information about a "consumer financial product or service that the consumer obtained from" the bank.  12 U.S.C. § 5533(a).  Because the ordinary meaning of "consumer" undisputedly refers only to an individual, Section 1033(a) simply allows the consumer to request his own information from his bank.  *See, e.g.*, *Consumer*, Webster's New World Compact School and Office Dictionary (4th ed. 2002) ("one who buys goods or services for personal needs only rather than to produce other goods").  Other uses of the word "consumer" throughout Section 1033 confirm that Congress intended this ordinary meaning.  For example, the provision requires banks to make data available to "*the* consumer" who "obtain[s]" a product or service from a bank, 12 U.S.C. § 5533(a) (emphasis added), and that phrase cannot reasonably be read to refer to a third party, *see Nielsen* v. *Preap*, 586 U.S. 392, 408 (2019) ("'[T]he' is 'a function word . . . indicat[ing] that a following noun . . . has been previously specified by context.'") (quoting Merriam-Webster's Collegiate Dictionary 1294 (11th ed. 2005)).  And the statute's clarification that a bank has no duty to "maintain or keep any information about a consumer" makes clear that Congress did not intend to impose any additional recordkeeping requirements about banks' own customers.  12 U.S.C. § 5533(c).  Had Congress intended to force banks to share data with thousands of third parties, it would make little sense to absolve banks of the responsibility to keep records about such

sharing in light of the obvious risk of compromise or misuse of that data—which is why the Bureau itself imposed record-keeping requirements. 12 C.F.R. 1033.441.

In the Rule, the Bureau resisted the ordinary meaning of "consumer" because the Dodd-Frank Act elsewhere provides a general definition of "consumer" that includes an individual's "agent, trustee, or representative." 12 U.S.C. § 5481(4). But as the Supreme Court and Sixth Circuit have explained, an Act-wide definition does not control where—as with Section 1033—"statutory context" and "the overall statutory scheme" indicate otherwise. *Utility Air Regul. Grp.* v. *EPA*, 573 U.S. 302, 316-20 (2014); *see Envt'l Def.* v. *Duke Energy Corp.*, 549 U.S. 561, 574 (2007) (presumption that a term takes its "statutory definition" "readily yields" when required by context); *Sanders* v. *Allison Engine Co., Inc.*, 703 F.3d 930, 938-39 (6th Cir. 2012) (warning against reflexively concluding "that a term defined by statute carries the same meaning every time it is used").

>       **2.    At most, a "consumer" under Section 1002(4) refers to someone with a special, fiduciary-like relationship with the individual consumer.**

Even if the Act-wide definition of "consumer" applied to Section 1033(a), a commercial third party in an arm's-length relationship with a consumer does not qualify as an "agent, trustee, or representative acting on behalf of" the consumer. 12 U.S.C. § 5481(4). Instead, as one would expect in the context of sensitive financial matters, an agent, trustee, or representative must have a fiduciary-like relationship with the consumer.

That interpretation follows from the specific terms Congress chose. "An 'agent owes a fiduciary obligation to the principal.'" *Percoco* v. *United States*, 598 U.S. 319, 329-30 (2023) (quoting 1 Restatement (Third) of Agency § 1.01, cmt. e (2005)). Similarly, a trustee

"stands in a fiduciary or confidential relationship to another." *Trustee*, Black's Law Dictionary (12th ed. 2024); Restatement (Third) of Trusts § 78, cmt. a (2007) ("[T]he trustee stands in a fiduciary relationship with respect to the beneficiaries as to all matters within the scope of the trust relationship.").

The final term, "representative," takes on a meaning similar to the meaning of "agent" and "trustee." *See, e.g.*, *Dubin* v. *United States*, 599 U.S. 110, 124-27 (2023) (interpreting the verb "use" in light of narrower verbs listed alongside it). Accordingly, a "representative" of the consumer under Section 1002(4) would be "one that represents [the consumer] as agent, deputy, substitute, or delegate [usually] being invested with the authority of the principal." *Representative*, Webster's Third New International Dictionary (2002); *see Representative*, American Heritage Dictionary (5th ed. 2022) ("[a]uthorized to act as an official delegate or agent"). In light of its association with "agent" and "trustee," a representative must have a relationship with the consumer that closely resembles that of a fiduciary in order to qualify as a "consumer" under Section 1002(4).

Third-party entities establishing arm's-length commercial relationships with consumers do not resemble agents or fiduciaries. *See* Final Rule at 90,921 (declining to dispute that "authorized third parties" under the Rule are not fiduciaries). "An essential element of agency is the principal's right to control the agent's actions," which consumers do not have under the Rule. *Hollingsworth* v. *Perry*, 570 U.S. 693, 713 (2013) (quoting 1 Restatement (Third) of Agency § 1.01, cmt. f (2005)). For example, a consumer has no choice about whether a fintech uses a fourth-party data aggregator to access his information. Relatedly, authorized third parties may provide a consumer's data to other

third parties without the consumer's permission or even knowledge. *See* 12 C.F.R. 1033.421(f). And authorized third parties have virtually unchecked ability to use consumer data "to improve the product or service the consumer requested," *id.* § 1033.421(c)(4), even if using consumer data in this way entails "provision of covered data . . . to other third parties," *id.* § 1033.421(c). Because authorized third parties can unilaterally choose to use consumers' data in these ways without any ability of those consumers to control those actions, they are not acting as consumers' agents. *See, e.g.*, *Johnson* v. *Priceline.com, Inc.*, 711 F.3d 271, 278 (2d Cir. 2013) (principal must retain right of "interim control" over agent in fulfilling agreed tasks).

For its part, FTA has urged a far broader definition of "representative" that encompasses anyone who "acts on behalf of another." ECF No. 64-1, FTA Br. 14 (quoting *Representative*, Black's Law Dictionary 1416 (9th ed. 2009)). But that interpretation conflicts with the statute's context and structure. Most obviously, it renders almost the entire definition of "consumer" in Section 1002(4) superfluous. First, if "representative" meant anyone who "acts on behalf of another," there would be no need to include "trustee" or "agent" in the definition: any remotely plausible trustee or agent would surely be a representative. But it gets worse: if a representative is anyone who acts on behalf of another, the *entire list* of "agent, trustee, or representative" is superfluous, because anyone who is "acting on behalf of [the] individual" is a "representative" of the individual and therefore a consumer. 12 U.S.C. § 5481(4). On that view, Congress could have simply defined "consumer" as "an individual or someone acting on behalf of an individual." As a "cardinal principle of statutory construction," courts construe statutes to avoid such

superfluity and "'give effect, if possible, to every clause and word of a statute.'" *Williams* v. *Taylor*, 529 U.S. 362, 404 (2000) (quoting *United States* v. *Menasche*, 348 U.S. 528, 538-39 (1955)). The surplusage that FTA's reading creates is especially problematic because it would render superfluous the very three-noun list (trustee, agent, representative) that is the focal point of the definition. *See Fischer* v. *United States*, 603 U.S. 480, 493 (2024) (applying the rule against surplusage to avoid rendering superfluous "a reticulated list" that Congress had "delineat[ed]").

FTA has also argued that a broad reading of the word "consumer" would make things more efficient by allowing banks to share consumer data directly with third parties rather than requiring consumers to upload it to a third-party app. FTA Br. 16. These policy appeals are irrelevant, as courts are not "free to rewrite clear statutes under the banner of . . . policy concerns." *Azar* v. *Allina Health Services*, 587 U.S. 566, 581 (2019). And it is *FTA's* position that would deviate from the overriding purpose of the Consumer Financial Protection Act to "regulate the offering and provision of consumer financial products or services," including those offered by fintechs, to further the interests of consumers. 12 U.S.C. § 5491(a). FTA's view would convert a party that is *regulated* throughout the entire Act (the fintech) into the party that is *protected* under the Act (the consumer).

Finally, historical context removes any doubt that Congress did not adopt Section 1033 to inaugurate open banking in the United States. The sole reference to Section 1033 in the legislative history of the Dodd-Frank Act is a Senate Report comment stating that Section 1033 "ensures that consumers are provided with access to their own financial information." S. Rep. No. 111-176, at p. 173 (2010). And FTA is wrong to suggest

-14-

that Congress was aware of "consumer-permissioned data sharing" and must have intended
Section 1033 to mandate that practice.  FTA Br. 18 (quoting the Final Rule at 90,881).  Open
banking was in its infancy in 2010, and many well-known fintechs or related companies did
not even exist, including three of the four members FTA highlighted in its motion to
intervene (the fourth, Stripe, Inc., was founded in 2009).[3]  And FTA cannot explain why
Congress would have ushered in open banking in the United States through a short, barely
discussed provision directing banks to make information "available to a consumer" rather
than using more precise language that (according to FTA) Congress was familiar with.
12 U.S.C. § 5533(a).

### B.  The Bureau Failed To Justify The Rule's Overall Framework, Which Places Consumer Data At Excessive Risk (Count II).

As the Bureau also now agrees, the Rule's overall data-sharing regime is arbitrary
and capricious because the Bureau failed to analyze or justify the cumulative impact of the
Rule's provisions on the security of customers' sensitive financial data.   *See* 5 U.S.C.
§ 706(2)(A).  As explained in Plaintiffs' complaint and summary-judgment briefing, the Rule
contains several interrelated provisions that directly impact the security of consumer data.
Although the Bureau attempted to justify each of these individual provisions, it never
addressed the combined impact of these individual choices, resulting in a dangerous data-
sharing framework.  "The cumulative effect" of individual provisions "is unquestionably an
important aspect of [a] problem" the agency is addressing, and the Bureau's failure to

---

[3] *See* ECF No. 43 at 4-5.  *See also Plaid*, Forbes, https://perma.cc/8TSL-QP9D; *The Wise
Story*,    Wise,    https://perma.cc/7FJF-WPVF;    *Ribbit    Capital*,    Tracxn,
https://perma.cc/3UA6-2EQQ; *Stripe*, Y Combinator, https://perma.cc/W4JZ-H7A9.

analyze that "cumulative effect, [or] to explain why it did not," renders its decision arbitrary and capricious. *Alliance for Hippocratic Med.* v. *U.S. Food & Drug Admin.*, 78 F.4th 210, 246 (5th Cir. 2023), *rev'd on other grounds*, 602 U.S. 367 (2024); *see Ohio* v. *EPA*, 603 U.S. 279, 293 (2024). That failure is reflected in four key choices that together put consumer data at severe risk.

*First*, the Rule mandates that banks share information that can be especially harmful: "[i]nformation to initiate payment to or from" a consumer's account. 12 C.F.R. 1033.211(c).[4] By design, this information can enable unauthorized third parties to remove money from a customer's account. That significant risk is why regulators in countries with open-banking regimes have imposed significantly heightened supervision and security requirements as a condition to sharing "payment initiation services." Ex. 1 at 12.

*Second*, the Bureau refused to assume any clear role in ensuring that third parties comply with the Rule's security requirements. Instead, the Rule deputizes *banks* to police the third parties the Rule directs them to share data with, including by "[d]ocument[ing]" third parties' compliance with authorization procedures prior to granting access to consumer data. 12 C.F.R. 1033.331(b)(1)(iii). The Bureau, on the other hand, takes on no role in vetting third parties prior to allowing consumer data access, a choice in stark contrast with established open-banking regimes in other countries where any third party seeking access to consumer data must first obtain authorization from the government

---

[4] As Plaintiffs have explained, the Bureau lacked statutory authority to impose this requirement in the first place. ECF No. 59-1 at 25-26.

regulator. *See, e.g.*, Ex. 6 (Teller, Inc. Cmt. Ltr.) at 5; Dan Awrey & Joshua Macey, *The Promise & Perils of Open Finance*, 40 Yale J. on Reg. 1, 15-16 (2023).

*Third*, the Rule prohibits banks from denying interface access based on concerns about risk to consumer data except in narrow, demanding circumstances. In particular, a denial must be "[d]irectly related to a specific risk of which the data provider is aware," and "[a]pplied in a consistent and non-discriminatory manner." 12 C.F.R. 1033.321(b). That showing—necessary to demonstrate that a denial is "reasonable" according to the CFPB— must be made even if the bank would otherwise deny access pursuant to its safety-and-soundness policies. *Id.* § 1033.321(a)(2). Such narrowly drawn limits on banks' core risk-management functions conflict with guidance from federal banking regulators, who stress the need for flexible risk management in dealing with third parties. *See* Board of Governors of the Federal Reserve System, FDIC & OCC, *Interagency Guidance on Third-Party Relationships: Risk Management*, 15 (June 6, 2023), https://perma.cc/D55F-26YE.

*Fourth*, the Bureau refused to ban the riskiest method of third-party access to customers' financial data: screen scraping. One of the stated goals of the Rule's mandate that banks create new developer interfaces was to avoid the widely acknowledged risks inherent in screen scraping. Final Rule at 90,922. Yet the Bureau rejected commenters' pleas to ban the practice and require use of the mandated developer interfaces.

## C. The Rule Unlawfully Prohibits Banks From Charging Fees For Interface Access (Counts IX, X).

The Bureau has likewise correctly conceded the unlawfulness of the Rule's ban on banks charging any fees to the commercial third parties who benefit from the interfaces the Rule orders banks to develop and maintain and then profit from the use of consumer data.

*See* 12 C.F.R. 1033.301(c). Congress gave the Bureau no authority to ban fees, and even if it had, the Bureau's decision to adopt a total fee prohibition was arbitrary and capricious.

Nothing in the text of Section 1033 authorizes the Bureau to take the extraordinary step of forcing banks to provide burdensome and complex services to other commercial actors for free. Yet courts demand clear authorization from Congress before allowing agencies to commandeer private markets and impose such serious burdens on businesses. *See Whitman* v. *Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001); *Sackett* v. *EPA*, 598 U.S. 651, 679 (2023) (requiring "exceedingly clear language" when Congress "wishes to significantly alter the . . . power of the Government over private property") (citation omitted). Implying such authority would be especially inappropriate in the banking context, where "the ability to charge fees" is a "fundamental national bank function." *Monroe Retail, Inc.* v. *RBS Citizens, N.A.*, 589 F.3d 274, 280, 283 (6th Cir. 2009); *see* 12 C.F.R. 7.4002(b)(2) (OCC directive that banks charge fees "according to sound banking judgment and safe and sound banking principles," taking into consideration "[t]he cost incurred by the bank in providing the service"). When Congress has sought to prohibit businesses from charging fees for certain services, it has said so expressly. *See* 15 U.S.C. § 1681c-1(a)(2)(B) (requiring consumer reporting agencies to provide disclosures "without charge to the consumer"); *id.* § 1691(e)(4) (creditors must provide appraisal copies "at no additional cost to the applicant"); *id.* § 1639h(c) (requiring appraisal copies "without charge" to applicants).

While conceding that Section 1033 does not mention fees, FTA Br. 47, FTA has gone even further, claiming that the *statute* prohibits banks from charging fees, *id.* at 45-47.

FTA relies primarily on Section 1033(a)'s requirement to "make" information "available . . . upon request," arguing that the dictionary definition of "available" allows for use "at one's disposal" and in a "costless" manner. *Id.* at 45, 46 (citation omitted). But "available" just as commonly means "able to be bought or used." Cambridge Advanced Learner's Dictionary (4th ed. 2013). A sign at a roadside inn indicating "Rooms Available" does not suggest that those rooms are free. FTA also relies on the reference to "[c]onsumer rights" in the heading of Section 1033, but that does not help FTA either. Anyone has the "right" to file a lawsuit, *see, e.g., Borough of Duryea* v. *Guarnieri*, 564 U.S. 379, 387 (2011) (recognizing a constitutional "right of access to courts") (citation omitted), but litigants pay filing fees, *see* 28 U.S.C. § 1914. "Marriage is one of the 'basic civil rights of man,'" *Loving* v. *Virginia*, 388 U.S. 1, 12 (1967) (internal citation omitted), but state and local governments charge fees for marriage licenses, *see, e.g.*, *Marriage Licenses*, Fayette County Clerk, https://perma.cc/8JGM-BCBS.

That is why Congress also speaks clearly when it intends something to be "made available" for free. *See, e.g.*, 42 U.S.C. § 1758(a)(5) (requiring schools to "make available to children free of charge . . . potable water for consumption"); *see also* 42 U.S.C. § 247d-11(e)(2)(C) (requiring states to "make available to all authorized users" certain "aggregate data sets," "free of charge"); 29 U.S.C. § 435(c) (requiring the Secretary of Labor to "make available without payment of a charge" copies of reports "upon request" of state agencies); 20 U.S.C. § 1090(a)(2)(A) (requiring the Secretary of Education to "make available . . . a free application" for federal financial aid). Congress's silence on the point in Section 1033 confirms that it did not permit the Bureau to adopt that interpretation.

Even if the Bureau had any authority to address fees in implementing Section 1033, the Bureau's decision to ban fees altogether was arbitrary and capricious. For starters, agencies must "give an explanation when [declining] to adopt less restrictive measures in promulgating . . . rules." *Cincinnati Bell Telephone Co.* v. *FCC*, 69 F.3d 752, 761 (6th Cir. 1995). The Bureau dedicated only two conclusory paragraphs to the alternative of limiting banks to charging reasonable fees, asserting there is no "workable and administrable standard for 'reasonable fees.'" *See* Final Rule at 90,886-87. But "conclusory statements" are no substitute for "reasoned explanation." *Cincinnati Bell*, 69 F.3d at 761. In any event, the CPFB's explanation was pretextual, as shown by its use of similar reasonableness standards throughout the Rule. *See, e.g.*, 12 C.F.R. 1033.311(c) ("interface[] performance must be commercially reasonable"); *id.* § 1033.311(d) (bank may not place "unreasonabl[e]" frequency limits on a third party's access requests). This "unexplained inconsistenc[y]" suggests the fee prohibition resulted not from reasoned decisionmaking, but from a predetermined choice to shift the costs of the new regime onto banks alone. *U.S. Sugar Corp.* v. *EPA*, 830 F.3d 579, 650 (D.C. Cir. 2016) (collecting cases); *see Nat. Res. Def. Council* v. *U.S. Nuclear Regul. Comm'n*, 879 F.3d 1202, 1214 (D.C. Cir. 2018).[5]

## D.    The Compliance Deadlines Are Themselves Unlawful (Count VIII).

Last but certainly not least, even the Rule's compliance deadlines themselves are arbitrary and capricious. Many of the Rule's vague requirements will not gain substantive

---

[5] This conclusion is reinforced by the CFPB's decision to exempt over 75% of banks from the Rule because they could not afford to comply without charging fees. Final Rule at 90,885, 90,985. Instead of allowing reasonable fees, the CFPB left many consumers without the "rights" it claimed Section 1033 grants—while simultaneously allowing data aggregators to charge any fee to fintechs (or even consumers) the market will bear.

content until private standard-setting organizations issue "consensus standards" for how to comply. And the Bureau itself acknowledged that, because consensus standards "assist entities in fulfilling their legal obligations" and should be "giv[en] due weight," Final Rule at 90,862, it is important that standards "be available before compliance begins," *id.* at 90,899. Many commenters thus requested a compliance timeline that began some period after those standards are set, rather than on a fixed date. Ex. 4 at 31; Ex. 1 at 22; Ex. 7 (CBA Cmt. Ltr.) at 52. Yet the Bureau set fixed compliance dates that are not tied to the issuance of consensus standards. That decision flouts the Bureau's obligations to reasonably explain its deadlines, *Piedra Alvarez* v. *Barr*, 829 F. App'x 833, 834 (9th Cir. 2020), and to respond to comments that "challenge[d] [the] fundamental premise" of beginning the compliance clock when consensus standards for compliance with substantive requirements do not exist, *MCI WorldCom, Inc.* v. *FCC*, 209 F.3d 760, 765 (D.C. Cir. 2000). The Bureau itself now agrees.

## II.   PLAINTIFFS WILL BE IRREPARABLY HARMED ABSENT INTERIM RELIEF.

If the Rule's compliance deadlines are not stayed, Plaintiffs and their members face imminent and irreparable harm in the form of the unrecoverable costs they will expend to come into compliance with the Rule. As courts widely recognize, such compliance costs constitute irreparable harm because, even if the Rule is ultimately vacated (or replaced), Plaintiffs and their members cannot recover such costs as damages "[d]ue to the federal government's sovereign immunity." *Kentucky* v. *Biden*, 57 F.4th 545, 556 (6th Cir. 2023); *Chamber of Com.* v. *Edmondson*, 594 F.3d 742, 770-771 (10th Cir. 2010) ("Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity

constitutes irreparable injury."). Indeed, the irreparable harm here is far more certain than the typical case: the Bureau's decision to commence a comprehensive new rulemaking process without postponing the existing Rule's compliance deadlines effectively guarantees that Plaintiffs will have to spend resources preparing to comply with a Rule that the Bureau is actively working to replace.

As Plaintiffs previously explained, due to the complex requirements the Rule imposes, they and their members already need to prepare to come into compliance with it. And "complying with th[e] Rule will be very expensive and burdensome for [Plaintiffs'] members." Ex. 10 at ¶ 9. As one representative example, BPI's summary-judgment declaration detailed the substantial expenditures and financial harm one of its members will incur in order to develop "a rule-compliant developer interface." *Id.* ¶¶ 9-10. These costs include personnel costs, technological development, and full-time infrastructure to maintain the interface once the Rule is in effect. *Id.* Completing this development by June 30, 2026 was already "unrealistic" in light of the enormous resource expenditure required. *Id.* ¶ 12. Now that the Bureau has embarked on a process to comprehensively reexamine the Rule, those expenditures to comply with the Rule will likely be wasted. *See* ECF No. 83 at 2 ("[T]he CFPB intends to effect significant changes to the current Rule.").

The Bureau's decision to initiate a new rulemaking process will not ameliorate the irreparable harm Plaintiffs face from the existing compliance deadlines. Those compliance deadlines, like the Rule itself, remain in effect and binding unless and until postponed by the Bureau or stayed by this Court. Indeed, FTA's non-opposition to the Bureau's motion for stay was predicated on its understanding that those compliance deadlines remain in

place, ECF No. 82 at 1-2, a fact this Court noted in its order granting the stay, ECF No. 83 at 1.  Plaintiffs and their members cannot simply elect to ignore the Rule and its deadlines when they still remain on the books and require substantial and immediate expenditure of time and resources to meet.

And the Bureau's rulemaking is all but certain to remain ongoing by the time the first compliance deadline arrives on June 30, 2026.  The Bureau has pledged an "accelerated" process, beginning with an advance notice of proposed rulemaking.  ECF No. 80 at 2-3.  But an *advance* notice of proposed rulemaking is not even the actual, subsequent notice of proposed rulemaking that commences the public-comment process under 5 U.S.C. § 553.  It is only "a preparatory step, antecedent to a potential future rulemaking, not itself a decision to reconsider the [previous] rule."  *P&V Enters.* v. *U.S. Army Corps of Eng'rs*, 516 F.3d 1021, 1026 (D.C. Cir. 2008), *overruled on other grounds by United States* v. *Kwai Fun Wong*, 575 U.S. 402 (2015); *see Consumer Fed'n of Am.* v. *Consumer Prod. Safety Comm'n*, 990 F.2d 1298, 1305 (D.C. Cir. 1993) (An advance notice of proposed rulemaking is "a generalized and tentative undertaking.").  The CFPB states that this advance notice will mark the beginning of its effort "to comprehensively reexamine" the "complex issues" underlying the Rule.  ECF No. 80 at 2.  In all likelihood, that effort will take years.  As a point of comparison, eight years elapsed between the Bureau's initial request for information and the promulgation of the current iteration of the Rule.  *Compare* 81 Fed. Reg. 83,806 (Nov. 22, 2016), *with* 89 Fed. Reg. 90,838 (Nov. 18, 2024).  Thus, the rulemaking process (and the existing stay of this litigation) is likely to last well beyond the June 30, 2026 compliance deadline.

Given that the Bureau has taken no action to postpone the Rule's compliance deadlines, only an order staying those deadlines and enjoining the Rule's enforcement can enable Plaintiffs to avoid the irreparable harm of expending substantial costs to come into compliance with an unlawful Rule.

## III.    THE EQUITIES OVERWHELMINGLY FAVOR INTERIM RELIEF.

The final factors relevant to a Section 705 stay or preliminary injunction—the "harm to the opposing party and the public interest"—"merge when the Government is the" party against whom an injunction would be entered. *Wilson* v. *Williams*, 961 F.3d 829, 844 (6th Cir. 2020) (quoting *Nken* v. *Holder*, 556 U.S. 418, 435 (2009)).  In this case, the public interest overwhelmingly justifies granting relief.

"There is generally no public interest in the perpetuation of unlawful agency action . . . . To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters* v. *Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington* v. *Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)); *see Texas* v. *Biden*, 10 F.4th 538, 559-60 (5th Cir. 2021) (same).  The public interest requires relieving regulated parties from the burden of complying with an unlawful Rule, particularly when the agency's own statements or conduct undermine it. *See, e.g.*, *Kane* v. *De Blasio*, 19 F.4th 152, 172 (2d Cir. 2021) (public interest weighed in favor of injunction's issuance where the government "conceded[]" its "process" was "constitutionally suspect") (citation omitted); *Louisiana* v. *Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (public interest favors an injunction where the government's public statements call into question the lawfulness and urgency of relevant policy).

-24-

But even putting aside the Rule's unlawfulness, the public interest still overwhelmingly favors a stay here, given that the Bureau has stated that it will "comprehensively reexamine" the Rule and "envisions" adopting a "new final rule that substantially revises the Rule under review." ECF No. 80 at 2. There is no legitimate interest in requiring regulated parties to incur enormous expense to comply with a Rule the Bureau intends to replace wholesale.

*       *       *

For all of these reasons, Plaintiffs should be unambiguously relieved of the burden of complying with the existing Rule while the CFPB undertakes its long and complex rulemaking to replace it. Plaintiffs respectfully request an order staying the Rule's compliance deadlines and enjoining the Rule's enforcement until one year following the conclusion of this litigation. Only at that point will all parties have certainty about all relevant regulatory obligations.

## CONCLUSION

Plaintiffs' motion to lift the stay of this litigation for the purpose of staying the Rule's compliance deadlines and enjoining the Rule's enforcement should be granted.

Respectfully submitted,

August 13, 2025

Timothy A. Schenk (KY Bar #92011)
KENTUCKY BANKERS
ASSOCIATION
600 W Main Street #400
Louisville, KY  40202
Tel:  (502) 582-2453
tschenk@kybanks.com

John Court*
Paige E. Pidano*
BANK POLICY INSTITUTE
1300 I Street NW, Suite 1100 West
Washington, D.C.  20005
Tel:  (202) 289-4322
john.court@bpi.com
paige.paridon@bpi.com

*  Admitted *pro hac vice*

John T. McGarvey (KY Bar #46230)
MORGAN POTTINGER MCGARVEY
401 South Fourth Street, Suite 1200
Louisville, KY  40202
(502) 560-6759
jtm@mpmfirm.com

 /s/ *Judson O. Littleton*
Jeffrey B. Wall*
Judson O. Littleton*
Nathan H. Golden*
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C.  20006
Tel:  (202) 956-7000
wallj@sullcrom.com
littletonj@sullcrom.com
goldenn@sullcrom.com

Robert A. Flatow*
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Tel:  (212) 558-4000
flatowr@sullcrom.com

*Counsel for Plaintiffs Forcht Bank, N.A.,
Kentucky Bankers Association, and Bank
Policy Institute*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 13, 2025, I electronically filed this Brief with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ *Judson O. Littleton*

*Counsel for Plaintiffs Forcht Bank,*
*N.A., Kentucky Bankers Association,*
*and Bank Policy Institute*