# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
### LEXINGTON DIVISION

|  |  |
|---|---|
| FORCHT BANK, N.A., KENTUCKY BANKERS ASSOCIATION, and BANK POLICY INSTITUTE, | |
| *Plaintiffs*, | Case No. 5:24-cv-00304-DCR |
| v. | Hon. Danny C. Reeves |
| CONSUMER FINANCIAL PROTECTION BUREAU and RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, | |
| *Defendants*, | |
| FINANCIAL TECHNOLOGY ASSOCIATION, | |
| *Intervenor-Defendant*. | |

**INTERVENOR-DEFENDANT FINANCIAL TECHNOLOGY ASSOCIATION'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO LIFT THE STAY FOR PURPOSES OF POSTPONING THE RULE'S COMPLIANCE DEADLINES AND ENJOINING ITS ENFORCEMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION ................................................................................................... 1

BACKGROUND ...................................................................................................... 3

STANDARD OF REVIEW ....................................................................................... 5

ARGUMENT ........................................................................................................... 6

I.     The Court Should Not Reconsider its Prior Stay Order.......................................... 6

II.    Plaintiffs Are Not Entitled to a Preliminary Injunction. ....................................... 8

     A.    Plaintiffs Are Unlikely to Succeed in Showing that the Rule is Unlawful. ....................................................................................................... 9

          1.    The Rule is consistent with the Act's definition of "consumer." ............... 9

          2.    The Rule properly addresses consumer data protection. ........................... 14

          3.    The Rule lawfully and reasonably prohibits access fees. ......................... 15

          4.    The Rule's compliance deadlines are reasonable. ..................................... 18

     B.    The Other Preliminary Injunction Requirements Are Not Satisfied..................... 19

          1.    Plaintiffs have not shown irreparable harm. .............................................. 19

          2.    An injunction would harm FTA, its members, and the public.................. 22

     C.    Plaintiffs' Requested Remedy Is Vastly Overbroad ............................................ 23

CONCLUSION....................................................................................................... 25

# TABLE OF AUTHORITIES

Cases

*Abney v. Amgen, Inc.*, 443 F.3d 540 (6th Cir. 2006) ...................................................19

*American Petroleum Institute v. EPA*, 683 F.3d 382 (D.C. Cir. 2012)........................ 7-8

*AngleFix Tech, LLC v. Wright Med. Technology, Inc.*, 2014 WL 11698746 (W.D. Tenn. Oct. 22, 2014) ...........................................................................................5

*Azar v. Allina Health Services*, 587 U.S. 566 (2019) ...................................................12

*Barry v. Ally Financial, Inc.*, 2021 WL 973079 (E.D. Mich. Mar. 16, 2021) ................5

*Boddie v. Connecticut*, 401 U.S. 371 (1971) ................................................................16

*Chinatown Service Center v. HHS*, 2021 WL 8316490 (D.D.C. Oct. 13, 2021)............8

*D.T. v. Sumner County Schools*, 942 F.3d 324 (6th Cir. 2019) ...............................20, 22

*Department of Agriculture Rural Development Rural Housing Service v. Kirtz*, 601 U.S. 42 (2024).................................................................................................13

*EOG Resources, Inc. v. Lucky Land Management, LLC*, 134 F.4th 868 (6th Cir. 2025) .......................................................................................................19

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021)..............................................14

*Garland v. Cargill*, 602 U.S. 406 (2024)......................................................................13

*Hastings v. Judicial Conference of United States*, 770 F.2d 1093 (D.C. Cir. 1985) ...................23

*Immigrant Defendants Law Center v. Noem*, 145 F.4th 972 (9th Cir. 2025) ...............24

*International Union of Painters & Allied Trades District Council No. 6 v. Smith*, - -- F.4th ----, 2025 WL 2170424 (6th Cir. July 31, 2025) ......................................19

*Kentucky v. Biden*, 57 F.4th 545 (6th Cir. 2023) .........................................................24

*Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274 (6th Cir. 2009) ...................17

*Munaf v. Geren*, 553 U.S. 674 (2008).........................................................................24

*Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998) .............................................8

*Sierra Club v. United States EPA*, 60 F.4th 1008 (6th Cir. 2023).................................8

*Tennessee v. Cardona*, 737 F. Supp. 3d 510 (E.D. Ky. 2024)................................6, 22

*Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025)................................................................24

*Tuttle v. Carroll County Detention Center*, 2010 WL 2305687 (E.D. Ky. June 7, 2010), *aff'd*, 500 F. App'x 480 (6th Cir. 2012) ...........................................................5

*Waetzig v. Halliburton Energy Services, Inc.*, 604 U.S. 305 (2025) ...........................11

*Winter v. NRDC*, 555 U.S. 7 (2008) .................................................................19, 24

*Wyoming v. Zinke*, 871 F.3d 1133 (10th Cir. 2017).....................................................8

**STATUTES**

10 U.S.C. § 4892(a)(3) ...............................................................................................17

12 U.S.C. § 5481(4) .................................................................................................9, 11

12 U.S.C. § 5493(c)(2)(A) ..........................................................................................13

12 U.S.C. § 5493(g)(1) ...............................................................................................13

12 U.S.C. § 5533(a) ..................................................................................9, 10, 14, 15

12 U.S.C. § 5533(d) ....................................................................................................10

15 U.S.C. § 78m(f)(4) .................................................................................................17

15 U.S.C. § 1639h(c) ..................................................................................................16

15 U.S.C. § 1639h(d) ..................................................................................................16

15 U.S.C. § 1681c-1(a)(2)(B) .....................................................................................16

15 U.S.C. § 1681j(f)(1) ...............................................................................................16

15 U.S.C. § 1691(e)(3) ................................................................................................16

15 U.S.C. § 1691(e)(4) ................................................................................................16

15 U.S.C. § 1693o-2(a)(1) ..........................................................................................17

15 U.S.C. § 1693o-2(a)(2) ..........................................................................................17

15 U.S.C. § 2669(d)(2) ...............................................................................................17

15 U.S.C. § 4723a(d) ..................................................................................................17

19 U.S.C. § 2544(b)(2) ...............................................................................................17

19 U.S.C. § 2575a .......................................................................................................17

19 U.S.C. § 2576a ...................................................................................................17

20 U.S.C. § 1090 .....................................................................................................17

20 U.S.C. § 1090(b) .................................................................................................17

29 U.S.C. § 435(c) ...................................................................................................17

41 U.S.C. § 1708(g) .................................................................................................17

42 U.S.C. § 247d-11(e)(2)(B) ..................................................................................17

42 U.S.C. § 247d-11(e)(2)(C) ..................................................................................17

42 U.S.C. § 1758(a)(5) .............................................................................................16

42 U.S.C. § 1758(b)(1)(A) .......................................................................................17

**LEGISLATIVE MATERIALS**

S. Rep. No. 111-176 (2010) .....................................................................................12

**OTHER AUTHORITIES**

12 C.F.R. § 1033.121(b) .............................................................................................3

12 C.F.R. § 1033.121(b)(1) ......................................................................................18

12 C.F.R. § 1033.401(a) ..........................................................................................10

12 C.F.R. § 1033.401(b) ..........................................................................................10

12 C.F.R. § 1033.401(c) ..........................................................................................10

12 C.F.R. § 1033.411(a) ..........................................................................................10

12 C.F.R. § 1033.411(b) ..........................................................................................10

12 C.F.R. § 1033.421 ...............................................................................................15

12 C.F.R. § 1033.421(e) ..........................................................................................10

12 C.F.R. § 1033.421(g) ..........................................................................................10

12 C.F.R. § 1033.421(h) ..........................................................................................10

12 C.F.R. § 1033.431(c) ..........................................................................................12

Michael S. Barr et al., *Consumer Autonomy and Pathways to Portability in Banking and Financial Services* (Univ. of Mich. Ctr. on Fin., Law & Pol'y Working Paper No. 01, 2019), https://financelawpolicy.umich.edu/sites/cflp/files/2021-07/umich-cflp-working-paper-consumer-autonomy-and-data-portability-pathways-Nov-3.pdf ................................................................................................12

Miriam Cross, *JPMorgan Chase Says It Has Fully Eliminated Screen Scraping*, Am. Banker (Oct. 6, 2022), https://www.americanbanker.com/news/jpmorgan-chase-says-it-has-fully-eliminated-screen-scraping................................................21

Fed. R. Civ. P. 16(b)(4).............................................................................................5

*Personal Financial Data Rights Reconsideration*, 90 Fed. Reg. 40,986 (Aug. 22, 2025) ...........................................................................................1, 5, 6, 7, 8

Proposed Rule, 88 Fed. Reg. 74796 (Oct. 31, 2023) ..................................................22

*Representative*, *Black's Law Dictionary* 1416 (9th ed. 2009) .....................................9

*Required Rulemaking on Personal Financial Data Rights*, 89 Fed. Reg. 90,838 (Nov. 18, 2024) ..........................................3, 10, 12, 13, 15, 17, 18, 19, 22, 23, 25

*Restatement (Third) of Agency* § 1.01 cmt. b (2006) ................................................11

**INTRODUCTION**

Plaintiffs' motion to lift the stay and enjoin enforcement of the compliance deadlines in the challenged Rule promulgated by the Consumer Financial Protection Bureau ("CFPB") came just two weeks after this Court entered its stay to permit the CFPB to engage in an "accelerated rulemaking process" to "reconsider the Rule" and replace it with "a new final rule" that "aligns with the policy preferences of new leadership and addresses the defects in the initial Rule." ECF No. 80 ¶¶ 6-7. Plaintiffs do not cite any events occurring during those intervening two weeks that affect the Court's prior analysis in granting the stay. Instead, Plaintiffs argue that the CFPB "has taken no action to postpone the existing Rule's compliance deadlines." Pls.' Br. on Mot. to Lift Stay (ECF No. 85-1) ("Br.") at 1. Even setting aside that the earliest of those deadlines is still ten months away, the CFPB has now published its advance notice of proposed rulemaking ("ANPRM"), which expressly states that "[a]s part of its reconsideration of the [current] Rule, the Bureau plans to issue a Notice of Proposed Rulemaking to extend the compliance dates." *Personal Financial Data Rights Reconsideration*, 90 Fed. Reg. 40,986, 40,989 (Aug. 22, 2025). That statement alone eliminates Plaintiffs' asserted need for a stay. The CFPB will soon decide whether, or to what extent, to extend compliance deadlines. The Court should allow the CFPB to reach a reasoned decision on that issue in the first instance, with the benefit of stakeholder input as part of the notice-and-comment process. If any stakeholder is dissatisfied with the CFPB's resolution of that issue, it may seek judicial review at that time.

In the ANPRM, the CFPB has requested comments on several of the legal and practical issues that Plaintiffs have teed up in this proceeding. Based on those comments, the CFPB will issue an NPRM and, ultimately, a new rule. The Court should leave the stay in place to allow the rulemaking process to unfold. Plaintiffs seek to lift the stay for purposes of obtaining a preliminary ruling on the Rule's legality, even while the CFPB has requested comments in its ANPRM on the

very same legal issues Plaintiffs raise. A court order deciding those issues while the CFPB actively reconsiders them would be inefficient and would interfere with the rulemaking process. The Court should not permit Plaintiffs to jump the line by re-litigating an already-decided stay motion to receive a preemptive ruling on a Rule that is soon to be replaced.

To be clear, Intervenor-Defendant Financial Technology Association ("FTA") and its members generally support the current Rule, including its compliance deadlines. The Rule benefits consumers by allowing them to authorize third-party companies to securely access their data in support of innovative financial products and services. Nonetheless, FTA and its members believe the current Rule could be improved, and thus support keeping the stay in place to allow the parties to participate in the administrative process.

Even if the Court lifted the stay, Plaintiffs would not be entitled to injunctive relief. Plaintiffs recycle their arguments from their motion for summary judgment, but those arguments fail for all the same reasons FTA previously explained. Under the statute's plain text, authorized third parties qualify as "representatives" of individual consumers. And the CFPB's Rule properly addresses consumer data security, lawfully prohibits banks from charging fees for data access, and sets forth reasonable compliance deadlines. Plaintiffs' motion should independently be denied because they have not established any irreparable harm they will incur over the next several months that justifies preliminary relief. Meanwhile, granting such relief would severely harm FTA's members and the public interest, as at least one of Plaintiffs' members is already making plans to begin charging fees for data access in direct violation of the Rule (and statute). Plaintiffs should not be granted a further postponement of the Rule's compliance deadlines while they are also taking steps to implement fees that will actively harm FTA's members and consumers.

Finally, even if the Court thought Plaintiffs had established some legitimate concerns, there

is still no basis for granting the vastly overbroad relief Plaintiffs seek to "enjoin[] enforcement of the Rule until one year after the conclusion of this litigation."  ECF No. 85, at 1.  The Court has other, more tailored tools at its disposal, such as requiring more frequent status reports from the CFPB, to ensure that the rulemaking proceeds expeditiously.  The proper course, therefore, is to maintain the current stay of proceedings and, at most, require more frequent reporting—but not to interfere with the CFPB's ongoing rulemaking.

## BACKGROUND

Plaintiffs filed this case in October 2024, *see* ECF No. 1, challenging the CFPB's rulemaking implementing Section 1033 of the Consumer Financial Protection Act ("CFPA").  *See Required Rulemaking on Personal Financial Data Rights*, 89 Fed. Reg. 90,838 (Nov. 18, 2024) ("Rule").  The Rule's earliest compliance deadline was originally set to take effect on April 1, 2026.  *See* 12 C.F.R. § 1033.121(b).

Following the change in Presidential Administration and leadership changes at the CFPB, on February 25, 2025, Plaintiffs and the CFPB filed a joint motion to stay proceedings for 30 days to provide time for "CFPB's new leadership . . . to review and consider the CFPB's position on various pending agency actions[.]"  ECF No. 40 ¶ 3.  The joint motion also requested a 30-day tolling of the compliance deadlines.  *Id.* ¶ 4.  The Court granted both requests.  *See* ECF No. 41. Then, "[t]o conserve the Court's resources," the parties requested an additional 60-day extension of the stay and a 60-day tolling of the compliance deadlines.  ECF No. 42 ¶¶ 3-4.  The Court again granted both requests, *see* ECF No. 45, tolling the earliest compliance deadline until June 30, 2026.

The Court granted FTA's motion to intervene in defense of the Rule, ECF No. 56, and the parties began briefing summary judgment.  The CFPB initially agreed with Plaintiffs that certain aspects of the Rule were unlawful.  *See* ECF No. 58-1.  FTA's cross-motion explained that the Rule was indeed lawful, but that FTA stood ready to work with the CFPB to improve the Rule

through appropriate notice-and-comment procedures.  *See* ECF No. 64-1 at 3.

On July 29, 2025, the CFPB filed a motion to stay further proceedings in this case.  *See* ECF No. 80.  In particular, the CFPB represented:

> In light of recent events in the marketplace, the Bureau has now decided to initiate a new rulemaking to reconsider the Rule with a view to substantially revising it and providing a robust justification.  The Bureau seeks to comprehensively reexamine this matter alongside stakeholders and the broader public to come up with a well-reasoned approach to these complex issues that aligns with the policy preferences of new leadership and addresses the defects in the initial Rule.

*Id.* ¶ 6.  The CFPB stated that it "plans to engage in an accelerated rulemaking process," beginning with issuing an ANPRM "within three weeks."  *Id.* ¶ 7.  Accordingly, "[t]o conserve judicial resources," the CFPB requested a stay given that its rulemaking "may obviate the need for the Court to rule on the current Rule under review," *id.* ¶ 8, with status reports every 90 days, *id.* ¶ 9.

The Court granted the CFPB's motion to stay.  The Court noted that "the parties and judicial economy are better served if a stay is issued, because it allows time for CFPB to administratively modify the rule with appropriate input from interested parties, which could likely obviate the need for this action."  ECF No. 83 at 2.  Additionally, the stay "serves the public welfare" because it allows the agency to reexamine the matter and "come up with a well-reasoned approach . . . that aligns with the policy preferences of new leadership[.]"  *Id.* (quotation marks omitted).  Finally, "because the CFPB intends to effect significant changes to the current Rule," the Court concluded that plaintiffs' claim of harm was "speculative."  *Id.*  Accordingly, the Court granted the motion to stay, denied the parties' motions for summary judgment without prejudice, and directed the parties "to submit a joint status report every **45 days**[.]"  *Id.* at 2-3.

Two weeks later, before the CFPB even published its promised ANPRM or submitted its first status report, Plaintiffs moved to lift the stay the Court had just entered.  Plaintiffs afforded the CFPB only one business day to confer regarding that request and then filed their motion despite

the CFPB being unable to provide its position. *See* ECF No. 85 at 2. Plaintiffs' motion requests that the Court lift the stay it just entered, for the purportedly "limited purpose" of "issuing an order staying the Rule's compliance deadlines under 5 U.S.C. § 705 and preliminarily enjoining enforcement of the Rule until one year after the conclusion of this litigation." *Id.* at 1.

The following week, the CFPB published its ANPRM seeking comment on, *inter alia*, all four issues identified in Plaintiffs' motion: "the proper scope of how the term 'representative' should be interpreted"; whether the current Rule "provide[s] adequate protections for the security of consumer's data"; whether costs of data access "should be shared between the consumer and the 'covered person'"; and "on the appropriateness of the compliance dates" in the current Rule. 90 Fed. Reg. at 40,987-89. On the last point specifically, the CFPB stated that "[a]s part of its reconsideration of the [current] Rule, the Bureau plans to issue a Notice of Proposed Rulemaking to extend the compliance dates." *Id.* at 40,989. The CFPB "encourage[d] the early submission of comments," but set a deadline of 60 days for submission, *i.e.*, by October 21, 2025. *Id.* at 40,986.

## STANDARD OF REVIEW

Courts generally require "good cause" before modifying a previously entered schedule or lifting a stay of proceedings. Fed. R. Civ. P. 16(b)(4); *see also, e.g.*, *Barry v. Ally Fin., Inc.*, 2021 WL 973079, at *5 (E.D. Mich. Mar. 16, 2021); *AngleFix Tech, LLC v. Wright Med. Tech., Inc.*, 2014 WL 11698746, at *1 (W.D. Tenn. Oct. 22, 2014). Moreover, given that Plaintiffs filed their motion to lift the stay barely two weeks after the Court entered that stay, Plaintiffs' motion is essentially a motion for reconsideration. Such motions are permissible only in narrow circumstances such as "clear errors of law" or "newly discovered evidence." *Tuttle v. Carroll Cnty. Det. Ctr.*, 2010 WL 2305687, at *1 (E.D. Ky. June 7, 2010) (Reeves, J.).

Apart from lifting the stay, Plaintiffs' motion also requests preliminary relief. Such relief requires Plaintiffs to satisfy the familiar four-part test: "(1) whether the movant has shown a strong

or substantial likelihood of success on the merits; (2) whether the movant has demonstrated irreparable injury; (3) whether the issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Tennessee v. Cardona*, 737 F. Supp. 3d 510, 528 (E.D. Ky. 2024) (Reeves, C.J.) (recognizing that the same four-factor test applies to requests for relief under 5 U.S.C. § 705).

## ARGUMENT

The Court should deny Plaintiffs' requests to lift the stay and grant a preliminary injunction. Plaintiffs have shown no sound basis for the Court to reconsider its stay order. Even if the Court lifts the stay, none of the criteria for a preliminary injunction are satisfied.

### I.    The Court Should Not Reconsider Its Prior Stay Order.

This Court already weighed the relevant factors governing the stay of proceedings and concluded that they supported a stay. *See* ECF No. 83. Plaintiffs do not contend that the Court applied the wrong factors, or that intervening developments require reconsideration of the Court's prior analysis. Thus, Plaintiffs do not establish good cause for lifting or reconsidering the stay.

Indeed, the only new development that has occurred since the Court's prior stay order is the CFPB's publication of its ANPRM, which supports continuing the current stay. The underlying premise of Plaintiffs' motion is that they are prejudiced because the CFPB sought "an indefinite stay of this litigation . . . without taking any action to postpone the Rule's compliance deadlines." Br. 9; *see also id.* at 1 ("For its part, the Bureau has taken no action to postpone the existing Rule's compliance deadlines[.]"); *id.* at 22, 24 (similar). Of course, Plaintiffs filed their motion before giving the CFPB the chance to issue its ANPRM (or even provide its position on their motion). And the ANPRM now refutes that premise, as it states that the "Bureau plans to issue a Notice of Proposed Rulemaking to extend the compliance dates." 90 Fed. Reg. at 40,989. In light of that statement, Plaintiffs cannot demonstrate any basis for lifting the stay.

6

Plaintiffs' requested relief would improperly inject the Court into the CFPB's anticipated rulemaking regarding the compliance deadlines. As part of the rulemaking process, the CFPB will hear from all stakeholders on whether, or to what extent, to alter compliance deadlines. With the benefit of all stakeholders' input, the CFPB can arrive at a reasoned decision.[1] Yet Plaintiffs now seek to extinguish that deliberative process before it starts via an overbroad and untailored court-imposed stay. Consistent with its prior stay order, the Court should give the CFPB the opportunity to address compliance deadlines in the first instance. If Plaintiffs, FTA, or any other stakeholder is dissatisfied with the CFPB's decision, they can seek judicial review at that time.

Even setting aside the CFPB's anticipated rulemaking over compliance deadlines, Plaintiffs have not shown good cause for the Court to reconsider its stay order. Plaintiffs' motion hinges on speculation that the CFPB's new rulemaking will proceed slowly. But the CFPB has represented that it will "engage in an accelerated rulemaking process." ECF No. 80 ¶ 7. It has already issued its ANPRM and required all comments to be submitted within 60 days. *See* 90 Fed. Reg. at 40,986. And this Court is closely monitoring the pace of the rulemaking, requiring status reports every 45 days rather than every 90 days (as the CFPB requested). ECF No. 83 at 3.

On the other side of the balance, maintaining the stay is the more efficient course. As this Court already noted, "the parties and judicial economy are better served if a stay is issued, because it allows time for CFPB to administratively modify the rule with appropriate input from interested parties, which could likely obviate the need for this action." ECF No. 83 at 2. Courts routinely stay cases to allow for agency reconsideration. *See* ECF No. 80 ¶ 8 (collecting cases); *Am.*

---

[1] To be clear, FTA's position is that the current deadlines should remain in effect. FTA thus reserves all rights in connection with any postponement of those deadlines, including the right to challenge any CFPB decision altering the deadlines. *See* ECF No. 82. For purposes of this motion, however, the key point is that the CFPB's statement defeats Plaintiffs' claimed need to lift the stay.

*Petroleum Inst. v. EPA*, 683 F.3d 382, 388 (D.C. Cir. 2012) ("[W]aiting to resolve this case allows [the agency] to apply its expertise and correct any errors, preserves the integrity of the administrative process, and prevents piecemeal and unnecessary judicial review."); *Sierra Club v. EPA*, 60 F.4th 1008, 1021-22 (6th Cir. 2023) (allowing agency reconsideration without vacating that decision in the interim); *Wyoming v. Zinke*, 871 F.3d 1133, 1146 (10th Cir. 2017).

Nor do Plaintiffs address the Court's prior determination that the stay "serves the public welfare" by allowing the CFPB to "reexamine this matter alongside stakeholders and the broader public to come up with a well-reasoned approach . . . that aligns with the policy preferences of new leadership[.]"  ECF No. 83 at 2.  Plaintiffs instead ask this Court to enjoin a Rule that the CFPB is already reconsidering, based on the very same issues.  *Compare* Br. 9-21 (raising four issues), *with* ANPRM, 90 Fed. Reg. at 40,987-89 (asking questions on all four issues).  Plaintiffs are essentially asking this Court to define the scope of the CFPB's authority in advance, hoping to hamstring the agency in its new rulemaking.  That is not how the administrative process is intended to unfold, and this Court should not lift the stay to consider such a preemptive challenge.  *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998) (requiring courts to consider "whether judicial intervention would inappropriately interfere with further administrative action").

Regardless of what the CFPB decides in its rulemaking on these issues, that will be a new decision, based on a new record and a new set of explanations.  It therefore "makes little sense for the Court to . . . expend resources resolving legal issues" associated with a Rule the CFPB intends to modify.  *Chinatown Serv. Ctr. v. HHS*, 2021 WL 8316490, at *2 (D.D.C. Oct. 13, 2021).

## II.    Plaintiffs Are Not Entitled to a Preliminary Injunction.

The Court should leave the stay in place and hence should not resolve Plaintiffs' motion for preliminary injunction.  But if the Court elects to lift the stay, it should deny the motion.

Plaintiffs are not likely to succeed, will not be irreparably harmed, and cannot show that the balance of equities and public interest tip in their favor. Further, Plaintiffs' proposed injunction is overbroad, untailored, and would exceed this Court's authority.

### A. Plaintiffs Are Unlikely to Succeed in Showing that the Rule Is Unlawful.

Plaintiffs' motion for a preliminary injunction is largely a reprise of their motion for summary judgment. As FTA explained in its response brief, Plaintiffs' arguments are wrong. The Rule, in its current form, complies with the CFPA and the APA.

#### 1. The Rule is consistent with the Act's definition of "consumer."

As FTA has explained, the Rule falls within the CFPB's statutory authority because it requires banks to share data with the individual consumer and "authorized third parties" who qualify as "representatives" under the CFPA's statutory definition of "consumer." *See* ECF No. 64-1 at 13-28. Plaintiffs' position that "consumer" means only the individual consumer or, "[a]t most, only a third party with a special, fiduciary-like relationship with the individual consumer," Br. 10, cannot be squared with the CFPA's text, structure, purpose, or history.

Section 1033 directs that a bank "shall make available to a consumer, upon request, information in the control or possession of [the bank]." 12 U.S.C. § 5533(a). The CFPA defines "consumer" to mean "an individual or an agent, trustee, or representative acting on behalf of an individual." *Id.* § 5481(4). And the ordinary meaning of the term "representative" is "[o]ne who stands for or acts on behalf of another." *Representative*, *Black's Law Dictionary* 1416 (9th ed. 2009); *see also* Br. 11-12 (similarly defining "representative" as someone who is "authorized to act" on behalf of the individual). "Authorized third parties," as defined in the Rule, satisfy the ordinary meaning of the term "representative." Consumers who use third-party services authorize those third parties to securely access data on their behalf. The Rule provides numerous protections

designed to ensure that authorized third parties genuinely act on behalf of consumers. Among other requirements, the Rule requires authorized third parties to provide "readily understandable" "authorization disclosures"; "certify that the third-party agrees to [various specified] obligations" to limit the "collection, use, and retention of" consumer data; obtain the individual consumer's "express informed consent" to access data; and permit consumers to easily revoke third-party access. 12 C.F.R. §§ 1033.401(a)-(c), 1033.411(a)-(b), 1033.421(e), (g), (h).

The structure of Section 1033 provides additional powerful evidence that Plaintiffs are unlikely to succeed. The statute provides that covered "information shall be made available in an electronic form usable by consumers," 12 U.S.C. § 5533(a), and specifies that the CFPB must prescribe rules to "promote the development and use of standardized formats for information, including through the use of machine readable files, to be made available to consumers," *id.* § 5533(d). "Machine readable" files (as opposed to "human readable" files) implies that the files will be used by third-party software providers, and "standardized formats" implies that nascent third-party providers could develop software compatible with those machine-readable files. Thus, the only common-sense interpretation of Section 1033 is that it is intended to facilitate a broader ecosystem in which authorized third parties securely access financial data on behalf of consumers.

Plaintiffs' position also makes little sense. Under Plaintiffs' reading of Section 1033, consumers would be forced to manually download their own data to their devices and then upload it to third-party services, rather than being able to digitally access and securely share the data from their banks with their chosen third-party services. Congress could not possibly have desired this illogical, insecure, and inefficient scheme. *See* Rule at 90,881 (recognizing that such a scheme would be minimally usable by individual consumers).

Plaintiffs' contrary arguments lack merit. Plaintiffs primarily argue that the Rule exceeds

the CFPB's statutory authority because "representative" should be understood to require a "special, fiduciary-like relationship" based on its neighbors "agent" and "trustee." Br. 11. According to Plaintiffs, those terms signal a fiduciary relationship at common law. Br. 11-12. But "agent" does not necessarily imply a fiduciary relationship: the "terminology of agency is widely used in commercial settings … to characterize relationships that are *not* necessarily encompassed by the legal definition of agency." *Restatement (Third) of Agency* § 1.01 cmt. b (2006).

Even if "agent" and "trustee" did imply a fiduciary relationship, it does not follow that a fiduciary relationship should be read into the word "representative" in the CFPA's definition. Plaintiffs' interpretation would cause "representative" to mean the same thing as "agent" and "trustee"—rendering the term "representative" surplusage and nullifying Congress's decision to pair the narrower terms "trustee" and "agent" with the broader term "representative." The *noscitur a sociis* canon does not require a court to construe all words in a list to mean the exact same thing. Instead, it merely holds that words in an enumerated list generally have a relevant similarity. Here, the statute *itself* specifies the relevant similarity: it is not the existence of a fiduciary relationship, but rather that the third party is "acting on behalf of [the] individual." 12 U.S.C. § 5481(4).

Plaintiffs respond that FTA has the bigger surplusage problem because "any remotely plausible trustee or agent would surely be a representative," and Congress otherwise could have simply defined "consumer" as "an individual or someone acting on behalf of an individual." Br. 13. But Congress frequently drafts statutes with enumerated lists, in which some listed items are broad enough to encompass others. As the Supreme Court very recently made clear, that drafting style is not a basis to rewrite a statute—especially when Plaintiffs' interpretation of "representative" would render that term duplicative of the other items in the list. *See Waetzig v. Halliburton Energy Services, Inc.*, 604 U.S. 305, 317 (2025) (holding that in the phrase "judgment,

11

order, or proceeding," "proceeding" should be construed to sweep more broadly than "judgment" and "order" so as to avoid rendering "proceeding" superfluous).

In an apparent effort to avoid rendering "representative" superfluous, Plaintiffs contend that "representative" requires a "fiduciary-*like* relationship." Br. 11 (emphasis added). But Plaintiffs do not explain what the amorphous term "fiduciary-like" means, how it differs from the plain and ordinary meaning of "representative," or what additional protections would be needed to satisfy that newly-minted legal standard.[2]

Finally, Plaintiffs claim that "historical context" supports their position, quoting from Dodd-Frank's legislative history. *See* Br. 14 (quoting S. Rep. No. 111-176, at 173 (2010)). But "legislative history is not the law," and "ambiguous legislative history" cannot "muddy clear statutory language." *Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019) (quotation marks omitted). In any case, individuals do gain "access to their own financial information," S. Rep. No. 111-176, at 173 (2010), when they elect to share that information with an authorized third party.

Even if such extratextual sources were relevant, the consistent understanding for years has been that Section 1033 covers authorized third parties. A "drafter of the provision that became § 1033" has stated that "the scope of the provision was intended to be broad—providing a framework for customer access that would encourage competition and innovation, including through the use of third-party providers and aggregators."[3] And these technologies were already

---

[2] Plaintiffs briefly argue that consumers have no choice about whether a "fourth-party data aggregators" is used to access the consumers' information, and that authorized third parties can use consumer data to improve their products and services. Br. 12-13. But data aggregators, too, are "representatives" because they too are extensively regulated and must act on the consumer's behalf. *See* 12 C.F.R. § 1033.431(c); *see also* Rule at 90,840, 90,950-53.

[3] Michael S. Barr et al., *Consumer Autonomy and Pathways to Portability in Banking and Financial Services* 4 (Univ. of Mich. Ctr. on Fin., Law & Pol'y Working Paper No. 01, 2019), https://financelawpolicy.umich.edu/sites/cflp/files/2021-07/umich-cflp-working-paper-consumer-autonomy-and-data-portability-pathways-Nov-3.pdf.

in existence when Section 1033 was enacted, contrary to Plaintiffs' assertion. *See* Rule at 90,840 ("[O]pen banking emerged in the early 2000s"); *id.* at 90,881 ("[M]any consumer-authorized third party representatives were providing personal financial management use cases well before 2010"). Plaintiffs' version of Section 1033—entitling individual consumers only to manual downloads of their data—would have been essentially useless even at the time of enactment. *Cf. Garland v. Cargill*, 602 U.S. 406, 427 (2024) ("Congress presumably does not enact useless laws.").

Plaintiffs also urge the Court to discard the statutory definition of "consumer" and instead hold that "consumer" "refers only to an individual." Br. 10. This argument defies basic principles of statutory interpretation. When "Congress takes the trouble to define the terms it uses, a court must respect its definitions as 'virtually conclusive.'" *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 59 (2024) (quoting *Sturgeon v. Frost*, 587 U.S. 28, 56 (2019)). And the Supreme Court has specifically clarified that courts may not "deviate from an express statutory definition merely because it 'varies from [the] term's ordinary meaning.'" *Kirtz*, 601 U.S. at 59 (quoting *Digit. Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160 (2018) (alteration in original)).

Plaintiffs offer no sound basis to ignore that statutory command. Plaintiffs argue that "[o]ther uses of the word 'consumer'" in Section 1033 "confirm that Congress intended this ordinary meaning." Br. 10. But courts "deviate from a statutory definition only when applying the definition would be 'incompatible with Congress'[s] regulatory scheme' or would 'destro[y] one of the statute's major purposes.'" *Kirtz*, 601 U.S. at 60 (alterations in original) (quoting *Digit. Realty Tr.*, 583 U.S. at 163–64). Plaintiffs have not remotely met that burden. In contexts where only the "individual" meaning would make sense, Congress used that language expressly. *See* 12 U.S.C. § 5493(c)(2)(A) (referring to "credit for both individuals and communities"); *id.* § 5493(g)(1) (referring to "financial literacy of individuals"). And, more broadly, the very purpose

13

of the CFPA is to provide the CFPB with authority to promote secure access to consumer financial products and services—not to limit such access. Redefining "consumer" to exclude authorized third parties would undermine Congress's intent to promote standardized data sharing.

Even taken on their own terms, none of the provisions that Plaintiffs cite evinces congressional intent to limit "consumer" only to an individual. Plaintiffs emphasize that Section 1033(a) refers to "*the* consumer" who "obtain[s]" a product or service from a bank. Br. 10 (quoting 12 U.S.C. § 5533(a)). But the full sentence states that the "product or service that the *consumer obtained from*" the bank must be "in an electronic form usable *by consumers*," 12 U.S.C. § 5533(a) (emphasis added), and that pairing makes perfect sense when the term "consumer" encompasses both individuals and authorized third parties. Indeed, third-party services are far more likely to depend on materials being provided in electronic form than individuals would.

Plaintiffs also argue Section 1033(c)'s statement that banks have no duty to "maintain or keep any information *about a consumer*" under Section 1033 must refer to the individual consumer. Br. 10 (emphasis added) (quoting 12 U.S.C. § 5533(c)). But a clarification that a bank has "no duty to maintain records" can apply equally to both an individual and an authorized third party acting on the individual's behalf. Thus, Plaintiffs are unlikely to succeed on this claim.

### 2. The Rule properly addresses consumer data protection.

Plaintiffs identify four "individual provisions" of the Rule that supposedly create data security concerns and argue that "the Rule's overall data-sharing regime is arbitrary and capricious because the Bureau failed to analyze or justify the cumulative impact of the Rule's provisions[.]" Br. 15. This argument fails because the Rule "reasonably explained" its treatment of each individual issue Plaintiffs highlight. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

First, sharing "[i]nformation to initiate payment to or from" a consumer's account is part

of Section 1033's mandate that "information relating to … account[s]" be made available, 12 U.S.C. § 5533(a), and the Rule amply addresses this issue (including its data security implications) across four pages. *See* Rule at 90,870–73. Second, Plaintiffs complain that the Rule "deputizes *banks* to police" third parties, Br. 16, but the regulation on which they focus speaks only to when a bank must make data available to a third party, Rule at 90,905, not the regime for policing third-party compliance. Indeed, the Rule separately addresses the CFPB's authority and oversight over third parties. *Id.* at 90,920-22; *see also* 12 C.F.R. § 1033.421 ("Third party obligations"). Third, Plaintiffs criticize the Rule's limits on when banks can deny "access based on concerns about risk to consumer data," Br. 17, but Plaintiffs again overlook the data security requirements imposed on third parties, and they also do not explain how data security would be furthered by allowing them to deny access in inconsistent or discriminatory ways, *see* Rule at 90,896-903. Fourth, the Rule reasonably declined to prohibit screen scraping and instead improved security by "reduc[ing] the risks of screen scraping[.]" *Id.* at 90,923. Each issue was fully addressed, and Plaintiffs cannot create a cognizable claim just by grouping their arguments together and asserting that their "cumulative impact" makes the Rule unlawful; four times zero is still zero.

### 3. The Rule lawfully and reasonably prohibits access fees.

Plaintiffs also reprise their argument that Section 1033 does not authorize the CFPB to prohibit fees, and that any such prohibition is arbitrary and capricious. Plaintiffs' analysis is backwards: the plain text *forecloses* fees, and at minimum such a prohibition is reasonable.

First, on the text: Section 1033 establishes "[c]onsumer *rights* to access information," and provides—in mandatory language—that banks "shall *make available … upon request*" certain information to consumers and their authorized representatives. 12 U.S.C. § 5533(a) (emphasis added). These terms reflect consumers' and their authorized third parties' legal entitlement to the

15

individuals' data, which banks are compelled to make available without qualification.  This text leaves no room for Plaintiffs' reading, under which this entitlement would be contingent on whatever fees banks may wish to charge.

Plaintiffs dispute Section 1033's status as an entitlement by analogizing to wholly different contexts.  For example, Plaintiffs say that "[a] sign at a roadside inn indicating 'Rooms Available' does not suggest that those rooms are free."  Br. 19.  But that is because nothing gives an individual a "right" to a room at the inn (the individuals do not own the rooms at the inn; the inn owns the rooms), let alone commands that the inn "shall make available . . . upon request" a room for the individual.  Individuals own and have a right to their financial data; simply because a bank holds that data does not mean the bank owns it.  Similarly, charging fees for government services (like marriage licenses or court filing fees) is fundamentally different from charging a fee for information that belongs to the individual and that the statute commands to be made available upon request.  And courts sometimes *do* invalidate such fees as improperly interfering with those rights. *Cf. Boddie v. Connecticut*, 401 U.S. 371 (1971).

Plaintiffs also invoke several statutes purportedly showing that "[w]hen Congress has sought to prohibit businesses from charging fees for certain services, it has said so expressly." Br. 18.  In each example, however, the statute operated as an *exception* to a business's otherwise extant authority to charge fees.  For example, Plaintiffs highlight that Congress required a free copy of a credit report for individuals affected by fraud, *see* 15 U.S.C. § 1681c-1(a)(2)(B), but that exception exists only because "a consumer reporting agency" may otherwise "impose a reasonable charge on a consumer" for such reports, *id.* § 1681j(f)(1). The other examples are similar.[4]  Far

---

[4] *Compare id.* § 1691(e)(4) (copy "at no additional cost"), *with id.* § 1691(e)(3) (allowing charging of "a reasonable fee"); *id.* § 1639h(c) (free copy), *with id.* § 1639h(d) (additional appraisals "conducted at the expense of the applicant"); 42 U.S.C. § 1758(a)(5) ("make available to children

from demonstrating that entities can charge whatever fees they want unless Congress affirmatively *prohibits* fees, these examples prove FTA's point: when Congress intends to allow fees, it says so expressly (and then carves out any appropriate exceptions). That is what Congress did in another section of Dodd-Frank, *see* 15 U.S.C. § 1693o-2(a)(1)–(2), and in numerous other provisions.[5]

Indeed, reading Section 1033 as a silent grant of authority for banks to charge fees would be inconsistent with "longstanding consumer financial regulations [that] prohibit fees when consumers seek to exercise statutory rights under Federal consumer financial laws that are otherwise silent on whether an entity may charge fees." Rule at 90,884. Plaintiffs identify no indication that Congress sought to depart from that background practice in enacting Section 1033.

Finally, Plaintiffs assert that "'the ability to charge fees' is a 'fundamental national bank function.'" Br. 18 (citation omitted). But Plaintiffs' authorities are about banks charging fees to their customers for services provided. *Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274, 280 (6th Cir. 2009). Here, banks seek to charge consumers for access to their *own* information, either themselves or via a representative—something that, until recently, was not occurring at all.

Even if Section 1033 left the matter to the CFPB's discretion, the Rule's decision to prohibit fees was not arbitrary and capricious. As the Rule explained, "no stakeholder offered any concrete indication of a workable and administrable standard for 'reasonable fees' despite the CFPB's solicitation of comment on [that] point." Rule at 90,886–87. Additionally, data providers

---

free of charge[] . . . potable water"), *with id.* § 1758(b)(1)(A) (restricting eligibility for "free and reduced price lunches"); 42 U.S.C. § 247d-11(e)(2)(C) (non-customized reports made available "free of charge"), *with id.* § 247d-11(e)(2)(B) (customized reports available "at cost"); 29 U.S.C. § 435(c) (documents available "upon payment of a charge based upon the cost of the service," except for some which are made available "without payment of a charge"). The Free Application for Federal Student Aid (FAFSA), 20 U.S.C. § 1090, is in a category of its own given that the statute's goal is to publicize the FAFSA as a tool available free of charge. *Cf. id.* § 1090(b).

[5] *See, e.g.*, 10 U.S.C. § 4892(a)(3); 15 U.S.C. § 78m(f)(4); *id.* § 2669(d)(2); *id.* § 4723a(d); 19 U.S.C. § 2544(b)(2); *id.* § 2575a; *id.* § 2576a; 41 U.S.C. § 1708(g).

like banks have an "incentive to restrict third party data access through fees," and thus "allowing data providers to charge what they see as commercially reasonable fees is likely to obstruct consumers' ability to use their data[.]" *Id.* at 90,886. The Rule's decision to prioritize the primary goal of Section 1033—ensuring consumers have the ability to use their data—all while accounting for banks' costs in other ways throughout the Rule, *see id.* at 90,885, was plainly rational.

4.  <u>The Rule's compliance deadlines are reasonable.</u>

Plaintiffs' claimed harms are rooted in the Rule's compliance deadlines, but their motion devotes only a single paragraph to challenging those deadlines. *See* Br. 20-21. They contend that the "consensus standards" must be available before the compliance deadlines, but as the CFPB explained, the relevant consideration in determining compliance timelines was not the development of compliance standards but rather the size and revenue of the data provider. *See* Rule at 90,859-60. The size and resources of a bank best capture how much time it would reasonably take to come into compliance, including because many of "[t]he largest data providers[] . . . already have the required interfaces in development[.]" *Id.* at 90,860. Thus, the first compliance deadline was only for the largest providers, 12 C.F.R. § 1033.121(b)(1), and their initial deadline was more than 16 months later on April 1, 2026. BPI itself sought a compliance deadline of 24 months, *see* BPI Comments at 22 (Dec. 29, 2023), only about 5 months beyond the current compliance deadline (of June 30, 2026), but the CFPB rationally explained that "many of the largest depository institution data providers already have interfaces that could be adapted to comply with the final rule's requirements when issued," and they "did not specify why 24 months would be necessary to build the developer interface required by the rule." Rule at 90,860.

Further, the CFPB acknowledged that industry standards may "become[] available after the relevant compliance date," but explained in some cases that "a data provider will have certainty

18

that its developer interface format complies with the requirement to be standardized, so long as the format is widely used." Rule at 90,889. In any case, given that the standards are only *indicia* of compliance, the Commission reasonably set deadlines based on size instead.

### B. The Other Preliminary Injunction Requirements Are Not Satisfied.

Even apart from likelihood of success on the merits, a plaintiff cannot obtain preliminary relief without satisfying the other factors as well. *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 885 (6th Cir. 2025) (confirming that each of the four factors is "a strict prerequisite" for obtaining relief). Plaintiffs' motion independently fails on each of these equitable factors.

#### 1. Plaintiffs have not shown irreparable harm.

"The irreparable harm factor is indispensable," and requires a plaintiff to "show why he needs relief now rather than at the lawsuit's end." *Int'l Union of Painters & Allied Trades Dist. Council No. 6 v. Smith*, --- F.4th ----, 2025 WL 2170424, at *3 (6th Cir. July 31, 2025). Moreover, "the harm must be both 'certain and immediate,' not 'speculative or theoretical.'" *Id.* at *4; *see also Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006). Plaintiffs here do not make the necessary "clear showing" of irreparable harm. *Winter v. NRDC*, 555 U.S. 7, 22 (2008).

Plaintiffs' theory is that they "are forced to incur substantial and unrecoverable costs to comply" with the Rule, because the CFPB's reconsideration of that Rule will "remain ongoing by the time the first compliance deadline arrives on June 30, 2026." Br. 2, 23. But this theory has several flaws. For starters, Plaintiffs' assumption that the CFPB's rulemaking will remain ongoing by the time of the compliance deadlines is speculative, for all the reasons discussed in Part I, *supra*.

More fundamentally, Plaintiffs have not proven their harms as a factual matter. They rely on the exact same declarations they submitted at summary judgment, but those declarations address Article III injuries allegedly stemming from the Rule *as a whole*, not irreparable harm

19

imminently occurring over the next few months.  Whether a party has standing is a fundamentally different question from whether a party has established "certain and immediate" harms warranting preliminary relief.  *See, e.g.*, *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019) (distinguishing injuries in "a standing case" from irreparable harm needed in "a preliminary-injunction case").  And turning to the specifics of the declarations themselves, there are multiple reasons why those submissions fail to prove irreparable harm.

First, the declarations do not differentiate between overall compliance costs associated with the Rule versus the short-term costs that must occur now while CFPB's rulemaking is unfolding. Even if "complying with th[e] Rule will be very expensive and burdensome for BPI's members," ECF No. 85-12 ¶ 9, that general statement does not prove that those costs will be incurred *in the coming months*, which is the relevant timeframe for Plaintiffs' request for emergency relief. Plaintiffs assert that "so long as the Rule and its compliance deadlines are on the books, Plaintiffs and their members have no choice but to prepare to comply with it," Br. 2, but the Rule was published over nine months ago.  To the extent Plaintiffs have already devoted resources to compliance, those are sunk costs that preliminary relief would not avoid.  And to the extent that Plaintiffs have not already taken certain steps towards compliance, Plaintiffs' submissions do not show that Plaintiffs must undertake those efforts now rather than deferring them.

Second, Plaintiffs treat their members as a unified whole, but in reality they are distinct companies with distinct compliance costs and timelines.  In particular, Plaintiffs identify only one member—JPMorgan Chase Bank, N.A. ("JPMC")—that must comply by June 30, 2026.  *See* ECF No. 85-12 ¶ 10.  Other banks need not comply until June 2029 or 2030, *see* ECF No. 85-11 ¶¶ 11-14, which makes any short-term harms to those members highly speculative.

Third, even as to JPMC, Plaintiffs' declaration is vague.  It asserts that JPMC will "commit

substantial resources" and "incur substantial costs," ECF No. 85-12 ¶ 10, but there are no specifics on amounts or timelines, which is notable given that JPMC already moved all of its data access to a developer interface almost three years ago. *See, e.g.*, Miriam Cross, *JPMorgan Chase Says It Has Fully Eliminated Screen Scraping*, Am. Banker (Oct. 6, 2022), https://www. americanbanker.com/news/jpmorgan-chase-says-it-has-fully-eliminated-screen-scraping.    And the recent announcement that JPMC—one of the largest banks in the United States—intends to "charge fees for [data] access," *see* ECF No. 79 at 40 n.10, evinces a clear intent to violate the express requirements of the Rule (and the statute itself). The Court should not credit a declaration from May 2025 discussing one large BPI member's purported compliance burdens, when as of July 2025 that member is actively planning *not* to comply with the Rule.

Fourth, Plaintiffs' filings tout that they "widely support open banking," and "have actively participated in developing API-based sharing of their customers' data." ECF No. 59-1 at 5-6. If they have already started developing new API platforms for sharing customer data, it is speculative whether they will incur additional compliance costs solely because of the Rule.

Fifth, it is speculative that Plaintiffs' members would *not* have to undertake the same compliance efforts under whatever new rule emerges from the CFPB's rulemaking. Even if the CFPB (unlawfully, in FTA's view) allowed Plaintiffs to charge reasonable fees, for example, Plaintiffs would still need to create developer interfaces for data access. Thus, Plaintiffs' stale declarations cannot show that emergency relief is needed to avoid any particular costs.

Ultimately, Plaintiffs' theory of irreparable harm is based on a series of contingencies: *if* the CFPB decides not to extend the compliance deadlines (despite what it said in the ANPRM); and *if* the CFPB's new rulemaking extends beyond the relevant compliance deadline for a bank (which is years away for many); and *if* that bank must undertake new compliance costs before then

21

that cannot be deferred until later; and *if* those costs stem exclusively from the Rule rather than any voluntary choice by the bank itself; and *if* those costs could have been avoided under whatever approach the CFPB adopts in its new rulemaking, then perhaps a particular bank might be able to claim harm.  But each one of those contingencies is inherently speculative.  *See D.T.*, 942 F.3d at 327 ("[A]ll those 'ifs' rule out the 'certain and immediate' harm needed for a preliminary injunction.").  This factor alone thus forecloses Plaintiffs' request for relief.

2.  <u>An injunction would harm FTA, its members, and the public.</u>

Before granting Plaintiffs' relief, this Court must also consider harm to others, as well as the public interest.  *Cardona*, 737 F. Supp. 3d at 528.  Those factors likewise foreclose Plaintiffs' requested injunction here, as indefinitely postponing the Rule would harm FTA and its members, further delay consumer control over their information, and place such information at risk.

As noted above, one of the largest banks in the United States, which is also a BPI member, recently announced that it will begin charging fees for data access.  If implemented, that effort will stifle innovation and competition in the financial services market, hurting both FTA's members and consumers alike.  *See, e.g.*, ECF No. 36-1 ¶ 2 ("FTA's members are innovators seeking to provide more seamless services, lower-cost products, and greater consumer choice in the financial services market."); Rule at 90,845 (describing benefits of a competitive market for financial products and services); *see also* Proposed Rule, 88 Fed. Reg. 74,796, 74,814 (Oct. 31, 2023) (describing anti-competitive effects of data providers charging fees for data access). The Court should not indefinitely delay the Rule in the wake of this overtly anticompetitive behavior, which would harm industry participants and the public alike.

Moreover, delaying the current Rule would likely have downstream consequences on the CFPB's future rule.  The current Rule contained compliance deadlines ranging from 16 months to

22

over 60 months, yet Plaintiffs nonetheless filed suit asserting that those deadlines were "unrealistic." Compl. ¶ 10. A complete halt of the current Rule will only encourage Plaintiffs to demand another lengthy wind-up in connection with the CFPB's forthcoming rulemaking, thereby further thwarting the protections and rights explicit in Section 1033. And in the interim, further delays will only exacerbate data-security risks, given that the lack of a standardized API means that developers must continue relying on screen scraping—even though "there is nearly universal consensus that safer forms of data access should supplant screen scraping." Rule at 90,841.

Those delays in full implementation of Section 1033 harm the public interest. And the public interest is best served by allowing the agency's process to unfold in the ordinary course, without injecting this Court into the rulemaking. *Cf. Hastings v. Jud. Conf. of U.S.*, 770 F.2d 1093, 1102 (D.C. Cir. 1985) ("As is traditional in judicial review of administrative action, a court should be loath to interfere, by means of injunction, with ongoing proceedings[.]").

These equitable considerations independently foreclose Plaintiffs' requested relief. Even if Plaintiffs established some measure of harm, the overall balance would still tip sharply in favor of FTA and the public. Plaintiffs are litigating primarily on behalf of institutions with the earliest compliance deadlines, *i.e.*, entities with over $250 billion in assets or $10 billion in total receipts over a calendar year. Even if those wealthy institutions must (hypothetically) incur compliance costs over the coming months, that does not outweigh the significant competitive and data-security harms to FTA and its members, the broader industry, and the public that would occur if, as Plaintiffs request, Section 1033's full implementation is delayed indefinitely.

### C.  Plaintiffs' Requested Remedy is Vastly Overbroad

Finally, without any meaningful argument on the issue, Plaintiffs' motion requests remarkably broad relief: "an order staying the Rule's compliance deadlines and enjoining the

Rule's enforcement until one year following the conclusion of this litigation."  Br. 25.  Plaintiffs should not be permitted to request wildly overbroad relief and then expect Defendants (or the Court) to properly tailor their request for them.  A preliminary injunction "is never awarded as of right," *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008), and Plaintiffs bear the burden of proof on all elements.  *Winter*, 555 U.S. at 20.  By failing to address the proper scope of relief, Plaintiffs cannot possibly have carried their burden to prove their entitlement to such relief.

Even a cursory examination reveals that Plaintiffs' requested relief is vastly overbroad.  First, the scope extends too far.  Plaintiffs identify only *one* specific member (JPMC) with compliance deadlines in 2026, yet they seek relief on behalf of *all* members, despite many not having compliance deadlines until 2029 or 2030 and thus having no imminent need for emergency relief.  Indeed, Plaintiffs do not even limit their request to Plaintiffs and their members; they request universal relief extending to non-parties, contrary to bedrock principles of equity.  *See Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2562-63 (2025); *Kentucky v. Biden*, 57 F.4th 545, 556-57 (6th Cir. 2023); *see also Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 995-96 (9th Cir. 2025) (confirming that the same principles apply to requests for § 705 stays).

Second, Plaintiffs request that the stay of compliance deadlines extend one year *beyond* the conclusion of this litigation, which in no sense is "preliminary" relief.  To the contrary, such relief would last even after this Court enters final judgment.  Plaintiffs are thus requesting that *even if they lose this case*—that is, even if the Court declines to vacate the Rule—the Rule should *still* be stayed for at least an additional year (and perhaps longer depending on appeals).  Plaintiffs do not cite any authority or theory justifying this type of preemptive post-judgment injunction.  Nor do Plaintiffs' declarations establish the need for such a preemptive one-year stay.

Third, Plaintiffs' motion challenges only four aspects of the Rule, but they seek relief

against the Rule in its entirety—in contravention of the Rule's severability provision. *See* Rule at 90,989. Their motion wholly fails to justify such expansive relief. *See* ECF No. 64-1 at 50.

Based on these flaws, the proper course is to deny Plaintiffs' motion entirely. It is neither FTA's nor the Court's responsibility to craft a more reasonable proposed order than the one Plaintiffs have requested, which is legally unavailable to them.

Nevertheless, to the extent the Court has any concerns about the pace of the CFPB's pending rulemaking and any potential harms to Plaintiffs, the proper remedy would be for the Court to require more frequent status updates from the CFPB—perhaps every 21 days instead of every 45 days—to ensure that the rulemaking proceeds expeditiously. FTA fully supports the goal of a swift and efficient rulemaking process. The best way to ensure a smooth process, however, is to require frequent status updates—not, as Plaintiffs suggest, to continue with litigation that only threatens to interfere with the CFPB's ability to move forward with that rulemaking expeditiously.

The Court should therefore deny Plaintiffs' motion and leave the stay in place, but to the extent the Court has any concerns, FTA respectfully suggests that the Court could modify its prior stay order to require more frequent status updates from the CFPB.

## CONCLUSION

Plaintiffs' motion to lift the stay and postpone compliance deadlines should be denied.

Dated:  September 3, 2025

Michael P. Abate
KAPLAN JOHNSON ABATE & BIRD LLP
710 W. Main Street, 4th Floor
Louisville, KY 40202
(502) 540-8280
mabate@kaplanjohnsonlaw.com

Respectfully submitted,

*/s/ Adam G. Unikowsky*

Adam G. Unikowsky (*pro hac vice*)
Arjun R. Ramamurti (*pro hac vice*)
Jonathan J. Marshall (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Avenue, NW,  Suite 900
Washington, DC 20001
(202) 639-6000
aunikowsky@jenner.com
aramamurti@jenner.com
jmarshall@jenner.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Kentucky, Lexington Division, using the CM/ECF system, which will send a notice of filing to all counsel of record who have consented to service by electronic means.

Dated:  September 3, 2025                    */s/ Adam G. Unikowsky*
                                            Adam G. Unikowsky