# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
### LEXINGTON DIVISION

FORCHT BANK, N.A., KENTUCKY BANKERS
ASSOCIATION, and BANK POLICY INSTITUTE,

        Plaintiffs,

        v.

CONSUMER FINANCIAL PROTECTION BUREAU
and RUSSELL VOUGHT, in his official capacity,

        Defendants, and

FINANCIAL TECHNOLOGY ASSOCIATION,

        Intervenor-Defendant.

No. 5:24-cv-304-DCR

**PLAINTIFFS' REPLY BRIEF IN FURTHER SUPPORT OF THEIR MOTION
TO LIFT THE STAY FOR PURPOSE OF
POSTPONING THE RULE'S COMPLIANCE DEADLINES
AND ENJOINING ITS ENFORCEMENT**

# TABLE OF CONTENTS

*Page*

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 1

I.   FTA OFFERS NO VALID REASON NOT TO LIFT THE STAY FOR
     THE LIMITED PURPOSE OF RULING ON PLAINTIFFS' MOTION. ............. 1

II.  PLAINTIFFS HAVE SHOWN THAT THE EXISTING RULE IS
     LIKELY UNLAWFUL. ........................................................................................ 3

     A.   Section 1033 Does Not Authorize Compelled Sharing With
          Commercial Third Parties (Count I). ...................................................... 3

     B.   The Bureau Failed To Justify The Substantial Data-Security Risks
          The Rule Creates (Count II). .................................................................. 7

     C.   The Rule Unlawfully Prohibits Banks From Charging Fees For
          Interface Access (Counts IX, X). ............................................................ 7

     D.   The Compliance Deadlines Are Themselves Unlawful (Count VIII)........... 10

III. FTA DOES NOT REFUTE PLAINTIFFS' SHOWING OF
     IRREPARABLE HARM. ...................................................................................... 10

IV.  THE EQUITIES OVERWHELMINGLY FAVOR PLAINTIFFS'
     REQUESTED INTERIM RELIEF. ..................................................................... 13

CONCLUSION ............................................................................................................. 15

CERTIFICATE OF SERVICE ..................................................................................... 17

# TABLE OF AUTHORITIES

*Page(s)*

CASES

*All. for Hippocratic Med. v. U.S. Food & Drug Admin.*,
78 F.4th 210 (5th Cir. 2023) ................................................................ 7

*Azar v. Allina Health Servs.*,
587 U.S. 566 (2019) ............................................................................ 5

*Barton v. U.S. Dep't of Labor*,
757 F. Supp. 3d 766 (E.D. Ky. 2024) ................................................ 15

*Becerra v. U.S. Dep't of the Interior*,
381 F. Supp. 3d 1153 (N.D. Cal. 2019) ............................................ 13

*Bruesewitz v. Wyeth LLC*,
562 U.S. 223 (2011) ............................................................................ 6

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) ...................................................... 12, 13

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*,
98 F.4th 220 (5th Cir. 2024) ............................................................ 14

*Corner Post, Inc. v. Bd. of Govs. of Fed. Res. Sys.*,
603 U.S. 799 (2024) ............................................................................ 9

*Fischer v. United States*,
603 U.S. 480 (2024) ............................................................................ 6

*Immigrant Defs. L. Ctr. v. Noem*,
145 F.4th 972 (9th Cir. 2025) .......................................................... 15

*John Doe Co. v. CFPB*,
849 F.3d 1129 (D.C. Cir. 2017) ........................................................ 13

*Kentucky v. Biden*,
57 F.4th 545 (6th Cir. 2023) ............................................................ 12

*Kentucky v. EPA*,
123 F.4th 447 (6th Cir. 2024) .......................................................... 15

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ............................................................. 10

*Monroe Retail, Inc.* v. *RBS Citizens, N.A.*,
    589 F.3d 274 (6th Cir. 2009) ............................................................. 8

*N.C. Growers' Ass'n* v. *United Farm Workers*,
    702 F.3d 755 (4th Cir. 2012) ........................................................... 13

*Nielsen* v. *Preap*,
    586 U.S. 392 (2019) ......................................................................... 4

*Percoco* v. *United States*,
    598 U.S. 319 (2023) ......................................................................... 5

*Sackett* v. *EPA*,
    598 U.S. 651 (2023) ......................................................................... 8

*Tennessee* v. *Cardona*,
    737 F. Supp. 3d 510 (E.D. Ky. 2024) ............................................ 15

*Trump* v. *CASA, Inc.*,
    145 S. Ct. 2540 (2025) ................................................................... 15

*United States* v. *Douglas*,
    885 F.3d 124 (3d Cir. 2018) ............................................................. 6

*United States* v. *Johnson*,
    79 F.4th 684 (6th Cir. 2023) ............................................................. 6

*Utility Air Regul. Grp.* v. *EPA*,
    573 U.S. 302 (2014) ......................................................................... 4

*Waetzig* v. *Halliburton Energy Servs., Inc.*,
    604 U.S. 305 (2025) ......................................................................... 6

*Washington* v. *Reno*,
    35 F.3d 1093 (6th Cir. 1994) ......................................................... 13

*Whitman* v. *Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ......................................................................... 8

*Wigod* v. *Wells Fargo Bank, N.A.*,
    673 F.3d 547 (7th Cir. 2012) ........................................................... 6

**STATUTES**

5 U.S.C. § 552 ............................................................................................. 8

5 U.S.C. § 705 ...................................................................................... 1, 12

12 U.S.C. § 5481 .................................................................................................... 4, 6

12 U.S.C. § 5533 ................................................................................................... 3, 4, 5

15 U.S.C. § 1693o-2 .............................................................................................. 9

**REGULATORY MATERIALS**

12 C.F.R. 1033.121 ............................................................................................... 12

12 C.F.R. 1033.311 ............................................................................................... 10

12 C.F.R. 1033.321 ............................................................................................... 10

88 Fed. Reg. 74,796 (Oct. 31, 2023) ................................................................. 11, 13

89 Fed. Reg. 90,838 (Nov. 18, 2024) ........................................................... 7, 8, 9, 12

90 Fed. Reg. 40,986 (Aug. 22, 2025) .............................................................. 2, 13, 14

**OTHER AUTHORITIES**

*114 Million Reasons To Keep Moving Forward on Industry-Led Standard
for Secure Data Sharing*, Financial Data Exchange (Apr. 25, 2025),
https://perma.cc/V75C-E95M ......................................................................... 14

Cambridge Advanced Learner's Dictionary (4th ed. 2013) ...................................... 8

*Machine-readable*, Merriam-Webster Online Dictionary,
https://perma.cc/NQ8R-S9VG ........................................................................ 5

# INTRODUCTION

The only question presented by this motion is whether Plaintiffs and their members should be forced to continue to spend unrecoverable money, time, and other resources to build towards compliance with a Rule the adopting agency has admitted is unlawful and is working to replace. The CFPB has not postponed the Rule's rapidly approaching compliance deadlines; it has merely mentioned compliance deadlines as one of many issues it intends to consider in a new rulemaking. But Plaintiffs and their members cannot simply stop all work needed to timely comply with a complex regulation that remains on the books, gambling on the outcome of a process that will last well into 2026 at a minimum. Perhaps recognizing as much, the CFPB has not opposed Plaintiffs' request that this Court postpone the Rule's compliance deadlines under 5 U.S.C. § 705. ECF No. 86.

Plaintiffs have easily shown their entitlement to this relief. FTA alone opposes it, but none of its arguments come close to justifying forcing Plaintiffs and their members to waste substantial time and money preparing to comply with a rule set to be overhauled. Simply put, Plaintiffs should not be placed in a worse position because the Bureau has agreed the Rule is unlawful and is working on replacing it. For the reasons stated in Plaintiffs' motion and below, this Court should enter an order postponing the Rule's compliance deadlines, granting preliminary injunctive relief, or both.

# ARGUMENT

## I. FTA OFFERS NO VALID REASON NOT TO LIFT THE STAY FOR THE LIMITED PURPOSE OF RULING ON PLAINTIFFS' MOTION.

FTA first attempts to dodge Plaintiffs' motion by urging the Court not to consider it. But its arguments mischaracterize Plaintiffs' motion and the relief Plaintiffs seek. First,

FTA asserts (at 6-7) that this Court "weighed the relevant factors" when it previously stayed this litigation, and that Plaintiffs have not "establish[ed] good cause" to "reconsider" that order. Plaintiffs do not challenge the Court's stay order or seek its "reconsideration." Plaintiffs merely ask the Court to lift that stay for the limited purpose of postponing the existing Rule's compliance deadlines while the Bureau undertakes its new rulemaking. With the certainty this relief would provide, Plaintiffs have no objection to awaiting the Bureau's new rule before proceeding any further in this litigation. Such a limited-purpose lifting of the stay is no different from what FTA obtained just a few months ago when asking the Court to rule on its motion to intervene. *See* ECF No. 47. FTA did not then try to meet the "good cause" standard it now claims that Plaintiffs have not satisfied, and no such showing is required.[1] In any event, lifting the stay to relieve regulated parties of the burdens of complying with an unlawful Rule that the CFPB is "comprehensively reexamin[ing]" meets any conceivable good-cause standard. ECF No. 80 at ¶ 6.

FTA's repeated claim (*e.g.*, at 1, 3, 8) that Plaintiffs seek to "interfere" with the Bureau's anticipated rulemaking similarly makes little sense—indeed, not even the CFPB itself shares those concerns. The Bureau's advance notice of proposed rulemaking (ANPRM) contains a single sentence stating that it "plans to issue a Notice of Proposed Rulemaking to extend the compliance dates" as "part of its reconsideration" of the Rule. 90 Fed. Reg. 40,986, 40,989 (Aug. 22, 2025). But the ANPRM gives no indication of the timing of any extension, and the CFPB's "reconsideration" of the Rule is likely to last well

---

[1] FTA cites (at 5) Rule 16(b)(4), but that rule applies to modifying a Rule 26(f) scheduling order. FTA's other authorities—two decisions from other districts—note that parties can move to lift a stay for good cause without saying such a showing is required.

into 2026 at the very earliest, bumping up against the existing Rule's compliance deadline. *See* ECF No. 85-1 (Mot.) at 23. FTA's suggestion (at 8) that Plaintiffs seek to "hamstring the agency in its new rulemaking" is likewise baseless. Plaintiffs' motion addresses five legal errors in the Rule that the CFPB has *already acknowledged*; FTA cannot explain why a ruling addressing errors the Bureau has conceded would interfere with a new rulemaking. In any event, as FTA itself repeatedly stated in its prior intervention motion, ECF No. 43 at 2, 8, 18, 20-21, the Court must consider Plaintiffs' likelihood of success on the merits when evaluating a motion under Section 705. There is no support for FTA's apparent view that the Court must avoid addressing the merits of an existing regulation merely because its analysis may incidentally bear upon the agency's consideration of a future rule.

## II. PLAINTIFFS HAVE SHOWN THAT THE EXISTING RULE IS LIKELY UNLAWFUL.

### A. Section 1033 Does Not Authorize Compelled Sharing With Commercial Third Parties (Count I).

Section 1033 contains a simple directive that banks "make available to a consumer" certain information "concerning the consumer financial product or service that the consumer obtained from" the bank. 12 U.S.C. § 5533(a). As the Bureau now agrees, that modest provision does not authorize the Rule's sweeping open-banking regime.

1. FTA does not dispute that the word "consumer" ordinarily refers to the individual consumer. Section 1033(a) confirms that ordinary meaning by requiring the bank to provide to "a consumer" information about the service that "the consumer" obtains from the bank. FTA notes (at 14) that the same sentence ends by referring to "an electronic form usable by consumers," which it believes is more likely to refer to third-party companies. But "usable by consumers" means just what it says—that the data can be used *by*

*consumers*. It does not "make[] perfect sense" (*id.*) to construe the "consumer" to mean two different things in one sentence. *See Nielsen* v. *Preap*, 586 U.S. 392, 408 (2019).

FTA argues (at 13) that the ordinary meaning of "consumer" is irrelevant because the Consumer Financial Protection Act generally defines a consumer to include an individual's "agent, trustee, or representative acting on behalf of [the] individual." 12 U.S.C. § 5481(4). But FTA concedes that a term need not always carry its defined meaning. Here, the "statutory context" and "overall statutory scheme"—including the oddity of converting, for the entire CFPA, regulated fintechs into consumers—show that a consumer is an individual. *See Utility Air Regul. Grp.* v. *EPA*, 573 U.S. 302, 316-20 (2014).

2. Even if the general Act-wide definition of "consumer" applies to Section 1033, the Rule is still unlawful. FTA correctly does not argue that an "authorized third party" is a consumer's trustee or agent, but nonetheless contends that fintechs and data aggregators are "representative[s]" of the consumer. But as Plaintiffs have shown (Mot. at 12), Congress's use of that term alongside agent and trustee means that a "representative" must also have a fiduciary-like relationship or other special duty of loyalty to the consumer. FTA recites (at 9-10) the Rule's basic third-party "protections," but does not contend that those perfunctory click-through consent provisions create a fiduciary-like duty of loyalty.

FTA fails to identify any support in the statute for its vastly overbroad definition of "representative" (at 9) as anyone who "acts on behalf of another." FTA first relies on the "structure" of Section 1033, noting that Section 1033(a) requires banks to share data "in an electronic form usable by consumers" and Section 1033(d) directs the Bureau to make rules "to promote the development and use of standardized formats for information, including

through the use of machine readable files." From these kernels, FTA proclaims (at 10) that "the *only common-sense interpretation* of Section 1033 is that it is intended to facilitate a broader ecosystem" of third-party data-sharing (emphasis added). That quantum logical leap does not work. Nothing about making information "electronic" and "usable by consumers" inherently refers to third parties, and "[m]achine readable" simply means "directly usable by a computer," which many (if not most) individual consumers owned in 2010. *Machine-readable*, Merriam-Webster Online Dictionary, https://perma.cc/NQ8R-S9VG. As for Section 1033(d), directing the CFPB to merely "promote the development and use of" standardized formats for information does not mandate anything, much less mass data-sharing with commercial third-party entities.

FTA responds with circular policy arguments, claiming (at 10) it is "illogical" and "inefficient" to require consumers "to manually download" data and then "upload it to third-party services." But courts may not "rewrite clear statutes under the banner of . . . policy concerns." *Azar* v. *Allina Health Servs.*, 587 U.S. 566, 581 (2019). And FTA's argument wrongly assumes that Section 1033's purpose is to mandate open banking. It is not surprising that a 2010 statute ensuring that consumers can obtain their own data does not match what FTA envisions as the most efficient third-party data-sharing regime.

FTA's responses to Plaintiffs' narrower definition of "representative" similarly fall short. FTA halfheartedly disputes (at 11) that an agent is "necessarily" a fiduciary, but it remains commonly understood that "[a]n 'agent owes a fiduciary obligation to the principal,'" and FTA offers no reliable alternative definition. *Percoco* v. *United States*, 598 U.S. 319, 329-30 (2023) (citation omitted). FTA also is wrong to claim (at 11) that

Plaintiffs' narrower reading of "representative" would "render[] the term . . . surplusage" in light of the nouns "trustee" and "agent." A representative can have a "fiduciary-like" duty of loyalty to a consumer that does not rise to a formal fiduciary relationship, as is commonly recognized in other contexts. *See, e.g.*, *United States* v. *Johnson*, 79 F.4th 684, 713 (6th Cir. 2023); *United States* v. *Douglas*, 885 F.3d 124, 133-34 (3d Cir. 2018); *see also* *Wigod* v. *Wells-Fargo Bank, N.A.*, 673 F.3d 547, 573 (7th Cir. 2012).

Indeed, it is FTA's definition that creates surplusage. If a "representative" means anyone who acts on behalf of another, Congress could have omitted the entire three-noun list of "agent, trustee, or representative" and defined "consumer" as anyone "acting on behalf of an individual." 12 U.S.C. § 5481(4). FTA cites *Waetzig* v. *Halliburton Energy Servs., Inc.*, 604 U.S. 305 (2025), for the notion that Congress "frequently drafts statutes with enumerated lists[] in which some listed items . . . encompass others" (at 11), but FTA's interpretation renders the *entire list* surplusage. Such a reading is foreclosed by *Fischer* v. *United States*, which refused to render superfluous "a reticulated list" that Congress has "delineat[ed]." 603 U.S. 480, 493 (2024).

Finally, FTA criticizes (at 12) Plaintiffs' reliance on the Senate Report on Section 1033 (without addressing the very narrow reading of that provision it endorses), only to then cite a "drafter" of Section 1033—not even an elected legislator—who said nine years later that Section 1033 was supposed to be broad. "Post-enactment legislative history . . . is not a legitimate tool of statutory interpretation." *Bruesewitz* v. *Wyeth LLC*, 562 U.S. 223, 242 (2011). In any event, neither FTA nor this individual can explain why Congress would have inaugurated open banking in the United States through stray references to

machine-readable files and standardized formats rather than using the open-banking, permissioned-data-sharing terminology FTA claims was well known in 2010.

**B.**  **The Bureau Failed To Justify The Substantial Data-Security Risks The Rule Creates (Count II).**

FTA also cannot defend the Bureau's failure to explain why the Rule repeatedly and irrationally prioritizes data portability over data security.  Plaintiffs identified (Mot. at 17) four features of the Rule that sacrifice security in favor of compelled data sharing, which the Bureau addressed only in isolation, but not in combination.  FTA repeats that same error, except to dismissively argue (at 15) that "four times zero is still zero."  But even the CFPB acknowledged that the Rule's provisions would create *some* additional risks to consumers, not zero.  *See, e.g.*, Final Rule at 90,923 (acknowledging "risks of credential-based screen scraping," which it declined to ban); *id.* at 90,873 (using tokenized account numbers to share payment initiation information "lower[s]," but does not eliminate, "the risk of unauthorized transactions").  FTA cannot dispute that the CFPB never evaluated the cumulative impact of those additional risks, or that courts have recognized the APA requires precisely this cumulative analysis.  Because "[t]he cumulative effect" of multiple regulatory provisions "is unquestionably an important aspect of the problem," the Bureau's failure to analyze that "cumulative effect, [or] to explain why it did not," renders its decision arbitrary and capricious.  *All. for Hippocratic Med.* v. *U.S. Food & Drug Admin.*, 78 F.4th 210, 246 (5th Cir. 2023), *rev'd on other grounds*, 602 U.S. 367 (2024).

**C.**  **The Rule Unlawfully Prohibits Banks From Charging Fees For Interface Access (Counts IX, X).**

FTA's attempted defense of the Rule's fee prohibition is even more radical than the CFPB's reasoning in adopting it.  As Plaintiffs explained (Mot. at 18), courts demand clear

authorization before allowing agencies to commandeer private markets and dictate that a business must provide costly services to another commercial entity for free. *See Whitman* v. *Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001); *Sackett* v. *EPA*, 598 U.S. 651, 679 (2023). That is especially true in the banking context, where "the ability to charge fees" is a "fundamental national bank function." *Monroe Retail, Inc.* v. *RBS Citizens, N.A.*, 589 F.3d 274, 280, 283 (6th Cir. 2009). FTA turns these principles upside down, essentially contending (at 17) that businesses need a "grant of authority" before they may charge for their services. Its only support for this notion is the prior CFPB's assertion that its own "consumer financial regulations" typically "prohibit fees when consumers seek to exercise statutory rights." Final Rule at 90,884. But those CFPB regulations have never been approved by a court, and the current CFPB has since disavowed the fee prohibition.

Nor can FTA show that "the plain text" of Section 1033 prohibits fees. FTA contends (at 15-16) that the statute's directive to "make" information "available" to a consumer "upon request" indicates banks must do so for free, but FTA cannot dispute that "available" commonly means "able to be bought or used." Cambridge Advanced Learner's Dictionary (4th ed. 2013); *see* Mot. at 19. Nor does "upon request" change the calculus. The Freedom of Information Act uses the same formulation, *see* 5 U.S.C. § 552(a)(3)(A), but authorizes a fee schedule for information requests in the very next paragraph, *id.* § 552(a)(4). Finally, the reference to a consumer's "right" to access information in Section 1033's heading similarly does not impliedly prohibit fees. FTA concedes (at 16) that rights need not be costless to exercise, noting instead that courts "sometimes" invalidate excessive fees that "improperly" burden rights. But that argument in no way justifies FTA's reading of the

word "right" in a section heading to imply costlessness as a matter of statutory interpretation.

Finally, FTA points (at 17) to another section of Dodd-Frank that expressly addresses interchange fees related to debit-card transactions. *See* 15 U.S.C. § 1693o-2(a)(1)-(2). But that provision did not authorize banks to charge fees in the first place—it imposed a limit on fees that banks were already charging. *See Corner Post, Inc.* v. *Bd. of Govs. of Fed. Res. Sys.*, 603 U.S. 799, 805 (2024).[2] Again, this statute simply confirms that Congress must be express if it wants to *limit* banks' ability to charge fees for their services.

Even if the fee prohibition were statutorily authorized, it was unreasonable, as the Bureau now concedes. *See* ECF No. 58-1 at 13. FTA claims (at 18) that the fee prohibition "prioritize[s] the primary goal" of "ensuring consumers have the ability to use their data," but it ignores that the fee prohibition led the CFPB to exempt *more than 75%* of banks (and their customers) from the Rule altogether because the Rule was too costly for them, thus depriving those banks' customers of this supposed primary goal. *See* Final Rule at 90,885, 90,985. FTA tries to justify the prohibition based on the notion that a bank might charge excessive or anticompetitive fees, but such speculation does not justify forcing banks to subsidize the business models of FTA's members, especially when those members can then charge market rates for the data they received for free. *That* is the approach that undermines fair competition.

---

[2] FTA also cites (at 17 n.5) various statutes that authorize government agencies to charge fees for services, but expecting agencies—as creatures of statute—to have express statutory authority to charge fees to taxpayers in no way suggests that private businesses need Congress's permission to charge for their services.

**D. The Compliance Deadlines Are Themselves Unlawful (Count VIII).**

FTA's defense of fixed compliance dates regardless of when (or if) consensus standards are announced merely repeats the Rule's deficient explanations. FTA first asserts (at 18) that a bank's size is "the relevant consideration in determining compliance timelines," but it is irrational to force *any* bank to comply with the Rule before the privately set consensus standards prescribe rules for compliance. FTA points (at 19) to one obligation related to data formatting where the Rule offers a safe harbor if a bank adopts a "widely used" data format. 12 C.F.R. 1033.311(b)(2). Every other provision in the Rule that depends on standards lacks this independent path to compliance. *See, e.g., id.* 1033.311(c)(2)(i)(A) (relying on standards to assess interface performance), 1033.311(d) (same for frequency limits on access requests), 1033.321(c)(1) (same for risk-management-based denials of interface access). As the Bureau has stated, "it was unreasonable for the Rule to create a regulatory framework that relies on consensus standards" and then ignore the standards "when setting the compliance deadlines." ECF No. 58-1 at 17.

**III. FTA DOES NOT REFUTE PLAINTIFFS' SHOWING OF IRREPARABLE HARM.**

FTA correctly does not dispute that expending unrecoverable time and funds to come into compliance with an unlawful rule constitutes irreparable harm. *See* Mot. at 22-23; FTA Br. 18-21. FTA instead protests that Plaintiffs have not sufficiently shown that their members will suffer such harms, at least before the Bureau completes its new rulemaking. "[A] preliminary injunction requires only a likelihood of irreparable injury[;] Damocles's sword does not have to actually fall on [Plaintiffs] before the court will issue an injunction." *League of Women Voters of U.S.* v. *Newby*, 838 F.3d 1, 8-9 (D.C. Cir. 2016)

(citation omitted). Plaintiffs' declarations, the CFPB's acknowledgment of the time needed to comply with its burdensome Rule, and plain common sense show that Plaintiffs easily meet this standard.

In its May 2025 summary-judgment declaration, Plaintiff BPI explained that its members were "in the difficult position of needing to start expending significant resources . . . to come into compliance" by the applicable deadlines. BPI Decl. (ECF No. 85-12) at ¶ 13. "Building a developer interface compliant with the Rule" requires advance work from numerous departments because of the significant "enhancements" banks must make "to existing platforms" and new "capabilit[ies]" and "functionalit[ies] banks will have to develop." *Id.* at ¶ 12. As one example, the Rule requires JPMorgan Chase Bank to "incur substantial costs," such as "dedicating full-time operations, technology, and compliance personnel to develop, test, and implement a rule-compliant developer interface." *Id.* at ¶ 10. And BPI explained that "[m]any other members of BPI are undertaking materially identical steps and are suffering the same harms as JPMC." *Id.* at ¶ 11. Those expenditures must continue unless and until the compliance deadlines are postponed.[3]

All of this is fully consistent with what the Bureau itself concluded when adopting the compliance timelines in the Rule. The CFPB initially proposed a six-month compliance period for the largest institutions. *See* 88 Fed. Reg. 74,796, 74,806 (Oct. 31, 2023). But after

---

[3] FTA baselessly asserts (at 21) that "[t]he Court should not credit a declaration" from JPMorgan Chase because, based on its announced intention to charge fees to data aggregators for data access, it purportedly is "actively planning *not* to comply with the Rule." That is false. Even on its own terms, the Rule's fee prohibition would not take effect until June 30, 2026. The Court should reject out of hand FTA's specious accusation that charging fees before compliance with the Rule is even required "evinces a clear intent to violate" any law.

receiving and agreeing with comments that the proposed timelines were "too short" to allow banks to perform the substantial work needed to come into compliance, the CFPB extended that compliance period to nearly 18 months. Final Rule at 90,859; *see* 12 C.F.R. 1033.121(b)(1). And it did so even accounting for the fact that many large banks "already have interfaces that could be adapted to comply with the final rule's requirements." Final Rule at 90,860. The conclusion is obvious: banks cannot do in six or eight months what the CFPB allotted 18 months for.

FTA's attempt to refute this common-sense showing boils down to sheer (and illogical) speculation. FTA muses (at 20) that, even if Plaintiffs "have already devoted resources to compliance," perhaps they can simply halt compliance efforts until some undetermined time. And it even goes so far as to imagine (at 21), despite the CFPB's intent to "substantially revise[]" the Rule, ECF No. 80 at ¶ 7, that the new rule may impose the same requirements as the current one, so Plaintiffs' expenses may not turn out to be entirely wasted. Such speculation does not defeat "concrete" showings of irreparable "economic harm" that are "supported by the record." *California* v. *Azar*, 911 F.3d 558, 581 (9th Cir. 2018). Forcing regulated parties to spend funds on the off chance that a different rule may someday impose those same costs would defeat the entire purpose of authority to "issue all necessary and appropriate process to . . . preserve status or rights" and avoid irreparable harm. 5 U.S.C. § 705; *see Kentucky* v. *Biden*, 57 F.4th 545, 556 (6th Cir. 2023).

FTA's argument that the CFPB may timely extend the compliance deadlines is equally speculative and unpersuasive. For starters, the possibility that Plaintiffs "might someday [obtain] relief" from another actor provides no reason for this Court to decline to

award relief. *John Doe Co.* v. *CFPB*, 849 F.3d 1129, 1137 (D.C. Cir. 2017) (Kavanaugh, J.,

dissenting). More importantly, as explained above, Plaintiffs are *already* incurring

irreparable harm from preparations to comply, and the CFPB will not complete its new

rulemaking remotely soon enough to avoid substantially more such harm. The ANPRM

requests comments by October 21, 2025. ANPRM at 40,986. Sometime thereafter, the

CFPB plans to publish a notice of proposed rulemaking to commence a new comment

period. The initial Rule's comment period ran for approximately 60 days, *see* 88 Fed. Reg.

at 74,796, and the next one must last a similar period to allow for sufficient public comment

on a highly complex rule. *See, e.g.*, *N.C. Growers' Ass'n* v. *United Farm Workers*, 702 F.3d

755, 770 (4th Cir. 2012) (significant reduction in comment-period length for rulemaking on

same subject provided evidence of inadequacy); *Becerra* v. *U.S. Dep't of the Interior*,

381 F. Supp. 3d 1153, 1177 (N.D. Cal. 2019). In other words, the Bureau will likely *begin*

analyzing comments and formulating a new rule in early 2026 at the soonest, and that

process took over nine months for the existing Rule. Perhaps recognizing all this, the

CFPB has studiously avoided any representation that its rulemaking process will conclude

even before the first compliance deadline on June 30, let alone in time to avoid Plaintiffs'

irreparable harm. Plaintiffs' evidence easily suffices to demonstrate a likelihood of such

harm. *See Azar*, 911 F.3d at 571 (economic harm sufficient to support injunction

demonstrated so long as links in causal chain "are not hypothetical or tenuous").

## IV.  THE EQUITIES OVERWHELMINGLY FAVOR PLAINTIFFS' REQUESTED INTERIM RELIEF.

The "public interest" lies "in having governmental agencies abide by the federal laws

that govern" them. *Washington* v. *Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994); Mot. at 24-25.

FTA's argument (at 23) that, even if the Rule is unlawful, various policy considerations "independently foreclose Plaintiffs' requested relief" defies that settled principle.

In any event, FTA's pleas for maintaining compliance deadlines for a soon-to-be-abandoned rule are both irrelevant and meritless. Many of FTA's arguments pretend that the open-banking ecosystem will collapse if the Rule's compliance deadlines are postponed. To the contrary, as FTA itself proclaimed in its summary-judgment brief (ECF No. 65 at 5-6), open banking is thriving. Over 114 million consumers have authorized as many as "10,000 fintech entities" to "access their account data" under a well-functioning private open-banking ecosystem. *114 Million Reasons To Keep Moving Forward on Industry-Led Standard for Secure Data Sharing*, Financial Data Exchange (Apr. 25, 2025), https://perma.cc/V75C-E95M; ECF No. 65 at 8. FTA also complains (at 22) that fees banks may charge third parties for data access could restrict competition, but the CFPB plans to consider that issue in its new rulemaking, ANPRM at 40,987, so FTA is welcome to make those arguments there. Those policy arguments are no reason not to stay the Rule's compliance deadlines, especially when the Bureau admits the current fee *ban* is unlawful.

FTA also wrongly contends (at 23-25) that Plaintiffs seek overbroad relief. While *Trump* v. *CASA* clarifies that preliminary injunctive relief can extend only to Plaintiffs and their members, *CASA* expressly declined to address remedies under the APA. 145 S. Ct. 2540, 2554 n.10 (2025). "[T]he scope of preliminary relief under Section 705" is different, because it "aligns with the scope of ultimate relief under Section 706, which is not party-restricted." *Career Colls. & Schs. of Tex.* v. *U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir.

2024).[4] The duration of Plaintiffs' requested relief—until one year following the conclusion of this litigation—is also permissible and sensible. As the CFPB acknowledged in prescribing the existing compliance deadlines, banks need a substantial amount of time *after* they have certainty about their obligations to build up to compliance. Finally, FTA nods to the Rule's severability provision, but there is nothing to sever when "the agency [has] committed a fundamental error—such as taking a substantively illegal action." *Kentucky* v. *EPA*, 123 F.4th 447, 472 (6th Cir. 2024) (quotation marks omitted); *Tennessee* v. *Cardona*, 737 F. Supp. 3d 510, 570-71 (E.D. Ky. 2024). That is precisely the case with the Rule, given its foundational statutory and procedural defects.

In any event, if the Court concludes that Plaintiffs' request is overbroad in any respect, the proper result is not to deny relief altogether, *contra* FTA Br. 23-24, but to grant the narrower relief the Court determines appropriate, *see, e.g.*, *Barton* v. *U.S. Dep't of Labor*, 757 F. Supp. 3d 766, 794 (E.D. Ky. 2024) (granting party-specific relief despite request for universal relief). FTA's alternative "remedy" (at 25)—requiring more frequent status updates from the Bureau like the two-page report filed a few days ago—is no remedy at all, as it provides *no* relief to Plaintiffs.

## CONCLUSION

Plaintiffs' motion to lift the stay of this litigation for the purpose of staying the Rule's compliance deadlines and enjoining the Rule's enforcement should be granted.

---

[4] FTA cites (at 24) a recent Ninth Circuit decision applying *CASA* to Section 705 stays, but that opinion did not explain its conclusion or address the APA-specific authority for universal relief. *See Immigrant Defs. L. Ctr.* v. *Noem*, 145 F.4th 972, 995-96 (9th Cir. 2025).

Respectfully submitted,

September 16, 2025

Timothy A. Schenk (KY Bar #92011)
KENTUCKY BANKERS
ASSOCIATION
600 W Main Street #400
Louisville, KY 40202
Tel: (502) 582-2453
tschenk@kybanks.com

John Court*
Paige E. Pidano*
BANK POLICY INSTITUTE
1300 I Street NW, Suite 1100 West
Washington, D.C. 20005
Tel: (202) 289-4322
john.court@bpi.com
paige.paridon@bpi.com

* Admitted *pro hac vice*

John T. McGarvey (KY Bar #46230)
MORGAN POTTINGER MCGARVEY
401 South Fourth Street, Suite 1200
Louisville, KY 40202
(502) 560-6759
jtm@mpmfirm.com

 /s/ *Judson O. Littleton*
Jeffrey B. Wall*
Judson O. Littleton*
Nathan H. Golden*
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C. 20006
Tel: (202) 956-7000
wallj@sullcrom.com
littletonj@sullcrom.com
goldenn@sullcrom.com

Robert A. Flatow*
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Tel: (212) 558-4000
flatowr@sullcrom.com

*Counsel for Plaintiffs Forcht Bank, N.A.,
Kentucky Bankers Association, and Bank
Policy Institute*

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2025, I electronically filed this Reply Brief with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ *Judson O. Littleton*

*Counsel for Plaintiffs Forcht Bank, N.A., Kentucky Bankers Association, and Bank Policy Institute*