EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| FORCHT BANK, N.A., et. al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 5: 24-304-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| CONSUMER FINANCIAL | ) | **MEMORANDUM OPINION** |
| PROTECTION BUREAU, et. al., | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

This matter is pending for consideration of Plaintiffs Forcht Bank, N.A., the Kentucky Bankers Association ("KBA"), and the Bank Policy Institute's ("BPI") motion to temporarily lift the stay of this litigation for the limited purpose of issuing an order staying the Personal Financial Data Rights Rule's compliance deadline under 5 U.S.C. § 705 and preliminarily enjoining enforcement of the Rule until one year after the conclusion of this litigation. [Record No. 85] The plaintiffs' motion will be granted for the reasons that follow.

**I. Background**

The plaintiffs in this action are Forcht Bank, the Kentucky Banker's Association ("KBA"), and the Bank Policy Institute ("BPI"). Forcht Bank is a federally chartered bank operating in Kentucky. [Record No 1 at 10] The KBA is a trade association representing approximately 150 national, state, and savings banks. [*Id*.] The BPI is a nonpartisan public policy, research, and advocacy organization representing universal banks, regional banks, and major foreign banks operating in the United States. [*Id*. at 11] The defendants include the Consumer Financial Protection Bureau ("CFPB"), an independent federal agency responsible

- 1 -

for consumer protection in the financial sector; Russell Vought, Acting Director of the CFPB; and Intervenor-Defendant the Financial Technology Association, an organization representing financial technology companies. [*See* Record Nos. 22, 36, 58.]

The plaintiffs filed this action seeking to invalidate the Personal Financial Data Rights Rule ("the Rule"), also known as the "open banking" rule, which the CFPB adopted under the prior presidential administration. [Record No. 1] The Rule requires financial institutions, upon the consumer's request, to share consumers' personal financial data with other providers at no cost. *See* 12 C.F.R. § 1033. The CFPB asserts authority for the Rule under Section 1033 of the Dodd-Frank Act, which provides that a bank "shall make available to a consumer, upon request, information in the control or possession of the [bank] concerning the consumer financial product or service that the consumer obtained from [the bank]." 12 U.S.C. § 5533(a). The CFPB interpreted this provision to authorize it to require banks to share their consumers' data not only with the consumers themselves, but also with any third-party the consumer authorizes to receive it.

The Rule requires banks share their customers' financial data with "authorized third parties." 12 C.F.R. 1033.101(b). These third parties include fintechs, data aggregators and other entities that meet the Rule's authorization and certification requirements. *See id*. §§ 1033.401, 1033.421. Banks must create a "developer interface" for transmitting data to these third parties to facilitate this data sharing. *See* 12 C.F.R. 1033.301(a), (b)(2); Final Rule at 90,839. The interface must operate in a "commercially reasonable" manner and satisfy various other requirements. 12 C.F.R. 1033.311(c). Through this interface, banks must share multiple categories of consumer financial data, including transaction history, account balances, upcoming bill information and payment initiation information such as account and routing

numbers. 12 C.F.R. 1033.211(a)-(c), (e). The Rule also delegates CFPB-designated private organizations the authority to develop "consensus standards" governing banks' compliance. *Id.* at § 103.141. These standards may define, for example, reasonable limits on third-party access frequency or valid grounds for denying access based on security risks. *Id.* at § 1033.321(c)(1). The CFPB acknowledged that banks will incur up to $47 million annually to comply with the Rule's requirements. *See* Final Rule at 90,961. Despite these costs, the Rule prohibits banks from charging third-parties fees to cover the expense of building and maintain secure systems for third-party data access. *See* 12 C.F.R. 1033.301(c).

The plaintiffs filed this action challenging the Rule on the day it was finalized. [Record No. 1] Their amended complaint contains ten counts, alleging the Rule exceeds the CFPB's statutory authority and is arbitrary and capricious. [Record No 22 at 46-71] After a change in presidential administrations, the Court stayed summary-judgment briefing for a total of 90 days to allow the CFPB, under its new leadership, to review its position on the Rule and this litigation. [*See* Record Nos. 41, 45.] To prevent prejudice to the plaintiffs, the Court also extended the Rule's compliance deadlines for an equivalent period, moving the first deadline from April 1 until June 30, 2026. [*Id.*]

During that time, the Court lifted the stay to grant FTA's motion to intervene as a defendant supporting the Rule. [Record No. 56] The CFPB determined that "the Rule is unlawful and should be set aside" after completing its review. [Record No. 57 at 1] It then moved for summary judgment, asking the Court to vacate the Rule on grounds like those raised by the plaintiffs—chiefly, that the Rule exceeds the CFPB's authority by requiring banks to share customer data with third parties. [Record No. 58-1 at 6-11] The CFPB argued that the

Rule's legal flaws "so permeate the entire Rule that the Court should" set it aside altogether. [Record No 58-1 at 18-19]

On July 29, 2025, rather than filing a reply brief supporting vacatur, the CFPB moved for an indefinite stay of this litigation, explaining that it "has now decided to initiate a new rulemaking to reconsider the Rule." [Record No. 80 at 2-3] The CFPB stated that it "seeks to comprehensively reexamine this matter alongside stakeholders and the broader public" and begin with an "advance notice of proposed rulemaking" within three weeks—a process it expected to "culminat[e] in a new final rule that substantially revises the [current] Rule." [*Id* at 2] The CFPB's motion did not address the approaching compliance deadlines in the existing Rule. [Record No. 82 at 1-2] The Court ultimately granted the CFPB's motion to stay pending the new rulemaking. [Record No. 83]

On August 22, 2025, the CFPB published an Advance Notice of Proposed Rulemaking ("ANPRM"), seeking public comment on several issues that align with the plaintiffs' concerns about the current Rule. 90 Fed. Reg. at 40,986. The CFPB requested input on topics such as appropriate interpretation of the term "representative," whether the Rule "provide[s] adequate protections for the security of consumer's data"; whether costs of data access "should be shared between the consumer and the 'covered person'"; and "the appropriateness of the compliance dates" in the current Rule. 90 Fed. Reg. at 40,987-89. Regarding the compliance dates specifically, the CFPB stated that "[a]s part of its reconsideration of the [current] Rule, the Bureau plans to issue a Notice of Proposed Rulemaking to extend the compliance dates." *Id.* at 40,989.

The deadline for submitting comments was October 21, 2025. *Id.* at 40,986. As of this writing, the CFPB has not announced any extensions of the compliance deadlines for the

current rule, and the first compliance deadline remains approximately eight months away. [*See* Record Nos. 41, 45.] The plaintiffs now move the Court to address the harms they allege they will suffer under the existing Rule because the compliance deadlines remain in effect. [Record No. 85]

## II. The Standard of Review

The APA provides that a district court "may issue all necessary and appropriate process to postpone the effective date of any agency action" to the extent necessary to prevent irreparable injury. 5 U.S.C. § 705. And for purposes of this Court's analysis, a motion for a stay under § 705 is judged by the same standard as a motion for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure. *Ohio v. Nuclear Reg. Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987). Accordingly, the Court applies the following factors to the pending motions: (1) whether the movant has shown a strong or substantial likelihood of success on the merits; (2) whether the movant has demonstrated irreparable injury; (3) whether the issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction. *Parker v. U.S. Dep't of Agric.*, 879 F.2d 1362, 1367 (6th Cir. 1989); *Michigan State AFL-CIO v. Schuette*, 847 F.3d 800, 803 (6th Cir. 2017). These factors are not "prerequisites that must be met" but, instead, "interrelated considerations that must be balanced together." *Ne. Ohio Coal. for Homeless and Serv. Emps. Intern. Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006).

## III. Analysis

Intervenor-defendants FTA argue that the current stay of litigation should remain in place to allow the parties to participate in the administrative process. [Record No. 87 at 2] It contends that "plaintiff have shown no sound basis for the Court to reconsider its stay order."

[*Id.* at 6] According to the FTA, "the only new development that has occurred since the Court's prior stay is the CFPB's publication of its ANPRM, which supports continuing the current stay" because the ANPRM indicates that the CFPB "plans to issue a Notice of Proposed Rulemaking to extend the compliance dates." [*Id.* (citing 90 Fed. Reg. at 40,989.)] However, the FTA mischaracterizes the plaintiffs' request. The plaintiffs do not challenge the Court's stay order. Rather, they ask the Court to lift that stay for the limited purpose of postponing the existing Rule's compliance deadlines while the CFPB conducts its new rulemaking. [*See* Record Nos. 85, 89.] Moreover, the ANPRN provides no indication of when the CFPB might extend the deadlines or complete its reconsideration of the Rule. *See* 90 Fed. Reg. at 40,989.

This Court has previously lifted a stay in this case for the limited purpose of ruling on FTA's motion to intervene. [*See* Record No. 47.] The present request is similar. The plaintiffs, therefore, are not required to make the "good cause" showing that FTA asserts.

## Preliminary Injunction

### A. Likelihood of Success on the Merits

To determine whether a preliminary injunction should be issued to prevent the CFPB from enforcing the Rule at the upcoming deadlines, the Court must first assess whether the plaintiffs are likely to succeed on their claims. The plaintiffs advance four principal arguments in their motion. [Record No. 85-1 at 9-21]

#### 1. The CFPB's Authority under Section 1033

The plaintiffs argue that the Rule exceeds the CFPB's authority because Section 1033(a) requires banks to make financial data available only to individual consumers, not to third parties such as fintech companies or data aggregators. [*Id.* at 9-10] They assert that the statute's text, structure, and context make clear that only consumers themselves—or possibly

fiduciary-like agents acting on their behalf—may request such data. [*Id.*] They further argue that the Dodd-Franks Acts' broader definition of "consumer," which includes an individual's "agent, trustee, or representative," does not apply here. And they contend that the statutory context and structure override the general definition, citing *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 316-20 (2014); see *Envt'l Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007) (presumption that a term takes its "statutory definition" "readily yields" when required by context); *Sanders v. Allison Engine Co., Inc.*, 703 F.3d 930, 938-39 (6th Cir. 2012) (warning against reflexively concluding "that a term defined by statute carries the same meaning every time it is used"). [Record No 85-1 at 11] Even if the broader definition applied, the plaintiffs maintain that commercial third parties in an "arm's-length relationship with a consumer" do not qualify as agents, trustees, or representatives because those roles require a fiduciary-like relationship. [*Id* at 12] The CFPB agreed with the plaintiff in its motion for summary judgment, arguing that "the Rule unlawfully seeks to regulate open banking by mandating the sharing of data with 'authorized third parties,' whereas Section 1033 is limited to ensuring that consumers can access their own data." [Record No. 58-1 at 12]

However, FTA contends that the Rule aligns with the Section 1033's definition of "consumer." [Record No. 87 at 9] It argues that the ordinary meaning of "representative" is "[o]ne who stands for or act on behalf of another." [*Id.* (citing Representative, Black's Law Dictionary 1416 (9th ed. 2009))] The FTA further asserts that "authorized third parties," as defined in the Rule, meet the ordinary meaning of the term "representative." [*Id.*] It also maintains that the structure of 1033 supports its interpretation, noting that the statute requires that covered information be made available electronically to consumers and directs the CFPB to issue rules that "promote the development and use of standardized formats for information,

including through the use of machine readable files, to be made available to consumers," [*Id.* at 10 (citing 12 U.S.C. § 5533(a), (d))] Accordingly, the FTA contends that Section 1033 was intended to "facilitate a broader ecosystem in which authorized third parties securely access financial data on behalf of consumers." [*Id.*] The FTA further avers that the plaintiffs' position fails because a fiduciary relationship should not be read into the word "representative." [*Id.* at 11]

The statute defines a consumer as an "individual or an agent, trustee, or representative acting on behalf of an individual." 12 U.S.C. § 5481(4). Both "agent" and "trustee" describe fiduciary relationships that involve a duty of loyalty to act for the principal's benefit. *See, e.g.,* Restatement (Third) of Agency § 1.01 (2006); Restatement (Third) of Trusts § 2 (2003). The plaintiffs' argument, therefore, turns on whether the "authorized third parties" provided for in the Rule come within the meaning of a "representative." When courts must choose between competing definitions, they look to the context in which the words appear. *McDonnell v. United States*, 579 U.S. 550, 568 (2016).

Under the interpretive canon *noscitur a sociis,* "a word is known by the company it keeps." *Id.* at 568-569 (quoting *Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307 (1961)). While not an absolute rule, this canon is often applied "where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." *Id.* at 569 (quoting *Jarecki,* 367 U.S. at 307). Accordingly, the term "representative" in the statute should be read in harmony with its companion terms "agent" and "trustee," rather than adopting the broader definition advanced by the FTA. Moreover, the only reference to Section 1033 in the Dodd-Frank Act's legislative history is a Senate Report comment stating that Section 1033 "ensures that consumers are provided with access to their own financial

information." S. Rep. No. 111-176, at p. 173 (2010). There is no indication that Congress intended the broader interpretation the FTA proposed. Therefore, it is likely that the plaintiffs will succeed on the merits of this claim.

## 2. Cumulative Impact on Data Security

The plaintiffs claim the Rule's data-sharing framework is arbitrary and capricious because the CFPB failed to assess the cumulative impact of its provisions on consumer data security. [Record No. 85-1 at 15 (citing 5 U.S.C. § 706(2)(A))] Although the CFPB attempts to justify the individual provisions, the plaintiffs assert that it ignored their combined effect, which they say create significant security risks. [*Id.*] The plaintiffs then contend that "'the cumulative effect' of individual provisions 'is unquestionably an important aspect of [a] problem' the agency is addressing, and the Bureau's failure to analyze that 'cumulative effect, [or] to explain why it did not,' renders its decision arbitrary and capricious." [*Id.* at 15-15 (citing *Alliance for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 246 (5th Cir. 2023), rev'd on other grounds, 602 U.S. 367 (2024); see *Ohio v. EPA*, 603 U.S. 279, 293 (2024))] They identify four features that heighten these risks. First, the Rule requires bank to share highly sensitive information, including payment initiation data. 12 C.F.R. 1033.211(c). Second, the CFPB shift responsibility for ensuring third-party compliance to banks. 12 C.F.R. 1033.331(b)(1)(iii). Third, banks may deny access based on data security concerns only in narrow circumstances. 12 C.F.R. 1033.321(a)(2) and (b). And fourth, the CFPB declined to prohibit screen scraping, a risky access method. [Record No 85-1 at 16-17]

The plaintiffs argue that failing to consider these cumulative effects violates the APA's requirement for reasoned decision-making. [*Id.* at 15-17] The CFPB agreed with the plaintiffs in its motion for summary judgment. [Record No. 58-1 at 13] However, FTA argues that all

four issues were fully addressed and the plaintiffs cannot "create a cognizable claim just by grouping their arguments together and asserting that their 'cumulative impact' makes the Rule unlawful." [Record No. 87 at 14]

An agency rule is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem." *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In enacting the Consumer Financial Protection Act, Congress emphasized the importance of consumer privacy. *See, e.g.*, 12 U.S.C. § 5512(b)(1)-(2) (requiring the CFPB to consider "benefits and costs to consumers" when issuing rules); *id.* § 5512(c)(8), (9) (directing the CFPB to account for privacy considerations when monitoring risks to consumers); 15 U.S.C. § 1691c2(e)(4) (authorizing the CFPB to modify or delete information to "advance a privacy interest"). The CFPB correctly understood that the Rule's impact on consumer privacy was an important part of the problem under consideration. *See, e.g.*, 89 Fed. Reg. at 90935-36 ("[T]he final rule advances several substantial interests, including the need for consumer control of personal financial data and privacy protections."); *id.* at 90957 (explaining that one of the Rule's chief aims was to "ensure privacy and data security for consumers by limiting the collection, use, and retention of data that are not needed to provide the consumer's requested service").

Because the "cumulative effect" of individual provisions "is unquestionably an important aspect of [a] problem" an agency must address, the CFPB's failure to consider the cumulative impact of the four provision affecting data security—or to explain its omission—renders the rulemaking likely arbitrary and capricious. *Alliance for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 246 (5th Cir. 2023), *rev'd on other grounds*, 602 U.S. 367 (2024).

### 3.     Banning Interface Access Fees

The plaintiffs also challenge the Rule's prohibition on banks charging fees for interface access. [Record No. 85-1 at 17] *See* 12 C.F.R. 1033.301(c). They argue that Section 1033 provides no authority for the CFPB to require banks to offer complex, resource-intensive services to commercial third parties without compensation. Citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) and *Sackett v. EPA*, 598 U.S. 651, 679 (2023), they assert that such an economic mandate requires clear congressional authorization, which is absent here. In its motion for summary judgment, the CFPB sided with the plaintiffs, arguing that Section 1033 does not authorize the CFPB to prohibit banks from charging fees for this service. [Record No. 58-1 at 17] The CFPB also contended that the Rule is arbitrary and capricious because the CFPB failed to engage in reasoned decision making when it determined in a "conclusory fashion" that allowing data providers to charge any fees, even reasonable ones, would impede consumers' right to access their data. [*Id.*]

The FTA argues that the plain text of Section 1033 prohibits fees, or at a minimum, that such a prohibition is reasonable. [Record No. 87 at 15] According to the FTA, Section 1033's language establishes consumers' and their authorized third parties' legal right to access personal data, which banks must provide without qualification. [*Id.* at 15-16] The statute mandates that banks "shall make available upon request" certain information to consumers and their authorized representatives. [*Id.* (citing 12 U.S.C. § 5533(a))] Even if Section 1033 left this issue up to the CFPB's discretion, the FTA maintains that the Rule's prohibition on fees was neither arbitrary nor capricious because the Rule explained that "no stakeholder offered any concrete indication of a workable and administrable standard for 'reasonable fees' despite the CFPB's solicitation of comment on [that] point." [*Id.* at 17 (citing Rule at 90,886–87)]

Further, the Rule stated that banks have an "incentive to restrict third party data access through fees," and thus "allowing data providers to charge what they see as commercially reasonable fees is likely to obstruct consumers' ability to use their data[.]" [*Id.* at 18 (citing Rule at 90,886)] The FTA concludes that the Rule rationally prioritizes Section 1033's core goal—ensuring consumers can use their data—while addressing banks' costs through other provisions. [*Id.* at 18 (citing Rule at 90,885)]

        4.    **Compliance Deadlines**

Finally, the plaintiffs contend that the Rule's fixed compliance deadlines are arbitrary and capricious because many of its "vague requirements" depend on future "consensus standards" to be developed by private standard-setting organizations. [Record No. 85 at 20-21] Because those standards are not yet available, the plaintiffs argue that the CFPB acted unreasonably by establishing compliance dates that are not contingent on their issuance. [*Id.*] They further note that many commenters specifically urged the CFPB to tie compliance deadlines to the release of these standards and state that they failed to address these requests. [*Id.* at 21] According to the plaintiffs, this omission "flouts the Bureau's obligation to reasonably explain its deadlines" and to "respond to comments that 'challenge[d] [the] fundamental premise' of beginning the compliance clock when consensus standards for compliance with substantive requirements do not exist." [*Id.* (citing *Piedra Alvarez v. Barr*, 829 F. App'x 833, 834 (9th Cir. 2020); *MCI WorldCom, Inc. v. FCC*, 209 F.3d 760, 765 (D.C. Cir. 2000))] Similarly, in its motion for summary judgment, the CFPB argued that—even if the Rule is substantively valid—the compliance deadlines are arbitrary and capricious because they unreasonably don't account for the development of consensus standards. [Record No. 58-1 at 22-23]

The FTA responds that the CFPB explained it based its compliance timelines on the size and revenue of the data providers, not the development of consensus standards. [Record No. 87 at 18 (citing Rule at 90,859-60)] The FTA argues that the CFPB acknowledged that an industry standard may "become available after the relevant compliance date," but that the CFPB explained that "a data provider will have certainty that its developer interface format complies with the requirement to be standardized, so long as the format is widely used." [*Id.* at 18-19 (citing Rule at 90,889)] The FTA further contends that the standards serve only as "indicia of compliance" and that the CFPB "reasonably set deadlines based on size instead." [*Id.* at 19]

The plaintiffs raise a reasonable argument that the CFPB failed to address a key issue: how data providers are expected to comply with the Rule when the "consensus standards" may not yet exist by the applicable deadlines. The Rule establishes a framework in which recognized standard-setting bodies will develop consensus standards that serve as benchmarks for compliance with various provisions affecting data providers and third parties. For example, a data provider may rely on a consensus standard related to risk management to determine whether it reasonably denied a consumer or third-party access to its interface. *See* 12 C.F.R. § 1033.321(c)(1). Likewise, a provider may rely on a consensus standard concerning data fields to assess whether it properly created a record of data fields related to covered data. *Id.* at § 1033.351(b)(1).

Because the plaintiffs are likely to succeed on the merits of their claims, this factor weighs in favor of granting a preliminary injunction. The CFPB itself previously moved for this Court to vacate the Rule based on the same legal deficiencies identified by the plaintiffs. Specifically, the CFPB acknowledged that the Rule exceeded its statutory authority under

Section 1033 of the Dodd-Frank Act by requiring disclosures to commercial third parties, and that it was arbitrary and capricious. [*See* Record No. 58.] Moreover, the CFPB has indicated that it intends to address these deficiencies by initiating a new rulemaking to replace the existing Rule. [*See* Record No. 80.]

### B.    Irreparable harm

The plaintiffs argue that they will incur unrecoverable compliance costs, which constitute irreparable harm. [Record No. 85-1 at 21] The FTA responds that the plaintiffs have not made a "clear showing" of irreparable harm. [Record No. 87 at 19] The FTA contends that the plaintiffs' theory is speculative because it assumes the CFPB's ongoing rulemaking process will remain incomplete by the time of the compliance deadlines. [*Id.*] The FTA further argues that the plaintiffs have not substantiated their alleged harm, relying instead on the same declarations submitted at summary judgment to establish Article III standing— declarations describing injuries stemming from the Rule as a whole rather than imminent, irreparable harm expected in the coming months. [*Id.* at 19-20] The FTA specifically asserts that the plaintiffs' declarations do not differentiate between overall compliance and the short-term costs incurred while the CFPB's rulemaking continues. [*Id.*] It also contends that the plaintiffs improperly treat their members as a uniform group despite differing compliance costs and timelines. [*Id.* at 20] According to the FTA, the declarations are vague, and the plaintiffs' claims are inconsistent because their members "have actively participated in development API-based sharing of their customers' data," yet now claim that compliance with the Rule will impose additional burdens. [*Id.* at 20-21] Finally, the FTA argues that the plaintiffs' alleged harm is speculative because it assumes their members would not face similar costs under future

CFPB rules.  [*Id.*]  In FTA's view, the plaintiffs' theory of irreparable harm rests on a series of contingencies.  [*Id.*]

However, the plaintiffs maintain that they and their members must already begin preparing to comply with the Rule.  [Record No. 85-1]  The Executive Vice President & Co Head of Regulatory Affairs at the BPI submitted a declaration stating that "complying with this Rule will be very expensive and burdensome for BPI's members." [Record No 85-12 at ¶ 9]  For example, one BPI member must dedicate full-time operations, technology, and implement a Rule-compliant interface to meet the compliance deadlines.  [*Id.* at ¶ 10]

These compliance costs are likely unrecoverable and, therefore, constitute irreparable harm under the facts presented here.  Courts have consistently recognized that nonrecoverable compliance costs incurred in anticipation of a government regulation may establish irreparable harm.  *See Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023) (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part) ("[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs.")).  Because the federal government's sovereign immunity generally bars recovery of such monetary losses, the plaintiffs will bear these expenses even if the Rule is later invalidated or replaced.  The plaintiffs have already begun, or will soon begin, incurring substantial costs to prepare for enforcement of the Rule.  Because the CFPB is currently conducting rulemaking to replace the Rule, the funds spent on compliance are likely to be wasted.

Although, as the FTA notes, the plaintiffs did not specify the exact amount they would incur in preparation costs, it would be unreasonable to require the plaintiffs and their members to bear compliance expenses for a rule that the CFPB itself previously argued was unlawful

and is now in the process of replacing through new rulemaking. This factor weighs in favor of granting injunctive relief.

### C.     Remaining Factors

The two remaining preliminary injunction factors—substantial harm to others if the preliminary injunction is granted and public interest in the matter—merge when the government is the defendant. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The first compliance deadline for the Rule is June 30, 2026. [*See* Record Nos. 41, 45.] It is unlikely that the CFPB will issue a new rule before that date, and it remains unclear whether or when the CFPB will extend the compliance deadlines. The CFPB has stated that it intends to "comprehensively reexamine" the Rule and "envisions" adopting a "new final rule that substantially revises the Rule under review." [Record No 80 at 2] Accordingly, the CFPB will suffer no harm if the Court prohibits the CFPB from enforcing a rule it is currently reconsidering. The public could arguably lose some benefit from the Rule not being enforced at the set compliance deadlines because it could "delay consumer control over their information." [Record No. 87 at 22] However, the plaintiffs also contend that enforcement of the current rule puts consumers at risk due to security risk as to their banking information. [Record 85-1] Accordingly, these factors do not tip the scale in either direction.

Ultimately, the CFPB is currently engaged in rulemaking to reconsider the Rule considering the plaintiffs' concerns about its lawfulness. Nevertheless, the plaintiffs and their members are being compelled to incur expenses that would be unrecoverable and unnecessary if the new rule substantially revises the existing requirements or if the current Rule is vacated. Under these unique circumstances, and to preserve the status quo while the CFPB completes its rulemaking process, the plaintiffs' motion for preliminary injunction will be granted

**Scope of the Preliminary Injunction**

The plaintiffs move for "an order staying the Rule's compliance deadlines and enjoining the Rule's enforcement until one year following the conclusion of this litigation." [Record No. 85-1 at 32] But the FTA contends that this request is overbroad. [Record No. 87 at 23] It argues that the plaintiffs seek relief on behalf of all members, even though many face compliance deadlines as late as 2029 or 2030 and, therefore, have "no imminent need for emergency relief." [*Id.* at 24] The FTA further asserts that the plaintiffs improperly request universal relief extending to non-parties, which violates "bedrock principle of equity." [*Id.* (citing *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2562-63 (2025); *Kentucky v. Biden,* 57 F.4th 545, 556-57 (6th Cir. 2023); *see also Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 995-96 (9th Cir. 2025))] The FTA argues that the plaintiffs' request for a stay extending one year beyond the conclusion of this litigation, and for relief against the entire Rule rather than only the four challenged provisions, makes the requested injunction overbroad. [*Id.*] The plaintiffs respond that "while *Trump v. CASA* clarifies that preliminary injunctive relief can extend only to the plaintiffs and their members, *CASA* expressly declined to address remedies under the APA." [Record No. 89 at 14 (*citing Trump v. CASA*, 145 S. Ct. 2540, 2554 n.10 (2025))]

The undersigned concludes that the appropriate course is to temporarily stay the Rule—postponing its effective date under 5 U.S.C. § 705—pending final rulemaking on its reconsideration. Section 705 authorizes a reviewing court, when "justice so requires" and "to the extent necessary to prevent irreparable injury," to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." The Supreme Court case in *Trump v. CASA* does not alter this analysis.

- 17 -

In *CASA*, the Supreme Court held that injunctive relief must be limited to "administer[ing] complete relief between the parties." *CASA*, 145 S. Ct. at 2557. However, it explicitly left open the question of "whether the [APA] authorizes federal courts to vacate federal agency action." *Id.* at 2554 n.10 (citing 5 U.S.C. § 706(2) (authorizing courts to "hold unlawful and set aside agency action")). Justice Kavanaugh's concurrence further notes that, even after *CASA*, "plaintiffs may ask a court to preliminarily 'set aside' a new agency rule" "in cases under the Administrative Procedure Act." *Id.* at 2567 (Kavanaugh, 1, concurring).

## IV. Conclusion

For these reasons, it is hereby **ORDERED** as follows:

1.  The plaintiffs' motion to temporarily lift the stay of this litigation for the limited purpose of issuing a preliminary injunction [Record No. 85] is **GRANTED**.

2.  The Consumer Financial Protection Bureau is **ENJOINED** from enforcing the Personal Financial Data Rights Rule until it has completed its reconsideration of the Rule.

Dated: October 29, 2025.

Danny C. Reeves, District Judge
United States District Court
Eastern District of Kentucky